# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
WASHINGTON, D. C. 20245

IN REPLY REFER TO:

Tribal Government Services

MAR 11 1980

Memorandum

To: Phoenix Area Director
Sacramento Area Director

From: Commissioner of Indian Affairs

Subject: Results of Research Report on Western Shoshone Award in Docket 326-K

The subject material is herewith submitted to you in compliance with the Indian Judgment Funds Act of October 19, 1973, 87 Stat. 466, as implemented by 25 CFR, Part 60.

A. BACKGROUND OF THE AWARD

On August 15, 1977, the Indian Claims Commission granted a final award of $26,145,189.89 in Docket 326-K to the Western Shoshone Identifiable Group as represented by the Temoak Bands of Western Shoshone Indians, Nevada. Litigation and other actions initiated by some Western Shoshone entities, including the Temoak (Te-Moak) Bands, discussed below, delayed until December 19, 1979, the appropriation of funds to satisfy the award.

The Commission concluded that the Western Shoshone Identifiable Group aboriginally exclusively used and occupied a large tract of land located principally in Nevada with a small portion extending into California. The tract formed roughly a wedge from near the northeast corner of Nevada extending south, southwest, with the point of the wedge in California, including Death Valley. It should be noted early in this report that the award does not derive essentially from the Western Shoshone Treaty of October 1, 1863, signed at Ruby Valley, Nevada. That treaty described only the northern portion of the Western Shoshone lands, was not a treaty of cession nor was it intended to be, and neither the Nevada nor the California lands were taken in 1863 (nor were they taken June 26, 1866, when the treaty was ratified or October 21, 1869, when proclaimed).

RECEIVE
MAR 17 19

The Commission found that the Western Shoshone California lands were acquired by the United States by statute on March 3, 1853, and that Indian title to the Nevada lands was extinguished gradually by the United States

CONSERVE AMERICA'S ENERGY

EXHIBIT
Blumberg No. 5118
D

BUREAU OF INDIAN AFFAIRS
TRIBAL OPERATIONS
RECEIVED
MAR 17 1980

Save Energy and You Serve America!

PHOENIX AREA DIRECTOR

which treated the tract as public lands. On February 11, 1966, the Commission approved a joint stipulation between the United States and the Western Shoshone plaintiff establishing July 1, 1872, as the aggregate valuation date for the encroachment upon and taking of the Nevada lands. On August 16, 1967, the Commission severed the Western Shoshone claim from the other claims of the constituent bands or subdivisions of the Shoshone Nation as originally filed in Dockets 326 and 367. The Western Shoshone land valuation claim was designated 326-K.

Prior to the agreement on the Nevada evaluation date the Commission had established that the Nevada tract consisted of 22,211,753 acres and that in California of 2,184,650 acres. On October 11, 1972, the Commission awarded in an Interlocutory Order $21,350,000 for the Nevada land, $200,000 for the California land, and $4,604,600 for the removal of minerals from the Nevada tract prior to the 1872 taking date. The Commission deducted $9,410.11 as payment on the claim, but nothing for offsets, resulting in the 1977 award of $26,145,189.89.

Pertinent Aspects of the Litigation

For many years, a significant element among the Western Shoshone people, principally those associated with the North Central Nevada area, has maintained that most of the Nevada tract was never ceded or taken. These Shoshone people, coalescing to a large extent around the Battle Mountain Colony, viewed with apprehension the progress of the Western Shoshone claim believing that the granting of an award would deprive all Western Shoshone of the land itself or at least jeopardize their claim to such land. In addition to employing arguments of a legal nature, principally deriving from their interpretation and evaluation of the above-cited Ruby Valley Treaty, the Shoshone element asserting retention or return of the Nevada lands characterized itself as "traditional" and expressed neo.nationalist and religious sentiments to the effect that they could not "sell" the land in question. The acceptance of an award, in fact the award itself, is genuinely regarded by these people to constitute a sale of their lands. They will not accept the decisions of the Indian Claims Commission and the Court of Claims that the Nevada lands were all taken by 1872.

