# In the United States Court of Federal Claims

**No. 06-896L**
**Filed: June 13, 2019**

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *      *
```

THE     WESTERN     SHOSHONE       *
IDENTIFIABLE GROUP, represented    *
by the YOMBA SHOSHONE TRIBE,       *
a federally recognized Indian Tribe, *
et al.,                            *

               **Plaintiffs,**  *

    v.                           *

UNITED STATES,                     *

           **Defendant.**    *

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *      *
```

Tribal Trust Funds; 25 U.S.C. § 162a; Breach of Fiduciary Duty; Duty to Prudently Invest.

**Kelli J. Keegan**, Barnhouse Keegan Solimon & West LLP, Los Ranchos de Albuquerque, NM, for plaintiffs. Of counsel were **Randolph Barnhouse** and **Michelle Miano**, Barnhouse Keegan Solimon & West LLP, Los Ranchos de Albuquerque, NM, and **Steven D. Gordon**, Holland & Knight, LLP, Washington, D.C.

**Joshua P. Wilson**, Trial Attorney, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Peter K. Dykema** and **Trent Crable**, Natural Resources Section, Environment & Natural Resources Division, and **Joseph H. Hunt**, Assistant Attorney General, Civil Division, Department of Justice. Of counsel were **Anthony P. Hoang**, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., **Michael Bianco** and **Joshua Edelstein**, Office of the Solicitor, United States Department of the Interior, Washington, D.C., and **Thomas Kearns** and **Rebecca Saltiel**, Office of the Chief Counsel, United States Department of the Treasury, Washington, D.C.

# O P I N I O N

In this Native American tribal trust fund case, three tribal plaintiffs and three individual plaintiffs have sued defendant, the United States, for allegedly mismanaging plaintiffs' three tribal trust funds, received as a result of three separate cases before the Indian Claims Commission (ICC) and its successors for the government's taking of the plaintiffs' ancestral lands in Nevada and California without just compensation, over a thirty-three-year period. Plaintiffs seek to recover $216,386,589.83 in damages for the

government's alleged mismanagement of the largest of the tribal trust funds, the 326-K Fund, and $1,592,822.43 in damages for the government's alleged mismanagement of the two smaller tribal trust funds, the 326-A-1 and 326-A-3 Funds. The three tribal plaintiffs are the Yomba Shoshone Tribe, Timbisha Shoshone Tribe, and the Duckwater Shoshone Tribe, three of the federally recognized Western Shoshone Tribes and three of the members of the Western Shoshone Identifiable Group. The three individual plaintiffs are Maurice Frank-Churchill, an enrolled member of the Yomba Shoshone Tribe, Jerry Millet, an enrolled member of the Duckwater Shoshone Tribe, and Virginia Sanchez, also an enrolled member of the Duckwater Shoshone Tribe. Plaintiffs allege that defendant "imprudently" invested their tribal trust funds in securities that were too short-term, resulting in less than maximum returns. It is not disputed by the parties that defendant was the trustee of the funds at issue, and was responsible for the administration, management, and investment of the funds at issue from the time the funds were appropriated for deposit in the trust accounts for the benefit of the Western Shoshone Identifiable Group until the time the funds were distributed to plaintiffs. Defendant asserts that based on the facts and circumstances at the time, plaintiffs' tribal trust funds were prudently invested, as evidenced in part by the 6.8% average annual return of plaintiffs' largest tribal trust fund.

The events leading up to this case, and this case, once filed, have a long history. The case in this court was filed in 2006 and originally assigned to a Judge other than the undersigned. On August 26, 2015, this case was transferred to the undersigned after the original presiding Judge had issued two Opinions in this case, one dismissing defendant's motion to dismiss and one denying defendant's motion for reconsideration. See W. Shoshone Identifiable Grp. v. United States, No. 06-896L, 2008 WL 9697144 (Fed. Cl. Oct. 31, 2008); see also W. Shoshone Identifiable Grp. v. United States, No. 06-896L, 2009 WL 9389765 (Fed. Cl. Nov. 24, 2009). After the issuance of two Opinions, there were settlement discussions and settlement attempts before the case was reassigned to the undersigned. Upon being assigned the above-captioned case in 2015, the undersigned pressed the parties to initiate and intensify efforts on pretrial proceedings and to get ready for trial, earlier settlement efforts having failed. Thereafter, the court held a five-day trial in Washington, D.C. This Opinion only addresses the issues of liability and whether the government breached its fiduciary duty to plaintiffs when investing the tribal trust funds. The facts described below are a brief summary of important, pertinent events taken from the extensive record before the court and the joint stipulations submitted by the parties which are relevant to deciding issues of liability in this case. By no means are the below facts an event-by-event description of everything that happened over the thirty-three-year period at issue.

## FINDINGS OF FACT

### I.   Origin of plaintiffs' tribal trust funds

Plaintiffs are the beneficial owners of three tribal trust funds stemming from three separate judgment awards. The first judgment occurred on August 15, 1977, when the ICC awarded $26,145,189.89 to the Western Shoshone Identifiable Group in Docket 326-

K for the taking of ancestral land located in modern day Nevada and California. Unlike the plaintiffs' awards in its second case before the ICC, docket number 326-A-1, discussed below, in which the plaintiffs were awarded a judgment, plus interest, based on the record before the court and the parties' revised joint stipulations of fact in the above-captioned case, plaintiffs were not awarded any interest for the award of the $26,145,189.89 in the 326-K Fund case. Both parties appealed the ICC's August 15, 1977 award of $26,145,189.89, which was subsequently affirmed by the United States Court of Claims[1] on February 21, 1979. See Temoak Band of W. Shoshone Indians, Nevada v. United States, 219 Ct. Cl. 346, 361, 593 F.2d 994, 1002, cert. denied, 444 U.S. 973 (1979). On December 19, 1979, the ICC's award of $26,145,189.89 was deposited into a tribal trust fund account in the United States Treasury under account number JA9334697. The parties in the above-captioned case refer to this tribal trust fund as the "326-K Fund," and it is the largest of the three tribal trust funds at issue.

The second judgment occurred on December 3, 1991, when the United States Claims Court[2] entered a judgment in Western Shoshone Identifiable Group v. United States, Docket Number 326-A-1, in the amount of $823,752.64 in favor of the Western Shoshone Identifiable Group. See Te-Moak Bands of Western Shoshone Indians of Nevada, et. al. v. United States, United States Claims Court, Docket No. 326-A-1, Judgment (Dec. 3, 1991). The award of $823,752.64 was comprised of $815,209.67, together with interest of $8,542.97. See id. On March 25, 1992, the second judgment award of $823,752.64 was deposited into trust in the United States Treasury under account number JA9087691. The parties refer to this tribal trust fund as the "326-A-1 Fund."

The third judgment occurred a little more than three years later, on June 16, 1995, when the United States Court of Federal Claims entered a judgment in Docket Number 326-A-3, in the amount of $29,396.60, in favor of the Western Shoshone Identifiable Group. See Te-Moak Bands of Western Shoshone Indians of Nevada, v. United States, United States Court of Federal Claims, Docket No. 326-A-3, Judgment (June 16, 1995). According to the final judgment entered on the 326-A-3 docket, which was introduced at trial as a joint exhibit, the 326-A-3 award did not appear to include interest. On September

---

[1] The United States Court of Claims is the predecessor court to the United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims, the court on which the undersigned presides over the above-captioned case. See Shields v. United States, 136 Fed. Cl. 37, 48 (2018) (stating that the "United States Court of Claims ('Court of Claims'), [is] the predecessor court to the Federal Circuit"); see also Health Republic Ins. Co. v. United States, 129 Fed. Cl. 757, 769 (2017) (noting that the "United States Court of Claims ('Court of Claims'), [is] a predecessor of this court and the United States Court of Appeals for the Federal Circuit"); Geiger v. United States, 3 Cl. Ct. 647, 650 (1983) (noting that the United States Court of Claims is "this court's predecessor").

[2] The United States Claims Court was renamed the United States Court of Federal Claims in 1992. See Federal Courts Administration Act of 1992, Pub. L. No. 102-572, § 902, 106 Stat. 4506, 4516 (1992).

15, 1995, the award of $29,396.60 was deposited into trust in the United States Treasury under account number JA1009693. The parties refer to this tribal trust fund as the "326-A-3 Fund." The account number and type, and the sources of the three funds are displayed below:

| ACCOUNT NO. & TYPE | SOURCE OF FUND |
|---|---|
| JA9334697 WESTERN SHOSHONE JUDGMENT FUNDS | INITIAL AWARD OF $26,145,189.89 ON 12/19/1979, ICC DOCKET 326-K |
| JA9087691 WESTERN SHOSHONE JOINT JUDGMENT FUNDS | INITIAL AWARD OF $823,752.64 ON 3/25/1992, ICC DOCKET 326-A-1 |
| JA9087691 WESTERN SHOSHONE JOINT JUDGMENT FUNDS | INTEREST CLAIM OF $29,369.60 ON 9/15/1995, ICC DOCKET 326-A-3 |

## II.   Investment of tribal trust funds

### a.   25 U.S.C. § 162(a)

The parties have stipulated that "Tribal Trust Funds" are tribal monies, including judgment awards, revenues, and other payments made to Indian tribes, which are required by law to be deposited in the United States Treasury and historically to be managed by the United States Department of the Interior. The parties also have stipulated to an abbreviated summary of the relevant history to the above-captioned case, some of which is described below. Some historical highlights for the purpose of providing some context follow. In 1880, the Department of the Interior was authorized to deposit tribal trust funds in the United States Treasury to earn a simple interest rate of four percent per year whenever it determined that such a course of action was in the best interest of an Indian tribe. In 1918, the Department of the Interior was permitted to deposit tribal trust funds into any public-debt obligations of the United States and into any notes, bonds, or other obligations that were unconditionally guaranteed as to both principal and interest, when the Department of the Interior determined doing so was in the best interests of an Indian tribe. In 1938, Congress passed the Act of June 24, 1938, ch. 648, § 1, 52 Stat. 1037, currently contained at 25 U.S.C. § 162a (2018), the statute at issue regarding plaintiffs' allegations of breach of trust in the above-captioned case, which codified the authority of the Secretary of the Department of the Interior to invest tribal trust funds.[3] According to Subsection (a) of 25 U.S.C. § 162a:

_____

[3] The Secretary of the Interior has had and continues to have the authority pursuant to 25 U.S.C. § 161 (2018) and 25 U.S.C. § 161a (2018) to deposit tribal trust funds in the United States Department of Treasury in lieu of investing tribal trust funds in securities allowed under 25 U.S.C. § 162a. See 25 U.S.C. §§ 161, 161a. The plaintiffs in the above-captioned case, however, do not allege that defendant breached a duty regarding the investment of the three funds at issue in the United States Treasury pursuant to 25 U.S.C.

The Secretary of the Interior is hereby authorized in his discretion, and under such rules and regulations as he may prescribe, to withdraw from the United States Treasury and to deposit in banks to be selected by him the common or community funds of any Indian tribe which are, or may hereafter be, held in trust by the United States and on which the United States is not obligated by law to pay interest at higher rates than can be procured from the banks. The said Secretary is also authorized, under such rules and regulations as he may prescribe, to withdraw from the United States Treasury and to deposit in banks to be selected by him the funds held in trust by the United States for the benefit of individual Indians . . . .

25 U.S.C. § 162a(a).

Subsection (a) of 25 U.S.C. § 162a further provides that:

[T]he Secretary of the Interior, if he deems it advisable and for the best interest of the Indians, may invest the trust funds of any tribe or individual Indian in any public-debt obligations of the United States and in any bonds, notes, or other obligations which are unconditionally guaranteed as to both interest and principal by the United States.

25 U.S.C. § 162a(a). As both parties noted during trial, Subsection (a) of 25 U.S.C. § 162a limits the government's investment of tribal trust funds to fixed-income securities backed by the full faith and credit of the United States, including bonds issued by federal agencies, the United States Department of Treasury (Treasury securities), mortgage-backed securities, and certificate of deposits (CDs). Moreover, both parties agree that Subsection (a) of 25 U.S.C. § 162a would not allow the government to invest in stocks or foreign-issued bonds. The parties do not contest that the government invested any of plaintiffs' three tribal trust funds in investments prohibited by law, nor do the parties contest that the government misappropriated or stole any of the plaintiffs' tribal trust funds. The contention in the above-captioned case is whether the government prudently invested the plaintiffs' three tribal trust funds in government-approved securities. According to plaintiffs, "[t]he issue is whether the government invested prudently." Plaintiffs challenge the government's investment of their three tribal trust funds among securities which were permissible at the time under the investment statute at 25 U.S.C. § 162(a). According to plaintiffs, the government did not prudently invest their three tribal trust funds, but instead consistently under-invested the three funds in too short-term securities. Defendant argued to the contrary.

Because Subsection (a) of 25 U.S.C. § 162a only allows the government to invest tribal trust funds in government-backed securities, both parties agree that the government faces virtually no credit risk when investing tribal trust funds, i.e., a risk that the fixed-

---

§ 161 or 25 U.S.C. § 161a, nor that defendant retained plaintiffs' three tribal trust funds in the United States Treasury instead of investing the funds.

income security[4] issuer will default on the security. Both parties also agree that the primary risk that the government faced when investing plaintiffs' tribal trust funds was "interest rate risk," the risk that interest rates will change over the life of a fixed-income security.  As both parties agree, the risk that interest rates will fluctuate is greater for fixed-income securities that have a longer-term maturity.[5] Defendant's liability expert, Dr. Laura Starks, explained in her expert liability report, "if interest rates increase, bond prices fall. That risk is greater for longer-maturity investments." Similarly, plaintiffs' rebuttal expert, Dr. Michael Goldstein, explained in his rebuttal expert report that, "longer-term investments" "[t]raditionally" experience higher-yields than shorter-term investments to reflect the "interest rate risk that the holder is taking (i.e., when rates change)." In addition, as plaintiffs' counsel noted during her opening statement at trial, "[a]ll of the experts agree that longer maturities normally offer larger average returns than shorter term maturities, but their value does fluctuate with changes in the interest rate, which can result in either capital gains or capital losses if they are sold before maturity." Thus, as the parties agree, if a bond-holder had to sell a bond prior to maturity, and interest rates increased from the time the bond-holder purchased the bond, the bond-holder will likely experience a loss on the principal of the bond because the bond's value has decreased. Conversely, if a bond-holder had to sell a bond before maturity, and interest rates decreased since the time of purchase, the bond-holder would likely experience a gain on the principal of the bond because the bond's value has increased. If the bond-holder holds the bond to maturity, any change in interest rates would not affect the bond's principal value. Interest rate risk, thus, becomes relevant when an investor decides to sell a bond before maturity. The

---

[4] At trial and in their expert reports, both parties' liability and damages experts referred interchangeably to "fixed-income securities" and "bonds" when discussing general investment principals. Therefore, for purposes of this Opinion, this court interchangeably shall refer to fixed-income securities and bonds, as used by the parties, when summarizing the parties' positions regarding general investment principals.

[5] As both parties' liability experts indicated at trial, the definition of a "longer-term" security versus a "shorter-term" security varies somewhat throughout the investment industry. According to the trial testimony of plaintiffs' liability expert, Mr. Kevin Nunes, "ultra-short-term" securities have maturities of one year or less, "short-term" securities have maturities between one and five years, "intermediate-term" securities have maturities greater than five and less than ten years, and "long-term" securities have maturities between ten and thirty years. Contrastingly, defendant's liability expert, Dr. Laura Starks, testified at trial, "[p]eople define" the terms "short-term," "intermediate term," and "long term" differently and that during her career, she has "actually seen these definitions change over time." According to Dr. Starks' trial testimony, "short-term investments is -- typically, to me, that would be a year or less, maybe a little over a year," and whether securities with a maturity of "two years" should be considered short-term would be "debatable." Dr. Starks testified at trial that "intermediate term" would be "primarily three to five years," and that "[t]here are others that extend intermediate to longer term." Dr. Starks also testified that "long term" would "typically" include securities with maturities of "ten years or more." Dr. Starks testified that securities with a maturity between five to ten years "don't have a real definition," and that "[t]o me, it's between what's clearly intermediate and what's clearly long term."

interest rate risk facing the government when investing plaintiffs' three tribal trust funds will be discussed in more detail below.

Subsection (d) of 25 U.S.C. § 162a, another provision of the statute relevant to plaintiffs' allegation of fund mismanagement, provides that:

The Secretary's proper discharge of the trust responsibilities of the United States shall include (but are not limited to) the following:

(1) Providing adequate systems for accounting for and reporting trust fund balances.
(2) Providing adequate controls over receipts and disbursements.
(3) Providing periodic, timely reconciliations to assure the accuracy of accounts.
(4) Determining accurate cash balances.
(5) Preparing and supplying account holders with periodic statements of their account performance and with balances of their account which shall be available on a daily basis.
(6) Establishing consistent, written policies and procedures for trust fund management and accounting.
(7) Providing adequate staffing, supervision, and training for trust fund management and accounting.
(8) Appropriately managing the natural resources located within the boundaries of Indian reservations and trust lands.

25 U.S.C. § 162a(d).

### b. The Department of the Interior's investment policies and procedures

In 1966, the Bureau of Indian Affairs (BIA), the office within the Department of the Interior which was delegated the task of investment tribal trust funds, began a formal investment program and published an investment policy statement. The 1966 policy statement, in pertinent part, stated that "[p]repatory to undertaking any investment program with surplus trust funds, a tribe necessarily would have to make a careful analysis of its current and future cash needs" to cover "at least two six-months periods." The 1966 policy also stated that "[e]ach Area Office is requested to review the amount of tribal trust funds each tribe in the respective Areas has on deposit in the Treasury," and that "[w]herever it appears that the amount is in excess of foreseeable cash needs of the tribe, discussions should be held with the tribal council and its wishes regarding investment of the funds ascertained." The 1966 policy statement also noted that "[g]overnment-backed securities, while basically safe, can result in losses unless held to maturity."

In 1973, Congress passed the Indian Tribal Judgment Funds Use and Distribution Act, Pub. L. No. 93-134, 87 Stat. 466 (1973) (Use and Distribution Act of 1973), which

established a process for distributing judgment awards to Indian tribes. Pursuant to the Use and Distribution Act of 1973, the Secretary of Interior had 180 days from "after the appropriation of funds to pay a judgment of the Indian Claims Commission or the Court of Claims to any Indian tribe," and to "prepare and submit to Congress a plan for the use or distribution of such funds." Use and Distribution Act of 1973, Section 2(A). When preparing the distribution plan, the Secretary was required to consider any distribution plan proposed by the tribes. See id. at Section 3(A)(1). The Secretary of Interior also was required to hold a "hearing or record" with the tribes to obtain their input regarding the distribution plan. See id. at Section 3(A)(2). The Secretary of Interior could request a 90-day extension of the 180-day timeline for submitting a proposed plan for the distribution of a judgment award to an Indian tribe, and such request was "subject to the approval of both the Senate and the House of Representatives committees on Interior and Insular Affairs." See id. at Section 2(B). The Secretary of Interior's plan submitted to Congress would become effective after 60 days, absent Congressional disapproval of the plan. Upon the plan becoming effective, the Use and Distribution Act of 1973 required that the Secretary of Interior "take immediate action to implement the plan for the use or distribution of such judgment funds." See id. at Section 5(A). If the Secretary of Interior did not submit a proposal within 180 days of the date of the appropriation of the particular judgment award, and no 90-day extension was granted, then the Secretary of Interior would have to submit proposed legislation to Congress in order for the funds to be used or distributed.

The Secretary of the Interior did not submit a distribution proposal within the required 180 days for the three funds at issue and no 90-day extension was granted. Thus, pursuant to the Use and Distribution Act of 1973, Congress would be required to pass legislation authorizing the distribution of the 326-K and 326-A Funds. As explained in more detail below, over the years, various members of Congress introduced bills for distributing the three tribal trust funds at issue, each of which did not pass. Distribution legislation was finally passed in 2004, and the 326-K Fund was fully distributed in 2012. The principal of the 326-A Funds was never to be distributed and is currently held in trust as a permanent education trust fund, with the interest of the 326-A-1 and 326-A-3 Funds to be used as educational grants for qualifying members of the Western Shoshone tribes.

In 1974, the BIA Acting Deputy Commissioner of Indian Affairs sent BIA's updated investment policy in a memorandum to the Area Directors of the BIA based in different geographical regions in the United States and in charge of overseeing the investment of various tribal accounts from tribes in their particular regions, which stated:

> Area and agency offices should work very closely with the tribes to determine the cash needs and ascertain if trust funds are available for investment. When a decision has been made that surplus funds are available for investment, arrangements should be made immediately with the Branch of Investments, Albuquerque, to invest the funds.

The 1974 policy memorandum also stated:

> Investments can be made for a period of one day or for as much as 25 years or longer. Therefore, all funds except the funds for immediate needs can be invested to provide a greater income to the tribe. The maturity dates can be arranged to coincide with the needs for the funds. If requested, the funds are returned to the U.S. Treasury at maturity and are available immediately for expenditure through the normal procedures for the advance of funds to the tribe.

> It is the policy of the Bureau of Indian Affairs to maximize returns on all tribal, as well as individual, trust funds. This comports with the recent decision in Manchester Band of Pomo Indians v. United States, 363 F. Supp. 1238 (N.D. California 1973).

> Each Area Director has the responsibility for determining if surplus funds are available for investment purposes and notifying the Branch of Investments, Albuquerque, to take the necessary action to invest the funds.

(underline in original).

Subsequently, the BIA included a policy statement as part of the BIA's "REPORT OF INVESTMENT OF INDIAN TRUST FUNDS FOR FISCAL YEARS 1986 and 1987," which was introduced as a joint exhibit at trial. (capitalization in original). Although titled a "REPORT," the document contained two separate sections which discussed the BIA's investment policy. (capitalization in original). The first, titled "AUTHORITY," stated:

> Our basic authority is contained in 25 USC 162a [sic], which is specific for Tribal and individual trust funds, and PL 98-146 which authorizes the investment of collections from irrigation and power projects. The Bureau can invest in certificates of deposit with banks and savings and loans which are insured by FDIC [Federal Deposit Insurance Corporation] or FSLIC [Federal Savings and Loan Insurance Corporation], or in banks which have pledged collateral securities guaranteed as to both principal and interest by the U.S. Government. Most of the purchased CD's are for periods of less than 1 year, although 1, 2 and 3 year CD's have been purchased on occasion. Investments can also be made through purchases of public debt obligations of the United States (Treasury issues) or other obligations which are guaranteed as to both principal and interest by the U.S. Government.

(capitalization and emphasis in original). The second section, titled "INVESTMENT POLICIES AND INSTRUCTIONS," stated:

> Although BIA is the Trustee for Indian funds, an ideal investment relationship is one in which Tribes participate fully by providing well thought-out investment policies and instructions based on realistic cash flow

> projections which are based on complete tribal budgets. It is possible, through knowing the amounts required and when disbursements are necessary, to plan the timing of investment maturities to maximize interest rates and earnings and also have the funds available when needed.

(capitalization and emphasis in original). The parties agree that throughout the 1980s and until the early 1990s, the BIA had a program in which it pooled approximately 70% to 80% of tribal trust funds managed by the Department of the Interior into short-term jumbo CDs in banks nationwide, which had a maturity of one year or less. Plaintiffs' liability expert, Mr. Nunes, testified at trial that during the 1980s, the BIA had a "blanket kind of approach to all Indian funds that we saw," which was to invest tribal trust funds in "very short term and almost entirely in their CD program." Defendant's liability expert, Dr. Starks, similarly testified at trial that:

> [I]n the 1980s, the primary investments were into certificate of deposits, and the -- the Government had this unique CD program in which they pooled the money from a lot of different tribes and invested it in bank CDs all over the country, and because of the pooling, they were able to buy very large CDs.

According to the trial testimony of defendant's liability expert, Dr. Starks, the general maturities of the BIA's CD investments "were usually one year or less." By pooling tribal trust funds, as Dr. Starks testified at trial, the BIA was able to achieve higher returns while ensuring that the tribal trust funds remained protected against any bank failures. Dr. Starks also testified at trial that the returns on the CDs were generally comparable to two- to three-year Treasury bonds.

Also, in 1983, 1984, and 1989, the Department of the Interior consulted with various private investment firms and received three investment proposals from outside firms with recommendations on how to improve the Department of the Interior's investment of its tribal trust funds. BIA received (1) a joint proposal from the American Indian National Bank (AINB) and Lehman Management Company (Lehman), (2) Security Pacific National Bank (Security Pacific), and (3) PricewaterhouseCoopers (PWC).[6] None of the firms proposed specific investment strategies for any particular tribal trust fund, including the tribal trust funds at issue in the above-captioned case, but instead recommended general investment strategies for tribes which had immediate cash flow needs and for tribes which had longer-term investment horizons. The Department of the Interior ultimately did not adopt those particular suggestions.

PWC submitted the first, and most in-depth investment proposal, to the government on December 24, 1983. According to PWC, it conducted "an in-depth review

---

[6] The court notes that although the parties refer to the December 24, 1983 investment proposal as the "PWC investment proposal," at the time of the proposal, the company's name was "Price Waterhouse." For consistency, and to follow the lead of the parties, the court refers to the December 24, 1983 investment proposal as the PWC investment proposal and refers to the company as PWC.

of the management of Indian trust funds," which consisted of the government's various tribal trust funds, "individual Indian monies" (IIM) accounts, "Indian Monies Proceeds of Labor" accounts, "Contributions," and the "Alaska Native Escrow Fund. Plaintiffs' 326-K Fund was one of various tribal trust funds the government held in trust during the 1980s. PWC reviewed the BIA's investment of "Indian trust funds" between 1976 and 1983. The PWC proposal stated that "there is no evidence that outside money managers would have improved on the investment performance during the period 1976-1983," but that moving forward, "we [PWC] recommend that the Bureau [of Indian Affairs] engage an outside investment advisor."

PWC's December 24, 1983 proposal stated:

In assessing the overall performance of the funds in recent years, we have found that the BIA Branch of Investments has achieved excellent investment results relative to other managed portfolios operating under similar investment authorizations. These recent successes are primarily attributable to a strategy of investing in short-term assets in the face of volatile interest rates and to the discovery of federal subsidies implicit in the pricing of FDIC and FSLIC insured CD's.

However, as the volatility of interest rates declines, yields will begin to reflect the relative risks associated with the maturity and underlying credit characterizing security investments. Further, the subsidies associated with fdic and fslic securities are under consideration by bank regulators and may not be available in the future.

(capitalization in original). The PWC investment proposal also noted that the "[w]hile the BIA investment strategy has worked well in the past, the unusual market conditions of the recent past," i.e., that the yield curve for bonds was inverted such that short-term securities had out-performed longer-term securities for the "last decade," 1973 to 1983, "may not continue." PWC also stated that "there is no guarantee that the current strategy of investing primarily in highly liquid short-term assets will achieve the same investment performance relative to other strategies if the capital markets return to traditional pricing behavior," which is what the BIA did and achieved for the 326-K Fund from its deposit into the Treasury on December 19, 1979 until December 24, 1983, the date of the PWC's proposal. According to the PWC investment proposal, unlike the "unusual" inverted yield curve between 1973 and 1983, "[u]nder the traditional yield curve," meaning that longer-term investments out-perform shorter-term investments, "investors who assume the risks associated with long-term securities, are rewarded more than investors who place their funds in shorter term issues."

Although PWC concluded that the BIA's management of the Indian trust funds between 1976 and 1983 was "excellent," PWC noted that its "[m]easurement of actual portfolio performance" of the Indian trust fund "was confounded by an absence of data" and that PWC had to make various assumptions when analyzing the BIA's investment performance during this time. The PWC investment proposal noted that:

The current BIA accounting system does not produce periodic reports of total returns (interest accrued each period plus changes in market value) for the Indian trust fund portfolios. In order to analyze the performance of the portfolio, we estimated total portfolio returns based on published returns earned on the following generic categories of securities comprising the Indian trust fund portfolios:

> o Insured or collateralized Certificate of Deposit (6 months to maturity)
> o Treasury Securities (5 months to maturity)
> o U.S. Government Agency Securities (7.1 years to maturity)

The PWC investment proposal stated that "[t]he asset allocation among" the three generic securities listed above for its analysis of the government's investment of Indian trust funds "was assumed to be the actual asset allocation for the IIM portfolio as of August 1983," a different type of account than the tribal trust funds at issue in this case.

The PWC investment proposal also provided "numerous recommendations by which the BIA can adjust to the changing investment environment and provide enhanced services to the beneficiaries of the trust funds," which included the recommendation that BIA "[d]evelop and implement an ongoing process which will assist tribes and individuals to formulate investment objectives." The PWC investment proposal recommended to the BIA a portfolio investment strategy of "passive diversification," i.e., "[i]nvestment in securities representing a variety of market sectors, and maturities where such investments are held to maturity," in order "to achieve the trust fund investment objectives as the capital markets begin to reflect the more traditional risk/return relationships." PWC included five sample portfolios to illustrate that by using the passive diversification strategy, "a portfolio of securities can be chosen that will perform better than any single security in the portfolio." PWC also explained in its investment report that of the five sample portfolios, three were "dominant," meaning that these three portfolios earned the greatest return for the least risk. The first dominant portfolio was comprised of "10% T-bills, 30% C.D.'s" and "30% Intermediates, 30% Long Term" and had an "Expected Return" of 11.20%.[7] The second dominant portfolio was comprised of "5% T-bills," "50% C.D.'s," and "25% Intermediates, 20% Long Term," and had an "Expected Return" of "10.92%." The third dominant portfolio was comprised of "20% T-bills, 40% C.D.'s" and "40% Intermediates," and had an "Expected Return" of "10.40%."

Of the non-dominant portfolios, the first was comprised of "22% T-bills, 70% C.D.'s" and "8% Intermediates," and had an "Expected Return" of "10.02%." The second was comprised of "22% T-bills, 70% C.D.'s" and "8% Intermediates," and had an "Expected Return" of "9.90%" The three dominant portfolios, which were expected to experience the

---

[7] The PWC investment proposal did not define what constitutes an "Intermediate" security and what constitutes a "Long-term" security. The PWC investment proposal, however, noted that "[t]wo-, three-, and five-year notes" were not considered "Long-term bonds."

highest rate of returns from PWC's five sample portfolios, contained the highest combination of long-term and intermediate-term securities.

The PWC investment proposal also noted that because the five portfolios assumed that a typical yield curve, i.e., when longer-term investments out-perform shorter-term investments, "observed during the period of 1926-1973 would prevail, it is not surprising that the dominant portfolios (earning the greatest return for least risk) contained a substantially larger proportion of longer-term securities than we have observed in the BIA portfolios."

AINB and Lehman submitted their joint investment proposal to the government on October 30, 1984 and "jointly" proposed "to organize, manage, and administer a mutual fund to serve as an alternative investment vehicle for the American Indian Tribal Trust Funds." Unlike PWC, AINB and Lehman did not present a review of the BIA's past investment of the Indian trust fund in its joint investment proposal, nor commented on whether the BIA had obtained "excellent" investment results in the past. AINB and Lehman proposed that the Department of the Interior's tribal trust funds, depending on the cash flow needs of a particular tribe, be invested in one of two portfolios. The first proposed portfolio was a money market portfolio "invested in money market instruments with maturities not exceeding one year." The second proposed portfolio was "an intermediate-term portfolio invested in obligations with maturities not to exceed five years. Such maturities typically have higher yields than money market instruments."

Security Pacific discussed its investment recommendations with the government during an investment meeting in San Diego, California from December 7-8, 1989, and its recommendations were memorialized in a BIA memorandum dated January 17, 1990. The BIA memorandum did not discuss whether Security Pacific had conducted a review of the BIA's past investment of the Indian trust fund in its investment proposal, nor did the BIA memorandum comment on whether Security Pacific believed that the BIA's investment of the Indian trust fund was "excellent," as PWC had concluded in its investment proposal. Security Pacific recommended that the BIA pool together and invest the largest twenty-five tribal trust funds as follows: 48% of the funds in short-term securities, 38% of the funds in intermediate-term securities, and 14% of the funds in long-term securities.[8] Security Pacific recommended that the BIA pool together and invest the remaining tribal trust funds as follows: 61% in short-term securities, 29% in intermediate-term securities, and 10% in long-term securities.

The BIA memorandum memorializing Security Pacific's investment recommendations did not state whether plaintiffs' 326-K Fund was one of the tribal trust funds considered by Security Pacific. According to the trial testimony of defendant's damages expert, Justin Mclean, plaintiffs' 326-K Fund would have been among one of the largest twenty-five tribal trust funds pooled together and invested in Security Pacific's proposed portfolio. The 326-A-1 and 326-A-3 Funds, the other two trust funds at issue in

---

[8] The Security Pacific proposal did not define what maturities would constitute a "short-term" security, an "intermediate" security, or a "long-term" security.

this case, were not yet in existence at the time that Security Pacific made its recommendations to the BIA.

In 1990, the Office of Trust Funds Management was established within the BIA at the Department of the Interior. The Office of Trust Funds Management consolidated the accounting and investment functions managing and governing tribal trust funds. As both parties' liability experts testified during trial in the above-captioned case, during the early 1990s, the Department of the Interior transitioned from its program of pooling together and investing tribal trust funds in short-term jumbo CDs to primarily investing tribal trust funds into other securities with varying maturities, such as agency and Treasury securities. Plaintiffs' liability expert, Mr. Nunes, testified at trial that around the early 1990s, the BIA made "a wholesale transition away from the CD program, which ultimately went away completely, and monies now were being invested in agency securities, mortgage-backeds, callable bonds, and things like that." Defendant's liability expert, Dr. Starks, testified at trial that "[a]fter about [19]91," the BIA made a "programmatic" switch from investing tribal trust funds in jumbo CDs into "agency securities in particular and a little bit longer term U.S. Treasuries."

The Department of the Interior's shift from CDs was reflected in the October 1, 1992 edition of the Office of Trust Funds Management's quarterly journal "TRUST," introduced at trial in the above-captioned by both parties as a joint exhibit. (capitalization in original). According to the October 1, 1992 journal, the Branch of Investments Chief at the Department of the Interior, Fred Kellerup, "got OTFM [Office of Trust Funds Management] on the right road four years ago [in 1988] when the trust funds investment portfolio began its transformation from CD's to government securities." Mr. Kellerup provided the following advice to tribes in the October 1, 1992 journal: "*Stay away from the long bond. There's no need for tribes to invest beyond 15 years. You're too far out if interest rates turn around. Shorten up on the maturity. Even if you have cash flow needs, go for the three-to-seven year government securities. Avoid the one-year CDs.*" (emphasis in original).

Also, during the early 1990s, Congress investigated BIA's management and investment of the Indian trust fund, comprised of tribal trust funds, such as the three tribal trust funds at issue in the above-captioned case, and the IIM trust fund. The Congressional Committee on Government Operations published the results of the investigation in an April 1, 1992 report, titled "MISPLACED TRUST: THE BUREAU OF INDIAN AFFAIRS' MISMANAGEMENT OF THE INDIAN TRUST FUND," (1992 Congressional Report) introduced at trial in the above-captioned case by both parties as a joint exhibit. (capitalization in original). The 1992 Congressional Report explained that the IIM trust fund is "a deposit fund, usually not voluntary, for individual participants and tribes." The Department of the Interior's investment of the IIM trust fund is not at issue in the above-captioned case. The 1992 Congressional Report also explained that as of April 1, 1992, "the BIA is responsible for managing and investing almost $2 billion in tribal and individual Indian funds."

The 1992 Congressional Report summarized the BIA's duty to Indian tribes as a "fiduciary duty to 'maximize the trust income by prudent investment.'" (quoting <u>Cheyenne-Arapaho Tribes v. United States</u>, 206 Ct. Cl. 340, 348, 512 F.2d 1390, 1394 (1975) (<u>Cheyenne-Arapaho</u>)). The 1992 Congressional Report explained that "[t]his responsibility requires the Government to stay well-informed about the rates of return and investment opportunities and to intelligently choose from among authorized investment opportunities to obtain the highest rate of return to make the trust funds productive." The 1992 Congressional Report noted that "the Bureau's fiduciary responsibilities are not dissimilar to the duties performed by many private trustees" and that:

> To fulfill these important obligations it is necessary for the agency to fully understand both its fiduciary duties and the financial marketplace. Stated simply these fundamental assignments are: To accurately account to the beneficiary; to make accounts productive for the beneficiaries; and to maximize the trust income through prudent investment. To successfully perform these tasks, the Bureau of Indian Affairs, as any fiduciary, must conduct itself as a sophisticated investor, a smart shopper, and a highly diligent and resourceful manager.

Upon review of the BIA's investment of Indian trust fund, the 1992 Congressional Report found that the BIA had "longstanding financial management problems in its administration of the Indian trust fund," primarily due to a failure to "accurately account for trust fund moneys." The 1992 Congressional Report explained that:

> Indeed, it [BIA] cannot even provide accountholders with meaningful periodic statements on their account balances. It cannot consistently and prudently invest trust funds and pay interest to accountholders. It does not have consistent written policies or procedures that cover all of its trust fund accounting practices. Under the management of the Bureau of Indian Affairs, the Indian trust fund is equivalent to a bank that doesn't know how much money it has.

Notably, the plaintiffs in the above-captioned case do not allege that defendant breached its fiduciary duty by failing to keep accurate records of the plaintiffs' tribal trust funds or that the defendant failed to provide plaintiffs with periodic account statements. Plaintiffs, instead, argued that the defendant invested their three tribal trust funds in too short-term securities, and, thus, did not maximize the investment return on their tribal trust funds.

Subsequently, Congress passed the American Indian Trust Fund Management Reform Act, Pub. L. No. 103-412, 108 Stat. 4239 (1994) (1994 Trust Fund Management Reform Act), which created the Office of the Special Trustee for American Indians (Office of the Special Trustee) within the Department of the Interior, to be headed by the Special Trustee. <u>See</u> 1994 Trust Fund Management Reform Act, codified at 25 U.S.C. § 4001 <u>et seq.</u> According to the 1994 Trust Fund Management Reform Act, the Special Trustee was to "ensure proper and efficient discharge of the Secretary[] [of the Interior's] trust

responsibilities to Indian tribes and individual Indians." 25 U.S.C. § 4043(a)(1) (1994). The 1994 Trust Fund Management Reform Act also recognized that

> [t]he Special Trustee shall ensure that the Bureau [of Indian Affairs] establishes appropriate policies and procedures, and develops necessary systems, that will allow it-- (i) properly to account for and invest, as well as maximize, in a manner consistent with the statutory restrictions imposed on the Secretary's investment options, the return on the investment of all trust fund monies . . . .

Id. at § 4043(b)(2)(B) (1994).

The 1994 Trust Fund Management Reform Act also established a nine-member Advisory Board to assist and advise the Special Trustee with implementation of the 1994 Trust Fund Management Reform Act. In 1996, the Office of the Special Trustee, a separate office within the Department of the Interior, took over the responsibility of managing tribal trust funds from the BIA. As the parties jointly stipulate to, on September 11, 1996, the Special Trustee appointed the "OTFM Management Board" to establish an operating policy to ensure that tribal trust funds were maintained in a proper and prudent mix and maturity distribution, "represent sound extensions of credit, and are appropriate assets with regard to legal requirements and needs of the Indian beneficiaries involved." (internal quotation marks omitted). The OTFM Management Board, as both parties further jointly stipulate to in the above-captioned case, became known in April 2005 as the Office of the Special Trustee Investment Management Committee, and was sometimes referred to as the "Portfolio Review Committee," according to the trial testimony of defendant's fact witness, Mr. Robert Winter.

Mr. Winter also testified at trial that the Portfolio Review Committee is "a group of senior officials that are well versed in all of the management functions in OST [Office of the Special Trustee], that meet with the investment group to review specifics about investments for all tribal trust funds annually." Mr. Winter also testified that he became a member of the Portfolio Review Committee in 2001 and was still a member of the committee at the time of trial in the above-captioned case. As Mr. Winter explained, the Portfolio Review Committee would review the account objectives for each tribal trust fund and whether the tribal trust fund was invested in accordance with the agency's policies. According to Mr. Winter's trial testimony, if the Portfolio Review Committee disagreed with a particular investment manager's investment strategy for a specific fund, the Portfolio Review Committee had the authority to direct the investment manager to change the investment strategy.  With regard to plaintiffs' 326-K Fund, Mr. Winter noted:

> You know, each year this account came up we made sure that we asked what further information do you have or, you know, certainly knowing amongst ourselves, we definitely got news of, you know, pending legislation, legislation that's been introduced, you know, the possibilities of

that legislation passing. So this was definitely a time period[9] when there were bills being introduced which caused us to, you know, limit it to -- not limit it to, but to make those maturities around two years.

On February 7, 1997, the Office of the Special Trustee sent a memorandum, which was introduced by both parties in the above-captioned case as a joint trial exhibit, titled "OTFM POLICY MEMORANDUM NO. POL97-002" to the Office of Trust Funds Management Division's Chiefs, Area Trust Accountants, and Agency Personnel, which discussed the Office of the Special Trustee's "Investment Policy" (1997 Office of the Special Trustee Policy). (capitalization in original). The 1997 Office of the Special Trustee Policy established "the criteria by which OTFM will manage the Tribal, Individual Indian Monies, and Special Funds entrusted to it for investment." Pursuant to the 1997 Office of the Special Trustee Policy, the "investment activities of OTFM will be conducted to achieve" three primary objectives. The first objective was "Quality" of the investment portfolio, which included the "safety of principal, minimization of market risk and overall risk diversification." (capitalization and emphasis in original). The second objective was having some "Liquidity" of investments, meaning that "an adequate percentage of the portfolio should be maintained in liquid, short-term investments that could be converted to cash, if necessary, in order to meet the tribal disbursement requirements." (capitalization and emphasis in original). The last objective was the "Rate of Return" of the portfolio. (capitalization and emphasis in original). According to the 1997 Office of the Special Trustee Policy,

> [o]f major importance in all of the OTFM managed portfolios is an acceptable rate of return over the long term without compromising the other stated objectives of quality and liquidity. The specific portfolios should be structured to achieve at least a market-average rate of return throughout economic cycles, taking into account the specific tribe's risk constraints and the cash flow requirements dictated by its use and distribution plans and/or budget forecasts. Whenever possible, and consistent with risk limitations as defined herein and prudent investment principles, investment officers shall seek to augment returns above the market average rate of return.

At trial, defendant's fact witness, Mr. Winter, explained his understanding of the 1997 Office of the Special Trustee Policy's Rate of Return objective and his involvement in reviewing and updating the Office of the Special Trustee's policies throughout the late 2000s. Mr. Winter testified that he began working at the Office of the Special Trustee in 1998 and that between "2007 and 2011," he "headed up the Office of Trust Services" which oversaw the "Office of Trust Funds Investments." The Office of Trust Funds Investments, according to Mr. Winter, is "essentially the investing shop at the Office of the Special Trustee." Mr. Winter also testified that during his time at the Office of Trust Services, he was responsible for "developing investment policy and reviewing and

---

[9] According to Mr. Winter's trial testimony, the "time period" referenced was the early 2000s, when Mr. Winter joined the Portfolio Review Committee and when Congress began to once again introduce bills for the distribution of plaintiffs' three tribal trust funds.

amending investment policy" for the Office of the Special Trustee, and also to "review the past policies of the Office of the Special Trustee and even those of its predecessor, the BIA." Mr. Winter testified that his understanding of the Rate of Return objective "simply refers to, in conjunction with ensuring the quality is there and that the cash flows have been identified and that there will be adequate liquidity within the portfolio, that we should structure the remainder of the portfolio in such a manner as to achieve above-average market rates." Mr. Winter also testified that in order to obtain "above-average market rates," as required by the Rate of Return objective contained within the 1997 Office of the Special Trustee Policy, it was his understanding that "we need to do adequate analysis of the cash flows in order to ensure that we obtain the highest rates for the maturities that we select in order to maintain those proper flows." Mr. Winter testified that the cash flow analysis differs with respect to different tribal accounts. Mr. Winter testified that regarding a cash flow analysis for a judgment fund, "where it's 100 percent per capita payout," like plaintiffs' 326-K Fund at issue in the above-captioned case, "then really all you need to know is the distribution date." When asked by defendant's counsel at trial what the effect of an uncertain timeline for the distribution of a particular judgment fund would have on the Office of the Special Trustee's cash flow analysis, Mr. Winter responded that, "[w]ell, we certainly try to obtain the most accurate data we can about a particular distribution date if there's not one already stated, and, you know, we try to base our maturity schedule on the earliest available date that that fund might be paid out."

The 1997 Office of the Special Trustee Policy also listed "**ACCEPTABLE PORTFOLIO INVESTMENTS AND PRACTICES**," which explained, among other practices, the Office of the Special Trustee's "'Holding' versus 'Trading'" practice. (capitalization and emphasis in original). According to the section of the 1997 Office of the Special Trustee Policy discussing "Holding versus Trading,"

> OTFM intends to manage its Indian trust portfolios in a manner that protects the integrity of the primary function of the portfolio, which is to provide maximum income for the tribes while conforming to prescribed statutory limitations and prudent fiduciary investment principles.
>
> Because OTFM has a small number of investment managers responsible for the investment management of over 1450 separate portfolios, OTFM will purchase securities with the intent to hold each security until maturity, while realizing that sales can and may occur prior to maturity form some of the following reasons:
>
> 1. When account review presents obvious opportunity for portfolio enhancement from the reinvestment of sales proceeds into comparable maturities thereby improving yield or quality without adversely affecting overall quality, mix or maturity of the investment portfolio.
> 2. The need to improve or increase portfolio liquidity.
> 3. The need to invest the proceeds of a security maturing within one year because of an interest-rate scenario that

> would be detrimental to the performance of the portfolio if held to maturity before investing, i.e., a rapidly falling interest rate period.
> 4. A reduced credit rating of the issuing Agency renders the security to be of less than acceptable quality to remain in the portfolio.

The 1997 Office of the Special Trustee's "Holding versus Trading" section also noted that "[i]nfrequent investment portfolio restructuring carried out in conjunction with a prudent overall risk-management plan that does not result in a pattern of gains being taken and losses deferred will generally be viewed as an acceptable practice within the context of an investment portfolio." According to the trial testimony of defendant's fact witness, Mr. Winter, the 1997 Office of the Special Trustee's "Holding versus Trading" practice meant that,

> that we need to purchase securities with the intent and ability to hold to maturity; and that, secondly, we're permitted infrequent investment restructuring if the market conditions present themselves as such, but we can't be doing so by establishing a pattern of buying and selling, reaping gains and losses on any sort of frequency.

According to Mr. Winter, the 1997 Office of the Special Trustee Policy was the "first formal policy adopted by the Office of the Special Trustee." Mr. Winter testified at trial that the Office of the Special Trustee issued amendments to the 1997 Office of the Special Trustee Policy in 1999, 2000, and 2005, but that these policy amendments, apart from extending the maturity limits of certain government-backed securities from an "average life" of ten to fifteen years, were not "material" changes to the 1997 Office of the Special Trust Policy. Moreover, Mr. Winter testified that the 2005 policy amendment was the policy in place up until the distribution of the 326-K Fund.

## III. The investment market for bonds from the early 1950s to 2013

The parties agree that between the early 1950s up until 1979, the beginning of the period at issue in the above-captioned case, interest rates on bonds steadily increased, and that there was an inverted "yield curve." A "yield curve" displays the relationship between a bond's yield and maturity. An inverted yield curve occurs when shorter-term securities are experiencing higher yields than longer-term securities. For example, according to Exhibit 6 to defendant's damages expert report by Dr. Alexander, beginning around 1958, the 5-year Treasury bond achieved higher returns than the 7-year Treasury bond or the 20-year Treasury bond, and such was the case until 1979. Plaintiffs did not contest the accuracy of Exhibit 6 to defendant's damages expert report.

From December 1979 until 1981, the first three years of the period at issue in the above-captioned case, interest rates on bonds continued to increase and the yield curve remained inverted. As defendant's liability expert, Dr. Starks, testified at trial, the "peak of interest rates from between 1950 and 2012" occurred in September 1981. Following the

September 1981 interest rate peak until September 2013, the end of the period at issue, the parties agree that the interest rates generally decreased and that bond prices steadily increased. The parties also agree that following the September 1981 interest rate peak, but for a few short-lived periods, the yield curve was upward sloping until 2013, the end of the investment period at issue. An upward sloping yield curve means that longer-term securities experience higher returns than shorter-term securities.

The parties agree that, the despite the inverted yield curve between the 1950s and 1981, the yield curve for fixed-income securities is typically upward sloping. Plaintiffs' expert report by Rocky Hill Advisors noted that a "2007 study of the past 80 years found that in 72 of those years (90% of the time) the yield curve was upward sloping and that, on average over all of those years, long-term Treasury bonds[10] tended to yield about 1-1/2% more than short-term Treasury bills." Defendant did not contest the validity of the 2007 study cited to by plaintiffs in their liability expert report. Plaintiffs' Rocky Hill Advisors' expert report also noted:

> Generally, the longer the maturity of a fixed-income investment, the higher will be its coupon interest rate (the contract rate of interest) and potential return. This is because investors perceive higher risk the further out in time an investment extends, thus they demand higher returns to compensate for the additional risk. Although there are periods where this relationship inverts (that is, interest rates on shorter-term investments exceed those on longer-term investments), the frequency and duration of such events is de minimis when compared to the norm.

(footnote omitted). Defendant's damages expert report, prepared by Dr. Gordon Alexander, similarly noted that the yield curve is normally upward sloping, stating that "[g]iven the fact that the yield curve is generally upward sloping, the practical result of this observation would be to invest primarily in long maturities when monies are expected to remain invested for longer periods."

Plaintiffs' expert report by Rocky Hill Advisors provided a hypothetical which illustrated that longer-term investments generally would have out-performed shorter-term investments during the thirty-three-year period at issue in this case. According plaintiffs' expert report by Rocky Hill Advisors, if an investor were to have invested $1,000.00 in three separate portfolios beginning in December 1, 1979, the starting month of the relevant time period in the above-captioned case, and have left that $1,000.00 fully invested through September 30, 2013, the end date of the relevant period in this case, the portfolio with the longest-term securities would have achieved the highest rate return. The three portfolios from the hypothetical are as follows:

---

[10] Plaintiffs' liability expert report does not define what maturities of Treasury securities would be considered "long-term Treasury bonds."

&bull; Portfolio 1 in a short-term (i.e., an average maturity of about 3 years) basket of Treasury securities represented by the Barclays 1-5 Year U.S. Treasury Index;

&bull; Portfolio 2 in an intermediate-term (i.e., an average maturity of about 7.5 years) basket of Treasury securities represented by the Barclays U.S. Treasury Index; and

&bull; Portfolio 3 in a long-term (i.e., an average maturity of 20+ years) basket of Treasury securities represented by the Barclays Long-Term U.S. Treasury Index.

According to the hypothetical, the $1,000.00 in Portfolio 1, the short-term portfolio, would have grown to $10,154.94 by September 30, 2013. The $1,000.00 in Portfolio 2, the intermediate-term portfolio, would have grown to $13,720.07 by September 30, 2013. The $1,000.00 in Portfolio 3, the long-term portfolio, would have grown to $20,868.30 by September 30, 2013.

Defendant's damages expert report by Dr. Alexander referred to a hypothetical similar to the hypothetical included in plaintiffs' expert report by Rocky Hill Advisors. Defendant's damages expert report looked at three $1,000.00 portfolios from 1979 to 2013. The first portfolio was invested in 5-year Treasury bonds, the second portfolio was invested in 7-year Treasury bonds, and the third portfolio was invested in 20-year Treasury bonds. The $1,000.00 invested in 5-year Treasury bonds grew the least, to approximately $14,000.00. The $1,000.00 invested in 7-year Treasury bonds grew to approximately $15,500.00. The $1,000.00 invested in the 20-year Treasury bonds grew the most, to approximately $21,000.00.

Additionally, plaintiffs' rebuttal expert witness, Dr. Goldstein, illustrated in his rebuttal expert report that, with regard to the 326-K Fund, a "simple buy-and-hold strategy that invested" plaintiffs' 326-K Fund "in 10-year U.S. Treasuries," from 1979, when the 326-K Fund was deposited into the United States Treasury, through 2004, when Congress passed the distribution plan legislation for plaintiffs' tribal trust funds, and "then rolling [the 326-K Fund] into 1-year U.S. Treasuries," from 2005 until 2013, the end of the period at issue, the government would have experienced higher returns than what it actually achieved. According to Dr. Goldstein's calculations, "had the BIA simply followed a mechanical strategy of investing in 10-year U.S. Treasuries, it would have ended the period with an additional $72 million above what it did under its chosen strategy." Dr. Goldstein did the same exercise "with 20-year U.S. Treasuries" and "[u]nder this simple strategy, the WSIG [Western Shoshone Identifiable Group] account would have held an additional $179 million." Dr. Goldstein noted in his report that "I stress that these are not damages estimates, which I have not been asked to provide. The figures are just a clear way to illustrate the benefits of locking in typically higher long-term rates over the relevant period."

## IV.    The Department of the Interior's investment of the 326-K Fund

The period at issue regarding the government's investment of the 326-K Fund was from December 19, 1979, the date on which the ICC's initial award payment of $26,145.189.89 was deposited into the United States Treasury, until September 30, 2013, the last date for which the Trust Account Database (TAD), the government's electronic account database, reported account information for the 326-K Fund. According to the trial testimony of plaintiffs' liability expert, Mr. Nunes, the TAD is "a compilation of several sub-databases that include information regarding the different accounting systems the Government had and the coding that they used to identify, you know, what a transaction was. It includes from 1972 -- from July 1, 1972, forward" a "compendium of all the transactions that went through an account, and then there's a lot of descriptive and other data that's in there as well." Mr. Nunes also testified at trial that the government provided plaintiffs with access to the TAD for plaintiffs' three tribal trust funds for the period at issue, December 1979 through September 2013. Both of the parties' liability experts relied on the TAD when re-constructing the investment performance of plaintiffs' 326-K Fund between December 1979 and September 2013 in their respective liability expert reports and damages expert reports. Both parties do not contest the data reflected in the TAD for the 326-K, 326-A-1, and 326-A-3 Funds.

The initial amount of the 326-K Fund, when deposited in the United States Treasury on December 19, 1979, was $26,145,189.89. Before the first distribution payment of the 326-K Fund was issued in 2011 to 3,187 individuals, the 326-K Fund balance had grown to approximately $183,794,000.00. According to defendant's opening statement at trial, between December 1979 until the first distribution of the 326-K Fund in 2011, the 326-K Fund experienced an average annual return of 6.8%, the accuracy of which plaintiffs did not contest. The final distribution payments of the 326-K Fund were made on September 29, 2012 and October 2, 2012. As of September 2013, the last date for which data was available regarding the government's investment of the 326-K Fund, a residual amount of approximately $36,000.00 remained in trust by the government. Plaintiffs' counsel explained at the trial closing argument that plaintiffs are not seeking to recover the residual amount of $36,000.00 in the above-captioned case. Plaintiffs' counsel did not clarify why $36,000.00 remained in the government's account. Plaintiffs' counsel at closing argument stated that a potential reason for the residual amount left in trust with the government was because "maybe you haven't identified a recipient or there's been some glitch, something like that."

As previously indicated, the parties primarily disagree as to whether the government invested the 326-K Fund in too short-term securities, and, thus, potentially did not maximize the returns for the 326-K Fund. Plaintiffs do not allege that the government misappropriated funds from the plaintiffs or that the government invested the 326-K Fund in securities prohibited by law or regulation.

The maturity structure of the 326-K Fund

In their liability expert reports, and at trial, both parties discussed the "average weighted maturity" of the 326-K Fund. According to the trial testimony of defendant's liability expert, Dr. Starks, the "average weighted maturity" is based on the maturity of all the securities in which the 326-K Fund was invested in at a given time. Dr. Starks testified that the maturity is then viewed as a "weighted average" based on the "value" that the securities "are in their  portfolio, so that if you have an investment that's very short term and is, you know, 50 percent of the portfolio, then it's going to be lower overall and vice versa." Plaintiffs argued that the average weighted maturity of the 326-K Fund throughout the thirty-three-year period at issue was too short- term, and, therefore, the 326-K Fund was imprudently invested. Defendant argued to the contrary.

At trial, the parties discussed three different methods for analyzing the average weighted maturity of the 326-K Fund. The first method calculated the average weighted maturity of the 326-K Fund based on the securities' stated years to maturity. For example, a ten-year bond has a stated ten-year maturity. The second method calculated the average weighted maturity of the 326-K Fund based on the securities' "years to call," which uses the call date of callable securities in which the government invested the 326-K Fund. According to the trial testimony of plaintiffs' liability expert, Mr. Nunes, a callable security is a security for which the issuer retains the right to call the security back before maturity by a specific "call" date. Therefore, if an issuer exercises its right call back a ten-year callable bond after five years following its issuance, then the ten-year bond's maturity would be five years. The parties' liability experts agreed in their respective expert reports that the government began to invest the 326-K Fund in callable securities beginning in the early 1990s. According to the trial testimony of plaintiffs' liability expert, Mr. Nunes, approximately 85% of the callable securities in which the 326-K Fund was invested were called back, which defendant did not contest. Even though only approximately 85% of the callable securities chosen by the government for the 326-K Fund were called back, both of the parties' liability experts appear to use the call dates for all callable securities in which the government invested the 326-K Fund when calculating the average weighted maturity based on years to call.

The third method discussed by the parties based the average weighted maturity of the 326-K Fund on the call dates of the callable securities and made an adjustment for the prepayment of mortgage-backed securities. Mortgage-backed securities, as explained in plaintiffs' rebuttal expert report by Dr. Goldstein,

> are asset backed securities backed by mortgages and include pass-through securities (such as those from GNMA [Government National Mortgage Association], FNMA [Federal National Mortgage Association], and FHLMC [Federal Home Loan Mortgage Corporation]) and Collateralized Mortgage Obligations ("CMOs"). Pass-through securities such as those from GNMA, FNMA, and FHLMC differ from normal bonds in that the principal value of the bond is amortized and thus paid off over time, rather than just at the time of maturity, so that each payment over the life of the mortgage-backed

security contains some principal repayment. As such, the stated maturity of pass-through securities is not representative of the expected, or average, life of the investment. Some mortgage-backed securities, such as CMOs, are often also divided into tranches, each with a different level of risk. Higher tranches (such as tranche A) have their principal paid back first, whereas later tranches have to wait longer hence have a longer expected life.

(footnotes omitted). According to plaintiffs' rebuttal expert report, "in the 1990s," the government invested the 326-K Fund "into mortgage backed securities where the average or expected life is notably shorter than the stated maturity. As a result, the actual weighted maturity of the fund," even "after considering the impact of callable bonds," would be "overstated" if not adjusted for the pre-payment of various mortgage-backed securities. Similar to plaintiffs' rebuttal expert report regarding the government's use of mortgage-backed securities, defendant's liability expert, Dr. Starks, testified at trial that the government began investing in mortgage-backed securities during the early 1990s, and that, "what's important about mortgage-backed securities is, especially in a falling interest rate environment, people refinance their homes, and so -- so you -- you usually don't get the maturity you think you're going to get because it can be paid off early."

Although the parties discussed the pre-payment mortgage issue, neither party presented at trial, or, in their expert reports, an accurate and complete calculation of the average weighted maturity of the 326-K Fund taking into account the pre-payment issue. Defendant's liability expert, Dr. Starks, presented at trial her attempt to account for the pre-payment issue in defendant's Demonstrative Exhibit 10,[11] a line graph depicting the 326-K Fund's average weighted maturity based on (1) the stated maturity, (2) years to call, and (3) years to call with an adjustment for the pre-payment issue. Dr. Starks, however, admitted at trial that her attempt was not the most accurate because she "throws out the mortgage-backed securities because of the prepayment issue" from her calculations, and, thus, undercalculates the average weighted maturity of the 326-K Fund. Plaintiffs did not present at trial any calculation of the average weighted maturity of the 326-K Fund which accounted for the pre-payment issue.

When analyzing the average weighted maturity of the 326-K Fund, the court will rely on the average weighted maturity based on the years to call. This method, as both parties agreed, more accurately depicts the maturity structure of the 326-K Fund than the average weighted maturity based on the stated years of maturity. As plaintiffs' counsel noted at closing argument, "Dr. Starks [defendant's liability expert] and Mr. Nunes [plaintiffs' liability expert] agree[]" that "the stated years to maturity was not as accurate when you're dealing with callable bonds, because it was more accurate to use the call date." Dr. Starks, defendant's liability expert, testified at trial that only considering the stated years to maturity of the 326-K Fund would make the 326-K Fund maturity structure appear a "little too long," because the government had invested in callable bonds that were called back before maturity. Mr. Nunes, plaintiffs' liability expert, similarly testified at

---

[11] Both parties' counsel used various demonstrative exhibits throughout trial, which were all introduced and accepted into the trial record.

trial that relying only on the stated years to maturity when calculating the average weighted maturity of the 326-K Fund, "actually makes the portfolio look like it has a longer structure than it actually does" because "almost entirely" all of the government's callable bonds were called back. The court is aware that the average weighted maturity based only on years to call does not take into account the pre-payment of the mortgage-backed securities. The record before the court, however, does not contain an accurate depiction of the weighted average maturity, taking into account the pre-payment issue of mortgage-backed-securities for the 326-K Fund, and the actual calculations to analyze the performance of the 326-K Fund, taking into account the pre-payment issue, remain somewhat elusive and speculative.

According to both parties' liability expert reports, which relied on the government's data from the TAD, beginning in December 1979 to approximately December 1991, the average weighted maturity years to call of the 326-K Fund never exceeded two years, and during most of this period, the average weighted maturity was one year or less. Beginning in December 1991 until September 1993, the average weighted maturity years to call increased, reaching a peak of a little less than ten years. Following this peak in September 1993, until May 2002, the average weighted maturity years to call steadily decreased, reaching a low of approximately less than one year in May 2002. Then, from June 2002 until approximately early-2008, the average weighted maturity years to call fluctuated between a less than one year and slightly more than two years. Beginning around mid-2008 until December 2010, the average weighted maturity years to call fluctuated, starting around two and a half years, increasing to almost three years, and then dropping back down to approximately one year. Beginning in early-2011, when the government began to distribute the 326-K Fund to qualifying members of Western Shoshone tribes, the government effectively liquidated the 326-K Fund such that the average weighted maturity years to call decreased to an all-time low of almost zero years of maturity and flatlined at almost zero years of maturity until September 2013, the end of the time period at issue.

As a visual aid of the 326-K Fund's average maturity structure throughout the thirty-three-year period at issue, defendant's Demonstrative Exhibit 10, which was introduced at trial during defendant's direct examination of defendant's liability expert, Dr. Starks, and used by plaintiffs' counsel during their cross-examination of Dr. Starks, is displayed below. Defendant's Demonstrative Exhibit 10 is titled "Maturity of WSJF [Western Shoshone Judgment Funds][12] portfolio varies over time" and contains three separate lines. The top most line, which was colored gray, displays the average weighted maturity of the 326-K Fund based on the stated years to maturity. The middle line, which was colored a light blue, depicts the average weighted maturity of the 326-K Fund, based on the call dates of the securities, and is the line which the court looks to in this Opinion. The

---

[12] As the Western Shoshone Claims Distribution Act, Pub. L. No. 108-270, 118 Stat. 805 (2004) (the Claims Distribution Act of 2004), the act which created the distribution mechanism for the three funds at issue, states, the "Western Shoshone Judgment Funds" refers to the 326-K Fund. The "Western Shoshone Joint Judgment Funds" refers to the 326-A-1 and 326-A-3 Funds.

bottom line, which was colored dark blue, displays the average weighted maturity of the 326-K Fund, based on the call dates of the securities and which did not include any mortgage-backed securities in order to account for the mortgage-backed security prepayment issue. As previously discussed, defendant's attempt to account for the pre-payment issue in Demonstrative Exhibit 10 would distort the average weighted maturity of the 326-K Fund and is not considered by this court. At trial, plaintiffs did not contest Demonstrative Exhibit 10's representation of the average weighted maturity of the 326-K Fund based on the stated years to maturity, which was colored gray in Demonstrative Exhibit 10, or the years to call, which was colored light blue in Demonstrative Exhibit 10.[13] In addition, both parties agree that the years to call, the middle line, which was colored a light blue, is a more accurate indicator than the years to maturity, the top line, which was colored gray.[14]

---

[13] Plaintiffs contested Demonstrative Exhibit 10's depiction of the average weighted maturity of the 326-K Fund that was adjusted to account for the pre-payment issue, which was colored dark blue.

[14] Demonstrative Exhibit 10 displays only one line between December 1979 and December 1991. This is because, as defendant's liability expert, Dr. Starks, testified to at trial, the 326-K Fund was not invested in any callable bond or mortgage-backed securities during this time, and, therefore, the average weighted maturity of the fund was the same whether one considered the years to maturity, the years to call, or whether there was any adjustment made for the pre-payment of mortgages.

# Maturity of WSJF portfolio varies over time



The types of securities in which the government invested the 326-K Fund

According to both parties' liability expert reports, which relied on the government data in the TAD, from 1979 to 1989, the government invested the 326-K Fund almost solely in jumbo CDs, with a small portion of the 326-K Fund invested in agency, Treasury, and "overnight" securities. According to the trial testimony of Mr. Winter, one of defendant's fact witnesses and director of Trust Operations at the Office of the Special Trustee at the Department of the Interior, overnight securities are highly "liquid" "one-day" securities that are invested and redeemed "the very next day." In the early 1990s, although the government continued to invest a portion of the 326-K Fund in CDs, the government began investing the 326-K Fund in a combination of agency securities, Treasury securities, mortgage-backed securities, and overnight securities. Some of the securities selected by the government beginning in 1991 were callable securities. Notably, by June of 1995, the government was no longer investing any of the 326-K Fund in CDs. From June 1995 until July 2011, the government invested the 326-K Fund in a mixture of agency securities, Treasury securities, mortgage-backed securities, non-government securities, and overnight securities. Beginning in August 2011, the government invested the 326-K Fund solely in overnight securities.

## V.   The Department of the Interior's investment of the 326-A-1 and 326-A-3 Funds

The investment period at issue for the 326-A-1 Fund was from March 25, 1992, when the judgment award of $823,752.64 was deposited into the United States Treasury, until September 30, 2013. The investment period at issue for the 326-A-3 Fund was from September 15, 1995, when the judgment award of $29,396.60 was deposited into the United States Treasury, until September 30, 2013, the last date for which the TAD, the government's electronic account database, reported account information for the 326-A Funds. The government did not co-mingle the 326-A-1 Fund with the 326-A-3 Fund and kept them in separate investment accounts. As discussed in more detail below, defendant did not present any evidence at trial regarding the 326-A-1 and 326-A-3 Funds because, according to defendant, plaintiffs do not have standing to assert a breach of trust with regard to the 326-A-1 and 326-A-3 Funds. Throughout trial and in post-trial briefing, plaintiffs' counsel, and plaintiffs' experts, Mr. Nunes and Dr. Goldstein, referred to the 326-A-1 and 326-A-3 Funds together as the "326-A Funds." Thus, for purposes of this Opinion, the court will discuss the investment performance of the 326-A-1 and 326-A-3 Funds together. By September 30, 2013, according to the TAD, the balance of the 326-A-1 and 326-A-3 Funds had grown to a total of $2,022,891.50.

The maturity structure of the 326-A-1 and 326-A-3 Funds

The only party to present evidence at trial regarding the maturity structure of the 326-A-1 and 326-A-3 Funds were plaintiffs, who based their maturity calculations from data from the TAD. At trial, plaintiffs' liability expert, Mr. Nunes, testified that, as with the 326-K Fund, the government called back approximately 85% of the callable bonds in which the 326-A-1 and 326-A-3 Funds were invested. As with the 326-K Fund, Mr. Nunes

28

also testified at trial that the average weighted maturity of the 326-A Funds, based on the years to call, more accurately displays the maturity structure of these two funds than the average weighted maturity based on the stated years to maturity. For purpose of this Opinion, when discussing the maturity structure of the 326-A-1 and 326-A-3 Funds, the court, therefore, refers to the average weighted maturity years to call.[15]

Between the deposit dates for the 326-A-1 Fund, which occurred on March 25, 1992, and the 326-A-3 Fund, which occurred on September 15, 1995, and August 1999, the average weighted maturity years to call for the 326-A-1 and 326-A-3 Funds was approximately three years or less. Then, around September 1999, the average weighted maturity years to call for the 326-A-1 and 326-A-3 Funds spiked to approximately six years. The 1999 spike in maturity was relatively short-lived. The average weighted maturity years to call of the 326-A Funds fluctuated between five and seven years until September of 2001, when the average weighted maturity years to call for both A Funds decreased to less than one year. For the next eight years, from October 2001 to February 2009, the average weighted maturity years to call for both A Funds did not exceed three years. Around March 2009, the average weighted maturity years to call for the 326-A-1 and 326-A-3 Funds spiked to a high of approximately ten years and then immediately began to decrease, reaching an average weighted maturity years to call of five years by August 2009. Between September 2009 to February 2012, the average weighted maturity years to call for the 326-A-1 and 326-A-3 Funds fluctuated between approximately five and eight years. Around February 2012, the average weighted maturity years to call for the 326-A-1 and 326-A-3 Funds, increased to fourteen years and began to decrease around December 2012, reaching an average weighted maturity years to call of eleven years. The average weighted maturity years to call for the 326-A-1 and 326-A-3 Funds remained at approximately eleven years until September 2013, the end of the time period in question.

As a visual aid of the 326-A-1 and 326-A-3 Funds' maturity structure throughout the twenty-one-year period at issue, plaintiffs' Demonstrative Exhibit 14, introduced at trial, is displayed below. Plaintiffs' Demonstrative Exhibit 14 contains two separate lines. The top line of the graph, which was colored blue, depicts the average weighted maturity based on the stated years of maturity. The bottom line of the graph, which was colored red, displays the average weighted maturity for the 326-A-1 and 326-A-3 Funds, taking into account the call dates for the callable securities and is the line which the court looks to in this Opinion. Defendant did not contest plaintiffs' representation of the average weighted maturity of the 326-A Funds contained in plaintiffs' Demonstrative Exhibit 14.

---

[15] As with the 326-K Fund, the record before the court does not contain data regarding the average weighted maturity of the 326-A Funds accounting for the pre-payment of mortgage-backed securities.



The types of securities in which the government invested the 326-A-1 and 326-A-3 Funds

According to plaintiffs' expert liability and damages report by Rocky Hill Advisors, which relied on the TAD, beginning from August 1992, when the government began to invest the 326-A-1 Fund, until March 1993, the government invested the entire 326-A-1 Fund in jumbo CDs. Around March 1993, the government began to diversify its investment of the 326-A-1 Fund by decreasing its investment in jumbo CDs and increasing its investment in agency securities. Then, from 1995, when the 326-A-3 Fund was deposited into the United States Treasury, until 2011, the government invested both the 326-A-1 and 326-A-3 Funds primarily in agency securities with a small portion of the funds invested in overnight securities and Treasury securities. From 2012 until September 2013, the government invested the 326-A-1 and 326-A-3 Funds in a mix of agency securities, mortgage-backed securities, and overnight securities.

## VI.    The distribution of the 326-K, 326-A-1 and 326-A-3 Funds

The following facts leading up to distribution of the funds at issue are relevant to plaintiffs' breach of trust claim. In 1973, even before the ICC entered its judgment in Docket 326-K, the BIA was aware that the distribution of any potential judgment award to the plaintiffs would require advance planning. According to a February 15, 1973 internal memorandum, the BIA stated that:

> [A]lthough the Western Shoshone case as of October 11, 1972 has only reached the interlocutory stage, it is mandatory that planning begin now in terms of the identification of beneficiaries, the disposition of the funds and the dissemination of useful information to interested groups and individuals. We are aware that the award of $26,154,600, subject to allowable offsets, may be appealed by either or both parties, but we are in full agreement with the Agency and the Western Shoshone Claims Committee that early attention to this case is necessary if we hope to avoid the confusion and the very time consuming problems encountered with the rather similar Northern Paiute judgment.

Mr. Nunes, plaintiffs' liability expert, testified at trial that the distribution of the Northern Paiute judgment, which was referenced by the BIA in its February 15, 1973 internal memorandum, had taken approximately sixteen years to execute.

Shortly following the deposit of the 326-K Fund into the United States Treasury, the BIA put together a research memorandum about the Western Shoshone. According to the research memorandum, dated March 11, 1980, there a was a significant element of the Western Shoshone who, "[f]or many years," opposed any monetary award on the Western Shoshone Identifiable Group's case on Docket No. 326-K, which was litigated before the ICC regarding the Western Shoshone Identifiable Group's claim for title to aboriginal lands. This faction of Western Shoshone believed that their ancestral lands in Nevada were never ceded over to the government or taken by the government. They, therefore, believed that granting of the 326-K award "would deprive all Western Shoshone

of the land itself or at least jeopardize their claim to such land." The March 11, 1980 research memorandum also recognized that "[t]he Western Shoshone entities were and are extremely scattered," and that "[i]t is not possible to describe the Western Shoshone in terms of forming a tribe or group of organized tribes." Nonetheless, the March 11, 1980 memorandum identified the following entities as the Western Shoshone beneficiaries of the 326-K Fund located in Nevada:

1. Temoak Bands of Western Shoshone Indians (Elko, Battle Mountain, South Fork and. Wells)
2. Shoshone-Paiute Tribes of the Duck Valley Reservation
3. Duckwater Shoshone Tribe of the Duckwater Reservation
4. Yomba Shoshone Tribe of the Yomba Reservation
5. Ely Indian Colony
6. Reno-Sparks Indian Colony
7. Paiute-Shoshone Tribe of the Fallen Reservation and Colony
8. Fort McDermitt Pauite and Shoshone Tribes of the Fort McDermitt Indian Reservation
9. Walker River Pauite Tribe of the Walker River Reservation
10. Lovelock Paiute Tribe of the Lovelock Indian Colony

The March 11, 1980 memorandum also identified the following entities as the Western Shoshone beneficiaries of the 326-K Fund located in California:

1. Owens Valley Paiute-Shoshone Band of Indians (Bishop, Big Pine, Fort Independence and Lone Pine Reservations),
2. Death Valley Timbi-Sha Shoshone Band.

Despite the divisions of interests and different positions among the Western Shoshone, the BIA attempted to work with the Western Shoshone to submit a distribution plan to Congress for approval within the 180-day statutory timeline, as required under the Use and Distribution Act of 1973. For example, on February 23, 1980, representatives from the BIA and Western Shoshone individuals met in Elko, Nevada. At the meeting, the "Western Shoshone Planning Committee" was officially formed to elicit distribution proposals from the various tribal groups of the Western Shoshone. This committee consisted of "about 10 [individuals]" from various tribal groups with the possibility of an additional three individuals, two of whom would be from Californian Shoshone tribal groups.

The BIA's willingness to move forward with a distribution plan, however, was temporarily slowed down by the August 25, 1980 Order granting an injunction in <u>United States v. Dann</u>, Civil No. R-74-60, Order (D. Nev. Aug. 25, 1980) before the United States District Court for the District of Nevada. In <u>United States v. Dann</u>, the United States had sued Mary Dann and Carrie Dann, two sisters, who were members of an autonomous band of the Western Shoshone, for trespass, alleging that the sisters, in grazing livestock without a permit from the United States, were acting in violation of regulations issued by the Secretary of the Interior. The sisters denied that they were trespassing, affirmatively

asserted their beneficial ownership of the land, and argued that their aboriginal title to the land precluded the United States from requiring grazing permits. In United States v. Dann, Judge Thompson found that the December 6, 1979 judgment in the ICC Docket 326-K was the date that Western Shoshone's title to the Nevada land was extinguished, as opposed to July 1, 1872, the date to which both the Western Shoshone Identifiable Group and the government had stipulated was the takings date of the Western Shoshone Identifiable Group's land before the ICC in Docket 326-K. Judge Thompson also enjoined the Dann sisters from using the lands located in Nevada, which the sisters had alleged belonged to them, as a basis to allow their livestock to graze upon, without first complying with the requirements of the Taylor Grazing Act of 1934, Pub. L. 73-482. Steve Feraca, a Tribal Services Specialist for the BIA, wrote in a memorandum to the Chief of the Division of Tribal Government Services for the BIA, dated May 6, 1980:

> In view of the [April 1980 district court] Thompson decision which cites a new taking date, December 6, 1979, I said that I could not recommend that a proposal for the funds be prepared until legal advice was forthcoming from the Solicitor [of the Department of the Interior] and the Department of Justice.

On May 23, 1980, BIA reviewed the April 25, 1980 Order issued in Dann and decided to try to move forward with preparing a distribution plan. The BIA concluded that the April 25, 1980 Dann Order "in no way affects the mandate of the 1973 Indian Judgment Funds Act," and that "[w]e appreciate that it is possible to meet the statutory deadlines," for submitting a distribution plan.

On June 20, 1980, the then Department of the Interior, Acting Deputy Assistant Secretary for Indian Affairs, Ralph Reeser, made a formal request to the United States Senate Select Committee on Indian Affairs for a 90-day extension of the 180-day period to submit a distribution plan to Congress. According to Mr. Reeser's letter, "the 180-day period for the submittal of a Secretarial plan ended on June 16, 1980."

On July 26, 1980, the BIA held a public hearing for Western Shoshone members to discuss a potential distribution plan for the 326-K Fund. According to an August 1, 1980 article published in the Native Nevadan, 85 individuals testified or submitted written statements at the July 26, 1980 public hearing regarding the distribution plan for the 326-K Fund. According to the article, the majority of the individuals who testified were opposed to immediate distribution of the funds. The article stated:

> In Summary, the majority of people who testified wanted the award money to be placed in an interest-bearing account until such times as the title issue is legally resolved. Those who testified in favor of an immediate distribution favored a 100 percent per capita distribution, with the 1/4 degree eligibility requirement.

William Robert McConkie, the BIA official leading the July 26, 1980 public hearing wrote a memorandum for his files, dated August 3, 1980, regarding his experience at the

public hearing. According to Mr. McConkie, there appeared to be disagreement among those that testified regarding the distribution plan, but such disagreement was allegedly staged by three lawyers representing certain Western Shoshone groups. Mr. McConkie wrote:

> Eighty persons testified. The hearing was adjourned at 5:30 p.m. The three lawyers were quite disruptive during the proceedings. They each represented essentially the same group. The Planning Committee had no lawyer. It was the apparent purpose of the lawyers opposed to the distribution to prevent the hearing, or secondarily to control the hearing and have their people discuss the various Federal District Court suits which dealt with obtaining the land rather than the judgment from the Court of Claims. Mrs. Carrie Dan [sic] was escorted from the hall after about 6 or 7 minutes testimony by herself. She refused to limit her remarks and I directed a tribal policeman to escort her into the lobby.

On August 4, 1980, Congress denied BIA's requested 90-day extension to submit a distribution proposal for the 326-K Fund. Senator John Melcher, Chairman of the Select Committee on Indian Affairs, wrote to Ralph Reeser, Department of the Interior, Acting Deputy Assistant Secretary for Indian Affairs, on August 4, 1980, noting that "[a]s a general rule, such extensions are routinely granted upon Departmental request. However, there are several factors which weigh against granting the extension in this case," including that "a significant number of Western Shoshone people oppose acceptance of the award at this time," and that,

> [t]here is pending litigation in the case of U.S. v. Dann in the U.S. District Court for the district of Nevada in which title to certain land and the date of compensable taking are still in issue. The outcome of that case could clearly have a strong bearing on the course of action the Congress, the Department and the Western Shoshone people might wish to pursue.

(underline in original). Mr. Melcher concluded by noting that "I trust the Department will submit appropriate legislation early in the 97th Congress."

Following Congress's denial of the BIA's request for a 90-day extension on August 4, 1980, the BIA worked with the Western Shoshone to get a draft distribution plan ready to submit to Congress. Although the BIA continued to work with the Western Shoshone, the BIA was aware that actually submitting a plan to distribute the 326-K Fund to Congress would likely have to await the outcome of the Dann sisters' appeal of the August 25, 1980 District Court Order in United States v. Dann, in which Judge Thompson established a takings date of the Western Shoshone's Nevada land as December 7, 1979. See United States v. Dann, Civil No. R-74-60, Order.

On December 30, 1980, Jay Suager, the Acting Director of the Office of Indian Services at the BIA wrote to Senator Alan Cranston of California, stating:

[A] significant faction among the Western Shoshone people rejects the award and is seeking title to the land. In particular, this faction is supporting the continuance of litigation in United States v. Dann which pertains to Western Shoshone land title issues. Probably, all interested parties will have to await the outcome of the appeal in the Dann litigation.

The Secretary of the Interior, pursuant to direction of the Act of October 19, 1973, 87 Stat. 466, undertook, through the Commissioner of Indian Affairs, to prepare a plan for the distribution of the judgment funds within 180 days of the appropriation of those funds. Such plan was not completed. A request for a 90-day extension . . . was denied by the Senate Select Committee on Indian Affairs. Accordingly, under the 1973 Act authorizing legislation will be necessary before there may be any distribution of the judgment funds. That should present sufficient opportunity to address questions which may be raised by United States v. Dann.

As of August 20, 1981, approximately one year after Congress denied the BIA's 90-day extension, an internal government memorandum sent from Kenneth Payton, the BIA Acting Deputy Assistant Secretary for Indian Affairs, to the BIA Phoenix Area Director, stated:

Primarily due to the status of the Dann litigation, in which some Western Shoshone people assert title to a vast portion of Nevada, the Senate Select Committee on Indian Affairs denied an extension of the date for the submittal of a Secretarial plan. The case is on appeal. If the plaintiffs' assertions are denied, we will then propose legislation. The existence of the Dann litigation, however, does not inhibit further discussion with the eligible Western Shoshone entities on the programing potential of these funds. On the contrary, such possibilities can be thoroughly examined and proposals developed during this time. This subject was considered at previous general Western Shoshone meetings and with the individual tribes prior to the Hearing of Record of July 26, 1980.

On January 22, 1982, in an internal BIA memorandum sent from the BIA Deputy Assistant Secretary for Indian Affairs to the BIA Phoenix Area Director, the BIA Deputy Assistant Secretary stated that, "we should now begin working with the beneficiaries on the development of the legislation which will be required in this instance." The BIA Deputy Assistant Secretary also stated in the January 22, 1982 memorandum:

To be kept in mind during this process is the fact that the actual introduction of legislation may not be possible until the Dann litigation is completed. However, this should not preclude beginning the process of working with the tribes to clarify their desires with respect to programming and to initiate appropriate planning with them providing such technical assistance as requested and as resources permit.

The January 22, 1982 memorandum also amended the results of the BIA's research report, dated March 11, 1980, which had originally listed twelve beneficiary groups for the 326-K Fund, reducing the number of beneficiaries of 326-K Fund to the following four groups:

1. Te-Moak Bands of Western Shoshone Indians (which includes the Elko, Battle Mountain, South Fork and Wells bands),
2. Duckwater Shoshone Tribe of the Duckwater Reservation,
3. Yomba Shoshone Tribe of the Yomba Reservation,
4. Ely Indian Colony.

The January 22, 1982 memorandum also stated that the "remaining beneficiaries consist of all other persons of Western Shoshone ancestry, in their individual capacity, who otherwise meet the criteria detailed in the March 11, 1980, Results of Research Report."

On May 11, 1982, the BIA Phoenix Area Director held a meeting with leaders of the Te-Moak Bands, Duckwater, Yomba, and Ely Indian Colony, the four recently identified beneficiary groups of the 326-K Fund. Following the May 11, 1982 meeting, Thomas Luebben, an attorney representing the Western Shoshone Identifiable Group, wrote to the BIA Phoenix Area Office on May 25, 1982 "to confirm the understandings" reached between the Phoenix Area Office and the Western Shoshone Tribal leaders, which included, in relevant part, the leaders' request for "[a] commitment from the BIA to not begin compiling a descendancy roll in anticipation of distribution of the Western Shoshone judgment." Mr. Luebben's May 25, 1982 letter also requested from the BIA:

A commitment from the BIA that the Interior Department will not attempt to draft legislation to distribute the Western Shoshone judgment prior to an actual written agreement between representatives of the United States and a Western Shoshone negotiating team (including primarily representatives of Western Shoshone tribal governments) on an appropriate draft of proposed legislation to achieve an overall settlement of Western Shoshone land claims and provide for distribution of the judgment funds.

On June 8, 1982, the BIA Phoenix Area Director responded to Mr. Luebben's May 25, 1982 letter in writing, stating that with regard to the descendancy roll request, "[s]ince we cannot develop any kind of roll for distribution purposes without an approved plan, we have no problem agreeing to this." With regard the draft legislation request, the BIA Phoenix Area Director responded:

As far as draft legislation for the distribution of the Western Shoshone judgment, we can decide our course of action within the Area, however, we cannot make a commitment for the Central Office or the Department. We expect any legislation developed would have the direct input of the affected Tribes and individuals that have an interest in the award.

On May 19, 1983, the United States Court of Appeals for the Ninth Circuit reversed the August 25, 1980 District Court Order in United States v. Dann and remanded the case back to the District Court for further proceedings regarding "factual issues of whether aboriginal title had been preserved to the date of trial and whether the Danns are entitled to share in it." United States v. Dann, 706 F.2d 919, 923 (9th Cir. 1983) ("We reverse the judgment granting the injunction and remand for further proceedings."), rev'd, 470 U.S. 39 (1985).

According to a July 28, 1983 internal BIA memorandum, "[s]ince the recent Federal court decision regarding the Dann case is now widely known, the various entities that have an interest in the Western Shoshone Land Claim have been actively pursuing their individual interests." The memorandum further stated:

> The entities we [the BIA] are aware of are: 1. Te-moak Tribe of Western Shoshone Indians. This groups appears to have a split as to what they want. . . . 2. Western Shoshone Sacred Lands Association. . . . Their main contention is that by the Treaty of Ruby Valley, [16] they never lost land title to their aboriginal lands. The Dann decision [by the Ninth Circuit] appears to support that premise. . . . 3. Tribal Chairmen Association. . . . I believe they support land plus money concept. 4. Great Basin Western Shoshone Descendants. . . . Their main interest is a per capita distribution and have not really been supportive of the additional land issue. . . . 5. Western Shoshone Land Federation. This is the newest entity to come upon the scene, and purportedly represent all of the above entities as a unified Shoshone group. Since I am not totally aware of what has been negotiated out among themselves with all of the already described interests, I am surmising that this group supports the per capita distribution, land return and tribal program concepts. It is my understanding that it will be through this group that negotiations with Federal officials to develop a comprehensive legislative package relative to the Western Shoshone Land Claim will be conducted.

---

[16] On October 1, 1863, the United States entered into the Ruby Valley Treaty with the "Western Bands of the Shoshone Nation of Indians," which, according to the treaty, was a "Treaty of Peace and Friendship" between the United States and the western bands of Shoshone Indians. The Ruby Valley Treaty authorized non-Indians to cross the Shoshone land located in Nevada on several already established traveled routes, such as train, mail, and telegraph lines, without "molestation or injury" from the western bands of Shoshone Indians. It also granted the United States the right to establish military posts in Shoshone lands, and that such lands "may be explored and prospected for gold and silver, or other minerals." In exchange for the western bands of Shoshone Indians' "inconvenience" resulting from the use of the travel routes in their land by "white men," the United States agreed to compensate the western bands of the Shoshone Indians $5,000.00 per year for twenty years, a total of $100,000.00.

Additionally, following the Ninth Circuit's 1983 decision in United States v. Dann, the BIA notified Congress that it could not submit proposed legislation at that time. The Director of the Office of Indian Services at the BIA wrote to Congresswoman Barbara Vucanovich, who was one of Nevada's Congressional representatives at the time, noting:

> For some time we and the Congress have been awaiting a Court of Appeals decision in the Dann case, Carrie and Mary Dann having contended that the Western Shoshone still retain aboriginal title to the Nevada portion of the lands claimed. On May 19, 1983, the Court ruled that no evidence had been presented by the Government establishing that aboriginal title had been lost. We do not know whether this decision will be appealed to the Supreme Court.[17] Meanwhile, the Western Shoshone people are scheduling a series of general meetings in an effort to develop a proposal that would incorporate the distribution of the funds and the utilization of the subject lands. The situation has become, as a result of the decision, extremely confused and under the circumstances we are most reluctant to submit proposed legislation for only the monetary award.

---

[17] The Dann case was appealed to the United States Supreme Court in 1985, which found that the Western Shoshone peoples' tribal title to their aboriginal land passed to the government when the 326-K Fund was awarded to the Western Shoshones in the ICC case, Docket No. 326-K, and placed into the United States Treasury in December 1979. See United States v. Dann, 470 U.S. 39, 49-50 (1985). The Dann case returned to lower courts for further proceedings regarding whether the Dann sisters had individual aboriginal rights, as opposed to tribal rights, in the Nevada lands at issue. See id. at 50. The Dann case was appealed once more to the United States Court of Appeals for the Ninth Circuit in 1989, which ruled that the Dann sisters had limited individual title rights, "restricted" to the land that they or their lineal ancestors actually occupied prior to November 26, 1934, the date that the federal government withdrew the Nevada lands in question from entry and settlement by the public. See United States v. Dann, 873 F.2d 1189, 1199, 1200-01 (9th Cir. 1989). Following the 1989 Ninth Circuit appeal, the Dann sisters pursued their land claim in the late 1990s before the Organization of American States' Inter-American Commission on Human Rights, an international tribunal, which found, on December 27, 2002, in favor of the Dann sisters' claim for title to their Nevada lands, and made the "RECOMMENDATION[]" that the sisters be "[p]rovide[d]" with "an effective remedy, which includes adopting the legislative or other measures necessary to ensure respect for the Danns' right to property." See Mary Dann and Carrie Dann v. United States, Case 11.140, Inter-Am. Comm'n H.R., Report No. 75/02, 47 (2002) (capitalization in original). The United States government, however, did not adopt the Inter-American Commission on Human Right's December 27, 2002 recommendation. On July 7, 2004, Congress passed the Claims Distribution Act of 2004, which provided for a monetary per-capita distribution of the 326-K Fund to qualifying Western Shoshone members, but did not provide the Dann sisters or any other Western Shoshone members with title to their ancestral lands.

> Undoubtedly, considerable time will have elapsed before the Western Shoshone people, the Secretary of the Interior and the Congress are able to reach agreement in this complex matter.

Also, on December 15, 1983, the Assistant Secretary for Indian Affairs at the BIA wrote Senator Mark Andrews, the Chairman of the United States Senate Select Committee on Indian Affairs, noting that it was "premature and not in the best interest of either the tribes or the government" to introduce proposed legislation. The Assistant Secretary for Indian Affairs at the Department of the Interior also noted:

> Presently, groups of Western Shoshone have been discussing proposed legislation to secure both the monetary settlement and a portion of the lands in Nevada. A particularly difficult problem exists with respect to any land restoration approach due to the virtual absence of a successor tribe or tribes representative of all the recommended beneficiaries. Consequently, meaningful planning has not yet occurred.

In November of 1984, the BIA began negotiations with the "Western Shoshone National Council," regarding potential distribution legislation for the 326-K Fund. The Western Shoshone National Council was comprised of various Western Shoshone tribal governments and political organizations and was designated by the Western Shoshone as the entity to represent the Western Shoshone in negotiations with the United States.

On May 20, 1985, the BIA received the Western Shoshone National Council's "PROPOSAL TO COMPLETE DATA GATHERING," (Proposal) in which the Western Shoshone National Council stated that they would need the next three years to prepare for their negotiations with the BIA. (capitalization in original). The Proposal detailed the various steps the Western Shoshone National Council would have to complete before entering into negotiations. The steps included:

> [E]stablish a data base for their land and land use; organize for negotiations, determine general land control assignments, and determine general policy for joint areas; develop preliminary policy for land use and preliminary land development plans; and, enter into and complete negotiations with the Federal government and define terms that can be incorporated into a legislated agreement.

According to the "Work Schedule" included in the Proposal, the Western Shoshone National Council stated that certain "Work Products," such as "Historical Analysis," "Demographic Description of Population," "Resources Inventory," and "Land Interests," would be completed between one to three years, and that these work products would be "needed for negotiations and development of agreement terms." (capitalization in original).

According to the BIA, by mid-1986, whatever negotiations had taken place between the government and the Western Shoshone National Council came to a virtual

standstill. On June 30, 1986, the BIA sent the Western Shoshone National Council a letter, stating that, "[a]fter over two years of negotiations, I am truly sorry that our respective positions remain so far apart. . . . [T]he Department does not recognize any valid legal claim to Western Shoshone tribal ancestral lands," and "the Department believes further negotiations at this time would be futile." As of July 27, 1986, as evidenced by a memorandum from the Assistant Secretary for Indian Affairs to the Phoenix Area Office, negotiations between the government and the Western Shoshone National Council  were "not proceeding," and the government "consider[ed] the negotiations to have been suspended indefinitely."

In light of the standstill in negotiations, on October 28, 1986, Senator Paul Laxalt, Senator Chic Hecht, Congresswoman Vucanovich, and then Congressman Harry Reid, of the Nevada Congressional delegation, wrote to the Secretary of Interior and noted that,  "[i]f the Shoshones do have a viable claim to private lands (approximately two million acres), the Nevada Congressional delegation is concerned that the Shoshone land rights question be resolved as quickly as possible without disruption of private titles." The Nevada Congressional delegation recognized that organizing a distribution for the 326-K Fund had been complicated, stating that,

> [t]he extent of continuing Western Shoshone land rights has been a frustrating problem for the Western Shoshone Indians, private parties, and governmental agencies for many years now. Although four negotiating sessions between Western Shoshone National Council delegates and the Department of the Interior have taken place over the last year, little progress has been made toward a comprehensive solution.

The Nevada Congressional delegation's October 28, 1986 communication also noted that,

> the United States Claims Court and the Senate Select Committee on Indian Affairs agree that a comprehensive legislative solution will be necessary. The present situation only promises to get worse. Once again, we urge the Department to meet with the Western Shoshone National Council to find a common basis for moving forward. While we realize that financial demands upon the Department are heavy, we urge you to consider resolution of the Shoshone controversy a priority, and to assist the Shoshones with necessary funding.

As of mid-1987, Congress did not believe a final resolution to the Western Shoshone judgment claim was "immediate." According to a May 29, 1987 letter from Senator Daniel Inouye, Chairman of the United States Senate Select Committee on Indian Affairs to Senator Hecht and now Senator Reid, it appears that the Western Shoshone National Council requested a Congressional hearing to discuss the Western Shoshone judgment claims. Senator Inouye stated in his letter that "I do not believe that a hearing will lead to any immediate solution to this problem," but, that such a hearing could at least establish "a basis for a fair resolution of this matter."

There also was disagreement within the government as to how to proceed with negotiations with the Western Shoshone National Council. The Chairman and Vice-Chairman of the United States Senate Select Indian Committee on Indian Affairs believed that future negotiations were dependent on the Western Shoshone National Council receiving sufficient funding for their requested "study to develop an inventory of the aboriginal lands and other natural resources which were subject of the 1863 Treaty of Ruby Valley and the judgment of the Indian Claims Commission in Docket No. 326-K." According to a July 28, 1987 letter from the Chairman and Vice-Chairman of the United States Senate Select Indian Committee on Indian Affairs to the Assistant Secretary of the Interior, "[t]he project that the Western Shoshone National Council now proposes would appear to be essential in order to establish a frame-work for future negotiations," and "we strongly urge that the Bureau of Indian Affairs join with ANA [Administration for Native Americans] to assure sufficient funds are made available to complete this project in a timely fashion." The Assistant Secretary for Indian Affairs at the Department of the Interior, however, disagreed with the Chairman and Vice-Chairman, and responded to the letter on August 12, 1987, stating:

> [T]he Western Shoshone have been compensated in the 'usual practice' for the loss of their aboriginal title and there is no further legal claim against the United States. Consequently, we do not perceive a need to survey their entire historical use area as that matter was addressed at length in the [Indian Claims] Commission and Court of Claims proceedings.

(brackets added).

As of August 1988, negotiations with the Western Shoshone National Council were still suspended, with no known date for re-opening negotiations. According to an August 3, 1988 BIA Phoenix Area briefing paper prepared for the Secretary of Interior, "negotiations have been suspended indefinitely" and "subsequent communication had not changed the situation."

Despite the lack of negotiations between the government and the Western Shoshone National Council, on September 28, 1989, Congresswoman Vucanovich proposed H.R. 3384, a distribution plan of the 326-K Fund. The Western Shoshone tribal governments strongly objected to the introduction of the bill. The Te-Moak Tribe of Western Shoshone Indians were "extremely angry" that H.R. 3384 was introduced without "consultation with the Western Shoshone National Council and without the approval of any of the nine Western Shoshone tribal governments." H.R. 3384 also was opposed by the staff at the Department of the Interior. According to an October 13, 1989 document from the BIA Acting Phoenix Area Director to the Assistant Secretary of the Interior commenting on H.R. 3384, "we [Phoenix Area Office] strongly recommend the proposal be opposed by the Department." According to the April 26, 1990 statement of Walter R. Mills, Deputy to the BIA Assistant Secretary for Indian Affairs at Interior, before the United States House of Representatives' Congressional Committee on Interior and Insular Affairs, Mr. Mills indicated, on behalf of the Department of the Interior, "[w]e strongly oppose enactment of H.R. 3384" for several reasons. For example, according to Mr. Mills,

"[t]he timeframes cited in the bill for publication of regulations, the time allotted for applications to enroll, and the time cited for the preparation of the Final Judgment Roll, are unrealistically short." According to H.R. 3384, as introduced, the Secretary of Interior had one hundred and twenty days from the enactment of the Act to complete a proposed judgment roll, sixty days from the disposition of appeals from individuals denied inclusion on the judgment roll to publish the final judgment roll, and sixty days from publication of the final roll to distribute the 326-K Fund on a per capita basis. The bill was not passed.

Thereafter, the Department of the Interior sent a letter, dated November 14, 1990, to the Western Shoshone National Council, stating:

> Our understanding is that the Nevada Congressional delegation and the Senate Select Committee are willing to act on the distribution of the funds in Docket 326-K and develop a settlement of outstanding land issues as they relate to Western Shoshone lands. Neither the Department of the Interior nor the Bureau of Indian Affairs have any immediate solutions to these exceedingly complex issues. However, when a new Congress convenes in January we certainly will be available to work with the Congress in developing a resolution of these issues.

(capitalization in original).

On November 22, 1991, Congresswoman Vucanovich introduced a second bill, H.R. 3897, to distribute the 326-K Fund. Denis Homer, the acting BIA director of Tribal Services testified before Congress on behalf of the Department of the Interior, and stated that the Department had concerns about the "tight timeframes specified in the legislation [H.R. 3897] in which the Secretary is to fulfill certain administrative responsibilities," similar to the concerns the Department of the Interior had with H.R. 3384. Mr. Homer stated that "[s]ome of these timeframes would be impossible to meet." Mr. Homer explained:

> While the process of updating the tribal rolls may be completed in a relatively short period of time, the overall technical process of bringing the supplemental rolls into final form could take far longer than the timeframes allotted in the bill. If the supplemental roll is considered a lineal descendancy roll, regulations necessary for its implementation will require considerable time to formulate, approve, and publish. The 90-day timeframe in section 5 to develop regulations to implement the provisions of the legislation and the 11-month period to publish the final judgment roll provided in section 2(c) do not provide adequate time to prepare a lineal descendancy roll in light of Administrative Procedures Act requirements.

In 1992, H.R. 3897 was not voted out of committee. According to a June 19, 1992 letter from Congressman George Miller, Chairman of the United States House of Representatives Committee on Interior and Insular Affairs, to Congresswoman Vucanovich regarding H.R. 3897,

>[i]n reviewing the record, there still appears to be a wide diversity of opinions and suggested approaches regarding the distribution of the Docket Funds[18] and resolution of other issues.
>
>While I believe we are closer to a resolution of this issue than we were in the 101st Congress, the Committee will not consider the measure until there is more of a consensus among the tribal governments.

(capitalization in original).

By mid-1992, the government was attempting to re-open negotiations with the Western Shoshone. According to a July 27, 1992 letter from the Department of the Interior to the Chairman of the United States Senate Select Committee on Indian Affairs, the Department of the Interior was contacting individuals to participate in an interagency negotiating team to assist the Chairman "in the development of a legislative solution to the claims of the Western Shoshone tribal governments against the United States." According to a June 22, 1992 letter from the Chairman of the United States Senate Select Committee on Indian Affairs to the Department of the Interior, "[i]t appears that there is a consensus growing among leaders of Shoshone tribal governments and other interested parties toward a comprehensive solution to the Western Shoshone claims." By June of 1993, the government was still working towards opening negotiations with the Western Shoshone. According to a June 6, 1993 letter from Secretary of the Interior, Bill Babbitt, to Senator Inouye, "we will be contacting representatives of the Western Shoshone Bands for preliminary discussions in the near future."

Also, during this time, certain governmental actors were not in favor of a 100% per capita distribution of the funds, as was proposed in prior bills which had not been passed by Congress. According to a January 7, 1994 letter from Congressman William Richardson, Chairman of the United States House of Representatives Subcommittee of Native American Affairs, which was part of the United States House of Representatives Committee on Natural Resources, to Secretary Babbitt, "[t]he Subcommittee on Native American Affairs generally would frown on any plan that does not include provisions for tribal economic development and long range economic planning." Further, Congressman Richardson stated that, "I feel it is of paramount importance that the docket funds of the Western Shoshone should not merely be divided up on a per capita basis and distributed." He also stated that "[i]n hearings before this Committee, Members have commented that the Western Shoshone should be provided with some land base." (capitalization in original). On September 15, 1995, the 326-A-3 Funds, the last of plaintiffs' three tribal

---

[18] The 326-A-1 Fund were deposited into the United States Treasury for investment by the government on March 25, 1992. At the time that Congressman Miller wrote the June 19, 1992 letter, the Department of Interior was holding in trust the 326-K Fund and the 326-A-1 Fund. The 326-A-3 Fund, the third and last of the tribal trust funds at issue in this case, was not deposited into the United States Treasury to be held in trust by the Department of Interior until September 15, 1995.

trust funds, were deposited into the United States Treasury for investment by the government.

In early 1997, consensus among the Te-Moak Bands of Western Shoshone Indians, one of the four Western Shoshone tribes recognized by the BIA as a beneficiary of the 326-K Fund in the BIA's January 22, 1982 amended research report, began to emerge. The Te-Moak Bands of Western Shoshone Indians was comprised of the Elko, Battle Mountain, South Fork, and Wells bands. The other three Western Shoshone tribes recognized by the BIA as beneficiaries of the 326-K Fund in the January 22, 1982 amended research report were the Duckwater Shoshone Tribe, the Yomba Shoshone Tribe, and the Ely Indian Colony. According to a March 3, 1997 internal BIA memorandum, the Te-Moak Tribal Council, the governing group for the Te-Moak Bands of Western Shoshone Indians, was planning to "pursue 100% distribution to 1/4 degree of Docket 326-K." The March 3, 1997 BIA memorandum also noted that the Te-Moak Tribal Council would pursue "a separate or companion proposal to seek restoration of land in Western Shoshone country," and that both proposals, "could run concurrently and not necessarily have to be tied together." The March 3, 1997 BIA memorandum also discussed a March 1, 1997 meeting between the BIA and two hundred members of Western Shoshone tribes. According to the March 3, 1997 BIA memorandum, after the March 1, 1997 meeting was over, "several people came up to tell us [the BIA] that they support the proposed Te-Moak plan but did not want to stand up in front of the audience and express themselves."

Also, according to a March 7, 1997 internal BIA memorandum from the Superintendent of the Eastern Nevada Agency to the Phoenix Area Director, other Western Shoshone tribes, apart from the Te-Moak Bands of Western Shoshone Indians, would potentially be introducing to the BIA their own version of a potential distribution plan for the 326-K Fund. According to the March 7, 1997 internal BIA memorandum:

> The Te-Moak Tribe will be sending a copy of their plan to the other three tribes named in the results of research. The purpose is to try and get the four proposed plans submitted about the same time so resolution could be achieved quickly. Duckwater has already presented their plan to the federal negotiating team. Ely will be supporting the Te-Moak Plan. We do not know what Yomba will do, rumors are they will parallel the Duckwater plan.

(capitalization in original). Despite the Te-Moak Tribal Council's emerging consensus in favor of a distribution plan for the 326-K Fund, the BIA was not optimistic that distribution plan legislation would be passed by Congress for the 326-K Fund in the near-term. On May 15, 1998, Donna Peterson, BIA Branch Chief of the Tribal Government Services sent a memorandum to the BIA Phoenix Area Director, stating that the BIA did "not anticipate a final distribution plan being presented to Congress by the end of this year." Ms. Peterson also noted that, "we do anticipate the development of a payment roll will be a tremendous and expensive task once the distribution plan is approved. Both the Eastern and Western Nevada Agencies have been very cognizant of this fact and are working along with the tribes in maintaining current tribal rolls." (capitalization in original).

Beginning in 1998, support from various Western Shoshone tribes in favor of a monetary distribution of the 326-K Fund and the setting aside of the 326-A-1 and 326-A-3 Funds as educational trust funds began to increase. In 1998, the BIA attended two public hearings held by the Western Shoshone Steering Committee, a "group of individual Western Shoshones that have organized to try and prepare a distribution plan," for a vote of approval a draft distribution proposal, in which the 326-K Fund would be fully distributed on a 100% per capita basis and the 326-A-1 and 326-A-3 Funds would be placed into a permanent education trust fund. The vote at the two meetings was that 1230 Western Shoshones were in favor of the draft proposal, while 53 were against the proposal.

On December 1, 1998, the BIA Phoenix Area Director wrote to the Deputy Commissioner for Indian Affairs at the BIA, noting that "an overwhelming majority of adult Western Shoshones favor distribution." In addition, according to a 1999 letter from Elko Band representatives to Bruce Babbitt, the Secretary of Interior at that time, the Elko Band representatives, co-chairmen of the Western Shoshone Claims Steering Committee, the committee that voted in favor of a distribution plan at two public hearings in 1998, noted that "at this point we feel it is both reasonable and prudent to move forward," and "we would be most appreciative of the Department of Interior's assistance in promoting the 'Western Shoshone Claims Distribution Act'[19] as the 'Act' enters and progresses through the congressional process." The Elko Band representatives also stated that they are the "largest number (approx. 1500) of Western Shoshone enrollees," and, therefore, wrote to the Secretary "on behalf of the **'majority'** of Western Shoshone people." (emphasis in original). Also, between February and March of 1999,  the Fallon Paiute Shoshone Tribe, "the second largest band of Shoshones in the state of Nevada," numbering approximately 601 eligible Western Shoshone beneficiaries of the 326-K docket, the Elko Band Council, the "largest Band of Western Shoshone in the State of Nevada," and the Western Shoshone of the Duck Valley Reservation, numbering "approximately 400 direct descendants of eligible Western Shoshone who are possible beneficiaries of Docket 326-K," each passed resolutions in favor of Congress passing the Western Shoshone Claims Distribution Act.

By June 7, 1999, the BIA was drafting proposed legislation as requested by various groups of Western Shoshone. According to a June 7, 1999 email from Daisy West, a BIA Tribal Relations Officer, to Pat Gerard, whose specific employment position is not identified in the email, but who appears to be another BIA employee, Ms. West was "working on the draft legislation for the Western Shoshone Judgment Funds" and requested from Pat Gerard the "current balances" of plaintiffs' three tribal trust funds.

During the early 2000s, Senator Reid, Senator John Ensign, and Congressman James Gibbons, members of the Nevada Congressional delegation, introduced legislation for the distribution of plaintiffs' three tribal trust funds. On May 9, 2000, the

---

[19] The "Western Shoshone Claims Distribution Act," was the act that the Western Shoshones voted in favor of during the two public hearings in 1998 and which proposed to distribute the 326-K Fund on a 100% per capita basis to individuals of ¼ Western Shoshone blood.

Assistant Secretary for Indian Affairs at the BIA submitted proposed draft legislation to "'authorize the Use and Distribution of the Western Shoshone Judgment Funds in Docket Nos. 326-K, 326-A-1 and 326-A-3'" to the Speaker of the House. (capitalization in original). The Assistant Secretary stated in the letter to the Speaker of the House:

> Although the governing bodies of three of the four successor tribes, due to the dynamics of tribal politics, have changed their position, or been silent until recently concerning the legislative proposal for the use of these funds, the individual Western Shoshone have been anxious for quite some time to have these funds distributed.

The Assistant Secretary also stated:

> We are confident that the Western Shoshone want these funds distributed as quickly as possible. We also believe that the best interests of the Western Shoshone will not be served by providing additional time for successor tribes to reach a consensus on the division and distribution of the land claims funds in Docket 326-K.

On June 27, 2000, Senator Reid introduced S. 2795, Western Shoshone Claims Distribution Act, which, however, did not pass during the 106th Congress. On September 6, 2001, Congressman Gibbons introduced H.R. 2851, Western Shoshone Claims Distribution Act before the United States House of Representatives Committee on Natural Resources, which, however, also did not pass. On November 14, 2002, Senator Reid tried again and introduced S. 958, Western Shoshone Claims Distribution Act, which was passed by the United States Senate, but later died before the United States House of Representatives Committee on Natural Resources.

On April 29, 2003, the BIA Office of Trust Funds Management met to discuss the investment performance of plaintiffs' three tribal trust funds at issue in the above-captioned case. The meeting was memorialized in a one-page document, dated April 29, 2003, which stated, in part, "[a]s the securities mature, reinvest the principal and interest not to exceed two year [sic]. The tribes at some point in the future may settle and distribute the funds." The above document also stated under the "Comments" section:

> The four successor Western Shoshone Tribes eligible to share in this award include Te-Moak, Ely, Duckwater, and Yomba. Also tribes with a significant number of tribal members of Western Shoshone descent eligible to share in the distribution are Duck Valley, Fallon and Fort McDermitt. The proposed use of Docket 326-K is 100% per capita distribution, however, at least one of the successor tribes still opposes acceptance of the award for land sale. The proposed use of Dockets 326-A-1 and 326-A-3 are principal restriction of the award [sic], with income to be used for educational grants and other forms of educational assistance to tribal members and descendants.

In 2003, Congressman Gibbons of Nevada introduced H.R. 884 in the United States House of Representatives. Also, in 2003, Senator Reid and Senator Ensign of Nevada introduced S. 618 in the United States Senate. Congress passed both H.R. 884 and S. 618, which were almost identical bills, and which became law on July 7, 2004, when President George W. Bush signed the Claims Distribution Act of 2004. According to the Claims Distribution Act of 2004, the 326-K Fund was to be paid out on a 100% per capita distribution, whereas the 326-A-1 and 326-A-3 Funds were to be used as education trust funds, from which individuals selected by the Western Shoshone Educational Committee would receive educational grants. The principals of the 326-A-1 and 326-A-3 Funds were to be held in perpetual trust and the interest of those funds would be distributed to selected individuals meeting certain eligibility criteria.

On May 19, 2005, the BIA published a proposed rule regarding the process for individuals to enroll in the judgment roll, as required under the Claims Distribution Act of 2004. See Preparation of Rolls of Indians, 72 Fed. Reg. 9,836 (Mar. 5, 2007) (to be codified at 25 C.F.R. pt. 61). The comment period for the proposed rule was open for 162 days, from May 19, 2005 to October 28, 2005. Id. Copies of the proposed rule were mailed to approximately 2,300 individuals and the BIA held two public meetings for the purpose of discussing the proposal. Id. The first meeting was held on August 20, 2005 in Elko, Nevada, which approximately 500 individuals attended. Id. The second meeting was held one week later, on August 27, 2005, in Reno, Nevada, which approximately 600 individuals attended. Id. The BIA also received written comments from 36 individuals regarding the proposed rule. Id.

On October 25, 2005, the Office of Trust Funds Management at the BIA met again to discuss the 326-K, 326-A-1, and 326-A-3 Funds, and documented the meeting, noting, "JA.9087.691 Funds [326-A Funds] are invested in short, intermediate and long securities. JA.9334.697 Receipt of award: as the securities mature, reinvest the principal and interest not to exceed 2008 [i.e., not to exceed a maturity of three years]. Settlement of docket 326-K is in the horizon." (capitalization in original).

On February 12, 2007, approximately two and a half years after the enactment of the Claims Distribution Act of 2004, Daisy West, BIA Chief, Division of Tribal Government Services, wrote an email to Robert Craff, BIA Regional Trust Administrator within the Western and Navajo Office of the Special Trustee for American Indians, and one of defendant's fact witness at trial, stating:

> The final enrollment regulations are with Mike Olsen for his signature. Once the regulations are signed they will be published in the Federal Register and become effective 30 days after the date of publication. The first distribution of funds will be in approximately 2 to 3 years when the application period closes. At that time we will make a partial per capita to approximately 2,500 individuals. . . . The balance of Docket 326-K funds will be distributed in 6 to 10 years.

On March 5, 2007, a little less than three years after the Claims Distribution Act of 2004 was enacted, the BIA published the final rule that established the process for enrolling in the judgment roll. The final rule establishing the judgment roll enrollment process was codified at 25 C.F.R. § 61.4(k) (2007). See Preparation of Rolls of Indians, 72 Fed. Reg. 9,836 (Mar. 5, 2007) (to be codified at 25 C.F.R. pt. 61).

According to 25 C.F.R. § 61.4(k),

(1) Under section 3(b)(1) of the Act of July 7, 2004, Pub. L. 108–270, 118 Stat. 805, the Secretary will prepare a roll of all individuals who meet the eligibility criteria established under the Act and who file timely applications prior to a date that will be established by a notice published in the Federal Register. The roll will be used as the basis for distributing the judgment funds awarded by the Indian Claims Commission to the Western Shoshone Identifiable Group of Indians in Docket No. 326–K. To be eligible a person must:

(i) Have at least ¼ degree of Western Shoshone blood;
(ii) Be living on July 7, 2004;
(iii) Be a citizen of the United States; and
(iv) Not be certified by the Secretary to be eligible to receive a per capita payment from any other judgment fund based on an aboriginal land claim awarded by the Indian Claims Commission, the United States Claims Court, or the United States Court of Federal Claims, that was appropriated on or before July 7, 2004.

(2) Indian census rolls prepared by the Agents or Superintendents at Carson or Western Shoshone Agencies between the years of 1885 and 1940, and other documents acceptable to the Secretary will be used in establishing proof of eligibility of an individual to:

(i) Be listed on the judgment roll; and
(ii) Receive a per capita payment under the Western Shoshone Claims Distribution Act.

(3) Application forms for enrollment must be mailed to Tribal Government Services, BIA–Western Shoshone, Post Office Box 3838, Phoenix, Arizona 85030–3838.

(4) The application period will remain open until further notice.

25 C.F.R. § 61.4(k). An individual who was denied eligibility for enrollment in the judgment roll could appeal the decision pursuant to the administrative appeal process set forth in 25 C.F.R. § 62. See 25 C.F.R. § 62.4 (2007) ("A person who is the subject of an adverse enrollment action may file or have filed on his/her behalf an appeal.").

On April 5, 2007, the BIA began to send applications to individuals to enroll in the judgment roll. By October 5, 2007, ninety days after the BIA began to send out applications, the BIA had received 5,265 applications. Approximately two years later, according to the BIA's September 30, 2009 progress report, BIA had received 2,819 more applications, for a total of 8,084 applications received as of September 2009. The progress report also stated that as of September 2009, 341 applications were reviewed and determined to be ineligible. The BIA also stated in that same update that "[t]he final deadline [for receiving applications] will be published in the Federal Register."

On October 19, 2009, the BIA was in the process of establishing the Educational Committee pursuant to section 4(a) of the Claims Distribution Act of 2004. The Educational Committee was the group of Western Shoshone tribal leaders who would select the winning individuals of educational grants to be paid from the interest earned on the 326-A-1 and 326-A-3 Funds. According to the BIA's October 19, 2009 update, "[f]ive of the six groups have identified their representative and are providing the documentation to confirm the appointments." The update also stated that, "[o]nce the Educational Committee is established, it will begin to develop the rules and procedures for approval by the Secretary."

On May 20, 2010, the BIA published the deadline for receiving applications for eligibility in the Federal Register. The notice stated that "[a]pplications must be received by close of business (5 p.m. Mountain Time) August 2, 2010." Deadline for Submission of Applications To Be Included on the Roll of Western Shoshone Identifiable Group of Indians for Judgment Fund Distribution, 75 Fed. Reg. 28,280 (May 20, 2010). The BIA also had sent by mail notice to potential applicants of the deadline for receiving applications. Some individuals, however, did not receive notice by mail, and, therefore the BIA extended the deadline for submitting applications for these individuals to December 31, 2010.

According to a November 30, 2010 BIA progress report, introduced by both parties as a joint exhibit at trial in the above-captioned case, the BIA had received 9,108 applications. Of these applications, 4,023 were determined eligible, 2,201 were determined ineligible, and 2,576 were pending review. The BIA also stated that 308 appeals had been filed and that it had "begun the quality control review process for the proposed partial payment targeted for February 2011." On March 6, 2011, the first partial distributions of the 326-K Fund were made to 3,187 individuals. The partial payment to each individual was $22,013.00. On September 28, 2012, the BIA completed the final judgment roll for the 326-K Fund, which contained a total of 5,415 individuals. Final distributions from the 326-K Fund were made to eligible recipients via direct deposit to individuals' bank accounts on September 29, 2012, and via check on October 2, 2012. The individuals who received an initial partial payment, received a second payment of $13,124.93, for a total of $35,137.93. The individuals who did not receive an initial partial payment received a one-time, final payment of $35,137.93.

## COURT PROCEDURAL HISTORY

On December 26, 2006, plaintiff Yomba Shoshone Tribe, one of the Western Shoshone tribes recognized by the Department of the Interior as a member of the Western Shoshone Identifiable Group, filed a complaint in the United States Court of Federal Claims against the United States, resulting in the above-captioned case. The complaint alleged that the government's "mismanagement of Plaintiff's trust funds and other trust assets in Defendants' custody and control," caused plaintiff "damages not sounding in tort." Since the filing of the complaint, more plaintiffs have joined the case and plaintiffs have narrowed the time frame at issue in this case, seeking damages from December 1979, when the 326-K Fund was deposited into the United States Treasury, until September 2013, the last month for which there is available data of the government's investment of three tribal trust funds at issue. On that same day, the case was assigned to Judge Edward Damich. On February 22, 2007, he ordered a stay of the proceedings in light of ongoing settlement discussions between the parties. On March 12, 2008, the complaint was amended adding individual plaintiffs Maurice Frank-Churchill, Jerry Millet, and Virginia Sanchez, on behalf of the Western Shoshone Identifiable Group.

On March 28, 2008, defendant filed a motion to dismiss plaintiffs' amended complaint, arguing that plaintiff Yomba Shoshone Tribe cannot state a claim for relief that would entitle it to money damages for "inadequate interest earnings *to the tribe*," because "[t]he Tribe has no right to any part of the distribution or interest that was earned during the time the funds reside[d] in Government accounts." (emphasis in original). Defendant argued that according to the Claims Distribution Act of 2004, "Congress expressly contemplated and directed that the entire fund [the 326-K Fund] be distributed *per capita*" on an individualized basis and not to any tribe. (emphasis in original). Defendant also argued that the Claims Distribution Act of 2004 similarly required that any interest earned on the 326-A-1 and 326-A-3 Funds be distributed not to any tribe but to "individual Shoshone members" for "the specific purpose of education-related assistance." Defendant argued that, in the alternative, all of the other Western Shoshone tribes were necessary parties under Rule 19(a) of the Rules for United States Court of Federal Claims (RCFC) (2008) and indispensable parties under RCFC 19(b), requiring dismissal, pursuant to RCFC 12(b)(7) (2008) and RCFC 19, for failure to join all of the other Western Shoshone tribes as necessary parties.

On June 25, 2008, the complaint was amended for a second time, before Judge Damich ruled on defendant's March 28, 2008 motion to dismiss, adding tribal plaintiffs Timbisha Shoshone Tribe and the Duckwater Shoshone Tribe, two additional Western Shoshone Tribes recognized by the Department of the Interior as members of the Western Shoshone Identifiable Group, bringing the total number of plaintiffs to six. The six plaintiffs, according to the June 25, 2008 amended complaint, were (1) tribal plaintiff Yomba Shoshone Tribe, (2) tribal plaintiff Timbisha Shoshone Tribe, (3) tribal plaintiff Duckwater Shoshone Tribe, (4) individual plaintiff Maurice Frank-Churchill, (5) individual plaintiff Jerry Millet, and (6) individual plaintiff Virginia Sanchez, the current six plaintiffs at issue in the above-captioned case.

On October 31, 2008, Judge Damich issued an unreported Opinion denying defendant's motion to dismiss, the first of two Opinions he issued in this case. Judge Damich rejected defendant's March 28, 2008 argument that tribal plaintiff Yomba[20] had no right to the distribution of the three tribal funds at issue because the funds were to be distributed on an individualized basis, not a tribal basis. Judge Damich found that "all three Tribal Plaintiffs—Yomba, Timbisha, and Duckwater (collectively 'the Tribes')—are federally-recognized tribes with interests in the tribal trust funds of the Western Shoshone Identifiable Group to which the Tribal Plaintiffs belong." W. Shoshone Identifiable Grp. v. United States, 2008 WL 9697144, at *1. Judge Damich explained that:

> As owners of tribal trust funds, the Tribes have the right to pursue their breach of trust claims against the Government for mismanagement of the tribal trust funds. The pro rata distribution mechanism in the Distribution Act is irrelevant because the Distribution Act does not divest the Tribes of any ownership interest in the trust funds and because the Tribes are not, in this case, challenging the distribution mechanism set forth in the Distribution Act.

Id. Judge Damich then stated that defendant "failed to show that the other Western Shoshone tribes are necessary parties, because, under 28 U.S.C. § 1505 (2006), any tribe may represent the Western Shoshone without joinder," and that defendant

> failed to show that either complete relief could not be granted to the Western Shoshone in the absence of all the Western Shoshone tribes or that any of the parties to the litigation are subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the Tribes' interest.

Id.

On August 7, 2009, defendant filed its motion for reconsideration of Judge Damich's Opinion denying its motion to dismiss. Defendant repeated its allegation that the tribal plaintiffs were not the beneficial owners of the 326-K, 326-A-1 and 326-A-3 Funds and that the beneficial owners were "individuals" who qualified to receive a pro-rata share of the 326-K Fund and an educational grant of the 326-A-1 and 326-A-3 Funds under the Claims Distribution Act of 2004. Defendant also argued that the tribal plaintiffs failed to establish the requisite money-mandating duty owed to them in order to sustain their breach of trust claims.

---

[20] At the time that defendant filed its motion to dismiss, tribal plaintiff Yomba was the only tribal plaintiff involved in this case. As previously discussed, following the filing of defendant's motion to dismiss and before Judge Damich issued his Opinion on defendant's motion to dismiss, the plaintiffs amended their complaint for a second time, adding two additional tribal plaintiffs, the Timbisha Shoshone Tribe and the Duckwater Shoshone Tribe.

On November 24, 2009, Judge Damich denied defendant's motion for reconsideration in an unpublished Opinion. See W. Shoshone Identifiable Grp. v. United States, 2009 WL 9389765, at *11. The court stated once again that the tribal plaintiffs are the beneficial owners of the 326-K, 326-A-1 and 326-A-3 Funds. See id. at *6. The court also explained that "insofar as the Tribal Plaintiffs are members of, and assert that they are representatives of, the Western Shoshone Identifiable Group and are advancing claims under the Indian Tucker Act," there was "no basis" for "Defendant's argument that the Tribal Plaintiffs do not have a money-mandating basis for jurisdiction in this Court or otherwise lack standing to bring this action on behalf of the Western Shoshone Identifiable Group." Id. at *10.

Judge Damich extended discovery in the case until May 11, 2012. Then, on June 7, 2012, the case was stayed, including expert discovery, pending the parties' then current settlement negotiations. Judge Damich subsequently lifted the stay on April 21, 2014, and the parties continued with expert discovery. On August 26, 2015, this case was re-assigned to the undersigned, who set the case on a course to trial.

The parties submitted several pre-trial filings, including a joint exhibit list of 433 joint exhibits, various demonstrative exhibits, and a revised statement of issues of fact and law to be decided by the court at trial. The parties jointly stipulated that the court must decide the following two mixed questions of fact and law at trial:

1. Liability: Did the United States breach a fiduciary duty to prudently invest the Western Shoshone Judgment Funds during the period December 1979 through September 2013?

2. Damages: If the United States breached a fiduciary duty to prudently invest the Western Shoshone Judgment Funds, what are Plaintiffs' damages?

The court held a five-day trial in Washington, D.C. Plaintiffs did not offer any fact witnesses at trial, but offered the following two experts:

- Mr. Nunes, of Rocky Hill Advisors, Inc., as an expert on liability and damages, and,

- Dr. Goldstein, as a rebuttal expert to defendant's liability expert and defendant's damages expert.

Plaintiffs also submitted as joint exhibits an expert report addressing both liability and damages, co-authored by Mr. Nunes and Peter Ferriero of Rocky Hill Advisors, Inc., (Rocky Hill Advisors), and a rebuttal expert report, also co-authored by Mr. Nunes and Mr. Ferriero. Plaintiffs' expert report stated that the "government breached its duty to invest prudently to maximize return" on the 326-K and 326-A Funds "through its failure to properly align the maturity capacity of WSIG's funds with the maturity structures of WSIG's investment portfolios." The plaintiffs' Rocky Hill Advisors' expert report stated that the government's investment of the 326-K Fund was imprudent because:

> Docket 326-K funds were paid into WSIG's trust accounts on December 19, 1979 in the amount of $26,145,189.89. Although these funds were designated for per capita distribution, there is a long history in the record that unequivocally supports our contention that very early in their life the Government should have known these funds would remain in trust for a considerable length of time and thus should have consistently invested them with a much longer term structure. We have seen no evidence the Government performed any analysis of the appropriate maturity capacity of the Docket 326-K funds, and this informs us that the Government failed in its fiduciary capacity to prudently invest these monies.

(capitalization in original).

With regard to the 326-A-1 and 326-A-3 Funds, the liability portion of plaintiffs' expert report stated:

> For the period from inception until December 1, 1998, Dockets 326-A-1/A-3 funds were no different than Docket 326-K funds from the standpoint of their maturity capacity and the Government's knowledge that these funds would remain in trust for a considerable length of time and thus should have been invested accordingly. But, just as with 326-K funds, there is no evidence the Government attempted to perform any analysis of the appropriate maturity capacity of the Dockets 326-A-1/A-3 funds, once again informing us that the Government failed in its fiduciary capacity to prudently invest these monies.

In addition, the liability section of plaintiffs' expert report stated that "a prudent trustee would have historically invested these funds in a much longer-term portfolio, particularly subsequent to December 1998 when it was determined these funds were to be used to create the permanent education fund."

According to the damages portion of plaintiffs' expert report by Rocky Hill Advisors, plaintiffs suffered $216,386,589.83 in damages due to the government's mismanagement of the 326-K Fund and $1,592,822.43 in damages due to the government's mismanagement of the 326-A Funds. The damages portion of plaintiffs' expert report stated that it employed the Barclays United States Treasury Index, a "passive benchmark" index, "to compute the returns that reasonably should have been obtained through prudent investment of WSIG's trust funds." The damages portion of plaintiffs' expert report based its damages model on its opinion that the 326-K Fund had an investment horizon of about fifteen years from 1980 to 2004, that it shortened to about seven and a half years after the passage of Claims Distribution Act of 2004, and that it became very short-term at the start of 2011, once the enrollment process for the judgment award was nearly complete.

Plaintiffs also submitted the rebuttal expert report of Dr. Goldstein, which responded to the expert reports of the government's liability expert, Dr. Starks, and the

government's damages report, prepared by defendant's expert, Gordon J. Alexander, Ph. D. Dr. Goldstein's report disagreed with defendant's liability expert report by Dr. Starks, which concluded that the government did not breach a fiduciary duty. According to Dr. Goldstein's report, the BIA "knew" that distribution process for plaintiffs' three tribal trust funds at issue "would take a long time," and, thus, a "prudent portfolio" for plaintiffs' three tribal trust funds "would have held more long-term investments." Dr. Goldstein's report also disagreed with the government's damages expert report submitted by Dr. Alexander, which argued that plaintiffs' damages request is "driven by unprecedented and unexpected drops in interest rates," and is "flawed and misleading" because plaintiffs' damages included the unexpected "capital gains," the gains earned on a bond from the unexpected decrease in interest rates. According to Dr. Goldstein, the decrease in interest rates during the investment period at issue in the above-captioned case, 1979-2013, "were not unexpected in the early 1980s," based on "yield curve data" and "contemporaneous discussions by the Federal Reserve." In addition, Dr. Goldstein argued that "it is important to recognize that there is no economic principle that asserts one must strip out the impact of unexpected interest rate movements when calculating damages." Plaintiffs also submitted as a joint exhibit at trial a supplemental report by Dr. Goldstein, which responds to the supplemental reports submitted by defendant's experts, Dr. Starks and Dr. Alexander.

Defendant offered at trial the following individuals as fact witnesses:

- Mr. Winter, the current Director of Trust Operations within the Office of Special Trustee for American Indians, Department of the Interior, and,

- Mr. Craff, the current regional trust administrator with the Office of Special Trustee for American Indians, Department of the Interior.

Defendant also offered at trial the following individuals as experts at trial:

- Dr. Starks, as an expert on liability, and,

- Mr. Mclean,[21] as an expert on damages.

Defendant submitted as two separate exhibits at trial the expert report and a supplemental expert report prepared by Dr. Starks regarding the government's alleged liability, but only in regard to the 326-K Fund. Dr. Starks was not hired by defendant's counsel to offer an expert opinion as to the prudence of the government's investment of

---

[21] Dr. Alexander was originally scheduled to testify at trial regarding the government's alleged damages. He was the author of the government's expert reports regarding damages. Dr. Alexander, however, became unavailable to testify at trial due to illness and, thus, Mr. Mclean became a substitute testifying expert. Mr. Mclean had assisted Dr. Alexander in preparing his expert and supplemental reports, and as stated at trial, Mr. Mclean fully endorsed the opinions expressed in Dr. Alexander's expert and supplemental reports.

the 326-A-1 and 326-A-3 Funds because, according to defendant, the three tribal plaintiffs and three individual plaintiffs in the above-captioned case do not have standing to bring a claim as to the 326-A-1 and 326-A-3 Funds. Whether plaintiffs have standing regarding the 326-A-1 and 326-A-3 Funds is discussed later in this Opinion.

Dr. Starks' expert report argued that the "government acted prudently" when it invested the 326-K Fund during the entire investment period at issue. Dr. Starks stated in her liability expert report "that it was reasonable for the Government to target shorter-term funds for the WSIG portfolio in the first part of the period at issue [December 1979 to late 1992]," because while this was a period of "uncertainty" regarding a distribution plan, there was "optimism of a forthcoming consensus," and "hope for prompt and speedy distribution of judgment funds." Dr. Starks then stated in her liability expert report:

> While it is my opinion that the Government would not have acted imprudently had it maintained the WSIG funds in shorter-term investments (due to the continued uncertainty, and unclear timeline of eventual disbursements), I also believe that moving the funds into securities with a somewhat longer WADTM [weighted average days to maturity] at this stage of the period [beginning around 1993] was within the range of prudence. Indeed, such a move could be seen as more desirable at this time (*i.e.*, relative to the beginning of the period) – both from an information perspective and also based on the available investment.

(emphasis in original). For the "balance of the period at issue," i.e., mid 1990s to 2013, Dr. Starks stated in her expert report:

> [I]t may have been optimal for the Government to target a slightly longer WADTM *if* it had reason to believe that a significant portion of the distributions would not be occurring at the front end of the anticipated distribution window. I have not seen evidence indicating that the Government had this understanding or the ability to forecast it based on the information at hand.

(emphasis in original) (footnote omitted). Dr. Starks concluded: "[T]he investments made by the Government for the WSIG portfolio were prudent given the totality of information available to the Government *a priori*, and that the Government fulfilled its fiduciary duty by making independent investment decisions to maximize return given prudent investments." (emphasis in original). Dr. Starks also indicated in her report that "only hindsight suggests a portion of the WSIG's trust funds could have safely been invested longer-term."

Defendant also submitted as two separate joint exhibits at trial the expert report and supplemental expert report by Dr. Alexander, regarding the government's alleged damages in the above-captioned case. Dr. Alexander's report stated that the plaintiffs' damages calculations for the 326-K Fund of approximately $216 million "is due to

historical circumstances present during the damages period that were, in part, unique and unknowable *ex ante*." (emphasis in original). According to Dr. Alexander's expert report:

> [T]he major driver of the damages [in the damages portion of plaintiffs' expert report by Rocky Hill Advisors] is the unprecedented decline in interest rates over a period of three decades. That decline caused longer-term bonds to increase in value and earn returns in excess of their yields. Rocky Hill's Investment Model [created by Mr. Nunes and Mr. Ferriero] would not necessarily have produced better earnings if interest rates had moved differently or circumstances had differed for the WSJF.

Dr. Alexander also proposed twelve alternative damages models that are "based on the assumption that the BIA should have used a 'but-for' portfolio different from what it actually chose, but more reasonable than that suggested by RHA [Rocky Hill Advisors]." The highest amount of damages proposed by Dr. Alexander's alternative models was $34,589,957.00. The lowest amount was zero dollars.

## DISCUSSION

### I.   Standing as to the 326-A-1 and 326-A-3 Education Funds

Initially, the court addresses the standing issues defendant raises regarding the two 326-A Education Funds. Defendant chose not to present any evidence at trial regarding the government's investment of the 326-A-1 and 326-A-3 Funds because, according to defendant, plaintiffs do not have standing to pursue investment recovery as to these two funds and plaintiffs should not be allowed to have their experts present evidence regarding the 326-A-1 or 326-A-3 Fund. Defendant's counsel stated during his opening argument at trial,

> [o]ur argument with respect to these funds [326-A-1 and 326-A-3 Funds] has been and remains that the Plaintiffs before the Court now lack proper standing to pursue claims with respect to education funds that have not been paid out to them and which they may never receive, and for that reason, our experts have not analyzed specifically how these funds were invested.

Defendant also stated in a joint status report filed after trial that,

> none of the Plaintiff tribes or any of the other Western Shoshone tribes (*e.g.,* Te-Moak Tribe of Western Shoshone Indians) has received any payment from the Docket 326-K funds which was distributed, beginning in 2011, to Western Shoshone individuals on a *per capita* basis. Likewise, the Dockets 326-A-1 and A-3 funds have been distributed only to Western Shoshone individuals pursuant to the terms of the 2004 Act and its implementing regulations; no Plaintiff tribe or any of the other Western Shoshone tribes has received those funds.

(emphasis in original).

As indicated above, this case was originally assigned to Judge Edward Damich of this court and transferred to the undersigned on August 26, 2015. In a decision on a motion to dismiss, Judge Damich held that the three tribal plaintiffs in the above-captioned case could bring a breach of trust claim with regard to the 326-K, 326-A-1 and 326-A-3 Funds despite the fact that the 326-K, 326-A-1 and 326-A-3 Funds were to be distributed on an individualized basis. Judge Damich stated in his October 31, 2008 Opinion on defendant's motion to dismiss that, "[t]he pro rata distribution mechanism in the Distribution Act is irrelevant because the Distribution Act does not divest the Tribes of any ownership interest in the trust funds and because the Tribes are not, in this case, challenging the distribution mechanism set forth in the Distribution Act."  W. Shoshone Identifiable Grp. v. United States, 2008 WL 9697144, at *1. In his November 24, 2009 Opinion on defendant's motion for reconsideration, Judge Damich stated that "the 2004 Distribution Act has no effect whatsoever on the beneficial interests of the Tribal Plaintiffs in the Western Shoshone tribal trust funds held by the Government" and that "insofar as the Tribal Plaintiffs are members of, and assert that they are representatives of, the Western Shoshone Identifiable Group and are advancing its claims under the Indian Tucker Act," defendant had "no basis" to claim that the tribal plaintiffs "lack[ed] standing to bring this action" as to any of plaintiffs' three tribal trust funds. See W. Shoshone Identifiable Grp. v. United States, 2009 WL 9389765, at *9-10.

In addition, although Judge Damich's Opinions specifically addressed whether the three tribal plaintiffs could bring a breach of trust claim in this case, the holding in Judge Damich's November 24, 2009 Opinion on defendant's motion for reconsideration would appear to extend to the three individual plaintiffs in this case.[22] According to Judge Damich's November 24, 2009 Opinion, the distribution mechanism of the Claims Distribution Act of 2004, which provides that the three tribal trust funds at issue would be distributed on an individualized basis, does not affect the tribal plaintiffs' right to assert a breach of trust "insofar as the Tribal Plaintiffs are members of, and assert that they are representatives of, the Western Shoshone Identifiable Group." Id. at *10.  According to the most recently filed and, thus, operative complaint in this case, the second amended complaint, the three individual plaintiffs brought this case "on their own behalf and on behalf of THE WESTERN SHOSHONE IDENTIFIABLE GROUP." (capitalization in original). Therefore, because the three individual plaintiffs also are bringing this case for themselves and on behalf of the members of the Western Shoshone Identifiable Group, Judge Damich's November 24, 2009 Opinion appears to encompass the three individual plaintiffs, as well. Therefore, the named plaintiffs in the most-recently filed and operative second amended complaint, both tribal and individual, appear to be able to bring the breach of trust claim as to all of the tribal funds at issue.

---

[22] Before Judge Damich, defendant did not challenge in either its motion to dismiss or its motion for reconsideration whether the individual plaintiffs had standing to bring a breach of trust claim. Defendant only challenged whether the three tribal plaintiffs could bring a breach of trust claim.

The doctrine of law of the case "generally bars retrial of issues that were previously resolved." Intergraph Corp. v. Intel Corp., 253 F.3d 695, 697 (Fed. Cir. 2001); see also Haggart v. United States, 131 Fed. Cl. 628, 637 ("Under this doctrine, 'a court will generally refuse to reopen or reconsider what has already been decided at an earlier stage of the litigation.'" (quoting Suel v. Sec'y of Health & Human Servs., 192 F.3d 981, 985 (Fed. Cir. 1999), reh'g denied (Fed. Cir. 2000)), recons. denied, 133 Fed. Cl. 568 (2017). "Reasons that may warrant departure from the law of the case" include "the discovery of new and different material evidence that was not presented in the prior action, or an intervening change of controlling legal authority, or when the prior decision is clearly incorrect and its preservation would work a manifest injustice." Intergraph Corp. v. Intel Corp., 253 F.3d at 698; see also Clark v. United States, 93 Fed. Cl. 756, 767-68 (2010), aff'd, 656 F.3d 1317 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2011).

Neither party in the above-captioned case has presented any new evidence or alleged an intervening change of authority which would warrant a departure from Judge Damich's two prior Opinions. Judge Damich's two prior rulings are not "clearly incorrect" so as to direct the undersigned to depart from the law of the case. See Intergraph Corp. v. Intel Corp., 253 F.3d at 698. Furthermore, even under defendant's logic, the individual tribal members would have standing to bring a breach of fiduciary duty claim regarding the 326-A-1 and 326-A-3 Funds. According to defendant, because the 326-A-1 and 326-A-3 Fund will be distributed to individual tribal members selected by an Educational Tribal Committee, defendant would appear to be arguing that only those members selected as recipients of the education grants paid from the 326-A-1 and 326-A-3 Funds would have standing to bring a claim as to both A Funds. There was no evidence in the record which indicates that the three tribal members named in this case, Mr. Millet, Ms. Sanchez, and Mr. Frank-Churchill, are prohibited from potentially applying for educational grants and from potentially being awarded an educational grant. Thus, even under defendant's logic, these three individual plaintiffs would have standing as to the 326-A-1 and 326-A-3 Funds. Judge Damich's two prior Opinions are applicable as the law of the case regarding the three tribal plaintiffs.

Moreover, defendant conceded in a joint status report filed after trial before the undersigned, to whom this case was transferred, that "[t]he United States understands that this Court previously issued a ruling that recognized the standing of the Plaintiff Tribes to maintain claims in this case on behalf of all members of the Western Shoshone Identifiable Group," and that the "Court's reasoning" "extend[s] to the individual Plaintiffs as well, who pursue their claims as alleged 'member[s] of the Western Shoshone Identifiable Group.'" (second brackets in original) (quoting Second Amended Complaint). Defendant also conceded in the same joint status report that "the United States regards the Court's [Judge Damich's] rulings on the motion for dismissal and for reconsideration as law of the case, and does not seek further reconsideration of the Court's rulings." (internal reference omitted). The court, therefore, will not depart from Judge Damich's conclusion that all of the named plaintiffs in above-captioned case have standing to bring the breach of trust claim as to all three tribal trust funds.

## II.   The statute at 25 U.S.C. § 162a

The parties in the above-captioned case agree that the statute governing the government's trust obligations at issue is 25 U.S.C. § 162a. The parties, however, dispute the duty of care the government owed to plaintiffs as a trustee pursuant to 25 U.S.C. § 162a. The statute at issue, 25 U.S.C. § 162a, in relevant part, states:

> The Secretary of the Interior is hereby authorized in his discretion, and under such rules and regulations as he may prescribe, to withdraw from the United States Treasury and to deposit in banks to be selected by him the common or community funds of any Indian tribe which are, or may hereafter be, held in trust by the United States and on which the United States is not obligated by law to pay interest at higher rates than can be procured from the banks. The said Secretary is also authorized, under such rules and regulations as he may prescribe, to withdraw from the United States Treasury and to deposit in banks to be selected by him the funds held in trust by the United States for the benefit of individual Indians: *Provided,* That no individual Indian money shall be deposited in any bank until the bank shall have agreed to pay interest thereon at a reasonable rate, subject, however, to the regulations of the Board of Governors of the Federal Reserve System in the case of member banks, and of the Board of Directors of the Federal Deposit Insurance Corporation in the case of insured nonmember banks, except that the payment of interest may be waived in the discretion of the Secretary of the Interior on any deposit which is payable on demand: *Provided further,* That no tribal or individual Indian money shall be deposited in any bank until the bank shall have furnished an acceptable bond or pledged collateral security therefor in the form of any public-debt obligations of the United States and any bonds, notes, or other obligations which are unconditionally guaranteed as to both interest and principal by the United States, except that no such bond or collateral shall be required to be furnished by any such bank which is entitled to the benefits of section 12B of the Federal Reserve Act, with respect to any deposits of such tribal or individual funds to the extent that such deposits are insured under such section: *Provided, however,* That nothing contained in this section, or in section 12B of the Federal Reserve Act, shall operate to deprive any Indian having unrestricted funds on deposit in any such bank of the full protection afforded by section 12B of the Federal Reserve Act, irrespective of any interest such Indian may have in any restricted Indian funds on deposit in the same bank to the credit of a disbursing agent of the United States. For the purpose of this section and said Act, said unrestricted funds shall constitute a separate and distinct basis for an insurance claim: *Provided further,* That the Secretary of the Interior, if he deems it advisable and for the best interest of the Indians, may invest the trust funds of any tribe or individual Indian in any public-debt obligations of the United States and in

any bonds, notes, or other obligations which are unconditionally guaranteed as to both interest and principal by the United States . . . .

25 U.S.C. § 162a(a) (emphasis in original).

Plaintiffs argued that as the United States Court of Claims, a predecessor court to this court, announced in Cheyenne-Arapaho, that under 25 U.S.C. § 162a, the government "has a fiduciary duty to invest Indian trust funds so as 'to maximize the trust income by a prudent investment.'" (quoting Cheyenne-Arapaho, 206 Ct. Cl. at 348, 512 F.2d at 1394). Plaintiffs also argued that Cheyenne-Arapaho remains good law in this court and was followed in Jicarilla Apache Nation v. United States, 100 Fed. Cl. 726 (2011) (Jicarilla II).[23]

Plaintiffs in the current case further argued that in 1994, in a subsequently enacted statute to 25 U.S.C. § 162a, the statute at issue in the above-captioned case, "Congress has reaffirmed the Government's obligation to invest tribal trust funds so as to maximize the return on them," when Congress "enacted the American Indian Trust Fund Management Reform Act ('Trust Reform Act'), Pub. L. No. 103–412, 108 Stat. 4239

---

[23] There are three separate Jicarilla decisions referred to in this Opinion, all stemming from the same Native American breach of trust case regarding allegations of mismanagement of tribal trust funds pursuant to 25 U.S.C. § 162a, the statute at issue in the above-captioned case. In United States v. Jicarilla Apache Nation, 564 U.S. 162 (2011) (Jicarilla I), the United States Supreme Court was tasked with determining whether the common-law "fiduciary" exception to the attorney-client privilege, which prevents a trustee from withholding from trust beneficiaries attorney-client communications relating to the administration of the trust, applies to 25 U.S.C. § 162a. See Jicarilla I, 564 U.S. at 170. The Supreme Court held that the common-law fiduciary exception to the attorney-client privilege did not apply within the context of 25 U.S.C. § 162a and reversed and remanded the case back to the United States Court of Federal Claims. See Jicarilla I, 564 U.S. at 165-66, 186. In Jicarilla II, cited to by plaintiffs in the current case, following the Supreme Court's remand in Jicarilla I, the Court of Federal Claims held that the court had jurisdiction over the tribe's breach of trust claim pursuant to the Indian Tucker Act, and that the Department of Interior had a fiduciary duty to "'maximize the trust income by prudent investment,'" pursuant to 25 U.S.C. § 162a. See Jicarilla II, 100 Fed. Cl. at 738-39 (quoting Cheyenne-Arapaho, 206 Ct. Cl. at 348, 512 F.2d at 1394). In Jicarilla Apache Nation v. United States, 112 Fed. Cl. 274 (2013) (Jicarilla III), the United States Court of Federal Claims found that the government had breached its fiduciary duty to invest the plaintiff's funds due to the "BIA's heavy reliance on short-term investments" for "nearly two decades," which "reduced the yield on Jicarilla's portfolios by failing to take appropriate advantage of the higher yields on longer-term investments." Jicarilla III, 112 Fed. Cl. at 290-92.

(1994)."[24] Plaintiffs cited to Section 303 of the 1994 Trust Fund Management Reform Act, which states that:

> (B)  Investments
>
>> The Special Trustee shall ensure that the Bureau [of Indian Affairs] establishes appropriate policies and procedures, and develops necessary systems, that will allow it—
>>
>>> (i)  properly to account for and invest, as well as maximize, in a manner consistent with the statutory restrictions imposed on the Secretary's investment options, the return on the investment of all trust fund monies, and
>>>
>>> (ii) to prepare accurate and timely reports to account holders (and others, as required) on a periodic basis regarding all collections, disbursements, investments, and return on investments related to their accounts.

25 U.S.C. § 4043(b)(2)(B). According to plaintiffs' post-trial brief:

> The Trust Reform Act "reaffirmed and clarified preexisting duties; it did not create them." Cobell v. Norton, 240 F.3d 1081, 1100 (D.C. Cir. 2001). "The legislative history of the 1994 Reform Act indicates that Congress intended the Act to merely reaffirm and codify the existing fiduciary duties of the Government to invest [Indian] funds outside the Treasury in order to maximize the return on those funds." Goodeagle v. United States, 122 Fed. Cl. 292, 295 (2015) (Wheeler, J.). "Failure to prudently invest both tribal and individual Indian funds results in a breach of fiduciary duty, and creates a cause of action in this Court. Plaintiffs are correct in their assertion that this fiduciary duty existed long before the enactment of the 1994 Reform Act . . . ." Id.

(brackets in original).

Contrastingly, defendant argued that the Department of the Interior has a "discretionary" duty to invest tribal trust funds pursuant to 25 U.S.C. § 162a(a). According to defendant's post-trial brief:

---

[24] Whether the government breached a duty arising under the 1994 Trust Fund Management Reform Act is not at issue in this case. Plaintiffs only allege that the 1994 Trust Fund Management Reform Act "reaffirmed" the fiduciary duty originally set out in 25 U.S.C. § 162a, not that the government breached a duty arising under the 1994 Trust Fund Management Reform Act.

Under Section 162a, "[t]he Secretary of the Interior . . . is authorized *in his discretion*, and *under such rules and regulations as he may prescribe*, to withdraw from the United States Treasury and to deposit in banks to be selected by him the common or community funds of any Indian tribe which are, or may hereafter be, held in trust by the United States." (emphasis added). The statute further provides that "the Secretary of the Interior *if he deems it advisable* and for the best interest of the Indians, *may* invest the trust funds of any tribe or individual Indian in any public-debt obligations of the United States and in any bonds, notes, or other obligations which are unconditionally guaranteed as to both interest and principal by the United States." (emphasis added). The language of § 162a thus makes clear that the Interior Department's duty to invest tribal trust funds is *discretionary*, subject to Interior's own regulations and rulemaking, and subject to the fundamental requirement that the investments that Interior may make in its discretion be virtually risk-free because "unconditionally guaranteed as to both interest and principal by the United States."

(emphasis in original).

Defendant also argued that its discretionary duty should be reviewed by the court for an abuse of discretion. According to defendant's post-trial brief,

when Congress expressly grants an agency discretion over a power prescribed by statute, that agency's exercise of its discretion is reviewed for abuse of discretion. See Duke v. Department of the Air Force, 230 Ct. Cl. 977, 979 (1982); Mitchell v. United States, 664 F.2d 265, 274 (Ct. Cl. 1981); see also Armstrong v. LaSalle Bank Nat'l Ass'n, 446 F.3d 728, 733 (7th Cir. 2006) (Posner, J.). Trust law follows the same rule: "When a trustee has discretion with respect to the exercise of a power, its exercise is subject to supervision by a court only to prevent abuse of discretion." Restatement (Third) of Trusts, § 87 (2007); Armstrong, 446 F.3d at 733 (the standard of judicial review applied to fiduciaries in the exercise of discretionary judgments is abuse of discretion) (Posner, J.). Accordingly, the question that the Court needs to resolve as concerns the Plaintiffs' claims is whether they have proven that the Interior Department abused its discretion in its choice of investments for the Western Shoshone Judgment Funds.

The United States Supreme Court explained in Jicarilla I, a case cited to by both parties in their post-trial briefs, that there is an

"undisputed existence of a general trust relationship between the United States and the Indian people." Mitchell II, 463 U.S., at 225, 103 S. Ct. 2691. The Government, following "a humane and self imposed policy . . . has charged itself with moral obligations of the highest responsibility and trust," Seminole Nation v. United States, 316 U.S. 286, 296–297, 62 S. Ct. 1049,

86 L. Ed. 1480 (1942), obligations "to the fulfillment of which the national honor has been committed," Heckman, supra, at 437, 32 S. Ct. 424. Congress has expressed this policy in a series of statutes that have defined and redefined the trust relationship between the United States and the Indian tribes. In some cases, Congress established only a limited trust relationship to serve a narrow purpose. See Mitchell I, 445 U.S., at 544, 100 S. Ct. 1349 (Congress intended the United States to hold land "'in trust'" under the General Allotment Act "simply because it wished to prevent alienation of the land and to ensure that allottees would be immune from state taxation"); Navajo I, 537 U.S., at 507-508, 123 S. Ct. 1079 (Indian Mineral Leasing Act imposes no "detailed fiduciary responsibilities" nor is the Government "expressly invested with responsibility to secure 'the needs and best interests of the Indian owner'").

In other cases, we have found that particular "statutes and regulations . . . clearly establish fiduciary obligations of the Government" in some areas. Mitchell II, supra, at 226, 103 S. Ct. 2961; see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 475, 123 S. Ct. 1126, 155 L.Ed.2d 40 (2003).

Jicarilla I, 564 U.S. at 176-77.

To determine whether a statute imposes a fiduciary duty on the government, as opposed to "only a limited trust relationship," the court looks to whether the statute provides the government "full responsibility to manage" the Indian assets at issue "for the benefit of the Indians." United States v. Mitchell, 463 U.S. 206, 224 (1983) (Mitchell II). In addition,

a fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians. All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds). "[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection." Navajo Tribe of Indians v. United States, 224 Ct. Cl. 171, 183, 624 F.2d 981, 987 (1980).

Mitchell II, 463 U.S. at 224-25 (footnote omitted).

In United States v. Mitchell, 445 U.S. 535 (1980) (Mitchell I), a breach of trust case brought by tribes alleging that the United States had allegedly mismanaged the tribes' timber resources on land held in trust by the government, the United States Supreme

Court found that Sections 1 and 5 of the General Allotment Act, codified at 25 U.S.C. §§ 331, 348 (1980), the sections under which the tribes had alleged a breach of trust, imposed no fiduciary duties on the government. See Mitchell I, 445 U.S. at 537, 543. Section 1 of the General Allotment Act authorized "the President to allot to each Indian residing on a reservation up to 80 acres of agricultural land or 160 acres of grazing land found within the reservation," id. at 540 (citing to 25 U.S.C. § 331), and Section 5 noted that the United States,

> shall retain title to such allotted lands in trust for the benefit of the allottees:
>
> > "Upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made . . . and that at the expiration of said period the United States will convey the same by patent to said Indian . . ., in fee, discharged of said trust and free of all charge or incumbrance whatsoever: *Provided*, That the President of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void."

Id. at 541 (emphasis and ellipse in original) (quoting 25 U.S.C. § 348). The United States Supreme Court explained in Mitchell I that Sections 1 and 5 of the General Allotment Act,

> indicate that the Indian allottee, and not a representative of the United States, is responsible for using the land for agricultural or grazing purposes. Furthermore, the legislative history of the Act plainly indicates that the trust Congress placed on allotted lands is of limited scope. Congress intended that, even during the period in which title to allotted land would remain in the United States, the allottee would occupy the land as a homestead for his personal use in agriculture or grazing.

Mitchell I, 445 U.S. at 542-43 (footnote omitted). The United States Supreme Court then looked to legislative history of the General Allotment Act and noted that Congress intended that title of the land be held by the government for twenty-five years before the title passed onto the tribe in order to prevent any state's attempt to tax the land from burdening the tribes. The United States Supreme Court stated that,

> [i]t is plain, then, that when Congress enacted the General Allotment Act, it intended that the United States hold the land . . . in trust not because it

> wished the Government to control use of the land and be subject to money damages for breaches of fiduciary duty, but simply because it wished to prevent alienation of the land and to ensure that allottees would be immune from the state taxation.

Mitchell I, 445 U.S. at 544 (internal quotation marks omitted) (ellipse in original). The United States Supreme Court concluded that "[t]he General Allotment Act, then, cannot be read as establishing that the United States has a fiduciary responsibility for management of allotted forest lands. Any rights of the respondents to recover money damages for Government mismanagement of timber resources must be found in some source other than that Act." Id. at 546. The United States Supreme Court remanded the case because the United States Court of Claims had not considered whether other statutes asserted by the tribes as a source of a fiduciary duty rendered the United States liable for a breach of trust. See id.

Following the remand in Mitchell I, the tribes' breach of trust case went on appeal once again to the United States Supreme Court in Mitchell II, but this time, the tribes had alleged that the government breached its fiduciary duty under a network of statutes and regulations regarding timber management. See Mitchell II, 463 U.S. at 211. Unlike in Mitchell I, the United States Supreme Court in Mitchell II found in favor of the tribes, holding that various federal timber management statutes, codified at 25 U.S.C. §§ 406-407, 466 (1983), various other federal statutes governing road building, rights-of-way, Indian funds, and Government fees, and the regulations promulgated under those statutes, imposed fiduciary duties upon the United States in its management of forested allotted lands. See Mitchell II, 463 U.S. at 224. The United States Supreme Court explained that, in contrast to the General Allotment Act at issue in Mitchell I, which created a "bare trust,"

> the statutes and regulations now before us clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians. They thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities.

> The language of these statutory and regulatory provisions directly supports the existence of a fiduciary relationship. For example, § 8 of the 1910 Act, as amended, expressly mandates that sales of timber from Indian trust lands be based upon the Secretary's consideration of "the needs and best interests of the Indian owner and his heirs" and that proceeds from such sales be paid to owners "or disposed of for their benefit." 25 U.S.C. § 406(a). Similarly, even in its earliest regulations, the Government recognized its duties in "managing the Indian forests so as to obtain the greatest revenue for the Indians consistent with a proper protection and improvement of the forests." Office of Indian Affairs, Regulations and Instructions for Officers in Charge of Forests on Indian Reservations 4 (1911). Thus, the Government has "expressed a firm desire that the Tribe should retain the benefits derived

from the harvesting and sale of reservation timber." <u>White Mountain Apache Tribe v. Bracker</u>, 448 U.S. [136, 149 (1980)].

Moreover, a fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians. All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds). "[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection." <u>Navajo Tribe of Indians v. United States,</u> 224 Ct. Cl. 171, 183, 624 F.2d 981, 987 (1980).

<u>Mitchell II</u>, 463 U.S. at 224-25 (footnotes omitted).

The United States Supreme Court has repeatedly referred to its holdings in <u>Mitchell I</u> and <u>Mitchell II</u> when trying to determine whether a statute or regulation imposes a fiduciary duty on the government in the context of Native American cases. For example, in <u>United States v. Navajo Nation</u>, 537 U.S. 488 (2003) (<u>Navajo I</u>), the Supreme Court stated that "<u>Mitchell I</u> and <u>Mitchell II</u> are the pathmarking precedents on the question whether a statute or regulation (or combination thereof)" can be fairly interpreted as imposing a money-mandating fiduciary duty on the government. <u>See</u> <u>Navajo I</u>, 537 U.S. at 503. In <u>Navajo I</u>, the tribe alleged that the government had breached its fiduciary duty when it approved a lease of land executed between the Navajo Nation, the lessor, and a third-party lessee, instead of seeking to acquire a higher leasing rate for the tribe before approving the lease. <u>See</u> <u>Navajo I</u>, 537 U.S. at 495-500. The United States Supreme Court noted that <u>Mitchell I</u> and <u>Mitchell II</u> "control this case" and concluded that the statute at issue in <u>Navajo I</u>, the Indian Mineral Leasing Act (IMLA), codified at 25 U.S.C. § 396 (2000), fell "within <u>Mitchell I's</u> domain," meaning that the IMLA imposed no fiduciary duties on the government. <u>See</u> <u>Navajo I</u>, 537 U.S. at 493. The IMLA governed aspects of mineral leasing on Indian tribal lands, and provided that

"unallotted lands within any Indian reservation," or otherwise under federal jurisdiction, "may, with the approval of the Secretary . . ., be leased for mining purposes, by authority of the tribal council or other authorized spokesmen for such Indians, for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities."

<u>Navajo I</u>, 537 U.S. at 493 (citing 25 U.S.C. § 396). The Supreme Court explained in <u>Navajo I</u> that:

Although "the undisputed existence of a general trust relationship between the United States and the Indian people" can "reinforc[e]" the conclusion

that the relevant statute or regulation imposes fiduciary duties, [Mitchell II, 463 U.S. at 225], that relationship alone is insufficient to support jurisdiction under the Indian Tucker Act. Instead, the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions. Those prescriptions need not, however, expressly provide for money damages; the availability of such damages may be inferred. See id., at 217, n. 16, 103 S. Ct. 2961 ("[T]he substantive source of law may grant the claimant a right to recover damages either expressly or by implication." (internal quotation marks and citation omitted)).

Navajo I, 537 U.S. at 506-07. The Supreme Court also explained that:

The IMLA and its implementing regulations impose no obligations resembling the detailed fiduciary responsibilities that Mitchell II found adequate to support a claim for money damages. The IMLA simply requires Secretarial approval before coal mining leases negotiated between Tribes and third parties become effective, 25 U.S.C. § 396a, and authorizes the Secretary generally to promulgate regulations governing mining operations, § 396d. Yet the dissent concludes that the IMLA imposes "one or more specific statutory obligations, as in Mitchell II, at the level of fiduciary duty whose breach is compensable in damages." Post, at 1099. The endeavor to align this case with Mitchell II rather than Mitchell I, however valiant, falls short of the mark. Unlike the "elaborate" provisions before the Court in Mitchell II, 463 U.S., at 225, 103 S. Ct. 2961, the IMLA and its regulations do not "give the Federal Government full responsibility to manage Indian resources . . . for the benefit of the Indians," id., at 224, 103 S. Ct. 2961. The Secretary is neither assigned a comprehensive managerial role nor, at the time relevant here, expressly invested with responsibility to secure "the needs and best interests of the Indian owner and his heirs." Ibid. (internal quotation marks omitted) (quoting 25 U.S.C. § 406(a)).

Instead, the Secretary's involvement in coal leasing under the IMLA more closely resembles the role provided for the Government by the GAA [General Allotment Act] regarding allotted forest lands. See Mitchell I, 445 U.S., at 540–544, 100 S. Ct. 1349. Although the GAA required the Government to hold allotted land "in trust for the sole use and benefit of the Indian to whom such allotment shall have been made," id., at 541, 100 S. Ct. 1349 (quoting 25 U.S.C. § 348), that Act did not "authoriz[e], much less requir[e], the Government to manage timber resources for the benefit of Indian allottees," Mitchell I, 445 U.S., at 545, 100 S. Ct. 1349. Similarly here, the IMLA and its regulations do not assign to the Secretary managerial control over coal leasing. Nor do they even establish the "limited trust relationship," id., at 542, 100 S. Ct. 1349, existing under the GAA; no provision of the IMLA or its regulations contains any trust language with respect to coal leasing.

Moreover, as in Mitchell I, imposing fiduciary duties on the Government here would be out of line with one of the statute's principal purposes. The GAA was designed so that "the allottee, and not the United States, . . . [would] manage the land." Id., at 543, 100 S. Ct. 1349. Imposing upon the Government a fiduciary duty to oversee the management of allotted lands would not have served that purpose. So too here. The IMLA aims to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties.

Navajo I, 537 U.S. at 507-08 (brackets, emphasis, and omission in original) (footnotes and internal reference omitted).

Furthermore, a statute need not explicitly state that the government is subject to a fiduciary duty in order to impose a fiduciary duty on the government. For example, in United States v. White Mountain Apache Tribe, 537 U.S. 465 (2003) (White Mountain) a Native American breach of trust case, the Supreme Court was tasked with determining whether Pub. L. No. 86-392, 74 Stat. 8 (1960), which the Supreme Court referred to as the "1960 Act," imposed a fiduciary duty on the government. See White Mountain, 537 U.S. at 469. The 1960 Act provided that the "'former Fort Apache Military Reservation' would be 'held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for the purpose.'" Id. (quoting the 1960 Act). Although the 1960 Act did not expressly use the phrase "fiduciary duty," the Supreme Court nonetheless found that the 1960 Act "expressly defines a fiduciary relationship" by stating that Fort Apache would be "'held by the United States in trust for the White Mountain Apache Tribe.'" Id. at 474 (quoting the 1960 Act). The Supreme Court also noted that unlike the General Allotment Act at issue in Mitchell I, which did not impose a fiduciary duty on the government, but created a "bare trust," the 1960 Act at issue in White Mountain "proceeds to invest the United States with discretionary authority to make direct use of portions of the trust corpus." White Mountain, 537 U.S. at 475. The Supreme Court also noted that although the 1960 Act does not

expressly subject the Government to duties of management and conservation, the fact that the property occupied by the United States is expressly subject to a trust supports a fair inference that an obligation to preserve the property improvements was incumbent on the United States as trustee. This is so because elementary trust law, after all, confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch. "One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets," Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 572, 105 S. Ct. 2833, 86 L.Ed.2d 447 (1985) (citing G. Bogert & G. Bogert, Law of Trusts and Trustees § 582, p. 346 (rev. 2d ed. 1980)); see United States v. Mason, 412 U.S. 391, 398, 93 S. Ct. 2202, 37 L. Ed. 2d 22 (1973) (standard of responsibility is "such care and skill as a man of ordinary prudence would exercise in dealing with

his own property" (quoting 2 A. Scott, Trusts 1408 (3d ed.1967) (internal quotation marks omitted))); Restatement (Second) of Trusts § 176 (1957) ("The trustee is under a duty to the beneficiary to use reasonable care and skill to preserve the trust property"). Given this duty on the part of the trustee to preserve corpus, "it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties." Mitchell II, supra, at 226, 103 S. Ct. 2961.

White Mountain, 537 U.S. at 475-76 (footnote omitted).

The United States Court of Appeals for the Federal Circuit in Hopi Tribe v. United States, 782 F.3d 662 (Fed. Cir. 2015) (Hopi), a case cited to by both parties, also recognized that a statute need not expressly use the phrase "fiduciary duty" in order to impose a fiduciary duty on the government. The Hopi court noted that by "simultaneously using trust language and authorizing exclusive use of the land," a statute could evoke "common-law trust principles," leading to the inference that Congress intended to impose a particular fiduciary trust duty on the government. See Hopi, 782 F.3d at 670 (citing White Mountain, 537 U.S. at 475). The statute at issue in Hopi was Executive Order of 1882, which was later ratified in the Act of July 22, 1958, Pub. L. No. 85-547, 72 Stat. 403 (1958) (the Act of 1958). See Hopi, 782 F.3d at 671. The Act of 1958, according to the Hopi court, provided that certain lands would be held "in trust" for the Hopi Indians, but made no mention as to whether the government had discretion when managing the lands, nor any mention of the government's role in managing the water supply located on the Hopi Tribe's lands. See id. at 665-66. The Hopi Tribe alleged that the government had breached its fiduciary duty contained in the Act of 1958 when the public water systems on their reservations contained unsafe levels of arsenic. See id. at 665. The Hopi Tribe also alleged that the government "funded and provided technical assistance for the construction of many of the wells that supply contaminated groundwater," and sought to recover damages to cover the cost of providing safe drinking water on the Hopi Reservation. See id. at 666. The Hopi court found that the statutes at issue did not create a fiduciary duty and instead

> created a bare trust in the Act of 1958 and, separately, authorized certain actions to assist the Hopi Tribe in providing safe drinking water. None of these later provisions use trust language that might evoke common-law principles. Nor do they collectively authorize the kind of plenary control the Supreme Court found significant in White Mountain Apache, 537 U.S. at 476, 123 S. Ct. 1126, and Mitchell II, 463 U.S. at 224, 103 S. Ct. 2961. They only require the United States to assist in the provision of safe drinking water, and do not restrict the Hopi Tribe from managing the resource itself. Accordingly, we cannot infer from the trust language in the Act of 1958, combined with separate and scattered obligations to help provide safe drinking water, that Congress has "expressly accepted" a common-law fiduciary duty to manage water resources. Jicarilla, 131 S. Ct. at 2325.

Hopi, 782 F.3d at 670-71.

The issue in this case is whether the statute at 25 U.S.C. § 162a is akin to the statutes and regulations at issue in <u>Mitchell II</u>, which were determined by the United States Supreme Court to have given the government "full responsibility," "control," and management authority over the tribal assets at issue, and, therefore, had imposed a fiduciary duty to manage tribal trust assets. <u>See</u> <u>Mitchell II</u>, 463 U.S. at 224-25. The statute at 25 U.S.C. § 162a, as well as the Department of the Interior's regulations implementing 25 U.S.C. § 162a, in accordance with the <u>Mitchell II</u> standard appear to "clearly give the Federal Government full responsibility to manage" tribal trust funds. <u>See</u> <u>Mitchell II</u>, 463 U.S. at 224.

The statute at Subsection (a) of 25 U.S.C. § 162a states that the Secretary of the Interior, "in his discretion," and his authority, is "hereby authorized . . . to withdraw from the United States Treasury," and "deposit" tribal trust funds in banks or

> if he deems it advisable and for the best interest of the Indians, may invest the trust funds of any tribe or individual Indian in any public-debt obligations of the United States and in any bonds, notes, or other obligations which are unconditionally guaranteed as to both interest and principal by the United States.

25 U.S.C. § 162a(a). Subsection (d) of 25 U.S.C. § 162a provides a non-exhaustive list of "[t]rust responsibilities of the Secretary of the Interior," for management of tribal assets, which states:

> The Secretary's proper discharge of the trust responsibilities of the United States shall include (but are not limited to) the following:
>
> (1) Providing adequate systems for accounting for and reporting trust fund balances.
>
> (2) Providing adequate controls over receipts and disbursements.
>
> (3) Providing periodic, timely reconciliations to assure the accuracy of accounts.
>
> (4) Determining accurate cash balances.
>
> (5) Preparing and supplying account holders with periodic statements of their account performance and with balances of their account which shall be available on a daily basis.
>
> (6) Establishing consistent, written policies and procedures for trust fund management and accounting.

(7) Providing adequate staffing, supervision, and training for trust fund management and accounting.

(8) Appropriately managing the natural resources located within the boundaries of Indian reservations and trust lands.

25 U.S.C. § 162a(d).

In addition, the Department of the Interior's regulations, implementing 25 U.S.C. § 162a, which were promulgated in 2001 following the creation of the Office of the Special Trustee and which remain in force, further evidences the government's control over tribal trust fund management. The regulations set forth "guidelines for the Secretary of the Interior" to "carry out the trust duties owed to tribes and individual Indians to manage and administer trust assets for the exclusive benefit of tribal and individual Indian beneficiaries pursuant to federal law." 25 C.F.R. § 115.001 (2018). Tribes may "recommend certain investments" to the Department of the Interior, "but the recommendations must be in accordance with the statutory requirements set forth in 25 U.S.C. §§ 161a and 162a" and "[t]he OTFM will make the final investment decision based on prudent investment practices." 25 C.F.R. § 115.809 (2018). Thus, pursuant to the Department of the Interior's regulations, the ultimate decision on how to invest tribal trust funds resided with the government, not with the tribes. As the United States Supreme Court announced in Mitchell II:

> "[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection." Navajo Tribe of Indians v. United States, 224 Ct. Cl. 171, 183, 624 F.2d 981, 987 (1980).

Mitchell II, 463 U.S. at 224-25. Based on the language of 25 U.S.C. § 162a, which was in effect during the entire time the government held in trust plaintiffs' three tribal trust funds, and its implementing regulations, which were promulgated during the investment period at issue for plaintiffs' three tribal trust funds, the Department of the Interior, and not the tribes, retained final control and supervision of plaintiffs' three tribal trust funds during the thirty-three-year period covered in the current case, including for the investment of the funds in government-backed securities. Furthermore, once the Secretary of the Interior decided to invest plaintiffs' three tribal trust funds in government-backed securities, the government was statutorily required to actively manage the tribal trust funds. See 25 U.S.C. § 162a(d). The government, thus, assumed a fiduciary duty when investing plaintiffs' tribal trust funds pursuant to 25 U.S.C. § 162a.

Previously, the United States Court of Claims, as indicated above, a predecessor court to this court, and Judges of the United States Court of Federal Claims have determined that the government has a fiduciary duty to invest tribal trust funds pursuant

to 25 U.S.C. § 162a. See Cheyenne-Arapaho, 206 Ct. Cl. at 348, 512 F.2d at 1394 (noting that the government has a "fiduciary duty" pursuant to 25 U.S.C. § 162a); see also Goodeagle v. United States, 122 Fed. Cl. at 296 (stating that the Department of the Interior had a "fiduciary duty" to invest tribal trust funds pursuant to 25 U.S.C. § 162a (citing Jicarilla III, 112 Fed. Cl. at 289)); Jicarilla III, 112 Fed. Cl. at 289 (noting that the duty set out in the various statutes underlying the government's "statutory investment scheme," including 25 U.S.C. § 162a, was a "'fiduciary duty'" (quoting Cheyenne-Arapaho, 206 Ct. Cl. at 348, 512 F.2d at 1394)); Osage Tribe of Indians of Okla. v. United States, 72 Fed. Cl. 629, 668 (2006) (stating that the government "undertook" a "fiduciary duty" to invest tribal trust funds under 25 U.S.C. §§ 161a, 162a (quoting Cheyenne-Arapaho, 206 Ct. Cl. at 348, 512 F.2d at 1394)); Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States, 69 Fed. Cl. 639, 662 (2006) (noting that pursuant to 25 U.S.C. §§ 161a, 162a, "[t]he executive branch has been charged by Congress with a fiduciary responsibility for the productive investment of funds held in trust for the Indians through the enactment and amendment of investment statutes that create specific fiduciary duties"); Ogala Sioux Tribe of Pine Ridge Indian Reservation v. United States, 21 Cl. Ct. 176, 189 (1990) (noting that "[f]rom the foregoing statutes," including 25 U.S.C. § 162a, "we think the Tribe has established that the defendant exercises such pervasive authority and elaborate control over tribal land and monies so as to create a trust relationship giving rise to fiduciary obligations for the management of the Tribe's assets at issue here").[25]

Defendant, however, asserted in its post-trial brief that, based on the language of Subsection (a) of 25 U.S.C. § 162a, defendant has a "discretionary" duty to invest tribal trust funds. As noted above, Subsection (a) of 25 U.S.C. § 162a states:

> That the Secretary of the Interior, if he deems it advisable and for the best interest of the Indians, may invest the trust funds of any tribe or individual Indian in any public-debt obligations of the United States and in any bonds, notes, or other obligations which are unconditionally guaranteed as to both interest and principal by the United States . . . .

25 U.S.C. § 162a(a). Although the statute allows the Secretary the discretion to decide whether to invest tribal trust funds in securities "unconditionally guaranteed as to both interest and principal by the United States," such discretion does not remain unsupervised

---

[25] The United States Court of Claims recognized that the government also has a fiduciary duty to invest tribal monies under 25 U.S.C. §§ 161a, 161b, statutes which provide that the government can maintain tribal trust funds in interest-bearing accounts in the United States Treasury. See Am. Indians Residing On Maricopa-Ak Chin Reservation v. United States, 229 Ct. Cl. 167, 203, 667 F.2d 980, 1002 (1981) ("Where the Government takes on or has control and supervision over tribal money or property, the normal relationship is fiduciary unless Congress expressly has provided otherwise." (citing Cheyenne-Arapaho, 206 Ct. Cl. at 345, 512 F.2d at 1392 (discussing the fiduciary duty applicable under 25 U.S.C. §§ 161a, 161b) (other citations omitted)))), cert. denied, 456 U.S. 989 (1982).

and without accountability. Once the Secretary of the Interior has made the decision to invest tribal trust funds in government-backed securities, the Secretary is obligated to accurately account for its investments of such funds and to properly manage the assets so invested in, including the provision of "adequate staffing, supervision, and training for trust fund management and accounting." See id. at § 162a(d). Therefore, the duty imposed on the government under 25 U.S.C. § 162a is not at the complete unsupervised discretion of the government or without oversight of whether the government is acting in accordance with standards on how to manage a fiduciary responsibility.

Even if defendant had complete discretion to invest tribal trust funds under 25 U.S.C. § 162a, which it does not, defendant's investment decisions still would be subject to responsible fiduciary standards. According to defendant's post-trial brief, "when Congress expressly grants an agency discretion over a power prescribed by statute, the agency's exercise of its discretion is reviewed for abuse of discretion" and claims that "Trust law follows" this principal, citing to the Restatement (Third) of Trusts § 87. Section 87 of the Restatement (Third) of Trusts states that "[w]hen a trustee has discretion with respect to the exercise of a power, its exercise is subject to supervision by a court only to prevent abuse of discretion." Restatement (Third) of Trusts § 87. The Restatement (Third) of Trusts explains, however, that "[a] court will not interfere with a trustee's exercise of a discretionary power (or decision not to exercise the power) when that conduct is reasonable, not based on an improper interpretation of the terms of the trust, and not otherwise inconsistent with the trustee's fiduciary duties." Restatement (Third) of Trusts § 87 cmt. b. The Restatement (Third) of Trusts also states that a "power is discretionary except to the extent its exercise is directed by the terms of the trust or compelled by the trustee's fiduciary duties." Id. at cmt. a. Thus, even though a trustee may have discretionary powers, the trustee's discretionary decision must still be exercised in accordance "with the trustee's fiduciary duties." See id.

In addition, defendant's argument that it only has a "discretionary," not fiduciary, duty to invest tribal trust funds pursuant to 25 U.S.C. § 162a has already been rejected by a Judge of this court. See Goodeagle v. United States, 122 Fed. Cl. at 296. In Goodeagle, defendant argued that the government's power to invest "individual Indian money" was "discretionary" pursuant to 25 U.S.C. § 162a.[26] See Goodeagle v. United States, 122 Fed. Cl. at 296. The Goodeagle court stated that defendant's position was "misguided" because "the Supreme Court has found there to be an existing statutory mandate to prudently invest Indian funds" even "absent explicit statutory language." Id. (citing Mitchell II, 463 U.S. at 225). The court also stated that "[t]his interpretation stems from a common law understanding that a fiduciary duty exists with respect to such monies or properties unless Congress has provided otherwise." Id. (citing White Mountain Apache

_____

[26] "Individual Indian money" is a different type of investment account than tribal trust funds, the investment accounts at issue in this case. Despite this difference, the duty to invest either type of account is the same and is governed by 25 U.S.C. § 162a. See Goodeagle v. United States, 122 Fed. Cl. at 296 (noting that "the same fiduciary duty applies equally to individual Indian funds" and "tribal trust funds" because "they are both governed by 25 U.S.C. § 162a").

Tribe of Ariz. v. United States, 20 Cl. Ct. 371, 383 (1990) (citing Mitchell II, 463 U.S. at 225)).

Defendant argued that "to the extent" that Cheyenne-Arapaho, a case relied upon by the plaintiffs, announces a common law duty to manage tribal trust funds, it is

> inconsistent and irreconcilable with the Supreme Court's opinions in more recent cases clarifying that "[t]he trust obligations of the United States to the Indian tribes are established and governed by statute rather than the common law." Jicarilla Apache Nation, 564 U.S. at 165, 131 S. Ct. at 2318; see also Navajo Nation, 537 U.S. at 506.

Plaintiffs, however, argued that "[t]he Cheyenne-Arapaho decision remains good law and is the controlling law in this circuit." Plaintiffs further asserted that "Cheyenne-Arapaho did not enunciate a common-law-based duty of the United States to manage tribal trust funds," but instead "permissibly employed common law principles to inform its interpretation of the governing statutes and to determine the scope of liability that Congress has imposed on the Government with respect to the investment of tribal trust funds."

In fact, Cheyenne-Arapaho did not announce that 25 U.S.C. § 162a imposes a common law duty on the government, but instead looked to the common law for help to define the contours of the government's fiduciary duty. In Cheyenne-Arapaho, various Indian tribes brought an action to recover damages for an alleged failure by the BIA to properly manage certain judgment funds held in trust for the tribes. See Cheyenne-Arapaho, 206 Ct. Cl. at 345, 512 F.2d at 1392. The United States Court of Claims, when deciding the parties' cross-motions for partial summary judgment as to defendant's liability for allegedly mismanaging the tribes' judgment funds, examined the various investment statutes codifying the Department of the Interior's investment options for tribal trust funds, including 25 U.S.C. §§ 160, 161a, and 161b (1970), and 25 U.S.C. § 162a (1970), an earlier version of 25 U.S.C. § 162a, the statute at issue in the above-captioned case. See Cheynne-Arapaho, 206 Ct. Cl. at 346-48, 512 F.2d at 1392-94. Although none of the statutes at issue in Cheyenne-Arapaho expressly used the phrase "fiduciary duty," the United States Court of Claims, in defining the government's duty, reviewed the history of the relevant investment statutes and noted that, pursuant to the "statutory scheme," the government held Indian tribal funds in "trust." Id. at 346, 512 F.2d at 1393. The United States Court of Claims also noted that pursuant to 25 U.S.C. § 162a, the government had the discretion to invest "the funds 'for the best interest of the Indians' in 'any public-debt obligations of the United States and in any bonds, notes or other obligations which are unconditionally guaranteed as to both interest and principle by the United States.'" Cheyenne-Arapaho 206 Ct. Cl. at 347-48, 512 F.2d at 1393-94 (quoting 25 U.S.C. § 162a). The United States Court of Claims concluded that the government had a "fiduciary duty" to invest tribal trust funds pursuant to 25 U.S.C. § 162a. See Cheyenne-Arapaho v. United States, 206 Ct. Cl. at 348, 512 F.2d at 1394 (citing Blankenship v. Boyle, 329 F. Supp. 1089, 1096 (D.D.C. 1971); and Restatement (Second) of Trusts, § 181 (1959)). Contrary to defendant's position, the court in Cheyenne-Arapaho did not

74

impose common law trust principles on the government. Instead, the Cheyenne-Arapaho court inferred that based on the trust relationship created by the various statutes at issue, including the earlier version of the statute at issue in the above-captioned case, as well as the government's discretion to invest tribal trust funds in various government-backed securities if it was in the "best interest of the Indians," the statutes at issue imposed a fiduciary duty on the government.

Also, according to the United States Supreme Court, while the government's fiduciary duty must stem from law, "[o]nce federal law imposes" a fiduciary duty on the government, "the common law could play a role. We have looked to common-law principles to inform our interpretation of statutes and to determine the scope of liability that Congress has imposed." Jicarilla I, 564 U.S. at 176 (internal quotation marks omitted) (citation omitted); see also United States v. Navajo Nation, 556 U.S. 287, 301 (2009) (Navajo II). Judge Allegra explained in Jicarilla II, when rejecting the government's argument that Cheyenne-Arapaho was no longer good law, the same argument the government makes in the case before this court that:

> [T]he essential premise for defendant's argument—that Cheyenne–Arapaho is at odds with intervening Supreme Court decisions—is simply wrong. In fact, in many ways, the reasoning employed by the Court of Claims in Cheyenne–Arapaho presaged the analysis later prescribed by the Supreme Court. Thus, as would later be dictated by Navajo I, the Court of Claims initially focused on the network of statutory provisions dealing with the investment of tribal funds . . . . Cheyenne–Arapaho, 512 F.2d at 1392–94. Examining the language and history of those statutes, the court found that they collectively imposed a fiduciary duty on the United States to make prudent investments. Id. at 1394. The court went on to flesh-out this skeletal duty in holding that defendant was liable to the plaintiffs for the difference between what had been earned on the funds and the maximum the funds could have legally and practically earned if properly invested. Id. at 1396. Toward this end, the Court of Claims outlined a series of government obligations that stemmed from that duty, none of which were itemized in the statutes. As would later be dictated by the Supreme Court, the court thus used common law principles not to establish the fiduciary obligations, but rather "to inform [its] interpretation of statutes and to determine the scope of liability that Congress has imposed." Jicarilla, 131 S. Ct. at 2325; see also White Mountain Apache, 537 U.S. at 475–76, 123 S. Ct. 1126; Sisk, supra, at 339 ("In the case of a Native American claimant, where the government has assumed pervasive control over Indian assets, the trust doctrine unavoidably overlays and infuses the legal analysis.").

*   *   *

This court will not be the first to blunder down this path. Like the courts before it, it can accept neither defendant's assertion that Cheyenne–

Arapaho has, *sub silentio,* been overruled, nor the wooden interpretation of the United States' statutory duties upon which that claim is based.

Jicarilla II, 100 Fed. Cl. at 734-35, 738 (emphasis in original) (footnotes omitted).

Moreover, a possible indication that the United States acknowledged a fiduciary duty to invest tribal trust funds as part of its obligations under 25 U.S.C. § 162a is that the Department of the Interior has promulgated policies that state that the government will actively and prudently invest tribal trust funds. As discussed in more detail below, the concept of prudently investing funds is part of the government's fiduciary duty to invest tribal trust funds. For example, on May 6, 1974, even before Cheyenne-Arapaho was decided, the Department of the Interior circulated its "Policy of the Bureau of Indian Affairs Regarding the Investment of Tribal Trust Funds," in an internal memorandum, which was submitted as a joint exhibit at trial and which suggested as a policy goal that, "[i]t is the policy of the Bureau of Indian Affairs to maximize returns on all tribal, as well as individual, trust funds." (capitalization in original). Similarly, the Department of the Interior's 1997 Office of the Special Trustee's Policy stated that:

> An OTFM Management Board (Board) was appointed by the Special Trustee, and is responsible for establishing operating policy which will ensure that investments are maintained in a proper and prudent mix and maturity distribution, represent sound extensions of credit, and are appropriate assets with regard to legal requirements and needs of the Indian beneficiaries involved.

The 1997 Office of the Special Trustee's Policy also provided that "OTFM intends to manage its Indian trust portfolio in a manner that protects the integrity of the primary function of the portfolio, which is to provide maximum income for the tribes while conforming to prescribed statutory limitations and prudent fiduciary investment principles."

Furthermore, defendant's fact witness, Mr. Winter, who was a member of the Portfolio Review Committee within the Office of the Special Trustee, which oversaw and reviewed the government's investment of plaintiffs' three tribal trust funds from 2001 to 2013, testified at trial that the government had a duty to prudently invest tribal trust funds. When asked by plaintiffs' counsel at trial, "[d]o you agree that the Office of the Special Trustee has an obligation to invest trust funds prudently," Mr. Winter testified that, "[y]es, I would agree." Also, when asked at trial by defendant's counsel about the "mission of the Office of the Special Trustee," the office within the Department of the Interior that took over responsibility for managing tribal trust funds in 1996 and the office in which Mr. Winter began working in "July of 1998," Mr. Winter responded, "[w]ell, the mission of the Special Trustee is to manage appropriately the Indian trust funds that we receive, to invest those in a prudent manner, and to distribute those, all as a fiduciary." The court, therefore, finds, in accordance with the Judges of this court and the United States Court of Claims that, pursuant to 25 U.S.C. § 162a, and its implementing regulations, defendant has a fiduciary duty to prudently invest and manage tribal trust funds.

How to define what constitutes prudent investment and management of tribal funds over a lengthy period of time is the true challenge of this and other cases contesting how tribal trust funds were invested by the Department of the Interior. Given fluctuating investment conditions and the many factual differences specific to each case, each individual case requires separate, in-depth scrutiny. The difficulty is compounded, in this and many other tribal trust fund cases, by the length of time between the dates of the investments and management of the funds and when this and other cases come to fruition in the courts. The liability expert reports of both plaintiffs and defendant, offered to the court at trial included overviews of chronological, selected slices of the government's investment of plaintiffs' 326-K, 326-A-1 and 326-A-3 Funds and offered opinions as to whether defendant's investment choices should be considered prudent. As discussed further below, after careful study of the records, the expert reports, as well as the testimony of the experts presented to the court, and the testimony of defendant's fact witnesses, the court has analyzed the thirty-three-year investment period at issue in this case in somewhat more refined chronological time periods than those chosen by plaintiffs or defendant, although all parties and the court implicitly understand that there is no absolutely correct way to divide up the investment period for the thirty-three years for analysis purposes. Given the record provided to the court, the court tried to review the two hard line, absolute positions offered by plaintiffs and defendant: imprudent versus prudent investment of the entire 326-K, the entire 326-A-1 and the entire 326-A-3 Funds throughout the entire thirty-three-year period at issue. Neither parties' liability experts took the position in their respective expert reports, nor at trial that the government breached its fiduciary duty or not during more discrete time periods. The court, upon careful review of the lengthy record before the court, has chosen somewhat more divided time-blocks than the time-periods analyzed by the parties, and has concluded that there were clear breaches during many of the periods of investment, but not during all.

Regarding the burden of proof in this case, in their pre-trial filings, plaintiffs initially asserted that defendant had the burden "to justify" less than maximum returns on the plaintiffs' three tribal trust funds and cited to Cheyenne-Arapaho. Plaintiffs, however, in their post-trial brief, in line with defendant's position, noted that the "burden is on WSIG [plaintiffs] to prove that the Government breached this duty and that a loss resulted." Plaintiffs' counsel also stated at closing argument that, "[o]ur position, Your Honor, is that the Plaintiff bears the burden of proof on liability."

In Cheyenne-Arapaho, the issue was whether the government's decision to maintain tribal trust funds in simple interest-bearing accounts in the United States Treasury instead of investing tribal trust funds in government-backed securities, pursuant to 25 U.S.C. § 162a, which could have obtained higher yields for the tribe, was a breach of trust. See Cheyenne-Arapaho, 206 Ct. Cl. at 346-47, 512 F.2d at 1393. The Cheyenne-Arapaho court announced that the burden of proof fell on the government to "justify less than a maximum return." Id. at 348, 512 F.2d at 1394. Unlike in Cheyenne-Arapaho, the plaintiffs in the above-captioned case are not alleging that the government completely failed to invest plaintiffs' three tribal trust funds in government-backed securities, but instead allege that the government invested plaintiffs' three tribal trust funds in too short-

term government-backed securities. The United States Court of Appeals for the Federal Circuit in <u>Confederated Tribes of Warm Springs Reservation of Oregon v. United States</u>, 248 F.3d 1365 (Fed. Cir. 2001) (<u>Warm Springs</u>), a Native American breach of trust case, noted that it "is a principle of long standing in trust law" that the "beneficiary" has to show "a breach of the trustee's duty and a resulting loss," which, as indicated above, the parties do not dispute.  <u>See</u> <u>Warm Springs</u>, 248 F.3d at 1371. Therefore, in line with the Federal Circuit's decision in <u>Warm Springs</u>, plaintiffs have the burden to prove their breach of trust claim.

III.    **The scope of the fiduciary duty to invest tribal trust funds pursuant to 25 U.S.C. § 162a**

There are no guaranteed outcomes when investing, nor, typically, were there, during the time in question, guaranteed formulas for an investor to use to obtain the correct balance to minimize risk or to maximize profit. Even with the more recent development of computer-based investment programs, there are no such guarantees. In addition, there is no definition contained in 25 U.S.C. § 162a which provides more than very general guidance on how the government should exercise its fiduciary duty to invest tribal trust funds. When a statute imposes a fiduciary duty on the government, but does not explicitly define the scope of the fiduciary duty or guide the mechanics of how to advance the desired result, the court may look to the common law for guidance on how to define the scope of the duty. <u>See</u> <u>Jicarilla I</u>, 564 U.S. at 177 ("Once federal law imposes such duties, the common law 'could play a role.' We have looked to common-law principles to inform our interpretation of statutes and to determine the scope of liability that Congress has imposed." (citation omitted)); <u>see also</u> <u>Navajo II</u>, 556 U.S. at 301; <u>White Mountain Apache Tribe v. United States</u>, 249 F.3d 1364, 1377 (Fed. Cir.) ("Once we have determined that a fiduciary obligation exists by virtue of the governing statute or regulations, it is well established that we then look to the common law of trusts, particularly as reflected in the *Restatement (Second) of Trusts,* for assistance in defining the nature of that obligation." (emphasis in original)), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2001), <u>aff'd</u>, 537 U.S. 465 (2003).

As an initial matter, the parties agree that the primary fiduciary duty at issue in this case is the duty of "prudence."[27] Although the parties both cited to the Restatement (Third) of Trusts[28] in their expert reports and their post-trial briefs, the parties did not discuss at

---

[27] Both parties' liability experts also discuss the related fiduciary duty to keep informed of the propriety of the investments made, which is discussed in more detail below.

[28] The Restatement (Second) of Trusts was published in 1959. The Restatement (Third) of Trusts is the most recent version of the Restatement, which published Volumes I and II in 2003, Volume III in 2007, and Volume IV in 2012. <u>See</u> Restatement (Third) of Trusts Foreword. The Restatement (Third) of Trusts also had previously published in 1992 a limited volume, entitled the "Prudent Investor Rule" Volume, and which is now included in Sections 90 through 92 of Volume III of the Restatement (Third) of Trusts. <u>See</u> <u>id.</u> at Part 6, Chapter 17, Forenote (stating that the prudent investor rule was "originally published as §§ 227-229 of Restatement Third, Trusts (Prudent Investor Rule), in 1992").

trial, in their filings, or in their expert reports whether the court should look for guidance as to the scope of the duty of prudence to the Restatement (Second) of Trusts, which was the restatement in circulation during the first approximately twelve years the 326-K Fund was in trust, i.e., from 1979 to 1991, or to the Restatement (Third) of Trusts, which was the restatement in circulation for the remaining years the 326-K Fund and the 326-A-1 and 323-A-3 Funds were held in trust, i.e., from 1992 to 2013.

The duty of prudence articulated in the Restatement (Second) of Trusts, also known as the "prudent-man rule," requires a trustee to "to make such investments as a prudent man would make of his own property having in view the preservation of the estate and the amount and regularity of the income to be derived." Restatement (Second) of Trusts § 227. The Restatement (Second) of Trusts explains that this duty requires the trustee to exercise care, skill, and caution. See id. at § 227 cmt. e ("In making investments, not only is the trustee under a duty to use due care and skill, but he must use the caution of a prudent man.").

The duty of prudence articulated in the Restatement (Third) of Trusts, also known as the "prudent investor rule," requires a trustee to act "as a prudent investor would, in light of the purposes, terms, distribution requirements, and other circumstances of the trust." Restatement (Third) of Trusts § 90. The Restatement (Third) of Trusts also requires the trustee to exercise "reasonable care, skill, and caution." Id. at § 77 (stating that the "trustee has a duty to administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust," and that the "duty of prudence requires the exercise of reasonable care, skill, and caution"). According to the Restatement (Third) of Trusts, the prudent investor rule was intended to modernize and create more flexibility for investment than what was available under the prudent-man rule of the Restatement (Second) of Trusts. See id. at Reporter's Notes on § 90 ("New § 90 was intended to apply in states that had adopted the traditional prudent-man rule by statute or judicial decision, and to assist in modernizing or clarifying the law of those states. This has been accomplished now in nearly all states by legislation since the Prudent Investor Rule volume was approved in 1990."). As the Restatement (Third) of Trusts explains, the current prudent investor rule "avoid[s] the unnecessary (and occasionally costly) controversy over whether trustees are to invest as prudent investors would in managing their own funds," which was the general understanding under the prudent-man rule, "or in managing the funds of others," which is the concept articulated in the prudent investor rule. See id. In addition, the general standards of care, skill, and caution under the older prudent-man rule had been inflexibly applied by courts. See id. at § 90 cmt. k; id. at Reporter's Notes on § 90. According to the Restatement (Third) of Trusts, under the older, prudent-man rule,

> general standards were often crystallized into subrules specifying the permissible types and acceptable characteristics of trust investments. This was done in varying degrees of definiteness and, although usually accompanied by recognition of some general requirement of diversification,

> tended strongly to judge and classify investments in isolation. Broad categories of properties and techniques came to be branded as "speculative," or not of "investment quality," and to be viewed as per se or presumptively imprudent. This was usually based on some perceived but undefined degree of risk that exceeded what the duty of caution would bear. The exercise of care, skill, and caution in establishing and implementing a suitable investment strategy usually was no defense in a surcharge action attacking a trustee's acquisition or retention of individual assets that were classified as "impermissible."
>
> The terms of a trust or statute may still make a particular type of investment or course of action impermissible. Otherwise, under the prudent investor rule, assets and techniques are no longer so classified in isolation.

Restatement (Third) of Trusts § 90 cmt. k (citations omitted).

Although the fiduciary duty of prudence articulated in the Restatement (Second) of Trusts differs slightly from the duty articulated in the Restatement (Third) of Trusts, both require the trustee to exercise reasonable care, skill, and caution. Also, although the prudent investor rule contained within the Restatement (Third) of Trusts is considered "more modern" than the prudent-man rule contained in the Restatement (Second) of Trusts, the prudent investor rule, as the Restatement (Third) of Trusts notes, is "consistent in principle" with the prudent-man rule. See id. at § 77; id. at Reporter's Notes on § 77. Furthermore, the liability experts for both parties in the above-captioned case discussed the prudent investor rule and relied upon and cited to the Restatement (Third) of Trusts in their expert reports when discussing the fiduciary duty applicable to defendant. Also, both the plaintiffs and defendants cited to the Restatement (Third) of Trusts in their post-trial filings when defining the government's scope of the fiduciary duty to prudently invest tribal trust funds. In light of the parties' reliance on the Restatement (Third) of Trusts, and, because the nuances between the fiduciary duty of prudence articulated in both restatements are not fundamentally inconsistent with each other, the court, as do the parties, looks to the Restatement (Third) of Trusts when defining the scope of 25 U.S.C. § 162a.

The duty to prudently invest by using "reasonable skill, caution, and care"

The fiduciary duty imposed on the government pursuant to 25 U.S.C. § 162a requires the government "to invest and manage the funds of a trust as a prudent investor would, in light of the purposes, terms, distribution requirements, and other circumstances of the trust."  Restatement (Third) of Trusts § 90; id. at § 77. As the Restatement (Third) of Trusts notes:

> This standard requires the exercise of reasonable care, skill, and caution, and is to be applied to investments not in isolation but in the context of the trust portfolio and as a part of an overall investment strategy, which should incorporate risk and return objectives reasonably suitable to the trust.

Restatement (Third) of Trusts § 90.

The three-pronged duty of care, skill, and caution is a duty that Judges of this court previously have applied within the context of 25 U.S.C. § 162a. See Goodeagle v. United States, 122 Fed. Cl. at 296 (noting that the government has a "statutory mandate to prudently invest Indian funds," which "stems from a common law understanding that a fiduciary duty exists with respect to such monies or properties unless Congress has provided otherwise"); Jicarilla III, 112 Fed. Cl. at 290 (noting that the BIA's fiduciary duty "has three prongs: the BIA must apply care in investigating the investments available for the funds; it must employ a reasonable degree of skill in selecting among those investments; and it must be cautious in preserving the trust estate while seeking a reasonable return on investment"). For example, as a Judge of this court explained in Osage, in cases alleging a breach of trust pursuant to 25 U.S.C. § 162a, in which the government's selection of securities has been circumscribed by law to government-backed securities, "defendant's prudent discharge" of the duties of care and caution, "is limited to selecting the highest yielding investment instruments of suitable maturity available for trust funds." Osage Tribe of Indians of Okla. v. United States, 72 Fed. Cl. at 667. The Osage court noted that the government also must observe that "[t]he requirement of skill obliges the BIA to obtain the highest rate of return available consistent with the prudent management of the statutorily-mandated investments." Id. The Osage court suggested that "[t]he fiduciary requirement to make prudent investments requires that any amount maintained as a cash balance that is in excess of the immediate disbursement needs for the period should be invested in a vehicle offering a higher return." Id. at 666-67.

The prudent investor rule is at least in part historically rooted in a decision decided long ago by the Supreme Judicial Court of Massachusetts in Harvard College v. Amory, a breach of trust case cited to by both defendant's liability expert, Dr. Starks, and plaintiffs' rebuttal expert, Dr. Goldstein, in their respective expert reports. According to the Harvard College court, a trustee is required to

> conduct himself faithfully and exercise a sound discretion. He is to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested.

Harvard College v. Amory, 26 Mass. (9 Pick.) 446, 461 (1830). The Restatement (Third) of Trusts also notes:

> The prudent investor rule of this Section [i.e., Section 90] has its origins in the dictum of Harvard College v. Amory, 9 Pick. (26 Mass.) 446, 461 (1830), stating that trustees must "observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in

regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested."

The rule was restated as the "prudent-man rule" in prior Restatements, declaring the trustee's duty "to make such investments and only such investments as a prudent man would make of his own property having in view the preservation of the estate and the amount and regularity of the income to be derived." Restatement Second, Trusts § 227 (1959).

Restatement (Third) of Trusts § 90 general note; see also Mellon Bank, N.A. v. United States, 265 F.3d 1275, 1279 (Fed. Cir. 2001) ("The prudence standard for trustee investing traces back to Harvard College v. Amory, 26 Mass. 466 (Mass. 1830).").

Judge Allegra in Jicarilla III likewise pointed to the Harvard College principal that a trustee must balance the trust's "probable" income with the "probable" safety of the capital applied within the context of a Native-American breach of trust case brought pursuant to 25 U.S.C. § 162a. See Jicarilla III, 112 Fed. Cl. at 293. In Jicarilla III, the court stated that, "defendant steadfastly maintain[ed] that the BIA's short-term investment strategy was mandated" because the BIA was allegedly "obliged 'to preserve the trust corpus above all else,'" and that "'BIA simply could not lose principal on investments.'" Id. (quoting First Ala. Bank of Montgomery, N.A. v. Martin, 425 So. 2d 415, 427 (Ala. 1982), cert. denied, 461 U.S. 938 (1983); and Jicarilla III defendant's post-trial brief). The Jicarilla III court rejected defendant's argument that the BIA could not lose principal on investments, explaining that defendant's position was once

the law governing fiduciary investments—*in the early nineteenth century*, before Justice Putnam enunciated the "prudent man" rule in his 1830 decision in Harvard College v. Amory, 26 Mass. 446, 469 (1830). The latter case broke away from the conservatism in English case law prohibiting investment in anything but those instruments considered extremely safe, in favor of an approach based on "how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in the regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested." Id. While it took some time for Putnam's farsightedness to become the prevailing view, the notion that a trustee was obliged "to preserve the trust corpus above all else" most certainly was no longer the paradigm for prudence long before the period in question. Need evidence of this? Look no farther than the 1959 version of the Restatement (Second) of Trusts § 227 cmt. e (1959), which advised that "[i]n making investments, . . . a loss is always possible, since in any investment there is always some risk. . . . It is not ordinarily the duty of a trustee to invest only in the very safest and most conservative securities available."

Jicarilla III, 112 Fed. Cl. at 293 (emphasis in original) (footnotes omitted).

Regarding the first prong, the duty of care, a trustee must "exercise reasonable effort and diligence in making and monitoring investments for the trust, with attention to the trust's objectives. The trustee has a related duty of care in keeping informed of rights and opportunities associated with those investments." Restatement (Third) of Trusts § 90 cmt. d. Under the second prong, the duty of skill, a trustee must use the "*skill* of an individual of ordinary intelligence," and "should be reasonably able to understand the basic duties of prudent trusteeship." Id. at § 77 cmt. b (emphasis in original). Under the third prong, the duty of caution, a trustee "must exercise the *caution* of a prudent person managing similar assets for similar purposes." Id. (emphasis in original). It requires that the trustee "invest with a view both to safety of the capital and to securing a reasonable return." Id. at § 90 cmt. e. The duty of caution also requires a "flexible application," because

> trusts differ considerably in their risk-bearing capacities, as well as their purposes. Risk tolerances also vary from time to time during the life of must trusts, especially private trusts, shifting with the likelihood and proximity of having to liquidate holdings in order to meet major (certain or uncertain) trust obligations.

Id. at § 90 cmt. e(1).

Both parties' experts in the above-captioned case recognized that the duty to prudently invest must be applied with a certain level of flexibility and that there is a range of investments that an investor may or could have selected and still maintain a prudent portfolio. Plaintiffs' rebuttal expert witness, Dr. Goldstein, testified at trial that, "I think there's a range of things that you can consider prudence [sic]. I don't know if there's, like, slightly pru -- I mean, there may be slightly prudent, very prudent. I think there's more likely a range of activities or investments or whatever that could be considered prudent." Defendant's liability expert, Dr. Starks, testified at trial that, "when you're looking at what a fiduciary has done, you know, different reasonable people could have different opinions on what's the best portfolio here. So there can be -- excuse me -- there can be a range of prudence on which portfolio is -- is the most appropriate, the best."

In addition, "[t]he duty to act with caution does not, of course, mean the avoidance of all risk, but refers to a degree of caution that is reasonably appropriate or suitable to the particular trust, its purposes and circumstances, the beneficiaries' interests, and the trustee's plan for administering the trust and achieving its objectives." Restatement (Third) of Trusts § 77 cmt. b. Notably, the Restatement (Third) of Trusts explains,

> it is essential to recognize that compensated risk is not inherently bad. Therefore, no objective, general legal standard can be set for a degree of risk that is or is not prudent under the rule of this Section. Beneficiaries can be disserved by undue conservatism as well as by excessive risk-taking. Decisions concerning a prudent or suitable level of market risk for a particular trust can be reached only after thoughtful consideration of its purposes and all of the relevant trust and beneficiary circumstances. This

process includes, for example, balancing the trust's return requirements with its tolerance for volatility.

Id. at § 90 cmt. e(1). Also, the Restatement (Third) of Trusts provides that,

one pervasive generalization prevails concerning the prudent investor's duty of caution: reasonably sound diversification is fundamental to the management of risk, regardless of the level of conservatism or risk appropriate to the trust in question. Therefore, trustees ordinarily have a duty to diversify investments. The purpose of diversification (apart from the role it may play in discharging the trustee's duty of impartiality) is not only to moderate risks that are inherent in investing but also to reduce risks that are not justified by some prospect of gain.

Id. (internal reference omitted). "So far as practical, the duty to diversify ordinarily applies even within a portion of a trust portfolio that is limited to assets of a particular type or having special characteristics." Id. at § 90 cmt. f.

The parties' experts in the above-captioned case agree that the duty to prudently invest does not require the trustee to avoid any risk of loss to the trust's principal. Plaintiffs' rebuttal expert report submitted by Dr. Goldstein noted that, "the avoidance of losses is not an absolute or even primary factor under" the prudent investor rule, nor "does this rule preclude investments which might involve some risk of capital loss." Defendant's liability expert, Dr. Starks, noted in her supplemental liability expert report that, "I agree that prudent investment can result in losses," and also noted that a fiduciary should not "take unnecessary risk by investing in instruments with longer maturities than the investment horizon suggests." Also, at trial, defendant's fact witness, Mr. Winter, who worked at the Office of Special Trustee and who was a member of the Portfolio Review Committee, which oversaw and reviewed the government's investment of plaintiffs' three tribal trust funds from 2001 to 2013, testified that with regard to the 326-K Fund, "with having the uncertainty surrounding the fund and when a payout could occur, I would always be incurring some sort of risk of loss based on when a future payout would be. My job is to try to minimize that risk."

The Restatement (Third) of Trusts also notes that whether the trustee acted prudently

is to be judged as of the time the investment decision in question was made, not with the benefit of hindsight or by taking account of developments that occurred after the time of a decision to make, retain, or sell an investment. The question of whether a breach of trust has occurred turns on the prudence and propriety of the trustee's conduct, not on the eventual results of investment decisions. The trustee is not a guarantor of the trust's investment performance.

Restatement (Third) of Trusts § 90 cmt. b; see also Navajo Tribe of Indians v. United States, 9 Cl. Ct. 336, 400 (1986) ("[T]he status of the trustee's act is judged by conditions

at the time he acted [;t]hat the act appears careless or imprudent in light of later circumstances is not material." (internal quotation marks omitted; second bracket in original)). In sum, the prudent investor rule takes into account the facts and circumstances at the time the investment was made and recognizes that what may be an imprudent course of action for one trust may be prudent for another trust. See Restatement (Third) of Trusts § 90 cmt. e(1) ("[T]he prudent investor rule, despite its requirement of caution, does not classify specific investments or courses of action as prudent or imprudent in the abstract. The rule recognizes that what may be underproductive of trust accounting income or risky—or even characterized as speculative—in isolation, or in a different context, may play a role in an investment strategy that contributes to the trustee's compliance with the requirement of caution.").

As part of the duty to prudently invest tribal trust funds, plaintiffs claim, quoting Cheyenne-Arapaho, 206 Ct. Cl. at 348-49, 512 F.2d at 1394, that the government must "invest Indian trust funds so as to 'maximize the trust income by prudent investment.'" Defendant recognizes that, generally speaking, the government should invest tribal trust funds to increase the value of the funds, and that to "maximize returns" is a policy goal of the Department of the Interior. Defendant stated in its post-trial brief that "since 1966, the Interior Department has followed a policy to hold bonds and securities to maturity, and to invest in a manner that seeks both to maximize returns and manage interest rate risk." Also, defendant's liability expert, Dr. Starks, noted in her expert report that "applicable fiduciary duties" for the government "include[d] adherence to a prudent process characterized by loyalty and care, as well as a policy to maximize expected income given prudent investment." The parties, however, disagree as to what it means to maximize returns, as well as the degree of allowable risk the government prudently was able to take, given the factors which gave context to the wisdom of the government's contemporaneous investment decisions for the funds at issue in this case, including the purpose of the funds and timing of the liquidation of the trust investments. Part of the difficulty, of course, is the difficulty of projecting breach as far as back as thirty-three years up until 2013 and putting hindsight in proper perspective.

The statute at 25 U.S.C. § 162a does not state that a trustee must "maximize" the trust income. See 25 U.S.C. § 162a. In addition, the Restatement (Third) of Trusts does not state that a fiduciary must "maximize" the trust income. The Restatement (Third) of Trusts "requires the trustee to invest with a view both to safety of the capital and to securing a reasonable return." Restatement (Third) of Trusts § 90 cmt. e.[29] A "reasonable return" refers "to total return, including capital appreciation and gain as well as trust-accounting income." Id.

---

[29] The court notes that even if it were to look for guidance within the Restatement (Second) of Trusts, that document does not state that a trustee must "maximize" trust income. The Restatement (Second) of Trusts states that a "trustee is under a duty to the beneficiary to use reasonable care and skill to make the trust property productive" and so "that it will produce an income." Restatement (Second) of Trusts § 181; id. at § 181 cmt. b.

Although 25 U.S.C. § 162a, nor the Restatement (Third) of Trusts, state that the trustee must "maximize" trust income as part of the duty to prudently invest, various courts, as well as the BIA's investment policies and the 1994 Trust Fund Management Reform Act, have referred to the government's fiduciary duty to invest tribal trust funds so as to "maximize" the trust income. In Manchester Band of Pomo Indians, Inc. v. United States, 363 F. Supp. 1238 (N.D. Cal. 1973) (Manchester Band), which appears to be one of the earlier cases to analyze the scope of the government's fiduciary duty under 25 U.S.C. § 162a, the court stated that the government must invest tribal trust funds yielding "the highest rate of return." Manchester Band, 363 F. Supp. at 1247-48. In Manchester Band, the court found that the BIA had breached its fiduciary duties when it (1) failed to invest plaintiffs' tribal trust funds in any investments from 1938 and 1959, allowing the funds "to lay fallow," and (2) placed plaintiffs' tribal trust funds, from 1966 to 1973, in the United States Treasury to receive a four percent return, which was permissible under 25 U.S.C. § 161a, when the evidence indicated that "numerous series of short-term government bonds were paying interest rates higher than 4 per cent [sic]," and, thus should have been invested in bonds with higher yields pursuant to 25 U.S.C. § 162a. See Manchester Band, 363 F. Supp. at 1247-48. In defining the government's fiduciary duty to invest tribal trust funds, the Manchester Band court looked to the Restatement (Second) of Trusts, the one in circulation at that time, and noted that "the trustee is under a duty to the beneficiary to use reasonable care and skill to make the trust property productive. In the case of trust moneys, it is thus normally the duty of the trustee to invest it so that it will produce income." Id. at 1245 (citing Restatement (Second) of Trusts § 181). The Manchester Band court also explained that within the context of the statutes at issue in the case, 25 U.S.C. § 161a and 25 U.S.C. § 162a, the fiduciary duty required the government to invest tribal trust funds in investments "yielding the highest rate of return." Manchester Band, 363 F. Supp. at 1247. According to the Manchester Band court,

> the Government is not free to choose any investment merely because that investment was authorized by statute. Under the present statutes there will always be several investment alternatives available to the trustee at any time. Thus, he could choose to deposit moneys in the Treasury and earn 4 per cent [sic] per annum where no higher return was available, but the failure to reinvest the interest generated on the funds would constitute a breach of duty, in the absence of any special circumstances which would demonstrate that such failure was in the best interest of the beneficiaries and in accord with the care and diligence which a man of ordinary providence would exercise in dealing with his own property. On the other hand, where the income from short-term Government bonds was higher, the trust obligations of the Secretary would not be satisfied by depositing the money in the Treasury at 4 per cent [sic], but rather by investment in those short-term bonds. Similarly, if other Government securities authorized for investment pay higher rates of return and are equally safe and liquid, then the trustee is obligated to invest in those government bonds yielding the highest rate of return. The Secretary of the Interior is under a duty to act pursuant to the Government's fiduciary obligations, and he is not prevented

from doing so by the statutes which authorize various investments for Indian trust funds.

Id.

Following the Manchester Band decision, the BIA noted in its 1974 policy memorandum regarding its investment of tribal trust funds that "[i]t is the policy of the Bureau of Indian Affairs to maximize returns on all tribal, as well as individual, trust funds." The BIA's 1974 policy memorandum noted that this standard "comports with the recent decision in Manchester Band of Pomo Indians v. United States, 363 F. Supp. 1238 (N.D. California 1973)." (underline in original).

The subsequent court decision to analyze the government's fiduciary duty under 25 U.S.C. § 162a was the United States Court of Claims' decision in Cheyenne-Arapaho, the case heavily cited to by plaintiffs in the case before this court. In Cheyenne-Arapaho, decided in 1975, two years after Manchester Band, the various Indian tribes at issue alleged that the government had breached its fiduciary duty to invest their tribal trust funds by maintaining their funds in a Treasury account paying four percent interest, pursuant to 25 U.S.C. § 161a, instead of using other investment tools available under 25 U.S.C. § 162a, such as government-backed bonds. See Cheyenne-Arapaho, 206 Ct. Cl. at 349, 512 F.2d at 1394. The Cheyenne-Arapaho court did not make a finding as to whether the government breached its fiduciary duty under 25 U.S.C. § 162a, stating that the record was not fully developed, and remanded the case back to the trial court to determine whether a breach had occurred. See id. at 350, 512 F.2d at 1395. The Cheyenne-Arapaho court, however, as previously noted, defined the scope of the government's fiduciary duty, stating:

The fiduciary duty which the United States undertook with respect to these funds includes the 'obligation to maximize the trust income by prudent investment,' and the trustee has the burden of proof to justify less than a maximum return. See Blankenship v. Boyle, 329 F. Supp. 1089, 1096

(D.D.C. 1971).[30] See also Restatement of Trusts 2d § 181 (1959).[31] A corollary duty is the responsibility to keep informed so that when a previously proper investment becomes improper, perhaps because of the opportunity for better (and equally safe) investment elsewhere, funds can be reinvested. While the trustee has a reasonable time in which to make the initial investment or to reinvest, he becomes liable for a breach of trust if that reasonable time is exceeded. Restatement of Trusts 2d §§ 231 and comm. b, 181 and comm. c (1959).

This is the general law governing the Government's duty and responsibility toward the Indian funds involved in this case.

Cheyenne-Arapaho, 206 Ct. Cl. at 348-49, 512 F.2d at 1394 (quotation marks in original).

Continuing with highlights from the relevant history, Congress issued a 1992 Congressional Report, which, as previously noted, summarized Congress's findings regarding the BIA's investment and management of various Indian funds, including tribal trust funds. The 1992 Congressional Report noted that "the Federal Government has a fiduciary duty to 'maximize the trust income by prudent investment,'" which required "the Government to stay well-informed about the rates of return and investment opportunities and to intelligently choose from among authorized investment opportunities to obtain the highest rate of return to make the trust funds productive." (quoting Cheyenne-Arapaho, 206 Ct. Cl. at 348-49, 512 F.2d at 1394). Congress then passed the 1994 Trust Fund

---

[30] Blankenship v. Boyle was a class action brought on behalf of coal miners, alleging a breach of trust by the trustee of the United Mine Workers of America Welfare and Retirement Fund of 1950. See Blankenship v. Boyle, 329 F. Supp. 1089, 1092 (D.D.C. 1971). The primary allegation was that the United Mine Workers of America Welfare and Retirement Fund of 1950 had accumulated "excessive amounts of cash" and "failed to invest cash that was available to generate income for the beneficiaries, and in total disregard of their duty allowed large sums to remain in checking accounts at the Bank without interest." Id. at 1095-96. The Blankenship court stated that "[a] basic duty of trustees is to invest trust funds so that they will be productive of income" and cited to a string of cases and the secondary source, "2 Scott on Trusts § 181 (3d ed. 1967)." Blankenship v. Boyle, 329 F. Supp. At 1095-96. The Blankenship court also stated, in passing, that "[t]he beneficiaries were in no way assisted by these cash accumulations while the Union and the Bank profited; and in view of the fiduciary obligation to maximize the trust income by prudent investment, the burden of justifying the conduct is clearly on the trustees." Id. at 1096 (citing Pepper v. Litton, 308 U.S. 295, 306 (1939)). The Blankenship court concluded that "[i]t was a continuous and serious violation of the trustees' fiduciary obligation for them to permit these accumulations of cash to remain uninvested." Id. at 1099.

[31] Section 181 of the Restatement (Second) of Trusts states that "[t]he trustee is under a duty to the beneficiary to use reasonable care and skill to make the trust property productive." Restatement (Second) of Trusts § 181.

Management Reform Act, which created the Office of the Special Trustee within the Department of the Interior and directed that the government should establish policies and procedures to "maximize" the trust income when investing tribal trust funds. See 25 U.S.C. § 4043(b)(2)(B). The 1994 Trust Fund Management Reform Act provided that the Office of the Special Trustee

> shall ensure that the Bureau [of Indian Affairs] establishes appropriate policies and procedures, and develops necessary systems that will allow it—(i) properly to account for and invest, as well as maximize, in a manner consistent with the statutory restrictions imposed on the Secretary's investment options, the return on the investment of all trust fund monies.

Id.

In 1997, the Office of the Special Trustee, within the Department of the Interior, took over the responsibility of investing tribal trust funds and published its investment policy, which provided that: "OTFM intends to manage its Indian trust portfolio in a manner that protects the integrity of the primary function of the portfolio, which is to provide maximum income for the tribes while conforming to prescribed statutory limitations and prudent fiduciary investment principles."

Since the Cheyenne-Arapaho case, was decided in 1975 by the Court of Claims, various Judges of this court have looked to Cheyenne-Arapaho in announcing that the government is required under 25 U.S.C. § 162a to "maximize" the trust income. See Goodeagle v. United States, 122 Fed. Cl. at 294 ("The Government's investment choices for both tribal and individual funds determine the rate of return on the accounts, and thus the Government, having chosen to make these investments, owes a fiduciary duty to individuals and tribes alike to invest their funds prudently in order to maximize return on the accounts." (citing Jicarilla III, 112 Fed. Cl. at 289 (citing Cheyenne-Arapaho, 206 Ct. Cl. at 348-49, 512 F.2d at 1394))); Jicarilla III, 112 Fed. Cl. at 288-29; Jicarilla II, 100 Fed. Cl. at 738 ("A phalanx of contrary precedent requires this court instead to honor the Court of Claims' holding that the trust investment statutes in question establish defendant's 'obligation to maximize the trust income by prudent investment.'" (quoting Cheyenne–Arapaho, 206 Ct. Cl. at 348-49, 512 F.2d at 1394)); Osage Tribe of Indians of Okla. v. United States, 72 Fed. Cl. at 668 ("The court in Cheyenne–Arapaho also adopted a prudent investor standard in defining the duty owed by the United States and made it clear that a prudent investment under these circumstances is one that maximizes the trust income earned from available investments.").

To "maximize," in the context of tribal trust fund investment decisions, however, does not necessarily mean that the fiduciary should seek out only the highest yielding instruments to achieve absolute top dollar without any consideration of the fiduciary duties of skill, caution, and care. For example, the concept of maximization as used by the Department of the Interior's 1997 investment policy, discussed above, indicated that the government was to "provide maximum income for the tribes," but also "conform[] to prescribed statutory limitations and prudent fiduciary investment principles." Additionally,

the Cheyenne-Arapaho court noted that the duty to maximize still required the investment to be "prudent." Cheyenne-Arapaho, 206 Ct. Cl. at 348-49, 512 F.2d at 1394. Furthermore, defendant's fact witness, Mr. Winter, who was an overseer of and reviewed the government's investment of plaintiffs' three tribal trust funds from 2001 to 2013, testified at trial that the government was not required to "simply chas[e] rates," but that it was required "to do adequate analysis of the cash flows" for a tribal fund's beneficiaries "in order to ensure that we obtain the highest rates for the maturities that we select in order to maintain those proper cash flows." Further, the court notes that among the various standard English dictionaries in circulation during the thirty-three-year investment period at issue for the 326-K Fund and the twenty-one-year period at issue for the 326-A-1 and 326-A-3 Funds, the term "maximize" has been understood in various ways, including to mean an increase in value, but while taking into consideration other "circumstances," such as risk. For example, Webster's abridged Ninth New Collegiate Dictionary defined the term "maximize" as to "find a maximum of value," and defined "maximum" as "an upper limit allowed (as by a legal authority) or allowable (as by the circumstances of a particular case)." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 734 (9th ed. 1991). Also, Webster's unabridged dictionary, the Third New International Dictionary of the English Language, defined the term "maximize" as "to make the most of : assign a position of maximum significance or worth to," and provided the following example of the term in usage: "unwise to [maximize] the importance of present profits at the risk of future security." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1396 (3rd ed. 2002) (punctuation in original).[32]

In Jicarilla III, the tribe alleged that from February 22, 1974 through September 30, 1992, the government had breached its fiduciary duty to prudently invest its tribal trust funds pursuant to 25 U.S.C. § 162a, the same statute which is at issue in the above-captioned case. See Jicarilla III, 112 Fed. Cl. at 278. The plaintiff's trust funds at issue in Jicarilla III were "'proceeds of labor'" accounts, which were accounts that "included funds received from the Nation's severance, timber, mineral, ranching, and farming activities," as well as various "'judgment award'" accounts, which, like plaintiffs' three tribal trust funds at issue in the above-captioned case, "included primarily funds received from awards made by the Indian Claims Commission." See id. at 279, 279 n.2.

The Jicarilla III court explained,

[d]uring the period in question, the BIA invested virtually all of Jicarilla's tribal trust funds in securities with maturities of one year or less. The weighted average days to maturity of these investments fluctuated between a low of 11 days to a high of 333 days, and typically ranged from approximately 30 to 180 days. Approximately 86 percent of Jicarilla's funds

---

[32] Although the version cited to above was printed in 2002, Webster's Third New International Dictionary of the English Language Unabridged (Webster's Third New International Dictionary) was first published in 1961, with the main text of the dictionary, including the definition above, remaining the same. New words have been added to Webster's Third New International Dictionary in an addendum section.

were invested in certificates of deposit (CDs) over this period, with the vast majority of non-CD investments (*i.e.,* government securities) limited to a five-year window from 1980 to 1984. From 1974 through 1978, in 1985, and again from 1989 through 1991, all of Jicarilla's funds were invested in CDs (as of the relevant reporting dates).

Id. at 280 (emphasis in original). The Jicarilla III court concluded:

The BIA's heavy reliance on short-term investments reduced the yield on Jicarilla's portfolios by failing to take appropriate advantage of the higher yields available on longer-term instruments. While there were isolated instances during the period in question when the yield curve was inverted (*i.e.,* short-term interest rates were higher than long-term interest rates), when push came to shove, none of the experts in this case—even defendant's—suggested that a prudent fiduciary would ever have counted on that being the case. As pointed out by plaintiff's experts, several studies suggest that the spread between investments of less-than-one-year and longer-term U.S. Treasury bonds (*e.g.,* between 5 and 10 years), was on the order of 1.5 percent. That spread, of course, represents an opportunity lost for the Nation. Moreover, the record suggests that the risks associated with long-term investments—principally, the risk of loss/price volatility associated with the sale of a Treasury security prior to maturity—were outweighed by the benefits that would have been produced had BIA employed a prudent investment strategy that employed a mix of short- and long-term investments.

Id. at 290-91 (emphasis in original) (footnotes omitted). The Jicarilla III court, therefore, held that the BIA had imprudently invested the Jicarilla III plaintiff's tribal trust funds when the BIA consistently invested the "lion's share of plaintiff's trust funds in relatively low-yielding, short-term obligations," the majority of which were CDs, and, thus, was "under a duty to pay the Nation the investment income lost by its imprudent management." Id. at 300.

The duty to keep informed and to monitor investments

A corollary duty to the fiduciary duty to prudently invest is the duty to "to keep informed so that when a previously proper investment becomes improper, perhaps because of the opportunity for better (and equally safe) investment elsewhere, funds can be reinvested." Cheyenne-Arapaho, 512 F.2d at 1394; see also Restatement (Third) of Trusts § 90 cmt. d ("The trustee has a related duty of care in keeping informed of rights and opportunities associated with those investments."). "The trustee must give reasonably careful consideration to both the formulation and the implementation of an appropriate investment strategy, with investments to be selected and reviewed in a manner reasonably appropriate to that strategy." Restatement (Third) of Trust § 90 cmt. d. Both of the parties' liability experts in the above-captioned case agreed that a trustee must take time to investigate the relevant market conditions and relevant facts

before making investments. According to defendant's liability expert report, authored by Dr. Starks, the trustee must "(1) gather pertinent information; (2) focus – pay attention – and deliberate before making a decision; and (3) use their skills in the process." (internal quotation marks omitted). Dr. Starks also testified at trial that a "fiduciary needs to use their skill and knowledge and experience, with caution, to investigate an investment." According to plaintiffs' expert report submitted by Rocky Hill Advisors, "the Government has an ongoing duty to monitor investments and to make portfolio adjustments if and as appropriate, with attention to all relevant considerations."

The parties, however, disagreed as to whether the duty to monitor investments obligates the trustee to document its investment strategy or to document it in a particular fashion. Plaintiffs argued that the government had a duty to document its investment practices for the 326-K Fund and that the government's alleged failure to document its process during the "1980s and 1990s" was a breach of its fiduciary duty to prudently invest plaintiffs' tribal trust funds. Plaintiffs noted that "[u]nlike the 1980s and 1990s, when there is no record outlining the Government's investment approach," the government documented its investment approach "after 2000," as evidenced by two separate documents introduced at trial as joint exhibits, which were an April 29, 2003 investment management report review of plaintiffs' three tribal trust funds by the BIA, and an October 25, 2005 investment management report review of plaintiffs' three tribal trust funds by the BIA. Plaintiffs argued that these two documents, however, "reflect" no "meaningful assessment of the investment horizon" conducted by the government "based on the relevant facts and available information." According to the trial testimony of plaintiffs' liability expert, Mr. Nunes, regarding the use of a written investment plan in his line of work as a financial officer at an investment firm, "[w]ell, for us, we're required to have -- it has to be written, of course. We have to be able to document that we have it." Mr. Nunes also testified that Rocky Hill Advisors, the investment firm owned in part by Mr. Nunes, is required to "develop a unique investment plan that's tailored to the client's needs, follow through on that plan, monitor that plan, [and] update that plan."

Contrastingly, defendant's post-trial brief noted that "[p]laintiffs' secondary argument[]," that "the United States did not prepare written 'investment plans,'" asks "the Court to impose duties upon the United States beyond what the law requires." According to defendant, the law "requires" the use of "reasonable care and skill to make the trust property productive," and not "that a trustee follow a particular written plan." (internal quotation marks omitted). Also, according to the trial testimony of defendant's liability expert, Dr. Starks, "they [the government] didn't have investment plans. That evolved over time. I mean, not just the Government. Investments, in general, for people didn't -- and even today, if you have a one-time payout, I don't know that you need an investment plan that's written down." The government, as discussed above, however, did develop evolving guidelines and policies and dedicated personnel to oversee and monitor investment decisions, which the parties do not dispute.

The statute at 25 U.S.C. § 162a does not require that the government create a written investment plan for each of the tribal trust funds the government manages. See 25 U.S.C. § 162a. The Restatement (Third) of Trusts also does not require a trustee to

maintain documentation of its investment strategy. Moreover, plaintiffs have not cited to any binding authority or case law in its filings submitted to the court which requires such documented investment strategy, nor does such a requirement appear to exist. Therefore, although Mr. Nunes, plaintiffs' liability expert, testified at trial that private investment firms maintain written investment plans, the government is not a private trustee and is not required to perform every policy and practice undertaken by private investment firms. See Jicarilla I, 564 U.S. at 174 (noting that "[t]he Government, of course, is not a private trustee," and that "Congress may style its relations with the Indians a 'trust' without assuming all the fiduciary duties of a private trustee").

Plaintiffs also argued that the "absence of evidence" regarding the government's investment process for the 326-K Fund during the "1980s and 1990s," "'must be weighed in plaintiff's favor,'" and that "'it is well-accepted that if a trustee fails to keep proper accounts, all doubts will be resolved against [the trustee] and not in [the trustee's] favor.'" (quoting Jicarilla III, 112 Fed. Cl. at 305 (citing Warm Springs, 248 F.3d at 1373); and citing Osage Tribe of Indians of Okla. v. United States, 75 Fed. Cl. 462, 475 (2007)). Plaintiffs point out that

> [t]here is no record whatsoever of why the Government, as trustee, invested the Docket 326-K funds as it did during the 1980s and 1990s. And there is no evidence that the Government ever, during these years, assessed the investment horizon of the funds or prepared an investment plan for the funds. This absence of evidence establishes that the Government's investment process was not prudent.

Plaintiffs' reliance on Jicarilla III is misplaced. In Jicarilla III, in addition to its underinvestment claim, the Jicarilla III plaintiff alleged that the government, without authorization, disbursed a portion of plaintiff's "tribal trust funds to pay for BIA payroll and expenses." Jicarilla III, 112 Fed. Cl. at 302. The Jicarilla Judge explained that "[d]espite defendant's claims to the contrary, the trustee bears the burden of proof to show that charges or expenses for which it claims a credit were proper disbursements." Id. The Jicarilla court also noted that:

> Consistent with the common-sense notion that it is the trustee's burden to show that trust fund disbursements were authorized and otherwise proper, "if a trustee fails to keep proper accounts, 'all doubts will be resolved against him and not in his favor.'" Confederated Tribes of Warm Springs Reservation of Or. v. United States, 248 F.3d 1365, 1373 (Fed. Cir. 2001) (citing William F. Fratcher, Scott on Trusts § 172 (4th ed. 1987)); see also White Mountain Apache Tribe of Ariz. v. United States, 26 Cl. Ct. 446, 449 (1992), aff'd, 5 F.3d 1506 (Fed. Cir. 1993), cert. denied, 511 U.S. 1030, 114 S. Ct. 1538, 128 L.Ed.2d 191 (1994) ("The burden of establishing the propriety of disbursements from tribal funds rests with the Government."); Minn. Chippewa Tribe, 14 Cl. Ct. at 125 ("The ultimate burden of proving the allowability of a disbursement is on defendant."). Defendant has failed to carry that burden with respect to the disbursements that plaintiff claims

were unauthorized. Accordingly, plaintiff prevails on its unauthorized disbursement claim.

Jicarilla III, 112 Fed. Cl. at 302-03 (footnote omitted). Plaintiffs in the above-captioned case do not allege that the government made unauthorized disbursements of their three tribal trust funds, but that the government underinvested their three tribal trust funds in too short-term securities.

Further, plaintiffs' reliance on the Warm Springs case, which is further discussed later in this Opinion, is also misplaced. The Warm Springs court noted that a trustee's "failure to keep proper accounts," will be "resolved against him and not in his favor" when determining the amount of damages in a breach of trust case. See Warm Springs, 248 F.3d at 1365 (internal quotation marks omitted). The Warm Springs tribal appellants alleged that "they should not bear the burden of proving losses that cannot be established with certainty because of the BIA's failure to keep adequate records." Id. The Warm Springs court noted that the tribal appellants introduced "specific evidence" that was "sufficient to establish a *prima facie* case of loss," due to the government's mismanagement of appellants' timber resources, and, thus, "to the extent that the difficulty in determining the amount of loss suffered by the Tribes," as a damages issue, "is attributable to improper accounting procedures followed by the BIA, the consequences of those difficulties should not be visited upon the Tribes." Id. at 1375 (emphasis in original). This current Opinion addresses whether plaintiffs can sufficiently prove that the government breached its fiduciary duty to prudently manage plaintiffs' tribal trust funds, not the amount of damages to be awarded if breach is established.

Additionally, in Warm Springs, the appellants alleged that the absence of records was due to the government's "fail[ure] to keep" accounting records and to "improper accounting procedures." Although the plaintiffs currently before this court alleged in the operative complaint, their second amended complaint, that the government failed to properly maintain tribal accurate accounting records for plaintiffs' three tribal trust funds, the plaintiffs did not develop this allegation in their pre- or post-trial filings before this court, nor did they argue that the government's failure to keep proper tribal accounting records resulted in a breach of the government's fiduciary duty when investing plaintiffs' three tribal trust funds at issue in this case. As previously discussed, both plaintiffs' and defendant's liability experts relied on the government's tribal trust accounting records for the plaintiffs' three tribal trust funds, as displayed in the government's electronic Trust Account Database, i.e., the TAD, to re-create the government's investment history of plaintiffs' three tribal trust funds for their analyses. Both of the parties' liability experts included a table in their respective expert reports, which displays a month-by-month break down of the maturity structure of the 326-K Fund, as well as the types of securities in which the 326-K Fund was invested, which was created using data from the TAD.[33]

---

[33] Plaintiffs' expert report prepared by Rocky Hill Advisors also relied on the TAD when creating a month-by-month break-down of the government's investment of the 326-A Funds. Defendant's liability expert, Dr. Starks, did not analyze the prudency of the 326-A Funds in her expert report, and, thus, did not discuss the history of the government's

Moreover, neither of the parties' experts contested the validity of the data contained in the TAD.

The parties jointly filed a document titled "REVISED STATEMENT OF ISSUES OF FACT AND LAW TO BE DECIDED BY THE COURT AT TRIAL," which stated that the issue of liability to be decided at trial was whether the government imprudently invested plaintiffs' three tribal trust funds in too short-term securities and did not include whether or not the government maintained accurate or complete tribal accounting records. (capitalization in original). Plaintiffs, however, note in their post-trial brief that there is simply an "absence of evidence" in the record of whether, "during the 1980s and 1990s," defendant "assessed the investment horizon of the funds or prepared an investment plan for the funds," and that "[t]his absence of evidence establishes that the Government's investment process was not prudent," presumably as a way to prove a lack of a carefully developed investment approach by the government. As previously discussed, the government during the 1980s and 1990s did develop policies and procedures regarding the investment of tribal trust funds and provided personnel to manage such funds. Also, as, the parties stipulated to in their joint stipulation of facts, the government had, as early as 1966 "initiated a formal investment program" for tribal trust funds. Thus, contrary to plaintiffs' position, the record is not void of evidence regarding the government's investment process for plaintiffs' tribal trust funds. Furthermore, a lack of evidence regarding a written investment strategy during the 1980s and 1990s does not resolve the issue of whether the government imprudently invested plaintiffs' tribal trust funds at issue in this case. As previously discussed, there was no legal requirement contained in the investment statute at issue, 25 U.S.C. § 162a, or the Restatement (Third) of Trusts, which would have required the government to document its investment strategy for plaintiffs' three tribal trust funds during the 1980s and 1990s.

Similarly, plaintiffs' reliance on the <u>Osage</u> case is misplaced. The <u>Osage</u> court stated that:

> When determining the amount of damages due to the beneficiary, the court should "attempt to place the beneficiary in the position in which it would have been absent a breach." [<u>Warm Springs</u>, 248 F.3d at 1371.] Principles of trust law also dictate that any ambiguities or doubts regarding potential investment earnings are resolved against the trustee. <u>Id.</u> Moreover, "if a trustee fails to keep proper accounts, 'all doubts will be resolved against [the trustee] and not in [the trustee's] favor.'" <u>Id.</u> (quoting William F. Fratcher, Scott on Trusts, § 172 (4th ed.1987)).

<u>Osage Tribe of Indians of Okla. v. United States</u>, 75 Fed. Cl. at 468. As in <u>Warm Springs</u>, the <u>Osage</u> court recognized that an absence of records could potentially be weighed against the government and lessen the plaintiff's burden of proving damages. At this liability stage of the proceedings, however, plaintiffs have the burden to prove the

---

investment of the 326-A Funds, nor included a chart displaying the government's month-by-month investment of the 326-A Funds.

government's breach of its fiduciary duty. Absent plausible allegations of wrongdoing in tribal trust fund account recordkeeping by the government, which plaintiffs did not develop in their pre-trial filings, expert reports, at trial, or in their post-trial briefing, the court should not lessen plaintiffs' burden of proof regarding breach. The issue remains whether or not the government prudently invested the plaintiffs' three tribal trust funds.

## IV.   Deference to the Department of the Interior's regulations and policies

Defendant argued in its pre-trial filing that, "[t]he Department of the Interior's interpretation of its statutory trust obligations is entitled to deference." According to defendant, "tribal trust investments within Interior are guided by formal investment policies that track § 162a's statutory language, and provide detailed guidance for investment decision-making," which policies are "entitled to deference in accordance with the standard articulated in Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)." Defendant stated that "[t]he Court should assign due weight" to the government's "investment decisions the record shows Interior made in compliance with those policies."

Plaintiffs argued in their post-trial brief that,

this Court does not defer to the agency's interpretation of its trust obligations. Chevron [U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44 (1984)] deference is inapplicable and the Government's investment policies are not entitled to any deference because of the 'Indian canon' of construction, which requires that the Government's investment obligations be construed liberally in favor of the Indians.

Plaintiffs also argued that "[t]here is no presumption that the Government's investment decisions were prudent simply because the investments it made were all permitted by law," nor "is there any basis under administrative law principles for this Court to defer to the Government's views about prudent investment."

As an initial matter, it is not clear why plaintiffs referred to "Chevron deference" in its post-trial filings when defendant is arguing in favor of Skidmore deference. Chevron deference is separate and distinct from Skidmore deference, as explained below. Moreover, Chevron deference does not appear to be appropriate for the Department of the Interior's policies that, according to defendant's post-trial briefing, "include directives to hold securities to maturity, refrain from frequent trading, and balance the goal of achieving high returns against the imperative to minimize risk of loss." As a Judge of this court explained, Chevron deference "applies to formal rulemaking (or similar situations) and requires deference to reasonable, authorized agency interpretations of statutes when the meaning of those statutes is ambiguous." Akpeneye v. United States, 138 Fed. Cl. 512, 541 (2018) (citing Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 842-44). In addition, "[a]gency interpretations lacking the force of law," such as an agency's interpretation of a statute contained in "'opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines,'" are not

entitled to <u>Chevron</u> deference, but instead potentially may be entitled to <u>Skidmore</u> deference and "'only to the extent those interpretations have the "power to persuade."'" <u>Akpeneye v. United States</u>, 138 Fed. Cl. at 541 (quoting <u>Christensen v. Harris Cty.</u>, 529 U.S. 576, 587 (2000) (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. at 140)); <u>see</u> <u>also</u> <u>Aqua Products, Inc. v. Matal</u>, 872 F.3d 1290, 1333 n.8 (Fed. Cir. 2017). <u>Skidmore</u> deference is a lesser form of deference than that allowed under the <u>Chevron</u> standard. <u>See</u> <u>Akpeneye v. United States</u>, 138 Fed. Cl. at 541. Neither party in the above-captioned case has argued that 25 U.S.C. § 162a, the investment statute at issue in the above-captioned case, is ambiguous. In addition, the Department of the Interior's policies introduced by defendant at trial, and which defendant argued should be afforded deference, do not carry the force of law, having never been submitted to the formal rulemaking process, but instead were internally circulated within the BIA in various policy memorandums and reports. Therefore, <u>Chevron</u> deference for the Department of the Interior is inapplicable in the above-captioned case.

Turning to whether <u>Skidmore</u> deference applies in this case, the United States Supreme Court has stated:

> In our view the agency's policy statements, embodied in its compliance manual and internal directives, interpret not only the regulations but also the statute itself. Assuming these interpretive statements are not entitled to full <u>Chevron</u> deference, they do reflect "'a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" <u>Bragdon v. Abbott</u>, 524 U.S. 624, 642, 118 S. Ct. 2196, 141 L.Ed.2d 540 (1998) (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 139–140, 65 S. Ct. 161, 89 L. Ed. 124 (1944)). As such, they are entitled to a "measure of respect" under the less deferential <u>Skidmore</u> standard.

<u>Fed. Express Corp. v. Holowecki</u>, 552 U.S. 389, 399 (2008); <u>see</u> <u>also</u> <u>Aqua Products, Inc. v. Matal</u>, 872 F.3d at 1333 n.8 ("An agency interpretation not entitled to <u>Chevron</u> deference may nonetheless be entitled to <u>Skidmore</u> deference which the Supreme Court describes as follows: 'Such a ruling may surely claim the merit of its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight.'" (quoting <u>United States v. Mead Corp.</u>, 533 U.S. 218, 235 (2001))); <u>W.E. Partners II, LLC v. United States</u>, 119 Fed. Cl. 684, 691 (2015) ("When <u>Chevron</u> deference does not apply, the agency's interpretation may still be subject to a lesser standard of deference articulated in <u>Skidmore v. Swift & Co.</u>, [323 U.S. 134]."), <u>aff'd</u>, 636 F. App'x 796 (Fed. Cir. 2016).

<u>Skidmore</u> deference can be warranted for an administrative action depending on the "'thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" <u>Warner–Lambert Co. v. United States</u>, 425 F.3d 1381, 1384 (Fed. Cir. 2005) (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. at 140); <u>see</u> <u>also</u> <u>Vance v. Ball State Univ.</u>, 570 U.S. 421, 462 (2013) (giving the Equal Employment Opportunity Commission's guidance document "respect proportional to its 'power to

persuade.'" (citation omitted)); United States v. Mead Corp., 533 U.S. at 228 ("The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." (footnotes omitted)).

Although defendant ultimately argued that this court should apply Skidmore deference to the Department of the Interior's investment "policies," defendant did not articulate its understanding of the Skidmore deference standard.  Defendant also did not specify which of the various Department of the Interior's investment policies or decisions discussed by the parties at trial should be afforded Skidmore deference, and, instead, referred globally to "Interior's investment policies" in its post-trial brief. Defendant stated in its post-trial brief, without any discussion or analyses of particular policies, that the Department of the Interior's investment "policies"

> set forth investment objectives that include directives to hold securities to maturity, refrain from frequent trading, and balance the goal of achieving high returns against the imperative to minimize risk of loss. As Messrs. Winter [defendant's fact witness and employee within the Office of the Special Trustee] and Craff [defendant's fact witness and employee within the Office of the Special Trustee] testified, Interior's investment policies are applied formally by a portfolio review committee that studies investments made for each tribal account and ensures the [sic] each account complies with policy.

(internal references omitted).

The issue in the above-captioned case is whether the government prudently invested plaintiffs' three tribal trust funds. Neither the statute, the applicable regulations, nor the Department of the Interior's policies introduced at trial, however, attempt to offer a definition or examples of a "prudent" investment, recognizing, of course, that the particular factual circumstances and market conditions at the time of the investment decision change what can be considered a prudent investment at any given time. For example, 25 C.F.R. § 115.809, promulgated in 2001 following the creation of the Office of the Special Trustee, the office within the Department of the Interior which took over the responsibility of investing tribal trust funds from the BIA in 1996, consistent with the statute, states that the government must prudently invest tribal trust funds, but does not give further guidance. See 25 C.F.R. § 115.809 ("Tribes may recommend certain investments to OTFM, but the recommendations must be in accordance with the statutory requirements set forth in 25 U.S.C. §§ 161a and 162a. The OTFM will make the final investment decision based on prudent investment practices.").

In addition, as the trial record indicates, the Department of the Interior issued various policies regarding the investment of tribal trust funds over the investment period in question, but the policies did not give much direction on which investment practices and investments might be considered prudent or imprudent. Beginning with the first

investment policy issued by the BIA in 1966, the BIA noted that "[e]ach Area Office is requested to review the amount of tribal trust funds each tribe in the respective Areas has on deposit in the Treasury," and that "[w]herever it appears that the amount is in excess of foreseeable cash needs of the tribe, discussions should be held with the tribal council and its wishes regarding investment of the funds ascertained." The 1966 policy statement also noted that "[g]overnment-backed securities, while basically safe, can result in losses unless held to maturity." The 1966 policy, however, did not discuss which types of investments were considered prudent for tribal trust funds.

The next policy issued by the BIA was in a 1974 internal BIA memorandum, which indicated that the BIA should "maximize returns on all tribal, as well as individual, trust funds." The 1974 policy memorandum also noted that "[e]ach Area Director has the responsibility for determining if surplus funds are available for investment purposes and notifying the Branch of Investments, Albuquerque, to take the necessary action to invest the funds." The 1974 policy memorandum, however, did not explain under what circumstances the government's investment of a tribal trust fund might satisfy the government's goal to maximize returns or what constituted prudent investment of tribal trust funds.

The government also issued a further policy statement within its report of its investments for tribal trust funds for fiscal years 1986 and 1987. The report recognized that the government has the authority to invest tribal trust funds pursuant to 25 U.S.C. § 162a and that the BIA should, "through knowing the amounts required and when disbursements are necessary," "plan the timing of investment maturities to maximize interest rates and earnings and also have the funds available when needed." The report for 1986 and 1987, however, like past BIA investment policies, did not provide more specific guidance as to when the government's investment of tribal trust funds might satisfy the duty of prudence.

Next, the trial record includes a 1997 internal policy memorandum released by the Office of the Special Trustee, the office which took over the BIA's investment of tribal trust funds in the 1996. The 1997 policy was updated with policy amendments by the Office of the Special Trustee in 1999, 2000, and 2005, and took its final form for the purposes of this case in 2005. The 2005 policy was the policy in place up through the disbursement of the tribal trust funds at issue. According to the 2005 policy, an acceptable investment practice was to "purchase securities with the intent to hold each security until maturity," i.e., a buy and hold strategy, as opposed to frequent trading of securities. The 2005 policy also indicated that unacceptable portfolio investments and practices included investing in any "corporate stock," the purchase of "commercial mutual funds," and "overtrading, adjusted trades or bond swapping." In sum, the Department of the Interior's investment policies issued throughout the years acknowledged the Department's role as the trustee and investor of tribal trust funds and attempted to provide broad guidance to government officials as to what investment practices were prohibited by agency policy, what investment practices were encouraged, and offered general investment goals, including to maximize investment returns. Given the fluctuating market conditions and changing events regarding the timing of distribution for plaintiffs' tribal trust funds, including the

required actions the BIA would need to take in order pay-out the 326-K Fund, however, specific, formulaic guidance as to what practices constituted a "prudent" investment practice would have been very difficult to establish by the Department of the Interior or any other governmental body.

Plaintiffs in the above-captioned case, however, have not alleged that the government invested the three tribal trust funds in any unacceptable investments as outlined in the Department of the Interior's various policies. Plaintiffs, instead, alleged that the government "imprudently" invested their three tribal trust funds in too short-term securities. The government's investment policies do not provide the court with a simple method for determining whether the government prudently invested plaintiffs' 326-K Fund over the thirty-three-year period at issue or plaintiffs' 326-A-1 and 326-A-3 Funds over the twenty-one-year period at issue.

Defendant requested in its post-trial brief that "[t]he Court should assign due weight" to the "investment decisions" made by Interior officials "in compliance with those policies." Defendant, however, did not specify which government "investment decisions" should be afforded discretion and did not offer any definition of the degree of "due weight" allegedly owed to the government's investment decisions. According to defendant,

> the Bureau of Indian Affairs and Office of the Special Trustee have at all times interpreted § 162a to require the Interior Department to make productive investments for the benefit of tribal entities, and to match investments to expected cash flows to avoid liquidating bonds or securities at a loss. Those policy imperatives flow right from the language of the statute, which authorizes Interior to invest tribal trust funds and admonishes the agency to limit investments to those insured by the full faith and credit of the United States. And there is nothing in Interior's interpretation of the statute that is unfavorable to tribal beneficiaries. The Court should assign due weight to Interior's investment policies, and to the investment decisions the record shows Interior made in compliance with those policies.

(internal reference omitted).

The parties do not dispute that the Department of the Interior invested plaintiffs' tribal trust funds in accordance with the Department of the Interior's general investment policies. The agency's policies, however, as previously indicated, give very limited guidance and set almost no rules regarding what would or would not be a prudent investment of tribal trust funds. Mr. Winter, defendant's fact witness, who reviewed the Office of the Special Trustee's investment of plaintiffs' three tribal funds beginning in 2001 until 2013, testified at trial that the agency's compliance with its policies does not necessarily dictate whether a particular investment is prudent. When asked by plaintiffs' counsel at trial, "just because you're in compliance with OST policies doesn't answer the question whether the particular portfolio structure is prudent or not prudent, correct?" Mr. Winter responded, "[c]ertainly not when looking at that in conjunction with the needs of the funds, correct." Thus, although the Department of the Interior may have invested

plaintiffs' three tribal trust funds in accordance with its policies, it does not necessarily follow that the Department of the Interior also prudently invested plaintiffs' three tribal trust funds. Therefore, although cognizant of the Department of the Interior's statutory framework and its policies and guidelines, the court must independently attempt to measure whether or not over the period of approximately thirty-three years for the 326-K Fund, and twenty-one years for the 326-A-1 and 326-A-3 Funds, the Department of the Interior invested the three tribal trust funds "prudently" and in accordance with its fiduciary responsibilities.

## V.  Whether defendant prudently invested the 326-K Fund

Plaintiffs alleged in their post-trial brief that the government mismanaged the 326-K Fund over an approximate thirty-three-year period, from December 1979 to September 2013, by investing the 326-K Fund in too short-term securities, and, thus, failed to maximize the investments and achieve higher returns that would have accompanied a more diversified portfolio in longer-term securities. Both of the parties' liability experts in the above-captioned case agreed that a "prudent" portfolio should match the maturity of its funds to the "investment horizon" of the underlying funds. As both parties' liability experts agreed, the "investment horizon" of a portfolio refers to the time horizon for a portfolio.[34] Plaintiffs' expert report submitted by Rocky Hill Advisors stated,

> [p]rudent investment management of a fixed-income portfolio requires the proper alignment of the maturity capacity of the funds invested with the maturity structure of the aggregate portfolio. In fact, it is our opinion that the maturity structure of any fixed-income investment portfolio is the single most significant determinant of the portfolio's potential returns.

(footnote omitted). Dr. Starks, defendant's liability expert, stated in her expert report that, "in the development of a prudent investment strategy, the fiduciary should assess the cash flow needs of the client and the predictability of those needs." Dr. Starks also noted in her supplemental liability expert report that "[p]laintiffs' experts agree with me that the term structure of a prudent portfolio should match the investment horizon of underlying funds."

Both parties' liability experts also agreed that a beneficiary, who does not have immediate or short-term cash flow needs, generally would be better positioned in a portfolio invested in longer-term securities. Plaintiffs noted in their post-trial brief that "bond investors who seek to maximize return would take advantage of the premium that longer-term instruments typically earn over shorter-term investments unless their near-term cash flow needs would make longer-term bonds too risky." Plaintiffs' expert report

---

[34] As noted above, plaintiffs' liability expert, Mr. Nunes, testified at trial that he prefers to use the phrase "maturity capacity" rather than investment or investor "horizon." Mr. Nunes also testified that "maturity capacity" "is interchangeable with what the Government's expert used, which is investor horizon, which is -- I will admit, that's more the standard terminology that's used in the industry."

by Rocky Hill Advisors also noted that "a fixed-income portfolio **with a long-term maturity capacity** that is invested short-term will, in almost every instance, underperform." (emphasis in original). Similarly, defendant's liability expert, Dr. Starks, stated in her liability expert report that, "[p]redictable cash flow needs in the distant future suggest a longer-term investment horizon, while immediate or unpredictable cash flow needs would suggest a shorter-term investment horizon," and that "an investor who does not expect significant cash flow needs until some future period may be well positioned to take advantage of the typical premium long-term investments earn over short-term investments." Dr. Starks also indicated in her supplemental expert report that "short-term investments are preferable *when one has a short-term investment horizon*." (emphasis in original).

Recognizing that plaintiffs have the burden of proof, based on the evidence presented, determining whether the 326-K Fund at issue was prudently invested over a thirty-three-year period is, as recognized above, a difficult challenge. The fluctuating market conditions, the on-going discussion amongst tribal members on how to proceed with the 326-K Fund distribution, the on-going litigation by some tribal members, and the necessity for Congressional action for distribution of the 326-K Fund further complicated the government's task of analyzing and predicting market investment conditions to the benefit of tribal members. It would have been an easier case and a clear breach had the monies for the 326-K Fund never been invested in the market—this is not that case. It also would have been easier to decide whether a breach had occurred if, without variation, the 326-K Fund had been invested on a much riskier course, such as only, or predominantly, in long-term securities for the entire period of time, or conversely, if the 326-K Fund had been invested too conservatively, for example, solely in overnight securities for the entire thirty-three-year period. The case currently before the court presents a much more complex challenge, as the court needs to evaluate whether the varying amounts of time until maturity of the 326-K Fund investments over the thirty-three-year period in question was too short-term, and, therefore, imprudent. Moreover, trying to reconstruct the mindset of the government's investment managers and the information they considered at the time becomes in large part speculative hindsight. The court, therefore, can only base the decision of whether the investment strategy was imprudent or not based on the information in the record, the expert reports, and the testimony at trial, and consider the likelihood, or not, of Congressional action and actual distribution of the 326-K Fund at varying points during the investment period.

The parties' liability experts appear to concur that their "fundamental disagreement" and basic question is whether the investment horizon of the 326-K Fund should have been longer than what was chosen by government officials. Defendant's liability supplemental expert report, authored by Dr. Starks, stated that, "[o]ur [the parties'] fundamental disagreement lies in our respective beliefs as to what the appropriate investment horizon of the WSIG funds should have been during the relevant period." Similarly, plaintiffs' post-trial brief stated that the parties' liability "experts agree" that their "'fundamental disagreement lies in [their] respective beliefs as to what the appropriate investment horizon of the WSIG [Docket 326-K] funds should have been during the relevant period.'" (brackets in original) (quoting defendant's liability supplemental expert

report). Additionally, plaintiffs further noted in their post-trial brief that the issue of liability regarding the government's investment of the 326-K Fund turns on "what was the appropriate investment horizon for the WSIG funds during the period at issue based on what the Government then knew or should have known."

> According to plaintiffs' expert report by Rocky Hill Advisors,

> there is a long history in the record that unequivocally supports our contention that very early in their life the Government should have known these funds [the 326-K Fund] would remain in trust for a considerable length of time and thus should have consistently invested them with a much longer term structure. We have seen no evidence the Government performed any analysis of the appropriate maturity capacity of the Docket 326-K funds, and this informs us that the Government failed in its fiduciary capacity to prudently invest these monies.

Contrastingly, according to defendant's liability expert report submitted by Dr. Starks, "the investments made by the Government for the WSIG portfolio" between the thirty-three-year period at issue "were prudent given the totality of information available to the Government *a priori*, and that the Government fulfilled its fiduciary duty by making independent investment decisions to maximize return given prudent investments." (emphasis in original). According to defendant's liability expert report, "Only Hindsight Suggests a Portion of WSIG's Trust Funds Could Have Safely Been Invested Longer-Term." (capitalization in original).

Plaintiffs' liability expert, Mr. Nunes, testified at trial that the government should have invested the 326-K Fund in a portfolio with an average weighted maturity of fifteen years between 1980, when Congress denied the BIA an extension to propose distribution legislation within the statutory 180-day deadline, and 2004, when Congress passed the Claims Distribution Act of 2004, which allowed plaintiffs' 326-K Fund to be distributed and which set aside the 326-A-1 and 326-A-3 Funds as education trust funds. Plaintiffs' expert report by Rocky Hill Advisors stated that the government should have invested the 326-K Fund in a portfolio with an average weighted maturity of seven years following the enactment of distribution legislation in 2004 until the 326-K Fund was ready to be distributed, beginning in 2011. Following the initial disbursements of the 326-K Fund in 2011, plaintiffs' expert report by Rocky Hill Advisors argued that the 326-K Fund should have been invested in cash securities until 2013, the end of the investment period in question. Dr. Starks, defendant's liability expert, spent considerable time at trial and focused a portion of her expert report and supplemental expert report arguing that the "should have been" alternative investment portfolio for the 326-K Fund urged by plaintiffs' liability expert, Mr. Nunes, was "imprudent." At trial, Dr. Starks testified that plaintiffs' "alternative portfolio relies on ex post evidence. It -- you know, they looked back, after 32[sic[35]] years, and it didn't pay out for 32 years, and so it appears the portfolio was

---

[35] The investment period at issue for the 326-K Funds was a thirty-three-year period, not a thirty-two-year period, as Dr. Starks even notes in a different section of her expert report.

engineered to take advantage of what happened over -- for interest rates over the 32 years." Dr. Starks also noted in her expert report that that "RHA's [Rocky Hill Advisors] Proposed Investment Approach is Without Merit and Would Have Been Imprudent." (capitalization in original).

On the issue of liability, the court, however, is tasked with analyzing the propriety of the government's investment strategy of the 326-K Fund over the period of time in question, not whether either the plaintiffs' or defendant's proposed investment portfolios could have resulted in better returns. As part of its review and analysis, the court considers plaintiffs' and defendant's proffered investment portfolio structures for the 326-K Fund, but neither plaintiffs' nor defendant's portfolio analysis is totally adopted by the court to determine whether a breach, or breaches, occurred. The court repeats that this Opinion only addresses a determination of the government's liability for breach of trust obligations. The appropriate amount of damages based on the degree of the government's breach, if any, will be addressed subsequently, after the parties provide additional, necessary information to determine damages.

"[O]nce the beneficiary has shown a breach of the trustee's duty," the "risk of uncertainty as to the amount of loss" falls on the government. See Warm Springs, 248 F.3d at 1371. "'The ascertainment of damages is not an exact science,' the Federal Circuit has warned, and 'where responsibility for damages is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision.'" Jicarilla III, 112 Fed. Cl. at 304-05 (quoting Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001)). As a Judge of this court recognized, the Federal Circuit's decision in Warm Springs, under certain circumstances, allows for "inferences" to be "drawn" as to the amount of damages to be awarded in the beneficiaries' favor, once liability has been established. Osage Tribe of Indians of Okla. v. United States, 97 Fed. Cl. at 544 (quoting Osage Tribe of Indians of Okla. v. United States, 93 Fed. Cl. at 22 (citing Warm Springs, 248 F.3d at 1371)).

Even if a potential inference is appropriate, however, a beneficiary will only be "'entitled to a reasonable estimate of the damages it is due.'" Osage Tribe of Indians of Okla. v. United States, 97 Fed. Cl. 542, 544 (2011) (quoting Osage Tribe of Indians of Okla. v. United States, 96 Fed. Cl. 390, 409 (2010)); see also Warm Springs, 248 F.3d at 137 (noting that plaintiffs only are entitled to the amount of damages that would place them "in the position in which [they] would have been absent a breach"); Jicarilla III, 112 Fed. Cl. at 304 ("Courts determine the amount of damages for such a breach by attempting to put the beneficiary in the position in which it would have been absent the breach."). Defendant, as the trustee, always has the opportunity to disprove plaintiffs' alleged damages amount. See Warm Springs, 248 F.3d at 1371 ("The burden of proving that the funds would have earned less than the amount is on the fiduciaries found to be in breach of their duty." (quoting Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir. 1985)). While "approximations certainly are appropriate," damages "awards may not be speculative." Jicarilla III, 112 Fed. Cl. at 307 n.52 (citing Franconia Assocs. v. United States, 61 Fed. Cl. 718, 746 (2004) ("[C]are must be taken lest the calculation of damages become a quixotic quest for delusive precision or worse, an insurmountable barrier to any

recovery.")). Furthermore, as indicated by the Federal Circuit in <u>Warm Springs</u>, it would be inappropriate to apply an inference when "the issue of damages" is based entirely on "unguided speculation." <u>Warm Springs</u>, 248 F.3d at 1372.

The plaintiffs' alleged period for trust breach for the 326-K Fund in this case is long, approximately thirty-three years, and the variation in the applicable changing time projections for distribution of the trust funds, the continuing changing investment profile, and the ongoing litigation, makes determination of a possible proper damages amount, upon a finding of any liability, very difficult. Based on the proceedings to date, neither of the parties' damages analyses contained in their expert reports and the parties' trial testimony are sufficiently detailed to establish a proper and reasonable estimate of damages for the specific periods of time determined below to be at issue.

In their pre- and post-trial filings, as well as at trial, plaintiffs heavily relied on Judge Allegra's decision in <u>Jicarilla III</u> to support their claim that the government in the above-captioned case breached its fiduciary duty when investing the 326-K Fund from 1979 to 2013. As previously noted, the <u>Jicarilla III</u> court found that the BIA had breached its fiduciary duty to prudently invest the <u>Jicarilla III</u> plaintiff's tribal trust funds and IIM funds pursuant to 25 U.S.C. § 162a when the government consistently invested the funds in too short-term securities between 1974 and 1992. <u>See</u> <u>Jicarilla III</u>, 112 Fed. Cl. at 300. In <u>Jicarilla III</u>, Judge Allegra allowed damages for the entire eighteen-year alleged breach period and did not parse out either the alleged time period or the alleged damages number offered by the plaintiff. <u>See</u> <u>id.</u> at 307-09. The <u>Jicarilla III</u> plaintiff was represented by Mr. Steven D. Gordon, of Holland & Knight, LLP, plaintiffs' co-counsel in this case. <u>See</u> <u>id.</u> at 277-78. The <u>Jicarilla III</u> plaintiff, like the current plaintiffs, also offered an expert report on liability and damages by Mr. Kevin Nunes and Mr. Peter Ferriero of Rocky Hill Advisors, as well as a rebuttal expert report by Dr. Michael Goldstein addressing defendant's damages expert report. <u>See</u> <u>id.</u> at 286. The <u>Jicarilla III</u> defendant, like the current defendant, offered an expert report by Dr. Gordon Alexander, regarding damages, and a liability expert report by Dr. Laura Starks, <u>see</u> <u>id.</u> at 287, although at trial in this case, Mr. Justin Mclean, who had worked on the damages expert report with Dr. Alexander, was the testifying witness, given Dr. Alexander's ill health at the time of the trial in this case. Despite some similarities between <u>Jicarilla III</u> and the facts of this case, as this court noted above and throughout trial in the above-captioned case, <u>Jicarilla III</u> is not binding on this court and the specifics presented for review in this case are different from any of the previous cases.[36]

---

[36] This court is only bound by precedent from the United States Supreme Court, the United States Court of Appeals for the Federal Circuit, and its predecessor, the United States Court of Claims. <u>See</u> <u>Dellew Corp. v. United States</u>, 855 F.3d 1375, 1382 (Fed. Cir. 2017) (noting that "the Court of Federal Claims must follow relevant decisions of the Supreme Court and the Federal Circuit"); <u>see also</u> <u>Coltec Indus., Inc. v. United States</u>, 454 F.3d 1340, 1353 (Fed. Cir.) ("There can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, our court, and our predecessor court, the Court of Claims."), <u>reh'g</u> <u>denied</u> (Fed. Cir. 2006), <u>cert.</u> <u>denied</u> (2007). Thus, although <u>Jicarilla III</u> is of interest for purposes of legal and factual guidance and analysis,

The parties introduced 433 joint exhibits and 125 demonstrative exhibits at trial, which, as previously noted, were included in the record in this case. In addition, defendant introduced fifteen of its own exhibits at trial, which also were included in the record.[37]

Following trial and a careful review of the record before the court and the parties' post-trial submission, the court has divided its analysis of whether the government breached its fiduciary duty for the 326-K Fund over the approximately thirty-three-year investment period at issue into three major sub-periods, December 1979 to November 1992, December 1992 to June 2004, and July 2004 to September 2013, which the court believes are sufficiently distinct to allow for a breach analysis for each sub-period. As discussed below, the court, at times, divides the three periods into even smaller sub-periods in order to account for identifiable shifts in the government's investment approach for the 326-K Fund. Daily, weekly, monthly, or even yearly analysis of the investment horizon for government's investment of the 326-K Fund was not undertaken by any of the experts and would have proven an expensive and unwieldly task due to the lengthy investment period at issue in this case.

At trial, the parties' liability experts presented their analyses of the investment horizon for the 326-K Fund during the thirty-three-year period at issue in roughly ten-year increments. Plaintiffs' liability expert, Mr. Nunes, during direct-examination, first discussed the evidence regarding the government's investment of the 326-K Fund from "'79, when the funds were awarded," and "all through this time period," referring to the 1980s. Mr. Nunes then discussed the government's investment of the 326-K Fund during the "1990s." Mr. Nunes then testified about the "2000s" up until distribution legislation was passed in July 2004. Following the enactment of distribution legislation in July 2004, Mr. Nunes discussed the government's investment of the 326-K Fund from mid-2004 "up until 2011," when the first distribution of the 326-K Fund occurred. Mr. Nunes then discussed

---

the distinct facts of the case currently before the court and precedential cases are the deciding factors for this court's analysis of whether the government breached its fiduciary duty to the above-captioned plaintiffs, not <u>Jicarilla III</u>.

[37] Plaintiffs attempted to introduce two exhibits at trial, which were rejected by the court. The first was a handwritten document dated September 2, 1980, which was addressed to "Paul." The document did not include a signature by the document's author nor did it provide any details concerning the identity of the author of the document or of "Paul." When asked at trial by the court, plaintiffs' counsel conceded that she did not know who was "Paul." The handwritten document included a typewritten letterhead that stated, "From the desk of ALLEN J. ANSPACH AKA DUFFY." (capitalization in original). The second was a press release from the Department of the Interior, titled "Allen Anspach New Regional Director for BIA's Western Regional Office in Phoenix," dated June 2, 2006, which discussed Mr. Anspach's employment at the BIA's Western Regional Office. (capitalization in original). Because plaintiffs' first exhibit was not self-authenticating, and the second exhibit was not relevant to the case, both exhibits were excluded from the record in this case.

the final years of the thirty-three-year period at issue, which, according to Mr. Nunes, began in 2011, with the first partial distribution made to qualifying Western Shoshone members, and ended in September 2013.

Similar to Mr. Nunes, Dr. Starks, defendant's liability expert, discussed the government's investment of the 326-K Fund at trial by dividing the thirty-three-year period into sub-periods which did not specifically identify a start or end date. Dr. Starks first discussed the government's investment of the 326-K Fund during the "1980s," and up through "1991," when Congresswoman Vucanovich attempted for the second time to pass distribution legislation for the 326-K Fund. Dr. Starks then discussed the government's investment of the 326-K Fund during the "mid-1990s," which defendant's counsel tried to clarify during Dr. Starks' direct examination as "about '92 and on for the next few years." Dr. Starks then discussed the government's investment of the 326-K Fund between 2000 and 2004. The next time period discussed by Dr. Starks at trial was between 2004 and a "point in 2010," although the exact date was not identified, when the government, according to Dr. Starks, began to shorten the 326-K Fund for distribution. The final time period discussed by Dr. Starks at trial was from "2011," when the distribution of the 326-K Fund began, until September 2013, the end of the investment period at issue.

### a.  Sub-period 1: December 1979 through November 1992

December 1979 to August 1980

From December 1979 to August 1980, defendant invested the 326-K Fund almost exclusively in CDs with an average weighted maturity years to call of one year or less. Defendant argued in its post-trial brief that the government "successfully" invested the 326-K Fund during this time. Although plaintiffs included this nine-month period in the investment period, plaintiffs more or less conceded that the government's investment of the 326-K Fund from December 1979 to August 1980 was reasonably placed in shorter-term securities. According to plaintiffs' liability expert report by Rocky Hill Advisors, from "12/1979-8/1980," "we believe uncertainty as to the future disposition of the funds was at its maximum," and that August 4, 1980 is "the first date on which the Government is put on notice that no distribution from the Docket 326-K Fund would be permissible for a significant length of time."

From December 19, 1979, when the 326-K Fund was deposited into the United States Treasury, until August 4, 1980, when Congress denied the BIA's request for a 90-day extension to submit distribution legislation, pursuant to the Use and Distribution Act of 1973,[38] the record indicates that the BIA was actively working towards submitting a

---

[38] As previously indicated, pursuant to the Use and Distribution Act of 1973, the Secretary of Interior had 180 days from "after the appropriation of funds to pay a judgment of the Indian Claims Commission or the Court of Claims to any Indian tribe," to "prepare and submit to the Congress a plan for the use or distribution of such funds." Use and Distribution Act of 1973, Section 2(A). The Secretary of Interior could request a 90-day extension of the 180-day timeline for submitting a proposed plan for distributing a

distribution plan for the 326-K Fund to Congress. On February 23, 1980, three months after the 326-K Fund was deposited into the United States Treasury, representatives from the BIA met with members of Western Shoshone Planning Committee, which was a committee formed to elicit distribution proposals from various tribal groups of the Western Shoshone, to discuss a potential distribution of the 326-K Fund. Then, on June 20, 1980, the BIA made a formal request for a 90-day extension to submit a distribution plan to Congress, noting that it was planning on meeting again with the Western Shoshone Planning Committee on July 26, 1980 and that, "[s]hortly after the hearing we expect to be able to submit a Secretarial plan" for distribution to Congress. Congress, however, denied the government's 90-day request on August 4, 1980. Congress also indicated to the BIA in an August 4, 1980 letter written by Senator John Melcher, on behalf of the United States Senate Select Committee on Indian Affairs, discussed in more detail below, that Congress was not going to consider distribution plan legislation for the 326-K Fund in the near future.

Thus, between December 19, 1979 and August 4, 1980, it was not unreasonable for the BIA to maintain the 326-K Fund in short-term securities in light of the BIA's intent and effort to obtain a 90-day extension to submit a distribution plan to Congress pursuant to the Use and Distribution Act of 1973. In addition, as previously noted, plaintiffs appear to concede that the government's investment of 326-K Fund was appropriately aligned with its short-term investment horizon during the December 1979 and August 1980 period. Therefore, the court finds that the government did not imprudently invest the 326-K Fund between December 19, 1979 and August 4, 1980, when Congress denied BIA's request for a 90-day extension to submit distribution legislation for the 326-K Fund and Senator Melcher indicated that prompt legislation was not likely.

August 1980 to November 1992

From August 1980 to 1989, defendant invested the 326-K Fund almost exclusively in CDs with an average weighted maturity years to call of one year or less. From 1990 to November 1992, the average weighted maturity years to call of the fund increased slightly to approximately two years. Because the government had not yet invested the 326-K Fund in any callable securities between 1980 and 1992, the average weighted maturity years to call for the 326-K Fund was the same as the average weighted maturity based on the stated years to maturity.

Plaintiffs argued in their post-trial brief that the 326-K Fund was imprudently invested in too short-term securities between August 1980 and November 1992, and that

---

judgment award to an Indian tribe, and such request was "subject to the approval of both the Senate and the House of Representatives committees on Interior and Insular Affairs." See id. at Section 2(B). If the Secretary of Interior did not submit a proposal within 180 days of the date of the appropriation of the particular judgment award, and no 90-day extension was granted, then the Secretary of Interior would have to submit proposed legislation to Congress, which would then have to pass the legislation, in order for the funds to be used or distributed.

the government should have invested the 326-K Fund in longer-term securities. Plaintiffs' liability expert, Mr. Nunes, testified at trial that the record indicates that "going back to prior to 1980 -- '79, when the funds [326-K Fund] were awarded, all through this time period [until the end of the 1980s]," the government

> had knowledge of in real time, and it's impossible for me to believe that any of this created an expectation that a distribution was imminent. And because of that, what that informs us is the Government knew this money was going to be sitting around for a very long time and that to prudently manage a portfolio for these funds, the maturity structure of that portfolio would need to be more closely aligned with the nature of the funds.

Mr. Nunes also testified at trial that despite the introduction of distribution legislation for the 326-K Fund in 1989 and 1991 by Congresswoman Vucanovich, both of which failed to pass, that by June 19, 1992, the record indicated that Congress would "not consider" another attempt to pass distribution legislation for the 326-K Fund until there was "more of a consensus among the tribes," and that among the tribes, there was "still a wide diversity of opinions regarding a distribution of the Docket 326-K funds [sic]."

Defendant argued in its post-trial brief that the government "successfully and profitably invested" the 326-K Fund between 1980 and 1992. According to defendant's opening argument at trial, the 326-K Fund could not be distributed without legislation authorizing the distribution, and "there was no way of knowing with certainty when Congress would act" to pass distribution legislation during the 1980s. In addition, defendant's liability expert, Dr. Starks, testified at trial that there was no evidence in the record that indicated that between 1979 and 1992, the 326-K Fund would be distributed within thirty years or within fifteen years, and instead, that the record indicated that "efforts were being made to push forward to a distribution." Therefore, according to defendant's post-trial brief, "Interior was smart to invest the 326-K Fund in a way that sought high yields, but minimized exposure to interest rate risk given the unpredictable timing for the Fund's distribution."

As of August 4, 1980, it is undisputed that that legislation authorizing the distribution of the 326-K Fund would have to be enacted before the 326-K Fund could be distributed to plaintiffs. During this period, there was not a consensus among the members of the Western Shoshone tribes as to how to or whether to pursue distribution of the 326-K Fund. Moreover, there also was no certainty as to when Congress would pass any particular legislation. The collective evidence presented at trial, however, including the various BIA documents in the record as to the posture of Congress during this period indicates that enactment of distribution legislation for the 326-K Fund was not likely to be immediate or even in the short term. The court notes, although the experts for both plaintiffs and defendant offered opinions offering projections of the proper timing the Department of the Interior should have understood when making investment decisions, including when the tribes and their members could come to a working understanding of their distribution plan preferences for the 326-K Fund and regarding when Congress was likely to pass distribution legislation for the 326-K Fund, none of the parties' liability

experts presented to the court were experts in tribal governance or the legislative process. Mr. Nunes, plaintiffs' liability and damages expert, was presented at trial as an expert "on investing and an expert on calculating damages relating to investment claims." Dr. Goldstein, plaintiffs' rebuttal expert witness on liability and damages, was presented at trial as an "expert in the field of financial economics." Dr. Starks, defendant's liability expert, was presented at trial "as an expert in financial economics, including the subdisciplines" of "finance, investments, and portfolio management." Mr. Mclean, defendant's damages expert, was presented at trial as "an expert in damages and investment." Estimating an appropriate investment horizon and re-creating an investment strategy which would have done more to optimize the returns of the 326-K Fund based on hindsight is easy. Investing the 326-K Fund at the time it was held in trust by the government, given the contemporaneous understanding of the complex issues at play, such as the great uncertainty regarding the tribal development of a more united position regarding a distribution plan for the 326-K Fund and the unpredictability of when Congress would pass a distribution plan, however, would have been difficult for the government or anyone, although certain useful patterns did emerge over time.

To begin with, on August 4, 1980, when Senator Melcher sent BIA a letter denying the BIA's 90-day extension, Senator Melcher also notified the BIA that Congress was likely not going to pass distribution legislation until the litigation regarding the August 1980 Order issued by Judge Thompson in the United States v. Dann case was concluded and the various affected tribes and tribal members were more unified in their position on how to proceed with a distribution plan for the 326-K Fund. Senator Melcher noted in his August 4, 1980 letter that, "[a]s a general rule, such [90-day] extensions are routinely granted upon Departmental request. However, there are several factors which weigh against granting the extension in this case." Senator Melcher noted that:

It appears that a significant number of Western Shoshone people oppose acceptance of the award at this time. There is pending litigation in the case of U.S. v. Dann in the U.S. District Court for the district of Nevada in which title to certain land and the date of compensable taking are still in issue. The outcome of that case could clearly have a strong bearing on the course of action the Congress, the Department and the Western Shoshone people might wish to pursue.

(capitalization and underline in original).

Also, during the early 1980s, the BIA was not ready to submit proposed draft distribution legislation to Congress in light of (1) then on-going United States v. Dann litigation, (2) the BIA's interactions with the relevant tribes and tribal members, and (3) the Congressional reluctance to enact legislation in the near-term expressed in the August 4, 1980 letter from Senator Melcher. For example, on December 30, 1980, Jay Suager, then the acting director of the BIA, wrote Senator Alan Cranston of California, stating that:

[A] significant faction among the Western Shoshone people rejects the award and is seeking title to the land. In particular, this faction is supporting the continuance of litigation in United States v. Dann which pertains to Western Shoshone land title issues. Probably, all interested parties will have to await the outcome of the appeal in the Dann litigation. . . . authorizing legislation will be necessary before there may be any distribution of the judgment funds. That should present sufficient opportunity to address questions which may be raised by United States v. Dann.

(underline in original).

The record also indicates that even following the Ninth Circuit's 1983 decision in United States v. Dann, distribution legislation for the 326-K Fund passing likely was not going to be imminent. For example, on August 3, 1983, the Director of the Office of Indian Services at the BIA wrote to Congresswoman Vucanovich, stating that:

For some time we and the Congress have been awaiting a Court of Appeals decision in the Dann case, Carrie and Mary Dann having contended that the Western Shoshone still retain aboriginal title to the Nevada portion of the lands claimed. On May 19, 1983, the Court ruled that no evidence had been presented by the Government establishing that aboriginal title had been lost. We do not know whether this decision will be appealed to the Supreme Court.[39] Meanwhile, the Western Shoshone people are scheduling a series of general meetings in an effort to develop a proposal that would incorporate the distribution of the funds and the utilization of the subject lands. The situation has become, as a result of the decision, extremely confused and under the circumstances we are most reluctant to submit proposed legislation for only the monetary award.

Undoubtedly, considerable time will have elapsed before the Western Shoshone people, the Secretary of the Interior and the Congress are able to reach agreement in this complex matter.

The record also indicates that, according to a December 12, 1986 letter from Thornton W. Field, Assistant Solicitor, Branch of Land and Minerals, Division of Indian Affairs, within the Department of the Interior, to Jerry Millett, Chief of the Western Shoshone National Council, "the Department [of the Interior] encouraged the formation of a Western Shoshone entity to negotiate the distribution of the Indian Claims Commission judgment award in Docket 326-K," and that "[t]he Western Shoshone National Council ('WSNC') became the entity and began negotiations with the Department in November 1984." According to a May 20, 1985 Proposal from the Western Shoshone National

---

39  As noted above, the Dann case was appealed to the United States Supreme Court in 1985, which reversed the United States Court of Appeals for the Ninth Circuit's decision and remanded the case to the United States District Court for the District of Nevada. See United States v. Dann, 470 U.S. 39.

Council to the BIA, the Western Shoshone Council even noted that it would need the next three years to prepare for the tribes' negotiations with the BIA. The May 20, 1985 Proposal listed various steps the Western Shoshone National Council felt it would need to complete before entering into negotiations, such as establishing a "data base for their land and land use," and determining "general land control assignments."

By mid-1986, whatever negotiations had taken place between the government and the Western Shoshone National Council came to a virtual standstill. On June 30, 1986, the BIA sent the Western Shoshone National Council a letter, stating that, "[a]fter over two years of negotiations, I am truly sorry that our respective positions remain so far apart" and that "the Department does not recognize any valid legal claim to Western Shoshone tribal ancestral lands." The BIA's June 30, 1986 letter also noted that "the Department believes further negotiations at this time would be futile."

Following the impasse in negotiations, the record before the court indicates that Congress, although interested in seeing the BIA work with the Western Shoshone tribes, did not expect a distribution of the 326-K Fund to occur in the near future. For example, on October 28, 1986, members of the Nevada Congressional delegation wrote to the Secretary of Interior to urge him to meet with the Western Shoshone National Council and "find a common basis for moving forward" and indicated that they had a "particular interest" in seeing any disagreement between the BIA and the Western Shoshone regarding a potential viable claim to private lands in Nevada "resolved as quickly as possible." The Nevada Congressional delegation also noted in their October 28, 1986 letter that finding a resolution to the distribution of the 326-K Fund had been a "frustrating problem" for the government and the Western Shoshones "for many years now" and that the "present situation only promises to get worse." On May 29, 1987, Senator Daniel Inouye, Chairman of the Senate Select Committee wrote to Senator Hecht and Senator Reid regarding a potential Congressional hearing with the Western Shoshone, and stated that:

> It has been clear since 1980 . . . that legislation would be necessary to achieve a final settlement of the Western Shoshone claims. While I do not believe that a hearing will lead to any immediate solution to this problem, it does appear that a hearing could assist both the Government and the Western Shoshone in establishing a basis for a fair resolution of this matter.

Despite the apparent stalemate in negotiations and no indication from the BIA or the Western Shoshone tribes that the 326-K Fund could or would be distributed in the near future, Congresswoman Vucanovich introduced distribution legislation for the 326-K Fund in 1989, and once again in 1991. Although distribution legislation was introduced, both bills failed to pass and the record before the court indicates that both bills did not have a realistic chance of getting passed. Regarding the 1989 proposed legislation, H.R. 3384, according to an October 3, 1989 press release, introduced at trial as a joint exhibit, the "Temoak Tribe of Western Shoshone Indians," one of the four BIA-identified beneficiary tribes of the 326-K Fund, was "extremely angry that Congresswoman Vucanovich and others introduced a bill into Congress . . . without our permission."

According to the October 3, 1989 press release, H.R. 3384 was introduced without "consultation with the Western Shoshone National Council," the council comprised of Western Shoshone tribal leaders which attempted to negotiate with the government a potential distribution of the 326-K Fund during the 1980s, and also "without the approval of any of the nine[40] Western Shoshone tribal governments." The Department of the Interior also opposed the introduction of H.R. 3384 to Congress. According to an April 26, 1990 statement of Walter R. Mills, Deputy to the Assistant Secretary for Indian Affairs at Interior, before the House Congressional Committee on Interior and Insular Affairs, introduced at trial as a joint exhibit, Mr. Mills stated that, "[w]e strongly oppose enactment of H.R. 3384" and one of the several reasons, according to Mr. Mills, was that, "[t]he timeframes cited in the bill for publication of regulations, the time allotted for applications to enroll, and the time cited for the preparation of the Final Judgment Roll, are unrealistically short."

Regarding the distribution legislation for the 326-K Fund proposed to Congress in 1991, H.R. 3897, the record before the court indicates that the Department of the Interior also opposed the passing of H.R. 3897 because of "tight timeframes specified in the legislation [H.R. 3897] in which the Secretary is to fulfill certain administrative responsibilities," similar to the concerns the Department of the Interior had with H.R. 3384, the previously introduced distribution legislation, which also had failed. Following the two failed bills, H.R. 3384 and H.R. 3897, the Chairman of the House Congressional Committee on Interior and Insular Affairs wrote to Congresswoman Vucanovich on June 19, 1992, noting that "there still appears to be a wide diversity of opinions and suggested approaches regarding the distribution of the Docket Funds and resolution of other issues," and that "[w]hile I believe we are closer to  resolution of this issue than we were in the 101st Congress, the Committee will not consider the measure until there is more of a consensus among the tribal governments." Thus, as of 1992, it appears from the record that Congress was not prepared to entertain distribution legislation seriously for the 326-K Fund and a short-term legislative solution was highly unlikely.

Based on the above timeline, spanning from August 4, 1980, to November 1992, the record indicates that legislation was not likely to be enacted in the near-term and the distribution of the 326-K Fund, therefore, was not likely to be implemented or occur in the near future, especially since no distribution rolls had been prepared which could be implemented upon the passage of legislation. The trial record supports the view that when an investor has no immediate cash flow needs, the investor will be better suited to maximum the return on the fund by investing it in longer-term securities. Thus, because the 326-K Fund did not have any realistic near-term possibility of distribution, the government's decision to maintain the 326-K Fund in very short-term CDs with an average weighted maturity years to call of one year or less during the 1980s, or in CDs

---

[40] The October 3, 1989 press release does not list which tribes were considered the "nine Western Shoshone tribal governments." As previously indicated, the BIA had identified the Te-moak Bands of the Western Shoshone Indians, the Duckwater Shoshone Tribe, the Yomba Shoshone Tribe, and the Ely Indian Colony as the four Western Shoshone tribes that were the beneficiaries of the 326-K Fund.

with a slightly longer average weighted maturity years to call of around two years between 1990 and November 1992 does not appear prudent. Based on the record before the court, the government should have been able to figure out that, at least a portion of the 326-K Fund, from August 4, 1980, until at least November 1992, could have and should have been placed in longer-term securities in order to achieve higher returns for the 326-K Fund for plaintiffs. Not to do so was imprudent.

Even assuming distribution plan legislation had been passed by Congress at any point between during the 1980s or early 1990s, the record before the court indicates that the actual distribution of the 326-K Fund to tribal members was going to be complex and would require additional planning and execution time, although how much time had still not been finalized. The BIA explained in an internal BIA memorandum, dated 1973, several years before the judgment was even entered in the ICC docket for the 326-K Fund and before the 326-K Fund was deposited into the United States Treasury in 1979, that planning was "mandatory" for the distribution of the 326-K Fund, and such planning needed to "begin now" in order to "avoid the confusion and the very time consuming problems" BIA encountered in the distribution of the "similar Northern Paiute judgment." As plaintiffs' liability expert, Mr. Nunes, testified at trial, the distribution of the Northern Paiute judgment, referenced by the BIA in the 1973 internal memorandum, had taken sixteen years to complete, which may have been case specific and extreme, but the timing suggests no immediate distribution could have been accomplished and significant planning would be required to accomplish plaintiffs' 326-K Fund distribution. By further example, the BIA opposed two separate distribution plans introduced to Congress, the first in 1989 and the second in 1991, because the time frames for the distribution process, in its opinion, were unrealistically short and would be "impossible to meet." The 1989 proposed legislation had required that distribution be completed within approximately a year after distribution legislation was enacted. The 1991 proposed legislation required that distribution be completed within approximately one year and a half after distribution legislation was enacted. Thus, the BIA apparently believed that it needed more than one and a half years after distribution legislation was passed by Congress to carry out the actual distribution of the 326-K Fund. Dr. Starks, defendant's liability expert, when pressed by plaintiffs' counsel at trial, conceded that even if distribution legislation was passed, the actual distribution of the 326-K Fund would have taken additional time to carry out. Plaintiffs' counsel asked Dr. Starks at trial that even if Congress passed a distribution act for the 326-K Fund, "that wouldn't mean that the money went out the door the next day, would it?" Dr. Starks responded that, "[t]here would still be the rolls," referring to the descendancy rolls the BIA would have to put together before distributing the 326-K Fund.[41]

Even though the BIA was aware as early as 1973 that planning for distribution of the 326-K Fund would require extensive planning, as of 1983, four years after the 326-K Fund was deposited into the United States Treasury, the record indicates that BIA had not started significant planning and disagreement remained among the tribal members

---

[41] A descendancy roll is a list of beneficiaries and their descendants who would be eligible to participate in the distribution of the 326-K Fund.

regarding the distribution of the 326-K Fund. According to a December 15, 1983 letter from the Acting Assistant Director of Indian Affairs at the Department of the Interior to the Chairman of the United States Senate Select Committee on Indian Affairs,

> In this instance the <u>Dann</u> case [<u>United States v. Dann</u>, 706 F. 2d 919 (9th Cir. 1983)] has been one of the complicating factors since it has provided an argument that land should be a factor in a final settlement since title has not been properly extinguished. Presently, groups of Western Shoshone have been discussing proposed legislation to secure both the monetary settlement and a portion of the lands in Nevada. A particularly difficult problem exists with respect to any land restoration approach due to the virtual absence of a successor tribe or tribes representative of all the recommended beneficiaries. Consequently, meaningful planning has not yet occurred.

(brackets in original).

The record also indicates that the BIA would not begin some aspects of the planning for the descendancy rolls for the 326-K Fund until a Congressional distribution plan was passed. On May 25, 1982, a representative for Western Shoshone tribal leaders wrote to the BIA Phoenix Area Office requesting that the BIA confirm its "commitment" to "not begin compiling a descendancy roll in anticipation of distribution of the Western Shoshone judgment" for the 326-K Fund. On June 8, 1982, the BIA Phoenix Area Director responded that "we cannot develop any kind of roll for distribution purposes without an approved plan," and thus agreed to the earlier request by Western Shoshone tribal leaders to not begin compiling a descendancy roll at that time. Therefore, also because defendant could have and should have known that distribution legislation for the 326-K Fund would not be passed by Congress between August 4, 1980 and November 1992, and that the distribution process would take multiple years to execute, defendant should have considered investing the 326-K Fund not only in short-term securities with an average weighted maturity of two years or less, but at least, in part, in longer-term investments, which, as the parties agree, generally out-perform shorter-term investments, when held to maturity. Additionally, even Dr. Starks, defendant's liability expert, when asked at trial by plaintiffs' counsel whether it would have been prudent for the government during the "1980s" to have invested the 326-K Fund in a longer-term portfolio with "a maturity structure of five years," Dr. Starks responded that she believed the government "could go out a little bit longer than what they did." Dr. Starks, however, testified at trial that she was "not clear about" whether five years was a prudent maturity timeframe for the 326-K Fund.

Moreover, it appears that the BIA failed to conduct any regular or reasonable cash flow analyses tailored to the 326-K Fund between August 1980 and November 1992 and instead invested the 326-K Fund in accordance with its generalized and department-wide CD program, in which the government pooled together various tribal trust funds and invested them in short-term jumbo CDs. As previously noted, the government had a duty to keep informed of the fund's performance and the factual occurrences relevant to the

particular fund so that when an "opportunity for better (and equally safe) investment elsewhere" arises, the government can reinvest the funds. See Cheyenne-Arapaho, 206 Ct. Cl. at 348-49, 512 F.2d at 1394; see also 25 U.S.C. § 162a; Osage Tribe of Indians of Okla. v. United States, 72 Fed. Cl. at 666-67. The duty to keep informed includes a duty to keep informed of the tribe's budgetary needs. See Jicarilla III, 112 Fed. Cl. at 298 (finding the BIA's failure to "take into account the Nation's budgetary needs" could only be "viewed as a plain and extended violation of defendant's fiduciary duties").

Defendant argued that in the case of the 326-K Fund, no cash flow analysis was necessary. Defendant stated in its post-trial brief that:

> The 326-K Fund was a judgment award fund with one expected cash flow: the per capita payment of the entire Fund at a date unknown. It is unclear how Interior could have been expected to 'perform' a serious analysis' of this cash flow 'to aid its investment planning,' when the timing of the distribution was fundamentally controlled by Congress, which had plenary power to act at any time.

(internal citation omitted).

Following Congress's enactment of a distribution plan for the 326-K Fund, the 326-K Fund would have to be liquidated for cash pay-outs, perhaps not all at once, at some future date.[42] A cash flow analysis regarding when distribution would occur and at what rate would appear to be an important factor in defendant's investment fund risk analysis strategy and part of the government's continuing requirement to analyze how to invest fiduciary trust funds. As previously discussed, the record before the court indicates that from August 4, 1980 to at least November 1992, there was a distinct probability that the distribution of the 326-K Fund would not be completed at any point in the near-term because distribution legislation had not yet been passed and because some portion of the Western Shoshone community was trying to reject a monetary distribution and advocated instead for the return of ancestral lands. The division among the Western Shoshone regarding monetary distribution of the 326-K Fund was well-known among members of Congress. For example, on October 28, 1986, the Nevada Congressional delegation wrote to the Secretary of Interior, noting that Western Shoshone advocated for a return of their land, and urged the BIA to provide the Western Shoshone the financial support it needed "to prepare the best arguments it can in favor of a substantial Western Shoshone land base." The Nevada Congressional delegation also told the Secretary of Interior that "[i]f the Shoshones do have a viable claim to private lands (approximately two million acres), the Nevada Congressional delegation is concerned that the Shoshone land rights question be resolved as quickly as possible without disruption of private titles." Even with the uncertainty of any absolute prediction as to when Congress would pass a particular piece of legislation, in this instance, it should have become apparent to the trust fund managers for the 326-K Fund that plaintiffs did not have immediate cash flow needs

---

[42] The actual distribution in the above captioned case was made in two parts, the first on March 6, 2011, and the second on September 28, 2012.

given the absence of necessary distribution legislation and division among the Western Shoshone people regarding a monetary distribution of the 326-K Fund. Therefore, having the 326-K Fund parked in short-term securities between August 1980 and November 1992 was not a prudent course.

Instead, the record before the court, and which the parties' liability experts do not challenge, indicates that the government invested the 326-K Fund during the 1980s and early 1990s in accordance with its CD program employed for all tribal trust funds, not only the 326-K Fund. As plaintiffs' supplemental liability expert report submitted by Rocky Hill Advisors stated, "[i]t is well known that up through the early 1990s, the Government routinely invested 70-80% of all BIA tribal trust funds in short-term time certificates of deposit (TCDs), with the remainder generally in short-term government securities or cash." Indeed, according to the BIA's yearly investment results for all tribal trust funds from 1980 to 1990, the BIA invested the majority of tribal trust funds in CDs for one year or less. At trial, defendant's liability expert, Dr. Starks, testified that the government invested the 326-K Fund in accordance with BIA's department-wide CD program. According to Dr. Starks, the "primary investments" in "the 1980s" for the 326-K Fund "were into certificate of deposits, and the -- the Government had this unique CD program in which they pooled the money from a lot of different tribes and invested it in bank CDs all over the country, and because of the pooling, they were able to buy very large CDs." According to Dr. Starks' trial testimony, the "maturities of these CD investments" were "usually one year or less." The record indicates that defendant did not conduct any separate cash flow analyses tailored towards plaintiffs' budgetary needs between August 1980 and November 1992, and instead pooled the 326-K Fund with other tribal funds into jumbo CDs with ultra-short-term maturities of two years or less, breaching the duty to keep informed of whether there existed an "opportunity for better (and equally safe) investment elsewhere" for the specific needs of the plaintiffs in the case. See Cheyenne-Arapaho, 512 F.2d at 1394; see also Jicarilla III, 112 Fed. Cl. at 298. Therefore, the government failed to prudently invest the 326-K Fund between August 1980 and November 1992.

Defendant argued in its post-trial brief that even though the majority of the 326-K Fund was invested in CDs with a maturity of one year or less during the 1980s, the CDs were not an imprudent investment vehicle because their returns were comparable to "2-3 year bonds." Even assuming that the CDs were performing as well as some other securities with a maturity of two to three years, the 326-K Fund had a highly probable, longer-term investment horizon between August 4, 1980 to at least November 1992, negating defendant's argument in this regard.

Defendant also defended the CD program in its post-trial brief by quoting from the PWC investment proposal, described above. In particular, defendant cited to the portion of the PWC investment proposal, which stated, "there is no evidence that outside money managers would have improved on the investment performance [by the BIA] during the period 1976-1983," which was the time period at issue in the PWC proposal. (internal quotation marks omitted). The PWC investment proposal also concluded that BIA had achieved "excellent investment results relative to other managed portfolios operating

under similar investment authorizations" between 1976 and 1983, and that, "[f]rom the published returns of managed portfolios operating under security selection constraints similar to those imposed on the Indian trust funds by statute, there is no evidence that outside money managers would have improved on the investment performance during the period 1976-1983."

The PWC investment proposal, however, does not present an accurate review of the BIA's investment performance of tribal trust funds between 1976 and 1983, let alone plaintiffs' 326-K Fund. To begin with, PWC did not analyze the investment horizon of the 326-K Fund, nor the facts and circumstances surrounding the distribution horizon of the 326-K Fund, from when the fund was first deposited into the United States Treasury on December 19, 1979 until December 24, 1983, when PWC published its investment proposal. PWC instead presented a review of the government's "overall" investment of all "Indian trust funds," which consisted of the government's various tribal trust funds, IIM accounts, "Indian Monies Proceeds of Labor" accounts, "Contributions," and the "Alaska Native Escrow Fund." Plaintiffs' 326-K Fund was just one of numerous tribal trust funds considered in the PWC investment proposal.

The PWC investment proposal further noted that its "[m]easurement of actual portfolio performance" of the BIA's Indian trust funds between 1976 and 1983 "was confounded by an absence of data" and that PWC had to make various assumptions when analyzing the BIA's investment performance during this time. PWC indicated:

> The current BIA accounting system does not produce periodic reports of total returns (interest accrued each period plus changes in market value) for the Indian trust fund portfolios. In order to analyze the performance of the portfolio, we estimated total portfolio returns based on published returns earned on the following generic categories of securities comprising the Indian trust fund portfolios:
>
> > o Insured or collateralized Certificate of Deposit (6 months to maturity)
> > o Treasury Securities (5 months to maturity)
> > o U.S. Government Agency Securities (7.1 years to maturity)

PWC stated that "[t]he asset allocation among" the three generic securities listed above for its analysis of the government's investment of Indian trust funds "was assumed to be the actual asset allocation for the IIM portfolio as of August 1983," a different type of account than from plaintiffs' 326-K Fund. It is undisputed that plaintiffs' 326-K Fund was a tribal trust fund account, not an IIM account. PWC purposefully selected the IIM portfolio, as opposed to the BIA's tribal trust fund portfolio, to analyze BIA's investment performance, because "the higher proportion of longer term agency securities in this fund relative to the other Indian trust funds makes this a more highly diversified portfolio, and thereby less risky and more conservative." The BIA's IIM portfolio used by PWC, which PWC later referred to in its report as "the hypothetical BIA portfolio," was comprised of "70 percent Certificates of Deposit, 6 month-maturity; 22 percent Treasury securities, 5-

month maturity; and 8 percent Agency securities with 7.1 year maturity." The 326-K Fund, however, was not comprised of the same types of securities as the PWC's "hypothetical" portfolio. First, the BIA did not have under its management the 326-K Fund during the entire period of review at issue in the PWC investment proposal, 1976 to 1983. The BIA only began to start investing the 326-K Fund in December 1979, and, once under its management, the BIA first invested the 326-K Fund solely in CDs with an average weighted maturity years to call of approximately six months or less. Thus, PWC's review of the "hypothetical" BIA portfolio is not overly helpful when determining whether the Department of the Interior's investment of the 326-K Fund was prudent.

Further, PWC stated that "[w]hile the BIA investment strategy has worked well in the past, the unusual market conditions of the recent past may not continue," and "there is no guarantee that the current strategy of investing primarily in highly liquid short-term assets will achieve the same investment performance relative to other strategies if the capital markets return to traditional pricing behavior." According to the PWC investment proposal, unlike the "unusual" inverted yield curve between 1973 and 1983, "[u]nder the traditional yield curve," when longer-term investments out-perform shorter-term investments, "investors who assume the risks associated with long-term securities, are rewarded more than investors who place their funds in shorter term issues." PWC proposed alternative investment strategies to the BIA, all of which consisted of either (a) a mix of short-term and intermediate-term securities, or (b) short-term, intermediate-term, and long-term securities. None of the proposed PWC portfolios modeled the ultra-short-term portfolio employed by the BIA during the 1980s and early 1990s, which consisted of investing the 326-K Fund in short-term CDs. For these additional reasons discussed above, the PWC investment proposal is not of great assistance for resolving whether the CD program for the 326-K Fund was a prudent investment approach between August 1980 and November 1992.

Following the publication of the PWC investment proposal in December 1983, as both parties to the above-captioned case agree, the yield curve returned to an upward slope for the remainder of the investment period at issue from 1983 until 2013, with the exception of a few and very short-lived instances when the yield curve became inverted. Despite the return to the upward sloping yield curve in the early 1980s, yet even despite PWC's advice that the BIA should begin to invest its tribal trust funds and other Indian monies accounts in longer-term securities to account for a possible return to an upward sloping yield curve, the BIA did not change its pattern of investing the 326-K Fund in ultra-short-term CDs for the remainder of the decade until late 1992. It was not until December 1992 that the BIA began to significantly lengthen the maturity of the 326-K Fund and diversify the types of securities in which the 326-K Fund was invested.

In sum, the evidence before the court indicates that defendant could have, and should have, become aware that the 326-K Fund had a longer-term investment horizon between August 4, 1980 and November 1992, and, thus, should have at least partially invested the 326-K Fund in longer-term securities. Defendant, however, consistently invested the 326-K Fund in short-term securities between August 4, 1980 and November

1992, which prevented the fund from obtaining higher returns and, therefore, breached its fiduciary duty to prudently invest the 326-K Fund during that time.

### b. Sub-period 2: December 1992 to June 2004

December 1992 to March 1997

Beginning in December 1992, the government significantly increased the average weighted maturity years to call of the 326-K Fund, reaching a peak of a little less than ten years by September 1993. Following the September 1993 peak, the maturity structure of the 326-K Fund steadily declined to about an average weighted maturity years to call of a little less than five years by March 1997. Also, by March 1997, the 326-K Fund was no longer invested in any CDs, and instead invested in a mixture of agency, Treasury, and mortgage-backed securities. At trial, plaintiffs acknowledged that the government invested the 326-K Fund in longer-term securities between December 1992 and March 1997 than it had previously done during the 1980s and early 1990s. Plaintiffs' liability expert, Mr. Nunes, however, testified at trial that government should have invested the 326-K Fund in even longer-term investments than those selected by the government, with an average weighted maturity of approximately fifteen years, due to the uncertainty surrounding when distribution plan legislation would be enacted by Congress and the time intensive process of compiling descendancy rolls and distributing the monies to qualifying Western Shoshone members. Defendant's liability expert, Dr. Starks, however, testified at trial that the government's investment of the 326-K Fund during this time, the "mid-1990s," was within a range of prudence.

The record indicates that as of December 1992, Congress had declined, in 1989 and 1991, to pass two bills to get the 326-K Fund distributed, in light of opposition from members of the Western Shoshones tribes and from members of the BIA. The record also indicates that Congress was not going to entertain another bill for the distribution of the 326-K Fund until there was more "consensus" among the Western Shoshone tribes regarding a potential distribution plan for the 326-K Fund, as evidenced by the June 19, 1992 letter from the Chairman of the United States House of Representatives Committee on Natural Resources to Congresswoman Vucanovich. Due to the lack of agreement between the government and the Western Shoshone regarding a potential distribution of the 326-K Fund during the early 1990s, it should have been apparent to defendant that the 326-K Fund would not be distributed in the near-term. Therefore, because plaintiffs had no immediate cash flow needs, as defendant's liability expert, Dr. Starks, recognized at trial, it made "sense" to lengthen the maturity structure of the 326-K Fund beginning in 1992.

In addition, as defendant's liability expert, Dr. Starks, testified at trial, it also made "sense" for the government to shift the 326-K Fund from short-term CDs into longer-term securities in 1993 based on contemporaneous market conditions. According to Dr. Starks at trial, the yield spread was widening around 1993, such that longer-term investments became more profitable with less associated risk than shorter-term investments. Fred Kellerup, a BIA employee, handling investments of tribal trust funds at the time, in an

October 1992 BIA monthly newsletter titled "TRUST," advised the BIA to "*[a]void the one-year CDs*," when investing tribal trust funds, and to begin investing tribal trust funds "*three-to-seven year government securities*," even "*if you have cash flow needs.*" (capitalization and emphasis in original). Mr. Kellerup also noted that the government should "[*s*]*tay away from the long bond. There's no need for tribes to invest beyond 15 years. You're too far out if interest rates turn around.*" (emphasis in original).

Between December 1992 and March 1997, the record also indicates that the government and the Western Shoshone tribes had not yet reached an agreement on how to proceed with the distribution of the 326-K Fund.  For example, on January 7, 1994, Congressman Richardson of the United States House of Representatives Native American Affairs Subcommittee wrote to Bruce Babbitt, Secretary of Interior, notifying the Secretary that the "plight of the Western Shoshone is one of the most difficult problems in all of Indian affairs," and advising the Secretary to engage with only "Federally recognized tribes on this matter." Congressman Richardson also noted that, "it is of paramount importance that the docket funds of the Western Shoshone should not merely be divided up on a per capita basis and distributed," and that the "Subcommittee on Native American Affairs generally would frown on any plan that does not include provisions for tribal economic development and long range economic planning." Despite potential opposition from the BIA and the Western Shoshone tribes, Congresswoman Vucanovich, nonetheless, introduced legislation in 1989 and 1991, which failed to get passed. Although the distribution process of the 326-K Fund undoubtedly would take some time, even after distribution legislation was passed, the record, however, does not indicate that distribution of the 326-K Fund, necessarily, would take as long as it did for Congress in the case of the Northern Paiute judgment or that it could not be accomplished within the intermediate time frame of five to ten years.

Although the government could have possibly invested the 326-K Fund in more longer-term securities following the approximate ten-year peak of the average weighted maturity years to call in September 1993, the government's decision to decrease the 326-K Fund to an approximate average weighted maturity years to call of a little less than five years by March 1997, is arguably within the range of prudence. As discussed above, both parties' experts agreed that there is a range of investments that an investor may select and still maintain a prudent portfolio. The record does not indicate that getting distribution legislation for the 326-K Fund passed through Congress or that getting the money distributed to plaintiffs would necessarily take longer than five to ten years, despite plaintiffs' argument to the contrary. In addition, the government's investment of the 326-K Fund between December 1992 and March 1997 stands in stark contrast to the government's far less prudent investment of the 326-K Fund during the 1980s and early 1990s. As previously discussed, during the 1980s and early 1990s, the government employed a stagnant investment approach of investing the 326-K Fund in ultra-short-term CDs with an average weighted maturity years to call of approximately two years or less. Between December 1992 and March 1997, however, the government diversified the types of securities in which the 326-K Fund was invested, and also invested the fund in significantly longer-term securities, with an average weighted maturity years to call ranging from approximately five to ten years. As previously noted, "reasonably sound

diversification" of a portfolio is part of a trustee's duty to prudently invest. <u>See</u> Restatement (Third) of Trusts § 90 cmt. e(1).

Also, the government's investment of the 326-K Fund between December 1992 and March 1997 was in line with Mr. Kellerup's October 1992 guidance provided in the Office of Trust Funds Management quarterly journal "TRUST," which announced to the public that the government should invest tribal trust funds in government bonds ranging from three to seven years. (capitalization in original). Furthermore, when pushed at trial on cross-examination, plaintiffs' liability expert, Mr. Nunes, conceded that the government's lengthening of the maturity structure of the 326-K Fund in late 1992 and early 1993 was "reasonable." When specifically asked whether the "portfolio they [defendant] had built at this period in time was a reasonable portfolio," Mr. Nunes testified at trial that "'reasonable' is accurate." Thus, the government's decision to maintain the 326-K Fund in an intermediate-term portfolio between December 1992 and March 1997, with an average weighted maturity years to call ranging between approximately five to ten years does not appear to violate the range of prudence so as to be too short-term.

As stated previously, the court recognizes that there is no scientific or formulaic way to decide a correct range of prudence. The record before the court, with its many gaps, and the expert reports and testimony of the experts in roughly ten-year blocks, as well as the trial testimony of defendant's fact witnesses, leaves many unanswered questions. The burden of proof, however, rests on plaintiffs to prove their claim that defendant imprudently invested the 326-K Fund between December 1992 and March 1997 in too short-term securities, which the plaintiffs have not done for this time period, and, in fact, plaintiff's liability expert, Mr. Nunes, conceded at trial that the government's investment of the 326-K Fund during part of this time period was "reasonable."

<u>April 1997 to December 1997</u>

Beginning in April 1997, the average weighted maturity years to call of the 326-K Fund had dropped to approximately three years and eight months. Between May 1997 and December 1997, the average weighted maturity years to call continued to drop to approximately three years.

Between April 1997 and December 1997, the record indicates that consensus among the Te-Moak Bands of Western Shoshone Indians, one of the four Western Shoshone tribes recognized by the BIA as a beneficiary of the 326-K Fund in the BIA's January 22, 1982 amended research report, began to emerge. The Te-Moak Bands of Western Shoshone Indians was comprised of the Elko, Battle Mountain, South Fork, and Wells bands. The other three Western Shoshone tribes recognized by the BIA as beneficiaries of the 326-K Fund in the January 22, 1982 amended research report were the Duckwater Shoshone Tribe, the Yomba Shoshone Tribe, and the Ely Indian Colony. According to a March 3, 1997 internal BIA memorandum, the Te-Moak Tribal Council, the governing group for the Te-Moak Bands of Western Shoshone Indians, was planning to "pursue 100% distribution to 1/4 degree of Docket 326-K." The March 3, 1997 BIA memorandum also noted that the Te-Moak Tribal Council would pursue "a separate or

companion proposal to seek restoration of land in Western Shoshone country," and that both proposals, "could run concurrently and not necessarily have to be tied together." The March 3, 1997 BIA memorandum also discussed a March 1, 1997 meeting between the BIA and two hundred members of Western Shoshone tribes. According to the March 3, 1997 BIA memorandum, after the March 1, 1997 meeting was over, "several people came up to tell us [the BIA] that they support the proposed Te-Moak plan but did not want to stand up in front of the audience and express themselves."

As previously discussed, there is a range of what can constitute a prudent portfolio investment strategy. The exact limitations of what would have been prudent for the 326-K Fund during 1997 is difficult to discern in hindsight and without far more analyses by the parties' expert reports and trial testimony on evidence in the record, including a detailed analysis of the 326-K Fund's performance in comparison to the performance of various other securities of varying maturity,[43] as well as more detail of tribal and BIA interactions. Hindsight tells us that distribution legislation for the 326-K Fund was in fact not passed until July 2004 and that the 326-K Fund was not distributed to qualifying Western Shoshone members until 2011 and 2012, but this should not dictate the analysis of the prudence of the contemporaneous investment decisions by the Department of the Interior. Part of the court's analysis must be to take into account the prudence of the investment decisions made at the time and whether those investment decisions correspond to changing circumstances contemporaneous to the time of the decision-making. See Restatement (Third) of Trusts § 90 cmt. b. There, of course, could be no absolute certainty that both Houses of Congress would pass legislation to enact a distribution plan at any specific time, that would have required crystal ball speculation. Nonetheless, the government's decision to place the 326-K Fund in shorter-term securities, ranging from three years and eight months in April 1997 to approximately three years in December 1997, appears to be too short-term, even given the Te-Moak Tribal Council's heightened optimism for a distribution of the 326-K Fund staring around mid-1997.

As discussed above, the Te-Moak Bands of Western Shoshone was one of four Western Shoshone tribes recognized by the BIA as a beneficiary of the 326-K Fund in the BIA's January 22, 1982 amended research report. According to a March 7, 1997 internal BIA memorandum from the Superintendent of the Eastern Nevada Agency to the Phoenix Area Director, the other three Western Shoshone tribes, the Duckwater Shoshone Tribe, the Yomba Shoshone Tribe, and the Ely Indian Colony, would potentially be introducing

---

[43] As noted above, the liability portion of plaintiffs' expert report by Rocky Hill Advisors, as well as defendant's damages expert report by Dr. Alexander, each included a hypothetical that indicated that longer-term Treasury securities, if held to maturity, out-performed shorter-term Treasury securities, during the thirty-three-year investment period at issue for the 326-K Fund. These two hypotheticals, while instructive that longer-term bonds generally out-perform shorter-term bonds, does not indicate whether Treasury securities would have outperformed the specific securities in which the 326-K Fund was invested during the entire thirty-three-year period at issue.

to the BIA their own version of a potential distribution plan for the 326-K Fund. According to the March 7, 1997 internal BIA memorandum, introduced at trial as a joint exhibit:

> The Te-Moak Tribe will be sending a copy of their plan to the other three tribes named in the results of research. The purpose is to try and get the four proposed plans submitted about the same time so resolution could be achieved quickly. Duckwater has already presented their plan to the federal negotiating team. Ely will be supporting the Te-Moak Plan. We do not know what Yomba will do, rumors are they will parallel the Duckwater plan.

Further, although the majority of the two hundred Western Shoshone members who attended the March 1, 1997 appeared to be in favor the Te-Moak Tribal Council's plan for distribution, the attendees of that meeting were just a sub-group of the thousands of Western Shoshone tribal members who would participate in a distribution of the 326-K Fund. According to the BIA's January 22, 1982 amended research report, as of 1982, the BIA had already estimated that there were 1,200 potential enrollees for the distribution of the 326-K Fund from the Te-Moak Bands of the Western Shoshone Indians, "about 230" enrollees for the Duckwater Shoshone Tribe, "about 300" enrollees for the Yomba Shoshone Tribe, and about "170" enrollees for the Ely Indian Colony.

In addition, as previously noted, even following the enactment of a Congressional distribution plan for the 326-K Fund, the BIA would need time to organize the descendancy rolls for the 326-K Fund, pass regulations regarding tribal member enrollment in the descendancy rolls, and allow time for tribal members to appeal the BIA's decision regarding the compilation of the descendancy rolls. As evidenced by the BIA's testimony before Congress in 1989 and 1991, distribution of the 326-K Fund would require more than one and a half years to accomplish. In sum, despite the emerging consensus between April 1997 and December 1997 among the Te-Moak Bands of Western Shoshone Indians, one of the four beneficiary tribes of the 326-K Fund, the record indicates that the BIA was aware that consensus among the remaining Western Shoshone tribes in favor of a distribution of the 326-K Fund had yet to occur, and that the distribution process of the 326-K Fund would take additional time. For these reasons, it appears unlikely that the BIA would have been able to accomplish the distribution of the 326-K Fund within approximately three and a half years or less. Therefore, the government's decision to continue to shorten the average weighted maturity years to call of the 326-K Fund from approximately three and a half years to three years between April 1997 and December 1997, despite the distinct probability that the 326-K Fund would not be distributed in the near-term, was imprudent.

January 1998 to June 2004

The question before the court is how short-term the government could structure the 326-K Fund investment strategy between January 1998 and June 2004 and continue to be considered a prudent investor of plaintiffs' 326-K Fund. Beginning in January 1998, the government continued to steadily shorten the maturity structure and appears to have drifted back to its old investment pattern from the 1980s and early 1990s of placing the

326-K Fund in a portfolio of an average weighted maturity years to call of approximately two and a half years or less. From January 1998 to October 2000, the average weighted maturity years to call steadily decreased from three years to a low of two years. From November 2000 to April 2002, the average weighted maturity years to call decreased to approximately one year. Between May 2002 and June 2004, the maturity structure of the 326-K Fund decreased even more, ranging between an average weighted maturity years to call of approximately seven to ten months.

The record indicates that beginning in 1998, the BIA and various Western Shoshone tribes were working towards getting a distribution plan ready to be introduced into Congress, yet, the introduction of such legislation was not likely going to happen within 1998. According to a May 15, 1998 internal BIA memorandum, the BIA noted that it did not "anticipate a final distribution plan [for the 326-K Fund] being presented to Congress by the end of this year," and that "development of a payment roll will be a tremendous and expensive task once the distribution plan is approved." The May 15, 1998 memorandum, however, noted that the "Eastern and Western Nevada Agencies" of the BIA "have been very cognizant of this fact and are working along with the tribes in maintaining current tribal rolls."

On December 1, 1998, the BIA Phoenix Area Director wrote to the Deputy Commissioner of Indian Affairs at the BIA, noting that "an overwhelming majority of adult Western Shoshones favor distribution." In addition, in 1999, the Elko Band Tribe of the Western Shoshone, which had the "largest number" of "Western Shoshone enrollees," approximately 1500, notified the Secretary of Interior that, "at this point we feel it is both reasonable and prudent to move forward" with a distribution plan for the 326-K Fund, which would be result in a 100% per capita monetary distribution, and "we would be most appreciative of the Department of Interior's assistance in promoting the 'Western Shoshone Claims Distribution Act' as the 'Act' enters and progresses through the congressional process."

Also in 1999, the Elko Band Tribe, the Fallon Paiute, "the second largest band of Shoshones in the state of Nevada," numbering approximately 601 eligible Western Shoshone beneficiaries of the 326-K docket, and the Western Shoshone of the Duck Valley Reservation, numbering "approximately 400 direct descendants of eligible Western Shoshone who are possible beneficiaries of Docket 326-K," each passed resolutions in favor of Congress passing distribution legislation for the 326-K Fund which would result in a 100% per capita monetary distribution.

Beginning in 2000, influential members of Congress, such as Senator Harry Reid of Nevada, introduced distribution legislation every year. Although several bills failed to pass, finally, the distribution legislation for the 326-K Fund, introduced in both houses of Congress in 2003, was passed and signed into law as the Claims Distribution Act of 2004 by President George W. Bush on July 7, 2004.[44]

---

[44] The distribution legislation that was passed in July 2004 also included a distribution plan for the 326-A-1 Fund, which had been deposited into the United States Treasury in

The record indicates that between January 1998 and June 2004, the probability that distribution legislation would be passed was ever increasing. Even after a distribution plan legislation was passed, however, the actual distribution of the 326-K Fund would require time. Plaintiffs' rebuttal expert, Dr. Goldstein, was the only expert in the case who seriously considered in his analysis the potential timeline for getting distribution legislation passed and then for getting tribal trust fund monies paid out. Dr. Goldstein included in his rebuttal expert report a table, titled "Table 1: Sample of times between appropriation and approval of tribal disbursement plans prior to 1980," displaying the years it took BIA to get a disbursement plan passed through Congress for twenty-one randomly selected tribes, plus the Northern Paiute tribe. Dr. Goldstein testified at trial that the twenty-two tribes were selected from a pool of a "little over 150" tribes. Dr. Goldstein also narrowed his selection to tribes whose tribal trust funds came into the government's supervision "prior to 1980" in order to illustrate the government's understanding of potential time frames for getting distribution legislation enacted as of 1980, around the time that plaintiffs' 326-K Fund was deposited into the United States Treasury. According to Dr. Goldstein's rebuttal expert report,  his Table 1 was intended to help illustrate that it "was not uncommon for per-capita distributions to take a significant amount of time," and that "long delays for distribution were not unique to the WSIG dispute."

According to Dr. Goldstein's research, the average time to get a disbursement plan passed through Congress for the twenty-two tribes was "4.4" years. When broken down, however, there was a wide variety in the amount of years it took to get distribution legislation passed for each of the twenty-two tribes. For eight tribes, it took less than three years to get distribution legislation passed. For nine tribes, it took between three to seven years to get distribution legislation passed. For the remaining four tribes, it took between seven and thirteen years to get distribution legislation passed. As indicated above, the trim for the remaining tribe, the Northern Paiute, to get distribution legislation passed was approximately sixteen years. Thus, Dr. Goldstein's analysis in Table 1, in fact, indicates that the BIA's experience in getting distribution legislation passed for these twenty-two tribes varied greatly and that no set pattern emerged for predicting when distribution legislation could be passed for a particular tribe.

Dr. Goldstein also attempted, in Table 1 of his rebuttal expert report, to calculate the amount of time it would have taken the BIA to get the twenty-two tribes' tribal trust funds paid out to their qualifying tribal members following the enactment of distribution legislation. Dr. Goldstein's calculation, however, was not based on the actual time it took the BIA to get the tribal trust funds paid out for each of the twenty-two tribes. During cross-examination, Dr. Goldstein testified that:

> [w]hat I didn't have -- and would have liked to have had but was unable to find -- was the actual amount of time that it took from date of disbursement

March 1992, and the 326-A-3 Fund, which had been deposited in the United States Treasury in September 1995. As described below, pursuant to the Claims Distribution Act of 2004, the 326-A Funds are perpetually held in trust.

plan to the actual cash going out for each one of these tribes. That definitely would have been better, all right? I was unable to find it. That doesn't mean it doesn't exist; I just wasn't able to find it.

Instead, Dr. Goldstein, in an indirect manner, calculated a "range" of time it would have taken the BIA to distribute the tribal trust funds for the twenty-two tribes "had their experience been similar to what occurred for the WSIG in 2004 through 2011." According to his rebuttal expert report, Dr. Goldstein looked to a February 2007 email sent by Daisy West, a BIA employee, who had estimated that the 326-K Fund, as of February 2007, would be distributed between two to ten years. Dr. Goldstein adjusted Ms. West's range by three years to reflect the fact that Ms. West's estimation came three years after distribution legislation was passed for the 326-K Fund in July 2004, resulting in a range of five to thirteen years. According to Dr. Goldstein, the BIA should have distributed each of twenty-two tribal trust funds within a minimum of five years and a maximum of thirteen years following the enactment of distribution legislation for each of the twenty-two tribes.

As defendant's counsel pointed out during Dr. Goldstein's cross-examination at trial, Dr. Goldstein's projections for the disbursement of the twenty-two tribes' judgment funds did not accurately reflect reality. With hindsight, defendant's counsel of record, Mr. Wilson, was able to find information regarding the time it took for the BIA to distribute the tribal trust funds for five of the twenty-two tribes, which Mr. Wilson presented at trial during the cross-examination of plaintiffs' rebuttal expert, Dr. Goldstein, and which plaintiffs did not contest. According to Mr. Wilson's cross-examination of Dr. Goldstein at trial, it took the following approximate times, following the enactment of each of the five tribal trust fund's Congressional distribution plan, to get tribal trust funds paid out to each of the five tribes: (1) three years for the Miami Indians of Indiana and Oklahoma, (2) six months for the Iowa Tribes of Kansas, Nebraska, and Oklahoma, (3) one year and three months for the Creek Nation of Indians, (4) ten months for the Cheyenne-Arapaho Tribes of Oklahoma, and (5) eight months for the Assiniboine Tribes of Montana. Therefore, as defendant's counsel, Mr. Wilson, indicated at trial, Dr. Goldstein's potential timeline for distribution of the twenty-two tribal trust funds listed in Table 1 of Dr. Goldstein's rebuttal expert report is not consistent with reality, and, thus, presents no useful analysis for determining how long it should have taken the BIA to distribute the 326-K Fund.

At the same time, although the BIA was able to distribute the tribal trust funds for the five tribes discussed by defendant's counsel at trial within a short amount of time, the BIA's experience with these five tribes does not dictate that the BIA should have been able to get distribution legislation passed through Congress and the 326-K Fund paid out in a similar short-term fashion. According to the newspaper articles documenting the disbursement of the funds for these five tribes, introduced at trial by defendant's counsel and which plaintiffs did not contest, three of the five tribal trust funds were each approximately one million dollars or less. The fourth tribal trust fund was approximately five million dollars, and the last tribal trust fund was approximately fifteen million dollars. Thus, all five tribal trust funds were significantly smaller than plaintiffs' 326-K Fund, which at the time the BIA began to distribute the 326-K Fund, had grown to approximately $183,794,000.00. It is reasonable to expect that a distribution process for smaller tribal

trust funds would take a shorter amount of time to organize and distribute than a larger tribal trust fund, such as plaintiffs' 326-K Fund. Furthermore, the distribution of plaintiffs' 326-K Fund was further complicated by the fact that there were numerous and diverse Western Shoshone tribes throughout Nevada and California which would partake in the distribution, and, thus, the compiling of descendancy rolls for the 326-K Fund would likely not be accomplished in an equally short-term term fashion. Also, as previously indicated, there was a faction of the Western Shoshone community still opposing a monetary distribution of the 326-K Fund in favor of the return of their ancestral lands during the 1980s and early- to mid-1990s. Thus, as the evidence indicates, the BIA's task of getting tribal consensus regarding a distribution plan for the 326-K Fund was complicated and time-consuming. In sum, none of the parties offered particularly helpful evidence regarding when the required distribution plan legislation for the 326-K Fund likely would be enacted by Congress or how long it would take the BIA to distribute the 326-K Fund to plaintiffs.

The record indicates, as noted above, that as of 1998, the BIA acknowledged that once distribution legislation was passed, the process of distributing the 326-K Fund would be a "tremendous" task, but the BIA also noted that the government had already been working with the Western Shoshone tribes to plan for the distribution process of the 326-K Fund by "maintaining current tribal rolls." The record indicates that the BIA had testified before Congress in 1989 and 1991 that the BIA would likely need more than one and a half years to prepare for and distribute the 326-K Fund following the passing of distribution legislation. The record also indicates that following Congress's enactment of distribution plan legislation for the 326-K Fund in July of 2004, there still were several steps the BIA would have to complete to effect distribution to the tribal members. As required by the various bills for the distribution of the 326-K Fund being introduced to Congress by various members of the Nevada Congressional delegation in the early 2000s and the finalized version of the Claims Distribution Act of 2004, which was signed and passed into law on July 7, 2004, once a distribution plan was passed by Congress, the BIA would have to publish "rules and regulations" governing the establishment of the descendancy rolls and publish regulations regarding the per capita distribution of the 326-K Fund. In addition, the government would have to allot time for Western Shoshone members to apply for and become approved for enrollment in the descendancy rolls, as well as time for sending out actual payments of the 326-K Fund to qualified Western Shoshone members.

Although it is difficult for the court to guesstimate, in retrospect, a projection of how the contemporaneous decision-makers quantified the time still needed for the government to distribute the 326-K Fund monies to Western Shoshone members between January 1998 and April 2002, given that Congress had yet to pass distribution plan legislation and that the BIA would need to execute various steps before the money in the 326-K Fund could be paid out to Western Shoshone members, it was not probable that the government could have distributed the 326-K Fund within approximately one to two and a half years. In light of this reality, the government should have known that the 326-K Fund could have been invested between January 1998 and April 2002 in a portfolio with a higher average weighted maturity years to call of approximately one to two and a half

years. Thus, between January 1998 and April 2002, the government imprudently invested the 326-K Fund in too short-term securities.

It was even less probable that, given that distribution legislation had not yet passed and considering the various steps the government would need to take to distribute the 326-K Fund to Western Shoshone members, the government would have been able to distribute the 326-K Fund within ten months or less, and, yet, between May 2002 and June 2004, the government maintained the 326-K Fund in a portfolio with an average weighted maturity years to call of approximately ten months or less during this time. In addition, by maintaining the 326-K Fund in a portfolio with an average weighted maturity years to call of approximately seven to ten months between May 2002 and June 2004, as plaintiffs' rebuttal expert report by Dr. Goldstein explained, the government was potentially exposing the 326-K Fund to unnecessary interest rate "rollover" risk, i.e., the risk that when the investor seeks to re-invest, interest rates have dropped or increased. If interest rates have dropped, then the investor will receive a less favorable return rate than in the past upon re-investment. If interest rates have risen, then the investor will receive a more favorable return rate than in the past upon re-investment. Dr. Goldstein stated in his rebuttal report:

> An investor that continually invests in 6-month T[reasury]-bills over a period of 5 years means that they reinvest in new short-term securities 9 times over the period (assuming they hold each 6-month bill to maturity). Yet, every time that the 6-month bill is rolled into a new 6-month investment, a new interest rate is set based on then-prevailing rates. The uncertainty over the rate at which reinvestments will occur under this strategy represent rollover risk (sometimes called re-investment risk).
>
> Conversely, holding a 5-year Treasury over the same 5-year period provides the investor with a known and fixed interest rate at each of the corresponding 6-month intervals on their initial principal investment. So this investor faces almost none of the same rollover risk on their initial principal that is faced by the investor who rolls 6-month treasuries.

(footnote omitted). Dr. Goldstein also stated in his rebuttal expert report that "[w]hen the investment decision is being made (i.e., *ex ante*) one would not expect to make money by holding a shorter-term bond and waiting to see when rates rise." (emphasis in original). According to Dr. Goldstein, "planning to continually roll" over short-term investments, such as a "30-day Treasury bills for 5 (or 15) years" is "unadvisable." Instead, according to Dr. Goldstein, if the investor can hold a security to maturity, "[b]y buying longer-term securities, an investor benefits by securing a relatively higher, fixed coupon payment for a longer-term horizon."

By investing the 326-K Fund in securities with an approximate average weighted maturity years to call of seven to ten months between May 2002 and June 2004, the government was consistently required to reinvest portions of the 326-K Fund throughout this time, exposing the 326-K Fund to interest rate rollover risk and fluctuating interest

rates. As the record indicates, the government could have invested the 326-K Fund in longer-term securities because the government knew or should have known at the time that Congress had yet to pass distribution legislation and that the process of distributing the 326-K Fund to qualifying Western Shoshone would take additional time. By extending the length of the maturity structure of the 326-K Fund, the government could have minimized interest rate rollover risk and potentially could have locked in more favorable interest rates for longer blocks of time than seven to ten months. For the above reasons, the government's investment of the 326-K Fund between May 2002 and June 2004 was too short-term to be considered within the range of prudence.

### c.  Sub-period 3: July 2004 to September 2013

Plaintiffs' expert report prepared by Rocky Hill Advisors argued that from July 2004, when Congress passed the Claims Distribution Act of 2004, which provided for the distribution of the 326-K Fund, as well as for the 326-A-1 and 326-A-3 Funds, until 2010, right before the first initial distribution of the 326-K Fund took place, the average weighted maturity of the 326-K Fund should have been seven years. Plaintiffs' expert report by Rocky Hill Advisors stated that the 326-K Fund should have been placed in ultra-liquid securities, such as cash, between 2011 and September 2013, the remainder of the investment period at issue. Defendant's liability expert, Dr. Starks, testified at trial that the government's investment of the 326-K Fund between July 2004 and September 2013, which was maintained in a portfolio with an average weighted maturity years to call ranging between approximately six months and a little less than three years, a much shorter maturity structure than plaintiffs' proffered seven-year average weighted maturity structure for the 326-K Fund, was within the "range of prudence." Dr. Starks, however, did not define the limits of what types of investments would have been considered within the range of prudence during this time.

July 2004 to September 2006

From July 2004 to September 2006, similar to its investment of the 326-K Fund from the previous two years, the government maintained the 326-K Fund invested in a portfolio with an average weighted maturity years to call between approximately six months and a little more than one year.[45] Once again, the court is presented with the question: when does an investment become too short-term to be considered prudent? The record indicates that the investment horizon for the 326-K Fund had certainly shortened following Congress's enactment of the Claims Distribution Act of 2004 on July

---

[45] There was a brief five-month period between January 2005 and May 2005 that the average weighted maturity years to call hovered around approximately one year and eight months before dropping back down to an average weighted maturity years to call of one year in June 2005. Following June 2005, the average weighted maturity years to call of the 326-K Fund remained around one year until September 2006, the end of this sub-period. This slight increase in the maturity structure of the 326-K Fund between January 2005 and May 2005, however, was still too short-term and too short-lived to be considered prudent.

7, 2004, which parties in the above-captioned case do not dispute. Despite the enactment of the distribution plan legislation, however, there were remaining steps left before the 326-K Fund needed to be liquidated to pay qualifying Western Shoshone members. The record indicates that the government's execution of the distribution plan would be a multi-step process of somewhat undefined duration. As previously noted, following the enactment of the Claims Distribution Act of 2004, the government would have to pass regulations for the creation of descendancy rolls, allow for Western Shoshone members to apply for enrollment in the descendancy rolls, process the applications from members of the tribes, and liquidate the 326-K Fund in order to distribute the 326-K Fund monies to qualified Western Shoshone members. As noted above, it is not probable that the government could have executed these various processes within an ultra-short time frame of approximately one year or less. Prudent investment would have likely extended the maturity structure of the 326-K Fund between July 2004 and September 2006, especially given the fact that the Claims Distribution Act of 2004 had just been recently enacted, and that the government's process to implement the distribution plan was at an early stage. For these reasons, the government imprudently invested the 326-K Fund in too short-term securities between July 2004 and September 2006.

October 2006 to December 2010

From October 2006 to December 2010, the average weighted maturity years to call of the 326-K Fund fluctuated between approximately one year and seven months and a little less than three years, which plaintiffs argued was too short-term to be considered prudent.[46] Plaintiffs argued that following the enactment by Congress of distribution legislation in July 2004, the 326-K Fund should have been invested in a portfolio with an average weighted maturity of seven years and primarily rely on one document in the record to support their position. The document is an email chain from February 11, 2007 and February 12, 2007, between Daisy West, the Chief of the Division of Tribal Government Services, BIA, and Robert Craff, one of defendant's fact witnesses, who, as noted above, was a regional trust administrator for the Office of the Special Trustee at the Department of the Interior assigned to plaintiffs' three tribal trust funds beginning in 2006 until the 326-K Fund's final distribution in 2012.[47] Mr. Craff testified at trial that as a

---

[46] During the latter half of 2010, the average weighted maturity years to call of the 326-K Fund began to decrease from two years to approximately one year. Although a one year average weighted maturity structure for the 326-K Fund would have been considered too short-term during the 1980s, 1990s, and 2000s for the 326-K Fund, during the mid- to late-2010, when distribution of the 326-K Fund was imminent and the only step left for the government to execute was the liquidation of the fund, the government's decision to begin to decrease the average weighted maturity of the 326-K Fund during the latter half of 2010 was reasonable. As the record indicates, the first partial distribution of the 326-K Fund was made in early 2011, followed by the final distribution payment of the 326-K Fund in 2012.

[47] Ms. West was not called to testify by either party at trial in the above-captioned case. In addition, plaintiffs' liability expert, Mr. Nunes, testified at trial that he did not seek out an opportunity to interview Ms. West or Mr. Craff at any point during this case, despite his

regional trust administrator, he was responsible for the "general oversight and management of all activities within the particular regions that we serve," and that he also had "direct supervision of the fiduciary trust officers that are located out in the field." Mr. Craff also testified that as a regional trust administrator, he was not in charge of investing plaintiffs' three tribal trust funds. The responsibility to invest plaintiffs' tribal trust funds, according to Mr. Craff, rested with the "investment shop," also known as the Office of Trust Funds Investment within the BIA. Mr. Craff further testified that in his role as regional trust administrator, he provided guidance to the investment shop regarding how to invest plaintiffs' tribal trust funds, which included information regarding the "time horizon for the distribution" of plaintiffs' tribal trust funds.

In the email chain between Mr. Craff and Ms. West, Mr. Craff initially reached out to Ms. West on February 11, 2007, requesting her estimate for the timing of the distribution of the 326-K and 326-A-1 and 326-A-3 Funds. Ms. West responded on February 12, 2007 that an initial distribution of the 326-K Fund would occur within two to the three years, and the per capita payment would be approximately a $11,000.00 payment to 2,500 individuals. Ms. West then stated that the balance of the 326-K Fund would be distributed in six to ten years. Ms. West stated that the 326-A Funds would be available for distribution when the initial distribution for the 326-K Fund occurred. Plaintiffs argued that because Ms. West estimated, as of February 12, 2007, the date of Ms. West's email, that the final distribution would not take place for another six to ten years, defendant should have shifted the 326-K Fund into longer-term securities following the passing of the Claims Distribution Act of 2004 on July 7, 2004.

This document, however, does not in and of itself prove that the 326-K Fund should have had been invested in longer-term securities. The email from Ms. West is only one data point to help determine whether the investment horizon of the 326-K Fund was prudent. Mr. Craff testified at trial that the Ms. West was "just one of a number of folks that I reached out to at that time," regarding a potential timeline for the distribution of the funds. Mr. Craff also testified that Ms. West was located at the "Central Office in Washington, D.C." Mr. Craff testified that as he reached out to agency officials located geographically closer to the Western Shoshone tribes at the BIA's "Western Nevada Agency," and at the "Western Regional Office," it "became clear" to him that Ms. West's "six- to ten-year" time frame for a final distribution of the 326-K Fund included in the February 2007 email, "probably was not reasonable" and too long. Mr. Craff testified at trial that he did not inform the investment officer for the 326-K Fund about Ms. West's distribution predictions.

For example, during the direct examination of Mr. Craff at trial, defendant's counsel introduced an email chain between Mr. Craff and Nona Tuchawena, dated March 2 through March 3, 2009, entered as a joint exhibit at trial. According to the Ms. Tuchawena's signature block in the email chain, Ms. Tuchawena's title at the time was the Acting Deputy Regional Director of Indian Services at the BIA for the Western Region,

---

heavy reliance on the February 2007 email chain in his liability analysis for the 326-K Fund.

based in Phoenix, Arizona. Also, as Mr. Craff testified at trial, Ms. Tuchawena was "an individual at the Bureau of Indian Affairs" who "was primarily responsible for development of the roll at that time." According to the email chain, Mr. Craff was going to have a conference call with Ms. Tuchawena and requested that Ms. Tuchawena invite "Sarah Yepa," who Mr. Craff testified was his "deputy at that time," "Richard Zakrzewski," who Mr. Craff testified was the "chief investment officer for the Western Shoshone account," and "Theresa Glinski," who Mr. Craff testified was "our fiduciary trust officer at the Western Nevada Agency at that time," to participate on the call.[48] According to Mr. Craff's trial testimony, the conference call was set up to "talk[] about the distribution timeline" of plaintiffs' three tribal trust funds. According to Mr. Craff's March 3, 2009 email sent to Ms. Tuchawena, Mr. Craff stated:

> I would like for Sarah, Theresa Glinski (who will be our new FTO [fiduciary trust officer] at W. Nev.) and our Senior Investment Officer, Rich Zakrzewski to participate in the call. Rich needs to be involved so that he can time the investments in the account to insure [sic] that there is sufficient liquidity available at the time of the per capita payment. Thus, I do have a conference call number that we can use (conf call # (877) 770-0914; passcode 4820347).

When asked by defendant's counsel at trial if he recalled whether the conference call referenced in the March 3, 2009 email took place, Mr. Craff testified that "I believe it did." Mr. Craff also testified that the conference call referenced in the March 3, 2009 email was not the only "instance of a call like this," but "typical of the types of conversations" he had during his time as a regional trust administrator between 2006 and 2012. Mr. Craff testified that the various calls he would have had "may start off with a technical question, but, you know, always part of our conversation was when do we anticipate the final distribution will occur," for plaintiffs' tribal trust funds.

Also, according to a separate March 3, 2009 email, introduced at trial by defendant's counsel as a joint exhibit, Mr. Zakrzewski wrote to Mr. Craff, Ms. Yepa, Ms. Glinski, Ms. Tuchawena, and Charles Evans, who Mr. Craff testified was Mr. Zakrzewski's supervisor, informing them that, "[b]ased on the information you received this morning: I placed $57 million in a one-year note with a 2/26/2010 maturity,1.05% coupon," for the 326-K Fund. Mr. Zakrzewski noted that "[t]here most likely will be an additional $40 million for reinvestment by September 2009. Will advise you then." Mr. Craff testified at trial that Mr. Zakrzewski's investment of a portion of the 326-K Fund in a security valued at $57,000,000.00 was made in response to the conference call that Mr. Craff had previously set up with Ms. Tuchawena regarding a potential distribution timeline. Mr. Craff also testified that Mr. Zakrzewski's email informed him that, regarding the 326-K Fund, "there were securities that would mature in September 2009 in the approximate amount of about $40 million and that at that time we would have to again kind of figure out what the investment time horizon would be." On cross-examination, plaintiffs' counsel asked Mr.

---

[48] Mr. Zakrzewski, Ms. Yeba, Ms. Tuchawena, and Ms. Glinski were not called to testify at the trial in the above-captioned case.

Craff why Mr. Zakrzewski chose the specific security valued at $57,000,000.00 for the 326-K Fund. Mr. Craff responded that he did not know why Mr. Zakrzewski chose that specific security because Mr. Craff was "not an investment manager," and that any details about the specific security would have to be directed at Mr. Zakrzewski, an individual who plaintiffs' counsel also chose not to call at trial.

Plaintiffs, in their post-trial brief, acknowledged that Ms. West's February 12, 2007 email "was made in February 2007," but argued that "it should have been available to the BIA years earlier," because Ms. West, according to plaintiffs, "had been involved in monitoring the potential distribution of the WSIG trust funds since at least 1998." Plaintiffs, however, did not introduce any evidence into the record to support their suggestion that Ms. West should have, could have, or did provide the government with a distribution date estimate for the 326-K Fund prior to February 2007. Moreover, Ms. West was just one mid-level government employee apparently offering her personal projection on timing.

Further, although an average weighted maturity years to call ranging between approximately one year and seven months to a little less than three years for the 326-K Fund was too short-term to be considered prudent for the 326-K Fund during the 1980s, 1990s, and early 2000s, when there was not clear tribal consensus in favor of a distribution of the 326-K Fund for many years, and no Congressional distribution plan had been enacted, the evidence indicates that this range of an average weighted maturity years to call between October 2006 and December 2010 appears to be not too short-term given the changing circumstances surrounding the distribution of the 326-K Fund during this time. The 326-K Fund was only invested in securities with an average weighted maturity years to call of one year and seven months for a brief two-month period in mid-2007 and then increased once again to average weighted maturity of approximately two years or greater for the next approximately two years. Although, with hindsight, it is now known that the first partial distribution of the 326-K Fund did not take place until 2011 and the final distribution took place in 2012, approximately seven to eight years after distribution legislation was passed for the 326-K Fund in July 2004, only a crystal ball could have dictated an investment horizon for the 326-K Fund of approximately seven to eight years following the enactment of legislation in July of 2004. Once the distribution legislation for the 326-K Fund was passed on July 7, 2004, the remaining task was to distribute the 326-K Fund. Although the evidence before the court indicates that a distribution process for the 326-K Fund was not going to be immediate and would take some time to begin to execute, the record also indicates that defendant's fact witness, Mr. Craff, was actively monitoring when a distribution would occur and was sharing such information with the investment team in charge of the 326-K Fund. According to Mr. Craff's trial testimony, Mr. Craff and his team were tasked with gathering information regarding a projected date for the potential distribution of the 326-K Fund and were relaying such information to the investment officers managing the 326-K Fund "whenever information became available." Mr. Craff also testified that he would share this information with the investment officers by phone, email, and face-to-face, noting that the investment officers were located about "30 yards" from his office, who in turn would take into consideration Mr. Craff's information when investing the 326-K Fund and invest the 326-K Fund in line with Mr. Craff's suggestion that the distribution would occur in the nearer-term, as

evidenced by Mr. Zakrzewski's March 3, 2009 email discussed above. Mr. Craff further testified at trial that he gathered information regarding a potential distribution date through a number of avenues, including in-person meetings, forums, and conference calls with BIA representatives as well as frequent meetings with tribal representatives that were interested in the distribution.

One of Mr. Craff's sources of information came from the office of Nevada Senator Harry Reid, who became Senate Majority Leader in 2007. As Mr. Craff testified at trial, he "often" communicated with Senator Reid's office about the distribution of plaintiffs' tribal trust funds. When asked by defendant's counsel what he understood "Senator Reid's interest in the fund [326-K Fund] to be," Mr. Craff testified that, "I think Senator Reid's office was receiving a lot of inquiries from their constituents, and his office was concerned with -- or trying to ensure that the Bureau was making progress in developing that role [sic] so that the distribution could occur just as soon as possible." When asked by defendant's counsel at trial whether Mr. Craff's communications with Senator Reid affected his "confidence that these distributions would occur sooner rather than later," Mr. Craff testified that when "the Senate Majority Leader is interested in a distribution, we take, I think, particular note of that. And so, you know, they were an intimate part of this whole process, and we had meetings and conference calls with staffers from Senator Reid's office quite often."

Moreover, Mr. Craff testified at trial that although he could not "pinpoint with a high degree of accuracy when" plaintiffs' tribal trust funds would be distributed until the government "got very close to" the actual distribution of plaintiffs' tribal trust funds, that "all along in this process," he became "reasonably confident,"  that the final distribution of the 326-K Fund would occur before 2012. Mr. Craff explained at trial that:

> I mean, all along in this process, like I said, we -- we talked very closely with the Bureau of Indian Affairs, and we would get, you know, their best guess, if you will, as far as when the distribution would occur. And, you know, many times they would provide us with a date, things would happen, and it would get shifted, you know, out a little bit farther. So reasonably confident that it would get distributed sooner rather than later, but not a precise time as far as when it would be distributed.

In addition, Mr. Craff testified at trial that the per capita distribution of the 326-K Fund "was substantially larger," than the per capita distributions Mr. Craff was familiar with, which ranged from "a couple hundred dollars up to, you know, maybe a thousand or $2,000." According to Mr. Craff's trial testimony, the per capita distribution amount for the 326-K Fund was "$35,000" and that the "beneficiaries" of the 326-K Fund were aware of this and "were very anxious to have these funds distributed just as soon as possible." Therefore, according to Mr. Craff's trial testimony, during the mid- to late- 2000s, there was "lots of pressure to get it [the 326-K Fund] distributed."

Based on Mr. Craff's credible trial testimony, the government was actively monitoring when the distribution of the 326-K Fund would occur and reasonably believed,

albeit without absolute certainty as to a particular distribution date, that the distribution would begin to occur in the shorter-term during the mid- to late-2000s. As previously discussed, both of the parties agree that a shorter-term investment horizon should correspond with shorter-term investments. Although the 326-K Fund potentially might have been extended into somewhat longer-term securities between October 2006 and December 2010, the exact limitations of how far out on the maturity scale the government could have invested the 326-K Fund was not predictable with any certainty. Moreover, there was no evidence presented at trial that indicated that securities that had slightly longer maturities by a few months or even a few years during this time would have achieved significantly better investment results than the securities chosen by the government for the 326-K Fund. Based on Mr. Craff's testimony that a distribution of the 326-K Fund was likely going to occur in the shorter-term, it was not unreasonable for the government to maintain the 326-K Fund in a portfolio ranging between an average weighted maturity years to call of approximately one year and seven months and a little less than three years from October 2006 to December 2010. Therefore, the government's investment of the 326-K during this time, when the distribution of the 326-K Fund was nearing, is considered by the court to be prudent.

January 2011 to September 2013

Based on the record before the court, between January 2011 and September 2013, the government invested almost the entire 326-K Fund in overnight securities, which, as previously noted, were redeemable within a twenty-four-hour period and, therefore, the equivalent of cash due to their highly liquid nature.[49] The average weighted maturity years to call of the 326-K Fund from the beginning of 2011 until September 2013 dropped down to almost zero years. During this three-year period, the government had finalized the distribution rolls and began the process of actually distributing the 326-K Fund to qualifying Western Shoshone members. The government made its first partial distribution payment of the 326-K Fund to 3,187 individuals in 2011 in the amount of $22,013.00 per person. Thereafter, the government made its second, and final, distribution payment of the 326-K Fund to 5,415 individuals in September and October 2012. The individuals, who initially received a partial payment in 2011, received a second payment of $13,124.93, for a total of $35,137.93. The individuals who did not receive any payment in 2011 received a one-time payment of $35,137.93.

Between January 2011, when the government was preparing to make its first payment of the 326-K Fund, and October 2012, when the final payment of the 326-K Fund was made to plaintiffs, the government's investment strategy for the 326-K Fund was reasonable and necessary. The government's need to liquidate the fund in order to make

_____

[49] For the first few months of 2011, the government invested a small percentage of the 326-K Fund in agency securities and mortgage-backed securities. Neither party in the above-captioned case, however, contests the prudency of maintaining a small portion of the 326-K Fund in agency securities and mortgage-backed securities during this time, securities which also had short-term maturities. By August 2011, the government had transitioned the entire 326-K Fund into overnight securities.

cash pay-outs to qualifying Western Shoshone members was consistent with the government's placement of the fund into overnight securities, which were redeemable within twenty-four hours. Moreover, plaintiffs appear to concede that the government's investment of the 326-K Fund during this time period was prudent. According to plaintiffs' expert report by Rocky Hill Advisors, short-term investments that were the equivalent of cash were proper for the 326-K Fund beginning in 2011. At trial, plaintiffs' liability expert, Mr. Nunes testified that a prudent maturity structure for the 326-K Fund portfolio starting in 2011, the beginning of the "very end of the period" at issue in this case, would have been "[t]o have it in cash."

From November 2012 through September 2013, the remainder of investment period at issue, plaintiffs' 326-K Fund was virtually paid-out, but for a residual amount of $36,000.00 left in the United States Treasury, which, as previously noted, plaintiffs do not seek to recover. Because the government was no longer investing the 326-K Fund between November 2012 and September 2013, the government was under no duty to plaintiffs with regard to the 326-K Fund, and, therefore, no breach occurred during this time.

## VI.    Whether defendant prudently invested the 326-A-1 and 326-A-3 Funds

Plaintiffs argued that the government imprudently invested the 326-A-1 and 326-A-3 Funds by investing them in too short-term securities from March 25, 1992, when the 326-A-1 Fund, the first A Fund, was deposited into the United States Treasury, until September 2013, the last month of data included in the TAD. The 326-A-3 Fund, the second A Fund to come into existence, was deposited into the United States Treasury on September 15, 1995, and was invested with the 326-A-1 Fund. Plaintiffs' expert report submitted by Rocky Hill Advisors argued from the time the 326-A-1 Fund was deposited into the United States Treasury on March 25, 1992 and the 326-A-3 Fund was deposited into the United States Treasury on September 15, 1995, until December 1, 1998, both of the 326-A Funds were no different than the 326-K Fund and should have been invested in longer-term securities with an average weighted maturity of fifteen years. Plaintiffs' liability expert report also argued that the investment horizon of the 326-A Funds changed on December 1, 1998 when the government had knowledge that these funds were designated to be earmarked as permanent education funds. According to plaintiffs' post-trial brief, because the principal of the permanent education fund was not to be invaded, but held in perpetual trust, the 326-A-1 and 326-A-3 Funds should have been transitioned to a permanently long-term portfolio beginning in 1998.

As previously noted, defendant did not present any evidence in its expert reports or at trial regarding the government's investment of the 326-A-1 and 326-A-3 Funds and instead argued that plaintiffs in this case had no standing to allege the government mismanaged these two funds.[50] Only in its post-trial brief did defendant raise a brief argument that the government prudently invested the 326-A-1 and 326-A-3 Funds at all

---

[50] As noted above, as law of the case, the court follows Judge Damich's determination that the plaintiffs have standing.

times during the twenty-one-year investment period. Defendant argued that these two funds were initially invested in shorter-term securities "to manage interest rate risk." In its post-trial brief, defendant argued that the 326-A-1 and 326-A-3 Funds were not legally designated "for long-term educational purposes" until the Claims Distribution Act of 2004 was passed, and according to defendant, were invested in securities at that time "in accordance with their purpose" as education trust funds. Defendant argued that even though the BIA had earmarked the 326-A Funds to be set aside as education trust funds as early as 1998, there was a risk that the final distribution plan approved by Congress would not set aside the 326-A Funds as education trust funds. Thus, according to defendant, if the government were to have moved the 326-A Funds into longer-term securities in 1998, as plaintiffs argued should have been done, only to find out that Congress authorized the 326-A Funds to be distributed on a per-capita basis, the government could have put the principal of the 326-A Funds at risk. This is because the government would potentially have had to sell the 326-A Funds before maturity in order to distribute them on a per capita basis, which, could have resulted in a loss if interest rates had dropped. For the 326-A Funds, the court has divided its analysis of whether the government breached its fiduciary duty for the 326-A Funds into four sub-periods, March 1992 to November 1998, December 1998 to June 2004, July 2004 to January 2012, and February 2012 to September 2013.[51]

### a. Sub-period 1: March 1992 to November 1998

Based on the record before the court, from March 1992 to April 1993, the average weighted maturity years to call of the 326-A-1 Fund, the first A Fund acquired by the government, hovered around two months of maturity, and was maintained exclusively in CDs. In May 1993, the average weighted maturity years to call of the 326-A-1 Fund spiked to three years, and began to almost immediately decrease, reaching an average weighted maturity years to call of two years by March 1994. During this time, the 326-A-1 Fund was invested in a mixture of CDs and agency securities. Between April 1994 and July 1995, the average weighted maturity years to call of the 326-A-1 Fund decreased from a high of two years to a low of one year. For most of this time, the 326-A-1 Fund was invested in a mixture of CDs, agency securities and Treasury securities. By February 1995, however, the government stopped investing the 326-A-1 Fund in any CDs, and instead invested the 326-A-1 Fund in a mixture of overnight securities, agency securities, and Treasury securities. From August 1995 to December 1997, the average weighted maturity years to call of the 326-A-1 Fund, and at this point, also the 326-A-3 Fund, which was deposited into the United States Treasury on September 15, 1995, fluctuated between less than one month and nine months. From January 1998 to November 1998, the average weighted maturity years to call of the 326-A Funds fluctuated between

---

[51] At trial, plaintiffs' liability expert, Mr. Nunes, discussed the investment performance of the 326-A Funds during the following three distinct periods: (1) 1992 to November 1998, (2) December 1998 to mid-2004, before distribution legislation was passed for the 326-A Funds, and (3) late-2004 until 2013, the end of the investment period in question. Dr. Starks, defendant's liability expert, did not address the prudency of the government's investment of the 326-A Funds.

approximately five months and one year. During this time, the 326-A Funds were invested in a mixture of overnight securities, agency securities, and Treasury securities.

To briefly summarize, as also discussed above with respect to the 326-K Fund, when the 326-A-1 Fund was deposited into the United States Treasury in March 1992, Congress had just experienced two failed attempts at getting distribution legislation passed for the 326-K Fund. Following these Congressional attempts, the record indicates that Congress was not likely to consider draft distribution legislation for plaintiffs' 326-K Fund or the 326-A-1 Fund until there was more of a consensus among the Western Shoshone tribes regarding a potential distribution plan. According to a June 19, 1992 letter from Chairman George Miller of the House Congressional Committee on Interior and Insular Affairs to Congresswoman Vucanovich, "there still appears to be a wide diversity of opinions and suggested approaches regarding the distribution of the Docket Funds and resolution of other issues." Mr. Miller also stated that "[w]hile I believe we are closer to a resolution of this issue than we were in the 101st Congress, the Committee will not consider the measure until there is more of a consensus among the tribal governments."

From mid-1992 to 1996, the record indicates that the government was attempting to work with the Western Shoshone tribes to create a potential distribution plan for the 326-K Fund and the 326-A Funds. For example, according to the June 6, 1993 letter from Secretary of Interior, Bill Babbitt to Senator Inouye, "we will be contacting representatives of the Western Shoshone Bands for preliminary discussions in the near future." During this time, however, there was not yet a consensus among the Western Shoshone tribes as to a potential distribution plan for either the 326-K Fund or the 326-A Funds.

As indicated above, beginning around March 1997, consensus among the Te-Moak Tribal Council for a monetary, per-capita distribution of the 326-K Fund, the largest of the three tribal trust funds at issue and the fund which was held in trust the longest, began to emerge. According to a March 3, 1997 internal BIA memorandum, the Te-Moak Tribal Council was planning to "pursue 100% distribution to 1/4 degree of Docket 326-K." The March 3, 1997 BIA memorandum also discussed a March 1, 1997 meeting between the BIA and two hundred Western Shoshone members. According to the March 3, 1997 BIA memorandum, the BIA representative who attended the March 1, 1997 meeting noted that after the meeting was over, "several people came up to tell us [the BIA] that they support the proposed Te-Moak plan but did not want to stand up in front of the audience and express themselves." There was, however, no mention of a potential distribution of the 326-A Funds in the Te-Moak Tribal Council's plan, nor any indication that the Te-Moak Tribal Council wanted the 326-A Funds distributed.

The above evidence indicates that between March 1992 and November 1998, there was no consensus among the tribes and the Department of the Interior regarding a potential distribution for the 326-A Funds. There is also no evidence in the record that Congress was prepared to imminently entertain distribution legislation for the 326-A Funds during this time. Thus, the government should have known that the 326-A-1 and 326-A-3 Funds would likely not be distributed within the near-term and that the investment

horizon for the 326-A Funds should have been extended into longer-term securities. But for a one all-time high of three years in May 1993, the average weighted maturity years to call of the 326-A Funds ranged from a low of less than one month and a high of two years between March 1992 and November 1998. Notably, for the first entire year the 326-A-1 Fund, the first A Fund to come into existence, was held in trust, the government kept the 326-A-1 Fund in ultra-short-term CDs with an average weighted maturity years to call of two months or less. Even assuming Congress was willing to introduce and pass distribution legislation for the 326-A Funds between March 1992 and November 1998, the BIA then would have had to organize and distribute the 326-A Funds to Western Shoshone members, which would have taken additional time. The 326-A Funds had the same tribal beneficiaries as the 326-K Fund. Like the 326-K Fund, which also was being invested by the government during this time, any potential distribution of the 326-A Funds would require planning to create descendancy rolls for the various tribal groups, and time to pay-out the A Funds even after a distribution plan was passed. Thus, the government's investment of the 326-A-1 Fund between March 1992 and August 1995, as well as the government's investment of both the 326-A-1 and 326-A-3 Funds between September 1995 and November 1998 was too short-term, and, therefore, imprudent.

As further confirmation that the government's investment of the 326-A Funds was too short-term between March 1992 and November 1998, the government's investment of the 326-K Fund, which, had the same investment horizon as the 326-A Funds during this time, was invested in significantly longer-term securities than the 326-A Funds during the majority of this time. As previously indicated, the average weighted maturity years to call of the 326-K Fund, beginning at the tail end of 1992, steadily increased from a low of two years, reaching an all-time high of ten years in September 1993. Between October 1993 to early-1997, the approximate average maturity years to call of the 326-K Fund decreased from nine years to a little less than five years. Contrary to the 326-K Fund, the 326-A Funds, which, but for a short-lived spike in May 1993 of an average weighted maturity years to call of approximately three years, had an average weighted maturity years to call of approximately two years or less. For these reasons, the court finds that the government imprudently invested the 326-A-1 Fund from March 1992 to August 1995, and both the 326-A-1 and 326-A-3 Funds from September 1995 to November 1998 in too short-term securities.

### b.  Sub-period 2: December 1998 to June 2004

As of December 1998, the average weighted maturity years to call of the A Funds was approximately nine months. Then, during the first half of 1999, the average weighted maturity years to call of the 326-A Funds began to increase, reaching an average weighted maturity years to call of approximately six years in September 1999. From October 1999 to August 2001, the 326-A Funds' average weighted maturity years to call fluctuated between five and seven years. In September 2001, the average weighted maturity years to call of both A Funds dropped rapidly to approximately eight months. From October 2001 to June 2004, the month before Congress passed distribution plan legislation for the 326-A Funds and established that the 326-A Funds would be set aside

as education trust funds, the average weighted maturity years to call of the 326-A Funds fluctuated between six months and one year and eight months.

Defendant argued in its post-trial brief that the "investment horizon for these Funds" was "uncertain prior to [July] 2004," when Congress passed distribution legislation for the 326-A Funds, and, thus, the 326-A Funds was invested prudently in "short-term investments" between December 1998 and June 2004. The record, however, indicates, that the investment horizon for the 326-A Funds was not uncertain during this time and that it became quite probable that the 326-A Funds would be held in perpetual trust as education grant money. According to a December 1, 1998 BIA memorandum, near the end of 1998, at two public hearings held by Western Shoshone Steering Committee, a committee of tribal leaders that was working with various Western Shoshone tribes and individuals in drafting a proposed distribution plan for the 326-K, 326-A-1 and 326-A-3 Funds, attended by BIA representatives, the Western Shoshone Steering Committee proposed that the 326-A Funds be earmarked as permanent education funds. The overwhelming majority of the attendees approved of the proposal to set aside the 326-A Funds as permanent education trust funds. In 1998, the BIA also had drafted distribution legislation that had earmarked the 326-A Funds for permanent education trust funds. Following the 1998 distribution plan drafted by the BIA, Congress introduced various distribution plans in the early 2000s for the 326-K, 326-A-1 and 326-A-3 Funds, although each of these failed to pass. Nonetheless, each of the proposed distribution plans had earmarked the 326-A Funds for permanent education trust funds, indicating that the generally accepted position, including the Congressional position, was that the 326-A Funds were to be set aside as education trust funds.

In addition, the Office of Trust Funds Management, the office within the Department of the Interior that monitored the investment of plaintiffs' tribal trust funds in the 2000s, was aware that the 326-A Funds' proposed use was for education grant monies, even before Congress passed distribution legislation for the 326-A Funds in July 2004. According to an April 29, 2003 "ANNUAL ACCOUNT MANAGEMENT REVIEW," a document which displayed the fund balances for plaintiffs' three tribal trust funds and the government's "Investment approach," the Office of Trust Funds Management noted that, "[t]he proposed use of Dockets 326-A-1 and 326-A-3 are principal restriction of the award, with income to be used for educational grants and other forms of educational assistance to tribal members and descendents [sic]." (capitalization in original). Yet, without explanation, the Office of Trust Funds Management's "Investment approach" for the 326-A Funds, as well as for the 326-K Fund, was, "[a]s the securities mature, reinvest principal and interest not to exceed two year [sic]. The tribes at some point in the future may settle and distribute the funds." As the Annual Account Management Review document notes, however, the 326-A Funds likely were not going to be distributed, but would be held in perpetual trust, and, therefore, an investment horizon of two years does not appear to be a logical investment horizon for the 326-A Funds. Although no legislation had been passed between 1998 and June 2004 that would have officially set aside the 326-A Funds as permanent education trust funds, the government itself appears to have acknowledged in its own internal investment report that there was a high probability that the 326-A Funds would be used as permanent education trust funds. Therefore, the government should

have begun to transition the 326-A Funds into longer-term securities beginning as early as December 1998. Moreover, even assuming that there was no indication that the 326-A Funds would be set aside as education trust funds between December 1998 and June 2004, which is not the case, a distribution of the A Funds to individual tribal members would likely not occur simultaneously with the enactment of distribution legislation, further suggesting that the 326-A-1 and 326-A-3 Funds, which appeared to be headed towards a permanent designation as education trust funds, could have been invested for longer periods of time, without jeopardizing distribution to tribal members.

Interestingly, defendant stated in its post-trial brief that because the investment horizon was so "uncertain" for the 326-A Funds before distribution legislation was passed in July 2004, the 326-A Funds were "invested in shorter term investments to manage interest rate risk." Also, as noted above, according to the Office of Trust Funds Management's Annual Account Management Review document, dated April 29, 2003, the 326-A Funds were not be invested in securities exceeding two years maturity. Defendant's counsel, however, during his opening statement at trial, acknowledged that the 326-A Funds appear to have been designated as a permanent education trust fund as early as December 1998. According to defendant's counsel, "[a]s Plaintiffs' counsel mentioned, in 1998, these funds were earmarked for use as a permanent education account, whose principal was never to be paid out and whose earned interest was to be used for educational purposes." In addition, based on the record before the court, the 326-A Funds were invested for a brief period of time, from mid-1999 through mid-2001, in securities with an average weighted maturity years to call of five to seven years. According to defendant's liability expert's trial testimony, Dr. Starks, securities with a maturity between five and ten years is "between what's clearly intermediate and what's clearly long term." Thus, although defendant argued that the uncertainty surrounding the distribution of the 326-A Funds between December 1998 and June 2004 required a short-term investment portfolio, the record indicates that the government did not follow its own recommended pattern. As plaintiffs' liability expert, Mr. Nunes, testified at trial, the likely explanation for the government's inconsistent pattern of investment of the 326-A Funds between December 1998 and June 2004 is that "there's really no plan here, that this is just sort of happening for whatever reason that we can't really identify." Based on the record before the court, the court finds that the government imprudently invested the 326-A Funds from December 1998 to June 2004.

### c.  Sub-period 3: July 2004 to January 2012

In July 2004, Congress passed the Claims Distribution Act of 2004, which stated that the 326-A-1 and 326-A-3 Funds were to be held in perpetual trust. The interest earned on these two funds, according to the Claims Distribution Act of 2004, was identified as to be paid out to qualifying Western Shoshone members as educational grants. Thus, by July 2004, there was no doubt that the principal of the 326-A Funds was not going to be distributed. As both parties agree, when an investor has no immediate cash flow needs, the investor is better suited to invest in a longer-term portfolio in order to benefit from the higher returns on longer-term securities. In addition, as plaintiffs' liability expert, Mr. Nunes, testified at trial, "the prudent approach when you have funds

whose principal can never be invaded," is to invest the funds in a long-term portfolio. Based on the record before the court, as of July 2004, plaintiffs would not have immediate cash flow needs regarding the 326-A Funds because the principal of the 326-A Funds was, by law, not to be distributed and was intended to be held in perpetual trust. Thus, beginning in July 2004, the government should have been aware that the 326-A Funds had a longer-term horizon and should have begun to transition the 326-A Funds into a much longer-term portfolio. Between July 2004 and February 2009, the 326-A Funds, however, remained in short-term securities, with an average weighted maturity of approximately two and a half years or less, and, therefore, too short-term to be considered prudently invested.

In March 2009, the government briefly increased the maturity structure of the 326-A Funds to an average weighted maturity years to call of approximately ten years, but then rapidly decreased the maturity structure. Between April 2009 and January 2012, the government invested the 326-A Funds in a portfolio with an average weighted maturity years to call of approximately five years to a little over eight years. Plaintiffs' liability expert, Mr. Nunes, testified a trial, a portfolio of five to eight years average weighted maturity is not long-term but should be considered intermediate-term. Similarly, defendant's liability expert, Dr. Starks, testified at trial that securities with maturities between five and eight years are not long-term, but between "what's clearly intermediate and what's clearly long term." As noted, as of July 7, 2004, when distribution legislation was passed for the 326-A Funds, there was no doubt that the principal of the 326-A Funds was not intended to be invaded. Therefore, the 326-A Funds had a long-term investment horizon and should have been placed in a long-term portfolio. The government, however, maintained the 326-A Funds in securities with an average weighted maturity years to call ranging between five to slightly more than eight years between mid-2009 and January 2012, despite the 326-A Funds' long-term investment horizon. For these reasons, the government imprudently invested the 326-A Funds between July 2004 and January 2012.

### d.  Sub-period 4: February 2012 to September 2013

From February 2012 until September 2013, the end of the investment period at issue in the above-captioned case, defendant finally transitioned the 326-A Funds into a longer-term investment portfolio, with an average weighted maturity years to call ranging from approximately eleven to fourteen years. Plaintiffs appear to concede that the government's investment of the 326-A Funds from February 2012 until 2013 was reasonable. Plaintiffs' liability expert, Mr. Nunes, testified at trial, that:

> When it -- when we start getting into, you know, very near-term, in 2012 and 2013 -- 2013, it -- I guess the good news is that the portfolio [for the 326-A Funds] is now a long-term portfolio. We would opine -- have opined that it's still probably a little shorter than it should be, but you're splitting hairs now, and I don't think that's what we want to do here.

Because plaintiffs do not appear to challenge the government's investment of the 326-A Funds between February 2012 and September 2013, and because the record indicates

that the government began to transition both A Funds into longer-term securities during this time, consistent with the long-term investment horizon of the funds, the court finds the government's investment of the 326-A Funds between February 2012 and September 2013 to have been prudent.

## CONCLUSION

The government invested plaintiffs' 326-K Fund for approximately thirty-three years and plaintiffs' 326-A Funds for approximately twenty-one years. During this time, the dynamics of the market, the unique and diverse make-up of the Western Shoshone peoples, and the complicated negotiating process between the BIA and the Western Shoshone people regarding proposed distribution plan legislation for plaintiffs' three tribal trust funds resulted in the government having the admittedly difficult task of balancing how to achieve distribution of the plaintiffs' three tribal trust funds at issue and of appropriately managing and investing those tribal trust funds for a significant period of time. Defendant, at all times during the approximately thirty-three-year investment period for the 326-K Fund and twenty-one-year investment period for the 326-A Funds, had the fiduciary duty to prudently invest plaintiffs' tribal trust funds by using a combination of reasonable care, skill, and caution, when trying to maximize the trust income, while also reasonably managing any risk of loss.

Having extensively and carefully reviewed the lengthy record in this case, including the documents and expert reports in evidence, the trial testimony, and the post-trial filings, the court finds that there were various times during the investment periods at issue for both the 326-K Fund and for the 326-A Funds when the government's investment of all three tribal trust funds fell below the required standard of prudence. In summary fashion of the discussion above, the court finds:

### For the 326-K Fund:

1. Between December 19, 1979 and August 3, 1980, the government did not breach its fiduciary duty. During this time, the BIA was actively working towards getting a distribution plan passed within the statutory 180-day period required under the Use and Distribution Act of 1973, and, therefore, reasonably maintained the 326-K Fund in short-term securities in the event that a distribution plan could be negotiated with the Western Shoshone tribes and timely considered by and accepted by Congress.

2. Between August 4, 1980 and November 1992, the government breached its fiduciary duty when Congress did not act on the BIA's request for an extension to submit a distribution plan for the 326-K Fund and no distribution legislation was forthcoming. During this twelve-year period, the government invested the 326-K Fund primarily in short-term CDs with an average weighted maturity years to call of approximately two years or less, even though the government knew or should have known during that time that there was a low probability that distribution legislation could be passed in the near-term. The short-term nature of the 326-K

Fund portfolio, therefore, was not prudently aligned with the fund's longer-term investment horizon.

3. Between December 1992 and March 1997, the government did not breach its fiduciary duty. During this time, when the enactment of distribution legislation for the 326-K Fund still remained unlikely to occur in the near-term, the government began to shift the 326-K Fund into different types of securities, including agency and Treasury bonds, and to decrease its reliance on short-term CDs. The government also lengthened the maturity structure of the 326-K Fund into longer-term securities, with an average weighted maturity years to call ranging from approximately five to ten years. Therefore, the government's lengthening of the maturity structure of the 326-K Fund portfolio during this time was within the range of prudence, given the longer-term investment horizon of the fund.

4. Between April 1997 and December 1997, the government, however, breached its fiduciary duty when the government shortened the maturity of 326-K Fund into securities with an average weighted maturity years to call ranging from three years to approximately three years and eight months. During this time, although there was emerging consensus for a distribution plan among the Te-moak Tribal Council, which represented one of the four beneficiary tribes of the 326-K Fund, the BIA was awaiting approval of a distribution plan from the remaining three Western Shoshone beneficiary tribes, and, thus, the enactment of distribution legislation for the 326-K Fund likely was not imminent. Further, even with distribution legislation enacted, the BIA would still need additional time to organize for and pay-out the 326-K Fund to qualifying Western Shoshone members. Therefore, the government's decrease of the maturity structure of the 326-K Fund during this time did not prudently corresponded with the investment horizon of the 326-K Fund, which was not likely to be distributed in the nearer-term.

5. Between January 1998 and April 2002, the government continued to breach its fiduciary duty by placing the 326-K Fund in even shorter-term securities with an average weighted maturity years to call ranging from approximately one to two and a half years. The government then continued to breach its fiduciary duty between May 2002 and June 2004, when the average weighted maturity years to call of the 326-K Fund dropped still further to approximately ten months or less. Although the likelihood for distribution legislation to be passed was increasing during the late-1990s and early 2000s, even after distribution legislation was enacted, the government would still have to distribute the 326-K Fund monies to qualifying Western Shoshone members, which probably would not get accomplished within two and a half years and was even less likely to be completed within ten months or less. Therefore, from January 1998 to June 2004, the government imprudently invested the 326-K Fund by continually and steadily decreasing the maturity structure of the 326-K Fund, resulting in an ultra-short-term portfolio, which did not align with the fund's investment horizon.

6. Between July 2004 to September 2006,[52] the government breached its fiduciary duty by continuing to maintain the 326-K Fund in short-term portfolio with an average weighted maturity years to call ranging from approximately six months to one year. Although Congress passed the Claims Distribution Act of 2004 on July 7, 2004, the government still had to develop its plan to distribute payment of the 326-K Fund to Western Shoshone members, which would have likely taken longer than six months to one year to accomplish at that time.

7. Between October 2006 and December 2010, the government did not breach its fiduciary duty. During this time, the average weighted maturity years to call of the 326-K Fund ranged from approximately one year and seven months to a little less than three years.[53] The record indicates that distribution legislation for the 326-K Fund had been enacted in July 2004 and that government officials reasonably believed that a pay-out of the 326-K Fund would occur within a couple of years and invested the 326-K Fund in accordance with such information. Therefore, the government's decision to place the 326-K Fund in shorter-term securities during this time prudently corresponded with the shortening investment horizon of the fund.

8. Between January 2011 to September 2013, the government did not breach its fiduciary duty, nor did plaintiffs appear to argue that the government's investment of the 326-K Fund was imprudent. During this time, the government began the distribution of the 326-K Fund monies to qualifying Western Shoshone members and, therefore, transitioned the entire fund into ultra-short-term overnight securities in order to liquidate the fund for distribution. Thus, the government's placement of the 326-K Fund in ultra-liquid securities during this time was prudent.

**For the 326-A Funds:**

1. Between March 1992 and August 1995, the government breached its fiduciary duty to prudently invest the 326-A-1 Fund, and also between September 1995 and November 1998 to prudently invest both the 326-A-1 and 326-A-3 Funds, by

---

[52] As previously discussed, there was a brief five-month period between January 2005 and May 2005 that the average weighted maturity years to call hovered around approximately one year and eight months before dropping back down to an average weighted maturity years to call of approximately one year in June 2005, where it remained until September 2006, the end of this sub-period. This slight increase in the maturity structure of the 326-K Fund between January 2005 and May 2005, however, was still too short-term and too short-lived to be considered prudent.

[53] As previously noted, the government's investment of the 326-K Fund in a portfolio with an average weighted maturity years to call of approximately one year and seven months lasted during a brief two-month period in 2007, which was immediately followed by the government's decision to increase the average weighted maturity years to call of the 326-K Fund to two years or more for the next, approximately, two and half years.

placing the both of these funds in short-term securities with an average weighted maturity years to call of approximately two years or less. During this time, it was unlikely that distribution legislation for the 326-A Funds was going to pass in the near-term, and, therefore the government knew or should have known that the investment horizon for the 326-A Funds should have been longer than two years.

2. Between December 1998 and June 2004, the government also breached its fiduciary duty by primarily investing the 326-A Funds in short-term securities with an average weighted maturity years to call of approximately two years or less.[54] During this time, the government became aware that various members of the Western Shoshone tribes were supportive or becoming supportive of placing the 326-A Funds into a permanent education trust fund, the principal of which was not to be invaded. The government even acknowledged in its 2003 internal investment report for the 326-A Funds that these funds likely would be set-aside as permanent education trust funds. Therefore, the government should have begun to transition the 326-A Funds into longer-term securities because the principal of the funds was not intended to be distributed.

3. Between July 2004 and January 2012, the government breached its fiduciary duty by maintaining the 326-A Funds in shorter-term securities even though the government had certainty that the principal of the 326-A Funds was not to be invaded as of July 7, 2004, when distribution legislation for the A Funds was passed. Between July 2004 and February 2009, the average weighted maturity years to call for the A Funds was approximately two and a half years or less. From April 2009 to January 2012,[55] the average weighted maturity years to call ranged between approximately five years to a little over eight years, which was still too short-term, given the fact that the principal of the 326-A Funds was not to be invaded. The government, therefore, imprudently maintained the 326-A Funds in

---

[54] The government increased the maturity structure of the 326-A Funds for a brief period between mid-1999 and mid-2001 to an average weighted maturity years to call of approximately five to seven years. This increase, however, was still too short-term given the fact that the principal of the A Funds were likely not to be invaded, but were to be set-aside as permanent education trust funds. Also, this increase in maturity was short-lived. The government proceeded to decrease the average weighted maturity years to call of the A Funds to approximately eight months by late 2001, and the average weighted maturity years to call never exceed three years for the next, approximately, eight years.

[55] In March 2009, the average weighted maturity years to call of the A Funds spiked to ten years, but then, without any apparent reason, rapidly decreased back down to approximately eight years in April 2009 and hovered between eight to five years for the next approximately three years. The government's random and short-lived one-month increase of the maturity of the 326-A Funds in March 2009 is not sufficient to make the government's investment of the 326-A Funds between July 2004 and January 2012 prudent.

too short-term securities even though the 326-A Funds had a long-term investment horizon between July 2004 and January 2012.

4.  Between February 2012 to September 2013, the government did not breach its fiduciary duty when it lengthened the maturity structure of the 326-A Funds into investments with an average weighted maturity years to call of eleven to fourteen years. Plaintiffs' liability expert, Mr. Nunes, acknowledged at trial that the government began to finally shift the 326-A Funds into longer-term securities during this time and testified that this shift was "good news." Therefore, in light of the fact that the 326-A Funds' principal was not to be invaded and was to be perpetually held in trust, the government's decision to lengthen the maturity structure of the 326-A Funds during this time was prudent and consistent with the long-term nature of the funds.

As previously indicated, this Opinion addresses liability only. In a separate Order, the court will set a schedule to confer with the parties on how to resolve the damages issues based on the breach periods identified in this Opinion.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**