Although these views have been held at least throughout the litigation period which commenced in 1951 with the filing of the claim, it was not until April 8, 1974, that formal action was taken. On that date a petition was filed with the Commission by the Western Shoshone Legal Defense and Education Association, and Frank Temoke, a group primarily, but by no means entirely, associated with Battle Mountain Colony. Frank Temoke, the named individual petitioner, is a descendant of Te-Moak who was one of the signatories of the Ruby Valley Treaty and a Western Shoshone leader during the Shoshone-American hostilities of the 1850's and early 60's.

The petition to intervene was filed prior to the settlement of the offsets phase of the claim and sought a stay of the proceedings and leave to present an amended claim. The petition was denied by the Commission

on February 20, 1975, an appeal to the Court of Claims was denied on February 18, 1976, and the Supreme Court on October 12, 1976, denied the request of the Association that it be allowed to intervene.

It is interesting that the Western Shoshone Legal Defense and Education Association during the course of its efforts questioned the propriety of the Temoak Bands in representing the Western Shoshone Identifiable Group. In its February 18, 1976, decision the Court of Claims noted that appellants maintained that they did not belong to the Temoak Bands. However, it was precisely the governing body of the organized Temoak Bands which continued the protest and legal actions initiated by the Legal Defense and Education Association, the members of the Association by that time having become politically persuasive within the Temoak Bands.

The original claim before the Indian Claims Commission, filed with all other Shoshone claims, was in the subject case in the name of the "Western Bands of the Shoshone Nation of Indians, represented by the Te-Moak Bands of Western Shoshone Indians, Nevada, etc." Plaintiffs were later designated by the Commission as the Western Shoshone Identifiable Group [as distinct from other Shoshone], represented by the Temoak Bands of Western Shoshone Indians, Nevada." The Commission, in its opinion of October 16, 1962, stated that the Temoak Bands "has the right to maintain this action for and on behalf of the descendants of the Western Shoshone identifiable group".

The "Te-Moak Bands of Western Shoshone Indians, Nevada", is organized under an Indian Reorganization Act constitution and bylaws approved August 24, 1938. The entity, orginating with Elko Colony, now comprises also Battle Mountain Colony, South Fork Reservation (including the practically uninhabited Ruby Valley Reservation and Odgers Ranch), and recently included the newly recognized Wells Colony which now has a tract held in trust.

The Temoak Bands appealed to the Indian Claims Commission from the final award of August 15, 1977. Earlier, like the Legal Defense and Education Association, the Bands had filed a motion to stay the proceedings. Essentially, the Bands sought a delay pending resolution of a claim in behalf of all Western Shoshone Indians before the Department of the Interior to ownership of lands in Nevada which the Commission had found were taken. Early in these proceedings serious controversy arose around the question of which entity properly represented the Western Shoshone before the Indian Claims Commission. Specifically, the question was whether the Temoak Bands or the Western Shoshone Claims Committee had the capacity to pursue the case and accept or reject a monetary award.

The Temoak Bands, continuing to assert their representation of the total Western Shoshone entity, attempted to terminate the contract of the Attorney of Record who had been representing them since the filing of the Western Shoshone claim in 1951. The Temoak Bands employed different counsel to pursue the land restoration issues with the courts and the Interior Department. The Western Shoshone Claims Committee, however, was anxious to achieve a monetary award and saw little merit in the Temoak position. This Claims

Committee was formed in 1965 by the Western Shoshone General Council. It has been maintained, in fact, that the Western Shoshone General Council initiated the claim with the Indian Claims Commission and that any authority the Temoak Bands had as a recognized representative of the Western Shoshone derived from the General Council. Further, it is maintained that as of General Council meetings held in 1965 the Claims Committee had sole authority to act on behalf of the Western Shoshone in claims matters.

The appeal of the Temoak Bands from the judgment of the Indian Claims Commission was made over the protests of the Western Shoshone General Council, the Western Shoshone Tribe of Nevada (incorporated in Nevada), the Claims Committee and the great majority of the Western Shoshone people. On February 21, 1979, the Court of Claims decided the appeal and affirmed the judgment of the Commission. The Temoak Bands applied to the Supreme Court for a writ of certiorari and simultaneously continued to seek the return of lands, or confirmation of what they regard to be ownership of the Nevada lands, from the Department of the Interior. The Department decided not to act on the matter and on November 26, 1979, the Supreme Court denied the request for certiorari. Covering funds, as stated earlier, were appropriated on December 19, 1979. Under the mandate of the 1973 Indian Judgment Funds Act we are, therefore, proceeding with the development of a Secretarial Plan or legislation for the disposition of the award. These processes must begin although we are aware of the bitter disappointment of those members of the Temoak Bands, and other Western Shoshone, who continue to assert ownership of the lands. We are aware also that the Dann case, involving Western Shoshone who are occupying federal grazing lands in Nevada which they hold to be theirs by virtue of the Ruby Valley Treaty, is pending. Other controversy exists in Nevada around Indian sentiments about proposed nuclear missile sites which are considered to be violative of the Ruby Valley Treaty and religious beliefs. Further protest is expected from a group which now refers to itself as the Western Shoshone Sacred Lands Association.

B. PERTINENT BACKGROUND OF THE SHOSHONE CLAIMS

The Shoshone (Shoshoni), who call themselves Newe (or variants thereof, meaning "people"), are within the Shoshonean linguistic stock which includes neighbors such as Northern Paiutes, Southern Paiutes and Utes. Linguistically and culturally the Shoshone exhibited remarkable similarities extending from their California territory through Nevada to portions of Idaho, Utah and Wyoming, which areas they occupied during the signing of the five "Doty Treaties" in 1863. Often called "Snakes", particularly as applied to the northern divisions, they were frequently confused with other peoples who were loosely known by the same name. Theoretically, and often in actual fact, Shoshones, particularly if mounted, could use any portion of the vast Shoshone territory. Essentially, and especially in the case of the Shoshone who remained in the Nevada-California area (the "Western Shoshone"), they retained the simple gathering and hunting culture, with very loose political organization, of the

Great Basin. Those Shoshone who moved well east of the area to the Southern Plains became Comanche and are not involved in Shoshone claims. The so-called Eastern or Northern Bands, such as those who came under the strong influence of the noted chief Washakie, became Plains-like in many respects, but it should be emphasized that a Shoshone network, strongly Great Basin in nature, extended throughout Shoshone territory. A number of historical and ethnological sources make clear that a Shoshone, once mounted, became a "Shoshoni", and once dismounted, even for a very temporary period, was called a "Shoshoko" or "Walker". The origin of both Indian terms is, however, apparently non-Shoshone. In the most general sense, the picture that emerges is that most Shoshone, including those associated strongly with a buffalo hunting economy, derived from the simpler gathering groups. Seasonal hunting and gathering, intermarriage, common language and cultural origins, the horse and the ability to travel freely throughout the total Shoshone area all contributed to the fluidity of the Shoshone subdivisions.

Problems in Shoshone Designations

The five Shoshone treaties of 1863, which were negotiated on behalf of the United States by Utah Territorial Governor James D. Doty and others, are instructive regarding political and territorial designations found among the Shoshones or recognized as such by the Government. However, those treaties were by no means all inclusive. Some Shoshone entities, such as the Lemhi Band in itself, were not treated with at that time and the more southerly Western Shoshone were not involved and neither were their lands described.

The first of these 1863 treaties was made on July 2 with the Eastern Bands led by Washakie, Wanapitz and others, at Fort Bridger, Wyoming (then within Utah Territory). The boundaries of the Eastern Bands were described in terms of the mountains north of the north side of the Snake River Valley (Idaho), by the Wind River Mountains and vicinity on the east (Wyoming), and by the Yampah River and Uintah Mountains on the south (Utah and Colorado). The western boundary was deliberately left undefined because there were "no Shoshones from that district of country present." The bands present claimed that their "own country" was bounded on the west by Salt Lake (emphasis added).

On July 30 a treaty was made with the Northwestern Bands, represented by the chiefs Pocatello and Sanpitz, and others, at Box Elder, Utah. They agreed to the provisions of the Eastern Bands treaty and described their western boundary as the Raft River (which flows from Utah north to the Snake River in Idaho) and their eastern boundary as the Portneuf Mountains in southeastern Idaho. A treaty with the Mixed Bands of Bannocks and Shoshones was concluded at Soda Springs in southeastern Idaho on October 14. This group agreed to the aforementioned Eastern and Northwestern treaties and claimed lands, jointly with the "Shoshone nation", extending from the "lower part of Humboldt River (north central Nevada) and the Salmon Falls, on Shoshonee River (Idaho) to the Wind River mountains (Wyoming)." The Bannocks

were Northern Paiutes who had become so intermingled and intermarried with Shoshones as to be often indistinguishable from them. They were principally associated with the so-called Mixed Bands and with the Lemhi Shoshone.

Prior to the making of the Mixed Bands Treaty, Governor Doty and the other Commissioners treated with the "Western Bands of the Shoshonee Nation," which treaty of October 1 has previously been noted, and the "Shoshonee-Goship Bands" or Goshute. The Goshute, as described by Great Basin anthropological authorities Omer Stewart and Julian Steward, and a number of others, were unquestionably Western Shoshone, being distinguished only in that they inhabited the most isolated and inhospitable portion of the Shoshone territory. The Tuilla Valley Goshute Treaty of October 12 placed their territory in western Utah and eastern Nevada, south of Salt Lake and south of the Northwestern Band territory and east of the territory of the Western Shoshone described in the Ruby Valley Treaty.

In very general terms the Indian Claims Commission's findings in the Shoshone cases followed the Doty treaty lines. The Lemhi Shoshone, comprised of Sheepeater Shoshone, other Shoshone and Bannocks occupied the area north of the Doty line from the headwaters of the Yellowstone westward into Idaho. We have seen that the most southerly Western Shoshone country was also outside the Doty line. The western Idaho Boise and Bruneau Shoshone country was not included in the claim because of the uncertainty of exclusive Shoshone use and occupancy.

Development and Disposition of Shoshone Awards

Petitioners, in the original Docket 326 claim, had asserted the existence of a single Shoshone aboriginal land-owning entity. Indeed, even culturally, particularly as concerns seed gathering, root digging and fishing economies with the attendant techniques, Shoshones throughout often exhibited marked similarities. Subsequent to the Doty treaties federal officials continued in the last century to report on and describe the Shoshone as one tribe or nation. Anthropologist E. Adamson Hoebel joined other experts like Stewart and Steward in describing Shoshone buffalo hunters exploiting also seed, small game and other resources of the country; and that, although various bands and other much smaller groups identified with particular territories, nothing precluded them from traveling great distances, including on foot, to exploit the resources of other parts of the Shoshone lands. A given Shoshone band received other Shoshone as guests. Omer Stewart found that after the acquisition of the horse the close Shoshone relationship was so extended that Shoshone buffalo hunters appeared as far west in Nevada as Ruby Valley.

In its Interlocutory Order of October 16, 1962, the Commission concluded that there was not one Shoshone land-holding entity, but four such entities, each of which held Indian title to a separate and distinct area of land. These

tribes and identifiable groups were the Shoshone Tribe (the Eastern, Northwestern and Mixed Bands of Shoshones and Bannocks), the Lemhi Shoshone Tribe, the Goshute and the Western Shoshone. The Commission concluded that the Shoshone Tribe exclusively used and occupied the Wyoming lands, the portion of Idaho, including the Snake River country, south of the Lemhi lands, the Great Salt Lake Utah area contigious to and north of the Goshute portion of Utah, and the northeast corner of Nevada contiguous to the Western Shoshone lands. The Commission assigned the Salmon River area and other portions of Idaho north of the Shoshone Tribe's territory to the Lemhi Shoshone. The northwest Utah and northeastern Nevada Shoshone lands were assigned to the Goshute, and the rest of the Shoshone lands in Nevada, and the California tract, were assigned to the Western Shoshone.

The other three Shoshone awards were granted prior to that of the Western Shoshone. The disposition of those awards is pertinent to the handling of the Western Shoshone award.

The Shoshone Tribe (Dockets 326-D, E, F, G, H, 366 and 367)

This award of $15,700,000 was the subject of the Act of December 18, 1971, 85 Stat. 737. The division of the award was complex, being based on agreements reached by the attorneys for the Shoshone Tribe of the Wind River Reservation, Wyoming, the Shoshone-Bannock Tribes of the Fort Hall Reservation, Idaho, and the Northwestern Band of Shoshone Indians. Further, the Wind River and Fort Hall Tribes had developed a 1965 agreement between themselves for the division of the award. In rough terms the Act provides for $500,000 for the Fort Hall Tribes, $1,375,000 for the Northwestern Bands, and the remainder divided between the Fort Hall and Wind River Tribes. Essentially, what the attorneys and the Shoshone entities agreed upon, although the cases had been consolidated, was that the Fort Hall Tribes be paid for their interests in Northwestern Bands, Mixed Bands of Shoshones and Bannocks and Fort Hall reservation claims awards, including cessions made after the Doty treaties, and Bannock tribal funds. The Wind River Tribe, the Fort Hall Tribes and the Northwestern Bands shared the portion of the award deriving from Dockets 326-H and 367, that is, the aboriginal lands of the "Shoshone Tribe" described above.

The Wind River Shoshone Tribe is an organized, reservation based entity, as is the Shoshone-Bannock Tribes of Fort Hall. The "Northwestern Bands" included in the 1971 Act is not an organized tribal entity, but a group of Shoshone at Washakie, Utah, who formed a Mormon colony. Some individuals acquired allotments at the site. The entity is by no means to be regarded as the full successor to the historic Northwestern Bands which in itself must have been rather fluid in composition. For example, by an 1877 Executive Order a reservation for what was then considered the Northwestern Bands was established at Carlin Farms, Nevada. In 1879, with the revocation of the Executive Order, about one third of the people, then designated "Western Shoshones" were removed to the Duck Valley Reservation which had been

established also in 1877. Most of the rest scattered to other locales in Nevada. As early as 1909 Anthropologist Alfred E. Kroeber found that the Mormon settlement at Washakie was comprised of Shoshone from all parts of the claimed areas. In 1873 federal officials prevailed upon part of the Northwestern Shoshone (a group under Pocatello) to settle on Fort Hall Reservation and another part to settle on Wind River Reservation.

We emphasize that Shoshone other than the Wind River and Fort Hall Tribes, as such, and descendants deriving from certain rolls of Washakie, Utah, Shoshone, did not and could not participate in the Shoshone Tribe award despite the amalgamation of Shoshone entities. In fact, the 1971 Act provided that a Northwestern Bands descendant would be precluded from sharing if he elected to participate in the then pending Western Shoshone and Goshute awards.

<u>The Lemhi Tribe (Docket 326-I)</u>

This award of $4,500,000 was the subject of the Act of September 29, 1972, 86 Stat. 743. The award was granted for the aboriginal lands of the Lemhi Shoshone which were taken in 1875 when an Executive Order reservation was established for them. This Lemhi Valley Reservation in northern Idaho was revoked by an 1880 Agreement ratified in 1889. Reluctantly, the Lemhi Shoshone, including Bannocks and Sheepeater Shoshone, moved to Fort Hall in 1907. The 1972 Lemhi Act vested the award exclusively in the Shoshone-Bannock Tribes of Fort Hall as the representative of and successor to the Lemhi Shoshone. It should be noted that adding to the conglomorate within the Fort Hall Tribes are some Boise and Bruneau Shoshone who were moved to Fort Hall in 1868.

<u>The Goshute Shoshone (Dockets 326-B and J)</u>

The Goshute were granted an award of $7,000,000 which was handled in a Secretarial Plan effective October 19, 1979. The plan provides that the award be divided on the basis of the respective memberships of the Confederated Tribes of Goshute Reservation and the Skull Valley Tribe. These two tribal entities were found to be the sole successors to the historic Goshute Shoshone. No other Shoshone are participating.

Consistent with the findings of the Indian Claims Commission, the provisions of the Shoshone Tribe and Lemhi Acts, and the Goshute Secretarial Plan, we conclude that the following individuals are precluded from participating in the Western Shoshone award:

a. members of the Shoshone Tribe of Wind River Reservation;
b. members of the Shoshone-Bannock Tribes of Fort Hall Reservation;
c. members of the Confederated Tribes of Goshute Reservation;
d. members of the Skull Valley Tribe;

e. the Washakie, Utah (Northwestern Bands), Shoshones who participated in the Shoshone Act of December 18, 1971, 85 Stat. 737; and

f. those persons whose Shoshone ancestry is derived solely from the Boise or Bruneau Bands.

Other preclusions must now be discussed in relation to the California award.

C. THE CALIFORNIA SPLINTER GROUP PROBLEM

In its deliberations on the Indians of California claim in Dockets 31, 37, etc., the Indian Claims Commission concluded on March 3, 1964, that the Quechan (Yuma) Tribe was not a proper party to the California suit since the Quechan claim included lands in Arizona in addition to California. The decision of the Commission affected also the other tribes and groups whose claims only partly included California lands. These entities came to be known as the "splinter groups". They are, in addition to the Quechan Tribe, the Northern Paiute, the Southern Paiute, the Mohave Tribe, the Chemehuevi Tribe, the Klamath and Modoc Tribes and the Yahooskin Band of Snakes (and the Walpapi Paiutes), the Washoe Tribe and the Shoshone Tribe. Accordingly, the Act of September 21, 1968, 82 Stat. 860, providing for the disposition of the Indians of California award precluded individuals from sharing in that award and also any of the splinter group awards. Persons of mixed "California" and "splinter group" ancestry were required to make a choice. Similar preclusions have appeared in all of the legislation and Secretarial plans for the disposition of the splinter group awards.

The subject report concerns the last of the splinter group awards, that of the Western Shoshone. The Shoshone Tribe, the Lemhi Shoshone, and the Goshute awards are not, although they have sometimes been referred to as such in earlier Bureau reports, splinter groups since after separation by the Indian Claims Commission only the Western Shoshone award involved California land. The splinter group preclusions, therefore, are not found in reference to the earlier Shoshone awards. They are found, for example, in the Northern Paiute Secretarial Plan effective October 10, 1974. Individuals who had shared as an Indian of California, who are members of the Washoe Tribe, who had shared in the Chemehuevi award, etc., are precluded from sharing in the Northern Paiute award. Many Nevada and California people are of both Western Shoshone and Northern Paiute ancestry.

Some of the splinter group awards have been vested solely in descendant entities (as was the California award) and others wholly or partly in tribal successor entities. Consistent with the handling of the California award and the splinter group awards, individuals in the following categories are precluded from sharing in the Western Shoshone award:

a. those who participated in the Indians of California award in Dockets 31, 37, 80, 80-D and 347;

b. those who elect to participate (the roll is nearly complete) in the Northern Paiute award in Docket 87 and, by extension, those who participated in the Malheur Paiute award in Docket 17;

c. those who participated in the Southern Paiute award in Docket 88 or who are members of the Moapa Paiute Tribe or the Kaibab Paiute Tribe;

d. those who participated in the Mohave award in Dockets 283 and 295 or who are members of the Fort Mohave Tribe;

e. members of the Washoe Tribe of Nevada and California (Docket 288);

f. members of the Quechan Tribe (Docket 319);

g. those who participated in the Chemehuevi award in Docket 351; and

h. members of the Klamath Tribe (terminated) (Docket 100) or whose Indian ancestry is derived solely from the Yahooskin Snakes or Walpapi Paiutes, all associated with the Klamaths and Modocs of the former Klamath Reservation.

D. IDENTIFYING THE WESTERN SHOSHONE BENEFICIARY

The Indian Claims Commission found the Western Shoshone Identifiable Group to be a land-using entity with cultural and economic but little political cohesion. They did not and do not today form a single political entity. Other than the temporary formation of some relatively large groups during the period of Shoshone-American hostilities, the usual grouping was in small camps, often no larger than family units. Larger groupings formed occasionally or seasonally as Western Shoshone interacted or cooperated in such activities as pine nut gathering, rabbit or antelope drives and limited ceremonialism. Their total numbers have always been and are still very small.

We have reviewed the high mobility, the fluidity and the amalgamations, partly effected by actions of the Federal Government, which characterized the various Shoshone subdivisions and reservation entities. We conclude that the representatives of the Western Shoshone are those Shoshone and their descendants who remain after precluding the Wind River, Fort Hall, Washakie, Utah, and Boise and Bruneau Shoshone, the Indians of California, and the splinter groups described above.

The Western Shoshone entities were and are extremely scattered. It is not possible to describe the Western Shoshone in terms of forming a tribe or a group of organized tribes, particularly in view of the Shoshone-Paiute combined organizations and the very real possibility that many Western Shoshone descendants (including those who strongly identify as Shoshone people) are not and never have been associated with any reservation entity. One reason for the development of this situation was the strong proclivity of Western Shoshone families to

attach themselves to scattered ranches and other establishments in the Nevada-California area. It does not follow, however, that Shoshone who have shared in the awards of other Shoshone land holding entities cannot and should not be distinguished from the Western Shoshone. As so-called Northwestern Bands people, for example, included rather recent arrivals from the Nevada area, so did the Nevada area Western Shoshone accrue Shoshone from areas north of them or from the Goshute. In the simplest terms, the present-day Nevada and California Shoshone have always been or have become the Western Shoshone.

Western Shoshone descendants may be found in many States. They are, however, in general very strongly associated with the Nevada and California reservation entities listed below and with the towns and cities near those reservations and colonies. Most of their communities, whether federally recognized or not, are very small. With the preclusion of so many groups from participating in the award, the total Western Shoshone descendant entity may not number more than a few thousand.

Contemporary Western Shoshone Entities

Nevada

1. Te-Moak Bands of Western Shoshone Indians, Nevada (Elko, Battle Mountain, South Fork and Wells); estimated enrollment 1200 (all enrollment figures were provided February 1980, by the Phoenix Area Office).

2. Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada (extends into Idaho); estimated enrollment 1200. Many of these people have or will have participated in the Malheur and Northern Paiute awards.

3. Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada; actual enrollment 228, probably all Shoshone.

4. Yomba Shoshone Tribe of the Yomba Reservation, Nevada; estimated enrollment 300, probably all Shoshone.

5. Ely Indian Colony of Nevada; estimated enrollment 170, probably all Shoshone.

6. Reno-Sparks Indian Colony, Nevada; estimated enrollment 670. The great majority of the enrollees are Washoe and Northern Paiute.

7. Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada; estimated enrollment 620, a very small minority of Shoshone.

8. Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada; estimated enrollment 500, a very small minority of Shoshone.

9. Walker River Paiute Tribe of the Walker River Reservation, Nevada; estimated enrollment 1,000, a very small minority of Shoshone.

10. Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada; estimated enrollment 500, a very small minority of Shoshone.

Persons of Western Shoshone ancestry are undoubtedly to be found associated with other reservation entities in Nevada. Western Shoshone, perhaps intermingled with Southern Paiute, are reportedly residing in the Pahrump Valley area in Nevada.

<u>California</u>

1. Owens Valley Paiute-Shoshone Band of Indians (includes Bishop, Big Pine, Fort Independence and Lone Pine Reservations); estimated enrollment 1,500, a minority of Shoshone.

2. Death Valley Timbi-Sha Shoshone Band. This group has recently submitted a petition for federal acknowledgment as an Indian tribe. Since the 1930's these Western Shoshone have been occupying, on the basis of a National Park Service permit, a forty acre site known as Furnace Creek Village within the Death Valley National Monument. The community claims a membership of about 150, with 35 residing in the village. The Death Valley Band has a 1978 Articles of Association and an elected council of five members. Bureau of Indian Affairs censuses of 1933 and 1936 were developed for them. To our knowledge they form the only Western Shoshone community, as such, which is not associated with a federally recognized tribe.

We find those Western Shoshone people, and their descendants, who derive from the censuses and other rolls of the above cited entities, and other descendants who prove Western Shoshone ancestry on the basis of rolls and records to the satisfaction of the Secretary of the Interior, to be the beneficiaries of the award in Docket 326-K. All necessary preclusions shall appear in the Secretarial plan or legislation for the disposition of the award.

At a general meeting held at Elko Colony on February 23 and chaired by the Chairman of the Te-Moak Bands, a Western Shoshone Planning Committee was officially formed. This committee is well representative of various Shoshone reservation and off-reservation communities in Nevada and intends to include California entities. The committee is charged, among other things, with the development of a proposal for the use and distribution of the judgment funds and to that end is expected to meet with and seek advice from their respective constituencies. It is most important that this report be made available to all members of the committee.

William Hallett

Commissioner of Indian Affairs

Rec'd 3/12/82 SMT

# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
WASHINGTON, D.C. 20245

IN REPLY REFER TO:
Tribal Government Services

JAN 22 1982

Memorandum

To: Phoenix Area Director

From: Acting Deputy Assistant Secretary - Indian Affairs (Operations)

Subject: Amended Results of Research Report on Western Shoshone Award in Docket 326-K

This memorandum replaces that of August 20, 1981, on essentially the same subject, and constitutes an amendment to the original Results of Research Report of March 11, 1980, relating to the subject award. This action is prompted by the Bureau's overall policy to designate successor tribes as beneficiaries of claims awards whenever possible in order that there might be maximum opportunity for those tribes that so wish to develop programming proposals for the use of judgment funds.

In this instance it is clear, as indicated in the March 11, 1980, report, that all of the tribes cited below are composed of individuals who are at least in part Western Shoshone and who have probably not participated in those awards which would preclude them from being beneficiaries of this one:

1. Te-Moak Bands of Western Shoshone Indians (includes Elko, Battle Mountain, South Fork and Wells); estimated total enrollment is 1,200.

2. Duckwater Shoshone Tribe of the Duckwater Reservation; enrollment is about 230.

3. Yomba Shoshone Tribe of the Yomba Reservation; enrollment is about 300.

4. Ely Indian Colony; enrollment is about 170.

Consequently, we are designating these tribes as tribal successors to the Western Shoshone entity of the period of 1853 - 1872 (the California and Nevada taking dates) and beneficiaries of a part of this award. The remaining beneficiaries consist of all other persons of Western Shoshone ancestry, in their individual capacity, who otherwise meet the criteria detailed in the March 11, 1980, Results of Research Report.

In connection with this determination, several additional items of explanation are in order. First, it is expected that the method employed to establish tribal shares, which has been explained at Western Shoshone general meetings, will be

EXHIBIT E

based on the numbers of members in each of the four tribes who have not participated in the California award or in any of the earlier "splinter group" awards such as Northern Paiute. Those tribal members who have so participated would not be included for purposes of determining a tribal share of the funds. Further, such tribal members would not be entitled to a per capita share under any use and distribution proposal developed by the affected tribe.

Second, we should now begin working with the beneficiaries on the development of the legislation which will be required in this instance. With respect to the tribal beneficiaries, our policy in working with them should be guided by the language of P.L. 93-134 insofar as programming of funds is concerned.

Third, there may be questions as to whether a tribal member ineligible for a per capita payment would be eligible to participate in tribal programming through the use of the same award funds. While this might well be specifically covered in the legislation, we believe the proper approach would be that such persons who are ineligible to receive per capita shares could nevertheless participate fully in tribal programs resulting from the award.

To move forward on this matter we believe you may wish to call a general meeting of all of the Western Shoshones in order to advise them of this amendment to the Results of Research Report. It would appear that separate meetings should then be held with the tribal governing bodies of the four successor tribes to work with them toward the development of proposed legislation. To be kept in mind during this process is the fact that the actual introduction of legislation may not be possible until the Dann litigation is completed. However, this should not preclude beginning the process of working with the tribes to clarify their desires with respect to programming and to initiate appropriate planning with them providing such technical assistance as requested and as resources permit.

Should you have any questions or if this office can be of assistance, please let us know.

Theodore C. Krenzke