# In the United States Court of Federal Claims

No. 06-896L
Filed: February 8, 2022

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *      *
THE     WESTERN     SHOSHONE                    *
IDENTIFIABLE GROUP, represented                 *
by the YOMBA SHOSHONE TRIBE,                    *
a federally recognized Indian Tribe,            *
et al.,                                         *
                              Plaintiffs,       *
            v.                                  *
                                                *
UNITED STATES,                                  *
                                                *
                              Defendant.        *
                                                *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *      *
```

**Kelli J. Keegan**, Barnhouse Keegan Solimon & West LLP, Los Ranchos de Albuquerque, NM, for plaintiffs. Of counsel were **Randolph Barnhouse** and **Michelle Miano**, Barnhouse Keegan Solimon & West LLP, Los Ranchos de Albuquerque, NM, and **Steven D. Gordon**, Holland & Knight, LLP, Washington, D.C.

**Joshua P. Wilson**, Trial Attorney, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Peter K. Dykema**, Natural Resources Section, Environment & Natural Resources Division, and **Todd S. Kim**, Assistant Attorney General, Civil Division, Department of Justice. Of counsel were **Anthony P. Hoang**, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., **Dondrae N. Maiden**, **Michael Bianco** and **Christopher King Edelstein**, Office of the Solicitor, United States Department of the Interior, Washington, D.C., and **Thomas Kearns** and **Rebecca Saltiel**, Office of the Chief Counsel, United States Department of the Treasury, Washington, D.C.

## O P I N I O N

In this Native American tribal trust fund case, three tribal plaintiffs and three individual plaintiffs have sued defendant, the United States, for the mismanagement of plaintiffs' three tribal trust funds, received as a result of three separate cases before the Indian Claims Commission (ICC) and its successors for the government's taking of the plaintiffs' ancestral lands in Nevada and California without just compensation, over a thirty-three-year period. Plaintiffs seek to recover $133,125,302.00 in damages for the

government's mismanagement of the largest of the tribal trust funds, the 326-K Fund, and $1,592,822.43 in damages for the government's alleged mismanagement of the two smaller tribal trust funds, the 326-A-1 and 326-A-3 Funds.[1] The three tribal plaintiffs are the Yomba Shoshone Tribe, Timbisha Shoshone Tribe, and the Duckwater Shoshone Tribe, three of the federally recognized Western Shoshone Tribes and three of the members of the Western Shoshone Identifiable Group. The three individual plaintiffs are Maurice Frank-Churchill, an enrolled member of the Yomba Shoshone Tribe, Jerry Millet, an enrolled member of the Duckwater Shoshone Tribe, and Virginia Sanchez, also an enrolled member of the Duckwater Shoshone Tribe. Plaintiffs allege that defendant "imprudently" invested their tribal trust funds in securities that were too short-term, resulting in less than maximum returns. It is not disputed by the parties that defendant was the trustee of the funds at issue, and was responsible for the administration, management, and investment of the funds at issue from the time the funds were appropriated for deposit in the trust accounts for the benefit of the Western Shoshone Identifiable Group until the time the funds were distributed to plaintiffs.

The complicated events leading up to this case, and this case, once filed, have a long history. The case in this court was filed in 2006 and originally assigned to a Judge other than the undersigned. On August 26, 2015, this case was transferred to the undersigned after the original presiding Judge had issued two Opinions in this case, one denying defendant's motion to dismiss and one denying defendant's motion for reconsideration. See W. Shoshone Identifiable Grp. v. United States, No. 06-896L, 2008 WL 9697144 (Fed. Cl. Oct. 31, 2008); see also W. Shoshone Identifiable Grp. v. United States, No. 06-896L, 2009 WL 9389765 (Fed. Cl. Nov. 24, 2009). After the issuance of two Opinions, there were settlement discussions and settlement attempts before the case was reassigned to the undersigned. Upon being assigned the above-captioned case in 2015, the undersigned pressed the parties to initiate and intensify efforts on pretrial proceedings and to get ready for trial, earlier settlement efforts having failed. Thereafter, the court held a five-day trial regarding liability in Washington, D.C. and, on June 13, 2019, issued an Opinion which addressed the issues of liability and whether the government breached its fiduciary duty to plaintiffs when investing the tribal trust funds. See generally W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States, 143 Fed. Cl. 545 (2019). After extensively and carefully reviewing the lengthy record in this case, including the documents and expert reports in evidence, the trial testimony, and the post-trial filings, the court found "that there were various times during the investment periods at issue for both the 326-K Fund and for the 326-A Funds when the government's investment of all three tribal trust funds fell below the required standard of prudence." See id. at 658. After the court's June 13, 2019 liability Opinion, the parties engaged in extensive expert discovery on the issue of damages, and after expert discovery was completed, and after a delay due to COVID related challenges, the court held a four-day trial to address the issue of damages.

The facts described below are a brief summary of important, pertinent events taken from the extensive record before the court. By no means are the below facts an event-

---

[1] As discussed below, alternatively, plaintiffs seek $113,830,811.00 in damages.

by-event description of everything that happened over the thirty-three-year period at issue. Some of the relevant facts from the court's June 13, 2019 liability Opinion are repeated below, and the court's earlier Opinion on liability is incorporated into this Opinion. Although the case was divided for purposes of liability and damages, in order to promote efficiency and given the complexity of the legal and factual issues, the Opinions still address the same, single case, and consider the same factual framework.

## FINDINGS OF FACT

<u>Origin of Plaintiffs' Tribal Trust Funds</u>

Plaintiffs are the beneficial owners of three tribal trust funds stemming from three separate judgment awards. The first judgment occurred on August 15, 1977, when the ICC awarded $26,145,189.89 to the Western Shoshone Identifiable Group in Docket 326-K for the taking of ancestral land located in modern day Nevada and California. Unlike the plaintiffs' awards in its second case before the ICC, docket number 326-A-1, discussed below, in which the plaintiffs were awarded a judgment, plus interest, based on the record before the court and the parties' revised joint stipulations of fact in the above-captioned case, plaintiffs were not awarded any interest for the award of the $26,145,189.89 in the 326-K Fund case. Both parties appealed the ICC's August 15, 1977 award of $26,145,189.89, which was subsequently affirmed by the United States Court of Claims[2] on February 21, 1979. <u>See</u> <u>Temoak Band of W. Shoshone Indians, Nevada v. United States</u>, 219 Ct. Cl. 346, 361, 593 F.2d 994, 1002, <u>cert.</u> <u>denied</u>, 444 U.S. 973 (1979). On December 19, 1979, the ICC's award of $26,145,189.89 was deposited into a tribal trust fund account in the United States Treasury under account number JA9334697. The parties in the above-captioned case refer to this tribal trust fund as the "326-K Fund," and it is the largest of the three tribal trust funds at issue.

The second judgment occurred on December 3, 1991, when the United States Claims Court[3] entered a judgment in <u>Western Shoshone Identifiable Group v. United States</u>, Docket Number 326-A-1, in the amount of $823,752.64 in favor of the Western Shoshone Identifiable Group. <u>See</u> <u>Te-Moak Bands of Western Shoshone Indians of Nevada, et al. v. United States</u>, United States Claims Court, Docket No. 326-A-1, Judgment (Dec. 3, 1991). The award of $823,752.64 was comprised of $815,209.67, together with interest of $8,542.97. <u>See</u> <u>id.</u> On March 25, 1992, the second judgment award of $823,752.64 was deposited into trust in the United States Treasury under

---

[2] The United States Court of Claims is the predecessor court to the United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims, the court on which the undersigned presides over the above-captioned case. <u>See</u> <u>Alford v. United States</u>, 961 F.3d 1380, 1384 (Fed. Cir. 2020) ("Our predecessor court, the Court of Claims . . . .").

[3] The United States Claims Court was renamed the United States Court of Federal Claims in 1992. <u>See</u> Federal Courts Administration Act of 1992, Pub. L. No. 102-572, § 902, 106 Stat. 4506, 4516 (1992).

account number JA9087691. The parties refer to this tribal trust fund as the "326-A-1 Fund."

The third judgment occurred a little more than three years later, on June 16, 1995, when the United States Court of Federal Claims entered a judgment in Docket Number 326-A-3, in the amount of $29,396.60, in favor of the Western Shoshone Identifiable Group. See Te-Moak Bands of Western Shoshone Indians of Nevada, v. United States, United States Court of Federal Claims, Docket No. 326-A-3, Judgment (June 16, 1995). According to the final judgment entered on the 326-A-3 docket, which was introduced at trial as a joint exhibit, the 326-A-3 award did not appear to include interest. On September 15, 1995, the award of $29,396.60 was deposited into trust in the United States Treasury under account number JA1009693. The parties refer to this tribal trust fund as the "326-A-3 Fund." The account number and type, and the sources of the three funds are displayed below:

| ACCOUNT NO. & TYPE | SOURCE OF FUND |
|---|---|
| JA9334697 WESTERN SHOSHONE JUDGMENT FUNDS | INITIAL AWARD OF $26,145,189.89 ON 12/19/1979, ICC DOCKET 326-K |
| JA9087691 WESTERN SHOSHONE JOINT JUDGMENT FUNDS | INITIAL AWARD OF $823,752.64 ON 3/25/1992, ICC DOCKET 326-A-1 |
| JA9087691 WESTERN SHOSHONE JOINT JUDGMENT FUNDS | INTEREST CLAIM OF $29,369.60 ON 9/15/1995, ICC DOCKET 326-A-3 |

Investment of Tribal Trust Funds

The parties have stipulated that "Tribal Trust Funds" are tribal monies, including judgment awards, revenues, and other payments made to Indian tribes, which are required by law to be deposited in the United States Treasury and historically to be managed by the United States Department of the Interior. The parties also have stipulated to an abbreviated summary of the relevant history to the above-captioned case, some of which is described below. Some historical highlights for the purpose of providing context follow. In 1880, the Department of the Interior was authorized to deposit tribal trust funds in the United States Treasury to earn a simple interest rate of four percent per year whenever it determined that such a course of action was in the best interest of an Indian tribe. In 1918, the Department of the Interior was permitted to deposit tribal trust funds into any public-debt obligations of the United States and into any notes, bonds, or other obligations that were unconditionally guaranteed as to both principal and interest, when the Department of the Interior determined doing so was in the best interests of an Indian tribe. In 1938, Congress passed the Act of June 24, 1938, ch. 648, § 1, 52 Stat. 1037, currently contained at 25 U.S.C. § 162a (2018), the statute at issue regarding plaintiffs' allegations of breach of trust in the above-captioned case, which codified the authority of

the Secretary of the Department of the Interior to invest tribal trust funds.[4] According to Subsection (a) of 25 U.S.C. § 162a:

> The Secretary of the Interior is hereby authorized in his discretion, and under such rules and regulations as he may prescribe, to withdraw from the United States Treasury and to deposit in banks to be selected by him the common or community funds of any Indian tribe which are, or may hereafter be, held in trust by the United States and on which the United States is not obligated by law to pay interest at higher rates than can be procured from the banks. The said Secretary is also authorized, under such rules and regulations as he may prescribe, to withdraw from the United States Treasury and to deposit in banks to be selected by him the funds held in trust by the United States for the benefit of individual Indians . . . .

25 U.S.C. § 162a(a).

> Subsection (a) of 25 U.S.C. § 162a further provides that:

> [T]he Secretary of the Interior, if he deems it advisable and for the best interest of the Indians, may invest the trust funds of any tribe or individual Indian in any public-debt obligations of the United States and in any bonds, notes, or other obligations which are unconditionally guaranteed as to both interest and principal by the United States.

25 U.S.C. § 162a(a). As both parties noted during the liability trial, Subsection (a) of 25 U.S.C. § 162a limits the government's investment of tribal trust funds to fixed-income securities backed by the full faith and credit of the United States, including bonds issued by federal agencies, the United States Department of Treasury (Treasury securities), mortgage-backed securities, and certificate of deposits (CDs). Moreover, both parties agreed that Subsection (a) of 25 U.S.C. § 162a would not allow the government to invest in stocks or foreign-issued bonds. The parties do not contest that the government invested any of plaintiffs' three tribal trust funds in investments prohibited by law, nor do the parties contest that the government misappropriated any of the plaintiffs' tribal trust funds.

Because Subsection (a) of 25 U.S.C. § 162a only allows the government to invest tribal trust funds in government-backed securities, both parties agree that the government

---

[4] The Secretary of the Interior has had and continues to have the authority pursuant to 25 U.S.C. § 161 (2018) and 25 U.S.C. § 161a (2018) to deposit tribal trust funds in the United States Department of Treasury in lieu of investing tribal trust funds in securities allowed under 25 U.S.C. § 162a. See 25 U.S.C. §§ 161, 161a. The plaintiffs in the above-captioned case, however, do not allege that defendant breached a duty regarding the investment of the three funds at issue in the United States Treasury pursuant to 25 U.S.C. § 161 or 25 U.S.C. § 161a, nor that defendant retained plaintiffs' three tribal trust funds in the United States Treasury instead of investing the funds.

faces virtually no credit risk when investing tribal trust funds, i.e., a risk that the fixed-income security[5] issuer will default on the security. Both parties also agree that the primary risk that the government faced when investing plaintiffs' tribal trust funds was "interest rate risk," the risk that interest rates will change over the life of a fixed-income security. As both parties agree, the risk that interest rates will fluctuate is greater for fixed-income securities that have a longer-term maturity.[6] At the liability trial, defendant's liability expert, Dr. Laura Starks, explained in her expert liability report, "if interest rates increase, bond prices fall. That risk is greater for longer-maturity investments." Similarly, plaintiffs' rebuttal expert, Dr. Michael Goldstein, explained in his rebuttal expert report that, "longer-term investments" "[t]raditionally" experience higher-yields than shorter-term investments to reflect the "interest rate risk that the holder is taking (i.e., when rates change)." Thus, as the parties agree, if a bond-holder had to sell a bond prior to maturity, and interest rates increased from the time the bond-holder purchased the bond, the bond-holder will likely experience a loss on the principal of the bond because the bond's value has decreased. Conversely, if a bond-holder had to sell a bond before maturity, and interest rates decreased since the time of purchase, the bond-holder would likely experience a gain on the principal of the bond because the bond's value has increased. If the bond-holder holds the bond to maturity, any change in interest rates would not affect the bond's principal value. Interest rate risk, thus, becomes relevant when an investor

---

[5] At the liability trial and the damages trial, and in their expert reports prepared for both trials, both parties' liability and damages experts referred interchangeably to "fixed-income securities" and "bonds" when discussing general investment principals. Thus, as with the June 13, 2019 liability Opinion, for purposes of this Opinion, this court interchangeably shall refer to fixed-income securities and bonds, as used by the parties, when summarizing the parties' positions regarding general investment principals.

[6] As explained at the liability trial, the definition of a "longer-term" security versus a "shorter-term" security varies somewhat throughout the investment industry. According to the testimony at the liability trial of plaintiffs' expert, Mr. Kevin Nunes, "ultra-short-term" securities have maturities of one year or less, "short-term" securities have maturities between one and five years, "intermediate-term" securities have maturities greater than five and less than ten years, and "long-term" securities have maturities between ten and thirty years. Contrastingly, defendant's expert, Dr. Laura Starks, testified at the liability trial, "[p]eople define" the terms "short-term," "intermediate term," and "long term" differently and that during her career, she has "actually seen these definitions change over time." According to Dr. Starks' trial testimony, "short-term investments is -- typically, to me, that would be a year or less, maybe a little over a year," and whether securities with a maturity of "two years" should be considered short-term would be "debatable." Dr. Starks testified at trial that "intermediate term" would be "primarily three to five years," and that "[t]here are others that extend intermediate to longer term." Dr. Starks also testified that "long term" would "typically" include securities with maturities of "ten years or more." Dr. Starks testified that securities with a maturity between five to ten years "don't have a real definition," and that "[t]o me, it's between what's clearly intermediate and what's clearly long term."

decides to sell a bond before maturity. The interest rate risk facing the government when investing plaintiffs' three tribal trust funds will be discussed in more detail below.

Subsection (d) of 25 U.S.C. § 162a, another provision of the statute relevant to plaintiffs' allegation of fund mismanagement, provides that:

> The Secretary's proper discharge of the trust responsibilities of the United States shall include (but are not limited to) the following:
>
>> (1) Providing adequate systems for accounting for and reporting trust fund balances.
>> (2) Providing adequate controls over receipts and disbursements.
>> (3) Providing periodic, timely reconciliations to assure the accuracy of accounts.
>> (4) Determining accurate cash balances.
>> (5) Preparing and supplying account holders with periodic statements of their account performance and with balances of their account which shall be available on a daily basis.
>> (6) Establishing consistent, written policies and procedures for trust fund management and accounting.
>> (7) Providing adequate staffing, supervision, and training for trust fund management and accounting.
>> (8) Appropriately managing the natural resources located within the boundaries of Indian reservations and trust lands.

25 U.S.C. § 162a(d).

<u>The Department of the Interior's Investment Policies and Procedures</u>

In 1966, the Bureau of Indian Affairs (BIA), the office within the Department of the Interior which was delegated the task of investment tribal trust funds, began a formal investment program and published an investment policy statement. The 1966 policy statement, in pertinent part, stated that "[p]repatory to undertaking any investment program with surplus trust funds, a tribe necessarily would have to make a careful analysis of its current and future cash needs" to cover "at least two six-months periods." The 1966 policy statement also stated that "[e]ach Area Office is requested to review the amount of tribal trust funds each tribe in the respective Areas has on deposit in the Treasury," and that "[w]herever it appears that the amount is in excess of foreseeable cash needs of the tribe, discussions should be held with the tribal council and its wishes regarding investment of the funds ascertained." The 1966 policy statement also noted that "[g]overnment-backed securities, while basically safe, can result in losses unless held to maturity."

In 1973, Congress passed the Indian Tribal Judgment Funds Use and Distribution Act, Pub. L. No. 93-134, 87 Stat. 466 (1973) (Use and Distribution Act of 1973), which

established a process for distributing judgment awards to Indian tribes. Pursuant to the Use and Distribution Act of 1973, the Secretary of Interior had 180 days from "after the appropriation of funds to pay a judgment of the Indian Claims Commission or the Court of Claims to any Indian tribe," and to "prepare and submit to Congress a plan for the use or distribution of such funds." Use and Distribution Act of 1973, Section 2(A). When preparing the distribution plan, the Secretary was required to consider any distribution plan proposed by the tribes. See id. at Section 3(A)(1). The Secretary of Interior also was required to hold a "hearing or record" with the tribes to obtain their input regarding the distribution plan. See id. at Section 3(A)(2). The Secretary of Interior could request a 90-day extension of the 180-day timeline for submitting a proposed plan for the distribution of a judgment award to an Indian tribe, and such request was "subject to the approval of both the Senate and the House of Representatives committees on Interior and Insular Affairs." See id. at Section 2(B). The Secretary of Interior's plan submitted to Congress would become effective after 60 days, absent Congressional disapproval of the plan. Upon the plan becoming effective, the Use and Distribution Act of 1973 required that the Secretary of Interior "take immediate action to implement the plan for the use or distribution of such judgment funds." See id. at Section 5(A). If the Secretary of Interior did not submit a proposal within 180 days of the date of the appropriation of the particular judgment award, and no 90-day extension was granted, then the Secretary of Interior would have to submit proposed legislation to Congress in order for the funds to be used or distributed.

The Secretary of the Interior did not submit a distribution proposal within the required 180 days for the three funds at issue, given the complexity of the distribution issues, and no 90-day extension was granted. Thus, pursuant to the Use and Distribution Act of 1973, Congress would be required to pass legislation authorizing the distribution of the 326-K and 326-A Funds. As explained in more detail below, over the years, various members of Congress introduced bills for distributing the three tribal trust funds at issue, each of which did not pass. Distribution legislation was finally passed in 2004, and the 326-K Fund was fully distributed in 2012. The principal of the 326-A Funds was never to be distributed and is currently held in trust as a permanent education trust fund, with the interest of the 326-A-1 and 326-A-3 Funds to be used as educational grants for qualifying members of the Western Shoshone tribes.

In 1974, the BIA Acting Deputy Commissioner of Indian Affairs sent BIA's updated investment policy in a memorandum to the Area Directors of the BIA based in different geographical regions in the United States and in charge of overseeing the investment of various tribal accounts from tribes in their particular regions, which stated:

Area and agency offices should work very closely with the tribes to determine the cash needs and ascertain if trust funds are available for investment. When a decision has been made that surplus funds are available for investment, arrangements should be made immediately with the Branch of Investments, Albuquerque, to invest the funds.

The 1974 policy memorandum also stated:

> Investments can be made for a period of one day or for as much as 25 years or longer. Therefore, all funds except the funds for immediate needs can be invested to provide a greater income to the tribe. The maturity dates can be arranged to coincide with the needs for the funds. If requested, the funds are returned to the U.S. Treasury at maturity and are available immediately for expenditure through the normal procedures for the advance of funds to the tribe.
>
> It is the policy of the Bureau of Indian Affairs to maximize returns on all tribal, as well as individual, trust funds. This comports with the recent decision in <u>Manchester Band of Pomo Indians</u> v. <u>United States</u>, 363 F. Supp. 1238 (N.D. California 1973).
>
> Each Area Director has the responsibility for determining if surplus funds are available for investment purposes and notifying the Branch of Investments, Albuquerque, to take the necessary action to invest the funds.

(underline in original).

Subsequently, the BIA included a policy statement as part of the BIA's "REPORT OF INVESTMENT OF INDIAN TRUST FUNDS FOR FISCAL YEARS 1986 and 1987," which was introduced as a joint exhibit at trial. (capitalization in original). The "REPORT" contained two separate sections which discussed the BIA's investment policy. (capitalization in original). The first section, titled "<u>AUTHORITY</u>," stated:

> Our basic authority is contained in 25 USC 162a [sic], which is specific for Tribal and individual trust funds, and PL 98-146 which authorizes the investment of collections from irrigation and power projects. The Bureau can invest in certificates of deposit with banks and savings and loans which are insured by FDIC [Federal Deposit Insurance Corporation] or FSLIC [Federal Savings and Loan Insurance Corporation], or in banks which have pledged collateral securities guaranteed as to both principal and interest by the U.S. Government. Most of the purchased CD's are for periods of less than 1 year, although 1, 2 and 3 year CD's have been purchased on occasion. Investments can also be made through purchases of public debt obligations of the United States (Treasury issues) or other obligations which are guaranteed as to both principal and interest by the U.S. Government.

(capitalization and emphasis in original). The second section, titled "<u>INVESTMENT POLICIES AND INSTRUCTIONS</u>," stated:

> Although BIA is the Trustee for Indian funds, an ideal investment relationship is one in which Tribes participate fully by providing well thought-out investment policies and instructions based on realistic cash flow

projections which are based on complete tribal budgets. It is possible, through knowing the amounts required and when disbursements are necessary, to plan the timing of investment maturities to maximize interest rates and earnings and also have the funds available when needed.

(capitalization and emphasis in original). The parties agree that throughout the 1980s and until the early 1990s, the BIA had a program in which it pooled approximately 70% to 80% of tribal trust funds managed by the Department of the Interior into short-term jumbo CDs in banks nationwide, which had a maturity of one year or less. Plaintiffs' liability expert, Mr. Nunes, testified at trial that during the 1980s, the BIA had a "blanket kind of approach to all Indian funds that we saw," which was to invest tribal trust funds in "very short term and almost entirely in their CD program." Defendant's liability expert, Dr. Starks, similarly testified at the liability trial that:

[I]n the 1980s, the primary investments were into certificate of deposits, and the -- the Government had this unique CD program in which they pooled the money from a lot of different tribes and invested it in bank CDs all over the country, and because of the pooling, they were able to buy very large CDs.

Dr. Starks further stated at the liability trial, the general maturities of the BIA's CD investments "were usually one year or less." By pooling tribal trust funds, as Dr. Starks testified at trial, the BIA was able to achieve higher returns while ensuring that the tribal trust funds remained protected against any bank failures. Dr. Starks also testified at trial that the returns on the CDs were generally comparable to two- to three-year Treasury bonds.

Also, in 1983, 1984, and 1989, the Department of the Interior consulted with various private investment firms and received three investment proposals from outside firms with recommendations on how to improve the Department of the Interior's investment of its tribal trust funds. BIA received (1) a joint proposal from the American Indian National Bank (AINB) and Lehman Management Company (Lehman), (2) Security Pacific National Bank (Security Pacific), and (3) PricewaterhouseCoopers (PWC).[7] None of the firms proposed specific investment strategies for any particular tribal trust fund, including the tribal trust funds at issue in the above-captioned case, but instead recommended general investment strategies for tribes which had immediate cash flow needs and for tribes which had longer-term investment horizons. The Department of the Interior ultimately did not adopt those particular suggestions.

PWC submitted the first, and most in-depth investment proposal, to the government on December 24, 1983. According to PWC, it conducted "an in-depth review

_____

[7] The court notes that although the parties refer to the December 24, 1983 investment proposal as the "PWC investment proposal," at the time of the proposal, the company's name was "Price Waterhouse." For consistency, and to follow the lead of the parties, the court refers to the December 24, 1983 investment proposal as the PWC investment proposal and refers to the company as PWC.

of the management of Indian trust funds," which consisted of the government's various tribal trust funds, "individual Indian monies" (IIM) accounts, "Indian Monies Proceeds of Labor" accounts, "Contributions," and the "Alaska Native Escrow Fund. Plaintiffs' 326-K Fund was one of various tribal trust funds the government held in trust during the 1980s. PWC reviewed the BIA's investment of "Indian trust funds" between 1976 and 1983. The PWC proposal stated that "there is no evidence that outside money managers would have improved on the investment performance during the period 1976-1983," but that moving forward, "we [PWC] recommend that the Bureau [of Indian Affairs] engage an outside investment advisor."

PWC's December 24, 1983 investment proposal stated:

In assessing the overall performance of the funds in recent years, we have found that the BIA Branch of Investments has achieved excellent investment results relative to other managed portfolios operating under similar investment authorizations. These recent successes are primarily attributable to a strategy of investing in short-term assets in the face of volatile interest rates and to the discovery of federal subsidies implicit in the pricing of FDIC and FSLIC insured CD's.

However, as the volatility of interest rates declines, yields will begin to reflect the relative risks associated with the maturity and underlying credit characterizing security investments. Further, the subsidies associated with fdic and fslic securities are under consideration by bank regulators and may not be available in the future.

(capitalization in original). The PWC investment proposal also noted that the "[w]hile the BIA investment strategy has worked well in the past, the unusual market conditions of the recent past," i.e., that the yield curve for bonds was inverted such that short-term securities had out-performed longer-term securities for the "last decade," 1973 to 1983, "may not continue." PWC also stated that "there is no guarantee that the current strategy of investing primarily in highly liquid short-term assets will achieve the same investment performance relative to other strategies if the capital markets return to traditional pricing behavior," which is what the BIA did and achieved for the 326-K Fund from its deposit into the Treasury on December 19, 1979 until December 24, 1983, the date of the PWC's proposal. According to the PWC investment proposal, unlike the "unusual" inverted yield curve between 1973 and 1983, "[u]nder the traditional yield curve," meaning that longer-term investments out-perform shorter-term investments, "investors who assume the risks associated with long-term securities, are rewarded more than investors who place their funds in shorter term issues."

Although PWC concluded that the BIA's management of the Indian trust funds between 1976 and 1983 was "excellent," PWC noted that its "[m]easurement of actual portfolio performance" of the Indian trust fund "was confounded by an absence of data" and that PWC had to make various assumptions when analyzing the BIA's investment performance during this time. The PWC investment proposal noted that:

The current BIA accounting system does not produce periodic reports of total returns (interest accrued each period plus changes in market value) for the Indian trust fund portfolios. In order to analyze the performance of the portfolio, we estimated total portfolio returns based on published returns earned on the following generic categories of securities comprising the Indian trust fund portfolios:

> o Insured or collateralized Certificate of Deposit (6 months to maturity)
> o Treasury Securities (5 months to maturity)
> o U.S. Government Agency Securities (7.1 years to maturity)

The PWC investment proposal stated that "[t]he asset allocation among" the three generic securities listed above for its analysis of the government's investment of Indian trust funds "was assumed to be the actual asset allocation for the IIM portfolio as of August 1983," a different type of account than the tribal trust funds at issue in this case.

The PWC investment proposal also provided "numerous recommendations by which the BIA can adjust to the changing investment environment and provide enhanced services to the beneficiaries of the trust funds," which included the recommendation that BIA "[d]evelop and implement an ongoing process which will assist tribes and individuals to formulate investment objectives." The PWC investment proposal recommended to the BIA a portfolio investment strategy of "passive diversification," i.e., "[i]nvestment in securities representing a variety of market sectors, and maturities where such investments are held to maturity," in order "to achieve the trust fund investment objectives as the capital markets begin to reflect the more traditional risk/return relationships." PWC included five sample portfolios to illustrate that by using the passive diversification strategy, "a portfolio of securities can be chosen that will perform better than any single security in the portfolio." PWC also explained in its investment report that of the five sample portfolios, three were "dominant," meaning that these three portfolios earned the greatest return for the least risk. The first dominant portfolio was comprised of "10% T-bills, 30% C.D.'s" and "30% Intermediates, 30% Long Term" and had an "Expected Return" of 11.20%.[8] The second dominant portfolio was comprised of "5% T-bills," "50% C.D.'s," and "25% Intermediates, 20% Long Term," and had an "Expected Return" of "10.92%." The third dominant portfolio was comprised of "20% T-bills, 40% C.D.'s" and "40% Intermediates," and had an "Expected Return" of "10.40%."

Of the non-dominant portfolios, the first was comprised of "22% T-bills, 70% C.D.'s" and "8% Intermediates," and had an "Expected Return" of "10.02%." The second was comprised of "22% T-bills, 70% C.D.'s" and "8% Intermediates," and had an "Expected Return" of "9.90%" The three dominant portfolios, which were expected to experience the

---

[8] The PWC investment proposal did not define what constitutes an "Intermediate" security and what constitutes a "Long-term" security. The PWC investment proposal, however, noted that "[t]wo-, three-, and five-year notes" were not considered "Long-term bonds."

highest rate of returns from PWC's five sample portfolios, contained the highest combination of long-term and intermediate-term securities.

The PWC investment proposal also noted that because the five portfolios assumed that a typical yield curve, i.e., when longer-term investments out-perform shorter-term investments, "observed during the period of 1926-1973 would prevail, it is not surprising that the dominant portfolios (earning the greatest return for least risk) contained a substantially larger proportion of longer-term securities than we have observed in the BIA portfolios."

AINB and Lehman submitted their joint investment proposal to the government on October 30, 1984 and "jointly" proposed "to organize, manage, and administer a mutual fund to serve as an alternative investment vehicle for the American Indian Tribal Trust Funds." Unlike PWC, AINB and Lehman did not present a review of the BIA's past investment of the Indian trust fund in its joint investment proposal, nor commented on whether the BIA had obtained "excellent" investment results in the past. AINB and Lehman proposed that the Department of the Interior's tribal trust funds, depending on the cash flow needs of a particular tribe, be invested in one of two portfolios. The first proposed portfolio was a money market portfolio "invested in money market instruments with maturities not exceeding one year." The second proposed portfolio was "an intermediate-term portfolio invested in obligations with maturities not to exceed five years. Such maturities typically have higher yields than money market instruments."

Security Pacific discussed its investment recommendations with the government during an investment meeting in San Diego, California from December 7-8, 1989, and its recommendations were memorialized in a BIA memorandum dated January 17, 1990. The BIA memorandum did not discuss whether Security Pacific had conducted a review of the BIA's past investment of the Indian trust fund in its investment proposal, nor did the BIA memorandum comment on whether Security Pacific believed that the BIA's investment of the Indian trust fund was "excellent," as PWC had concluded in its investment proposal. Security Pacific recommended that the BIA pool together and invest the largest twenty-five tribal trust funds as follows: 48% of the funds in short-term securities, 38% of the funds in intermediate-term securities, and 14% of the funds in long-term securities.[9] Security Pacific recommended that the BIA pool together and invest the remaining tribal trust funds as follows: 61% in short-term securities, 29% in intermediate-term securities, and 10% in long-term securities.

The BIA memorandum memorializing Security Pacific's investment recommendations did not state whether plaintiffs' 326-K Fund was one of the tribal trust funds considered by Security Pacific. According to the testimony of defendant's damages expert, Justin Mclean, at the liability trial, plaintiffs' 326-K Fund would have been among one of the largest twenty-five tribal trust funds pooled together and invested in Security Pacific's proposed portfolio. The 326-A-1 and 326-A-3 Funds, the other two trust funds at

---

[9] The Security Pacific proposal did not define what maturities would constitute a "short-term" security, an "intermediate" security, or a "long-term" security.

issue in this case, were not yet in existence at the time that Security Pacific made its recommendations to the BIA.

In 1990, the Office of Trust Funds Management was established within the BIA at the Department of the Interior. The Office of Trust Funds Management consolidated the accounting and investment functions managing and governing tribal trust funds. As both parties' liability experts testified during the liability trial in the above-captioned case, during the early 1990s, the Department of the Interior transitioned from its program of pooling together and investing tribal trust funds in short-term jumbo CDs to primarily investing tribal trust funds into other securities with varying maturities, such as agency and Treasury securities. Plaintiffs' liability expert, Mr. Nunes, testified at the liability trial that around the early 1990s, the BIA made "a wholesale transition away from the CD program, which ultimately went away completely, and monies now were being invested in agency securities, mortgage-backeds, callable bonds, and things like that." Defendant's liability expert, Dr. Starks, testified at the liability trial that "[a]fter about [19]91," the BIA made a "programmatic" switch from investing tribal trust funds in jumbo CDs into "agency securities in particular and a little bit longer term U.S. Treasuries."

The Department of the Interior's shift from CDs was reflected in the October 1, 1992 edition of the Office of Trust Funds Management's quarterly journal "TRUST," introduced at trial in the above-captioned by both parties as a joint exhibit. (capitalization in original). According to the October 1, 1992 journal, the Branch of Investments Chief at the Department of the Interior, Fred Kellerup, "got OTFM [Office of Trust Funds Management] on the right road four years ago [in 1988] when the trust funds investment portfolio began its transformation from CD's to government securities." Mr. Kellerup provided the following advice to tribes in the October 1, 1992 journal: "*Stay away from the long bond. There's no need for tribes to invest beyond 15 years. You're too far out if interest rates turn around. Shorten up on the maturity. Even if you have cash flow needs, go for the three-to-seven year government securities. Avoid the one-year CDs.*" (emphasis in original).

Also, during the early 1990s, Congress investigated BIA's management and investment of the Indian trust fund, comprised of tribal trust funds, such as the three tribal trust funds at issue in the above-captioned case, and the IIM trust fund. The Congressional Committee on Government Operations published the results of the investigation in an April 1, 1992 report, titled "MISPLACED TRUST: THE BUREAU OF INDIAN AFFAIRS' MISMANAGEMENT OF THE INDIAN TRUST FUND," (the 1992 Congressional Report) introduced at trial in the above-captioned case by both parties as a joint exhibit. (capitalization in original). The 1992 Congressional Report explained that the IIM trust fund is "a deposit fund, usually not voluntary, for individual participants and tribes." The Department of the Interior's investment of the IIM trust fund is not at issue in the above-captioned case. The 1992 Congressional Report also explained that as of April 1, 1992, "the BIA is responsible for managing and investing almost $2 billion in tribal and individual Indian funds."

The 1992 Congressional Report summarized the BIA's duty to Indian tribes as a "fiduciary duty to 'maximize the trust income by prudent investment.'" (quoting <u>Cheyenne-Arapaho Tribes v. United States</u>, 206 Ct. Cl. 340, 348, 512 F.2d 1390, 1394 (1975) (<u>Cheyenne-Arapaho</u>)). The 1992 Congressional Report explained that "[t]his responsibility requires the Government to stay well-informed about the rates of return and investment opportunities and to intelligently choose from among authorized investment opportunities to obtain the highest rate of return to make the trust funds productive." The 1992 Congressional Report noted that "the Bureau's fiduciary responsibilities are not dissimilar to the duties performed by many private trustees" and that:

> To fulfill these important obligations it is necessary for the agency to fully understand both its fiduciary duties and the financial marketplace. Stated simply these fundamental assignments are: To accurately account to the beneficiary; to make accounts productive for the beneficiaries; and to maximize the trust income through prudent investment. To successfully perform these tasks, the Bureau of Indian Affairs, as any fiduciary, must conduct itself as a sophisticated investor, a smart shopper, and a highly diligent and resourceful manager.

Upon review of the BIA's investment of Indian trust fund, the 1992 Congressional Report found that the BIA had "longstanding financial management problems in its administration of the Indian trust fund," primarily due to a failure to "accurately account for trust fund moneys." The 1992 Congressional Report explained that:

> Indeed, it [BIA] cannot even provide accountholders with meaningful periodic statements on their account balances. It cannot consistently and prudently invest trust funds and pay interest to accountholders. It does not have consistent written policies or procedures that cover all of its trust fund accounting practices. Under the management of the Bureau of Indian Affairs, the Indian trust fund is equivalent to a bank that doesn't know how much money it has.

Notably, the plaintiffs in the above-captioned case do not at all allege that defendant breached its fiduciary duty by failing to keep accurate records of the plaintiffs' tribal trust funds or that the defendant failed to provide plaintiffs with periodic account statements. Plaintiffs, instead, argued that the defendant invested their three tribal trust funds in too short-term securities, and, thus, did not maximize the investment return on their tribal trust funds.

Subsequently, Congress passed the American Indian Trust Fund Management Reform Act, Pub. L. No. 103-412, 108 Stat. 4239 (1994) (1994 Trust Fund Management Reform Act), which created the Office of the Special Trustee for American Indians (Office of the Special Trustee) within the Department of the Interior, to be headed by the Special Trustee. <u>See</u> 1994 Trust Fund Management Reform Act, codified at 25 U.S.C. § 4001 <u>et seq.</u> According to the 1994 Trust Fund Management Reform Act, the Special Trustee was to "ensure proper and efficient discharge of the Secretary's trust responsibilities to Indian

tribes and individual Indians." 25 U.S.C. § 4043(a)(1) (1994). The 1994 Trust Fund Management Reform Act also recognized that

> [t]he Special Trustee shall ensure that the Bureau [of Indian Affairs] establishes appropriate policies and procedures, and develops necessary systems, that will allow it-- (i) properly to account for and invest, as well as maximize, in a manner consistent with the statutory restrictions imposed on the Secretary's investment options, the return on the investment of all trust fund monies . . . .

Id. at § 4043(b)(2)(B) (1994).

The 1994 Trust Fund Management Reform Act also established a nine-member Advisory Board to assist and advise the Special Trustee with implementation of the 1994 Trust Fund Management Reform Act. In 1996, the Office of the Special Trustee, a separate office within the Department of the Interior, took over the responsibility of managing tribal trust funds from the BIA. As the parties jointly stipulate, on September 11, 1996, the Special Trustee appointed the "OTFM Management Board" to establish an operating policy to ensure that tribal trust funds were maintained in a proper and prudent mix and maturity distribution, "represent sound extensions of credit, and are appropriate assets with regard to legal requirements and needs of the Indian beneficiaries involved." (internal quotation marks omitted). The OTFM Management Board, as both parties jointly stipulated to in the above-captioned case, became known in April 2005 as the Office of the Special Trustee Investment Management Committee, and was sometimes referred to as the "Portfolio Review Committee," according to the testimony of defendant's fact witness, Mr. Robert Winter, at the liability trial.

Mr. Winter also testified at the liability trial that the Portfolio Review Committee is "a group of senior officials that are well versed in all of the management functions in OST [Office of the Special Trustee], that meet with the investment group to review specifics about investments for all tribal trust funds annually." Mr. Winter also testified that he became a member of the Portfolio Review Committee in 2001 and was still a member of the committee at the time of liability trial in the above-captioned case. As Mr. Winter explained, the Portfolio Review Committee would review the account objectives for each tribal trust fund and whether the tribal trust fund was invested in accordance with the agency's policies. According to Mr. Winter's testimony at the liability trial, if the Portfolio Review Committee disagreed with a particular investment manager's investment strategy for a specific fund, the Portfolio Review Committee had the authority to direct the investment manager to change the investment strategy. With regard to plaintiffs' 326-K Fund, Mr. Winter noted:

> You know, each year this account came up we made sure that we asked what further information do you have or, you know, certainly knowing amongst ourselves, we definitely got news of, you know, pending legislation, legislation that's been introduced, you know, the possibilities of

that legislation passing. So this was definitely a time period[10] when there were bills being introduced which caused us to, you know, limit it to -- not limit it to, but to make those maturities around two years.

On February 7, 1997, the Office of the Special Trustee sent a memorandum, which was introduced by both parties in the above-captioned case as a joint trial exhibit, titled "OTFM POLICY MEMORANDUM NO. POL97-002" to the Office of Trust Funds Management Division's Chiefs, Area Trust Accountants, and Agency Personnel, which discussed the Office of the Special Trustee's "Investment Policy" (1997 Office of the Special Trustee Policy). (capitalization in original). The 1997 Office of the Special Trustee Policy established "the criteria by which OTFM will manage the Tribal, Individual Indian Monies, and Special Funds entrusted to it for investment." Pursuant to the 1997 Office of the Special Trustee Policy, the "investment activities of OTFM will be conducted to achieve" three primary objectives. The first objective was "<u>Quality</u>" of the investment portfolio, which included the "safety of principal, minimization of market risk and overall risk diversification." (capitalization and emphasis in original). The second objective was having some "<u>Liquidity</u>" of investments, meaning that "an adequate percentage of the portfolio should be maintained in liquid, short-term investments that could be converted to cash, if necessary, in order to meet the tribal disbursement requirements." (capitalization and emphasis in original). The last objective was the "<u>Rate of Return</u>" of the portfolio. (capitalization and emphasis in original). According to the 1997 Office of the Special Trustee Policy,

> [o]f major importance in all of the OTFM managed portfolios is an acceptable rate of return over the long term without compromising the other stated objectives of quality and liquidity. The specific portfolios should be structured to achieve at least a market-average rate of return throughout economic cycles, taking into account the specific tribe's risk constraints and the cash flow requirements dictated by its use and distribution plans and/or budget forecasts. Whenever possible, and consistent with risk limitations as defined herein and prudent investment principles, investment officers shall seek to augment returns above the market average rate of return.

At the liability trial, defendant's fact witness, Mr. Winter, explained his understanding of the 1997 Office of the Special Trustee Policy's Rate of Return objective and his involvement in reviewing and updating the Office of the Special Trustee's policies throughout the late 2000s. Mr. Winter testified that he began working at the Office of the Special Trustee in 1998 and that between "2007 and 2011," he "headed up the Office of Trust Services" which oversaw the "Office of Trust Funds Investments." The Office of Trust Funds Investments, according to Mr. Winter, is "essentially the investing shop at the Office of the Special Trustee." Mr. Winter also testified that during his time at the Office

---

[10] According to Mr. Winter's trial testimony at the liability trial, the "time period" referenced was the early 2000s, when Mr. Winter joined the Portfolio Review Committee and when Congress began, once again, to introduce bills for the distribution of plaintiffs' three tribal trust funds.

of Trust Services, he was responsible for "developing investment policy and reviewing and amending investment policy" for the Office of the Special Trustee, and also to "review the past policies of the Office of the Special Trustee and even those of its predecessor, the BIA." Mr. Winter testified at the liability trial that his understanding of the Rate of Return objective "simply refers to, in conjunction with ensuring the quality is there and that the cash flows have been identified and that there will be adequate liquidity within the portfolio, that we should structure the remainder of the portfolio in such a manner as to achieve above-average market rates." Mr. Winter also testified that in order to obtain "above-average market rates," as required by the Rate of Return objective contained within the 1997 Office of the Special Trustee Policy, it was his understanding that "we need to do adequate analysis of the cash flows in order to ensure that we obtain the highest rates for the maturities that we select in order to maintain those proper flows." At the liability trial, Mr. Winter testified that the cash flow analysis differs with respect to different tribal accounts. Mr. Winter testified that regarding a cash flow analysis for a judgment fund, "where it's 100 percent per capita payout," like plaintiffs' 326-K Fund at issue in the above-captioned case, "then really all you need to know is the distribution date." When asked by defendant's counsel at trial what the effect of an uncertain timeline for the distribution of a particular judgment fund would have on the Office of the Special Trustee's cash flow analysis, Mr. Winter responded that, "[w]ell, we certainly try to obtain the most accurate data we can about a particular distribution date if there's not one already stated, and, you know, we try to base our maturity schedule on the earliest available date that that fund might be paid out."

The 1997 Office of the Special Trustee Policy also listed "**ACCEPTABLE PORTFOLIO INVESTMENTS AND PRACTICES**," which explained, among other practices, the Office of the Special Trustee's "'Holding' versus 'Trading'" practice. (capitalization and emphasis in original). According to the section of the 1997 Office of the Special Trustee Policy discussing "Holding versus Trading,"

> OTFM intends to manage its Indian trust portfolios in a manner that protects the integrity of the primary function of the portfolio, which is to provide maximum income for the tribes while conforming to prescribed statutory limitations and prudent fiduciary investment principles.

> Because OTFM has a small number of investment managers responsible for the investment management of over 1450 separate portfolios, OTFM will purchase securities with the intent to hold each security until maturity, while realizing that sales can and may occur prior to maturity form some of the following reasons:

> 1. When account review presents obvious opportunity for portfolio enhancement from the reinvestment of sales proceeds into comparable maturities thereby improving yield or quality without adversely affecting overall quality, mix or maturity of the investment portfolio.
> 2. The need to improve or increase portfolio liquidity.

3. The need to invest the proceeds of a security maturing within one year because of an interest-rate scenario that would be detrimental to the performance of the portfolio if held to maturity before investing, i.e., a rapidly falling interest rate period.
4. A reduced credit rating of the issuing Agency renders the security to be of less than acceptable quality to remain in the portfolio.

The 1997 Office of the Special Trustee's "Holding versus Trading" section also noted that "[i]nfrequent investment portfolio restructuring carried out in conjunction with a prudent overall risk-management plan that does not result in a pattern of gains being taken and losses deferred will generally be viewed as an acceptable practice within the context of an investment portfolio." According to the trial testimony of defendant's fact witness at the liability trial, Mr. Winter, the 1997 Office of the Special Trustee's "Holding versus Trading" practice meant that,

that we need to purchase securities with the intent and ability to hold to maturity; and that, secondly, we're permitted infrequent investment restructuring if the market conditions present themselves as such, but we can't be doing so by establishing a pattern of buying and selling, reaping gains and losses on any sort of frequency.

According to Mr. Winter, the 1997 Office of the Special Trustee Policy was the "first formal policy adopted by the Office of the Special Trustee." Mr. Winter testified at the liability trial that the Office of the Special Trustee issued amendments to the 1997 Office of the Special Trustee Policy in 1999, 2000, and 2005, but that these policy amendments, apart from extending the maturity limits of certain government-backed securities from an "average life" of ten to fifteen years, were not "material" changes to the 1997 Office of the Special Trust Policy. Moreover, Mr. Winter testified that the 2005 policy amendment was the policy in place up until the distribution of the 326-K Fund.

The Investment Market for Bonds from the Early 1950s to 2013

At the liability trial, the parties agreed that between the early 1950s up until 1979, the beginning of the period at issue in the above-captioned case, interest rates on bonds steadily increased, and that there was an inverted "yield curve." A "yield curve" displays the relationship between a bond's yield and maturity. An inverted yield curve occurs when shorter-term securities are experiencing higher yields than longer-term securities. For example, beginning around 1958, the 5-year Treasury bond achieved higher returns than the 7-year Treasury bond or the 20-year Treasury bond, and such was the case until 1979.

From December 1979 until 1981, the first three years of the period at issue in the above-captioned case, interest rates on bonds continued to increase and the yield curve remained inverted. As defendant's liability expert, Dr. Starks, testified at the liability trial,

the "peak of interest rates from between 1950 and 2012" occurred in September 1981. Following the September 1981 interest rate peak until September 2013, the end of the period at issue, the parties agreed that the interest rates generally decreased and that bond prices steadily increased. The parties agreed that following the September 1981 interest rate peak, but for a few short-lived periods, the yield curve was upward sloping until 2013, the end of the investment period at issue. An upward sloping yield curve means that longer-term securities experience higher returns than shorter-term securities.

The parties agree that, the despite the inverted yield curve between the 1950s and 1981, the yield curve for fixed-income securities is typically upward sloping. Plaintiffs' liability expert report by Rocky Hill Advisors, Inc. (Rocky Hill Advisors) noted that a "2007 study of the past 80 years found that in 72 of those years (90% of the time) the yield curve was upward sloping and that, on average over all of those years, long-term Treasury bonds[11] tended to yield about 1-1/2% more than short-term Treasury bills." Defendant did not contest the validity of the 2007 study cited to by plaintiffs in their liability expert report. Plaintiffs' Rocky Hill Advisors' liability expert report also noted:

> Generally, the longer the maturity of a fixed-income investment, the higher will be its coupon interest rate (the contract rate of interest) and potential return. This is because investors perceive higher risk the further out in time an investment extends, thus they demand higher returns to compensate for the additional risk. Although there are periods where this relationship inverts (that is, interest rates on shorter-term investments exceed those on longer-term investments), the frequency and duration of such events is de minimis when compared to the norm.

(footnote omitted). Defendant's damages expert report, prepared by Dr. Gordon Alexander, similarly noted that the yield curve is normally upward sloping, stating that "[g]iven the fact that the yield curve is generally upward sloping, the practical result of this observation would be to invest primarily in long maturities when monies are expected to remain invested for longer periods."

Plaintiffs' liability expert report by Rocky Hill Advisors provided a hypothetical which illustrated that longer-term investments generally would have out-performed shorter-term investments during the thirty-three-year period at issue in this case. According to plaintiffs' expert report by Rocky Hill Advisors, if an investor were to have invested $1,000.00 in three separate portfolios beginning in December 1, 1979, the starting month of the relevant time period in the above-captioned case, and have left that $1,000.00 fully invested through September 30, 2013, the end date of the relevant period in this case, the portfolio with the longest-term securities would have achieved the highest rate return. The three portfolios from the hypothetical are as follows:

---

[11] Plaintiffs' liability expert report did not define what maturities of Treasury securities would be considered "long-term Treasury bonds."

• Portfolio 1 in a short-term (i.e., an average maturity of about 3 years) basket of Treasury securities represented by the Barclays 1-5 Year U.S. Treasury Index;

• Portfolio 2 in an intermediate-term (i.e., an average maturity of about 7.5 years) basket of Treasury securities represented by the Barclays U.S. Treasury Index; and

• Portfolio 3 in a long-term (i.e., an average maturity of 20+ years) basket of Treasury securities represented by the Barclays Long-Term U.S. Treasury Index.

According to the hypothetical, the $1,000.00 in Portfolio 1, the short-term portfolio, would have grown to $10,154.94 by September 30, 2013. The $1,000.00 in Portfolio 2, the intermediate-term portfolio, would have grown to $13,720.07 by September 30, 2013. The $1,000.00 in Portfolio 3, the long-term portfolio, would have grown to $20,868.30 by September 30, 2013.

Defendant's damages expert report by Dr. Alexander in advance of the liability trial referred to a hypothetical similar to the hypothetical included in plaintiffs' expert report by Rocky Hill Advisors. Defendant's damages expert report looked at three $1,000.00 portfolios from 1979 to 2013. The first portfolio was invested in 5-year Treasury bonds, the second portfolio was invested in 7-year Treasury bonds, and the third portfolio was invested in 20-year Treasury bonds. The $1,000.00 invested in 5-year Treasury bonds grew the least, to approximately $14,000.00. The $1,000.00 invested in 7-year Treasury bonds grew to approximately $15,500.00. The $1,000.00 invested in the 20-year Treasury bonds grew the most, to approximately $21,000.00.

Additionally, plaintiffs' rebuttal expert witness at the liability trial, Dr. Goldstein, illustrated in his rebuttal expert report that, with regard to the 326-K Fund, a "simple buy-and-hold strategy that invested" plaintiffs' 326-K Fund "in 10-year U.S. Treasuries," from 1979, when the 326-K Fund was deposited into the United States Treasury, through 2004, when Congress passed the distribution plan legislation for plaintiffs' tribal trust funds, and "then rolling [the 326-K Fund] into 1-year U.S. Treasuries," from 2005 until 2013, the end of the period at issue, the government would have experienced higher returns than what it actually achieved. According to Dr. Goldstein's calculations, "had the BIA simply followed a mechanical strategy of investing in 10-year U.S. Treasuries, it would have ended the period with an additional $72 million above what it did under its chosen strategy." Dr. Goldstein did the same exercise "with 20-year U.S. Treasuries" and "[u]nder this simple strategy, the WSIG [Western Shoshone Identifiable Group] account would have held an additional $179 million." Dr. Goldstein noted in his report that "I stress that these are not damages estimates, which I have not been asked to provide. The figures are just a clear way to illustrate the benefits of locking in typically higher long-term rates over the relevant period."

<u>The Department of the Interior's Investment of the 326-K Fund</u>

The period at issue regarding the government's investment of the 326-K Fund was from December 19, 1979, the date on which the ICC's initial award payment of $26,145.189.89 was deposited into the United States Treasury, until September 30, 2013, the last date for which the Trust Account Database (TAD), the government's electronic account database, reported account information for the 326-K Fund. According to the testimony of plaintiffs' liability expert, Mr. Nunes, at the liability trial, the TAD is "a compilation of several sub-databases that include information regarding the different accounting systems the Government had and the coding that they used to identify, you know, what a transaction was. It includes from 1972 -- from July 1, 1972, forward" a "compendium of all the transactions that went through an account, and then there's a lot of descriptive and other data that's in there as well." Mr. Nunes also testified at the liability trial that the government provided plaintiffs with access to the TAD for plaintiffs' three tribal trust funds for the period at issue, December 1979 through September 2013. Both of the parties' liability experts relied on the TAD when re-constructing the investment performance of plaintiffs' 326-K Fund between December 1979 and September 2013 in their respective liability expert reports and damages expert reports. Both parties do not contest the data reflected in the TAD for the 326-K, 326-A-1, and 326-A-3 Funds.

The initial amount of the 326-K Fund, when deposited in the United States Treasury on December 19, 1979, was $26,145,189.89. Before the first distribution payment of the 326-K Fund was issued in 2011 to 3,187 individuals, the 326-K Fund balance had grown to approximately $183,794,000.00. According to defendant's opening statement at trial, between December 1979 until the first distribution of the 326-K Fund in 2011, the 326-K Fund experienced an average annual return of 6.8%, the accuracy of which plaintiffs did not contest. The final distribution payments of the 326-K Fund were made on September 29, 2012 and October 2, 2012. As of September 2013, the last date for which data was available regarding the government's investment of the 326-K Fund, a residual amount of approximately $36,000.00 remained in trust by the government. Plaintiffs' counsel explained at the closing argument for the liability phase of trial, that plaintiffs are not seeking to recover the residual amount of $36,000.00 in the above-captioned case. Plaintiffs' counsel did not clarify why $36,000.00 remained in the government's account. Plaintiffs' counsel at closing argument stated that a potential reason for the residual amount left in trust with the government was because "maybe you haven't identified a recipient or there's been some glitch, something like that."

<u>The Maturity Structure of the 326-K Fund</u>

In their liability expert reports, and at the liability trial, both parties discussed the "average weighted maturity" of the 326-K Fund. According to the testimony of defendant's liability expert, Dr. Starks, at the liability trial, the "average weighted maturity" is based on the maturity of all the securities in which the 326-K Fund was invested in at a given time. Dr. Starks testified that the maturity is then viewed as a "weighted average" based on the "value" that the securities "are in their portfolio, so that if you have an investment that's very short term and is, you know, 50 percent of the portfolio, then it's going to be lower

overall and vice versa." Plaintiffs argued that the average weighted maturity of the 326-K Fund throughout the thirty-three-year period at issue was too short- term, and, therefore, the 326-K Fund was imprudently invested. Defendant argued to the contrary.

At the liability trial, the parties discussed three different methods for analyzing the average weighted maturity of the 326-K Fund. The first method calculated the average weighted maturity of the 326-K Fund based on the securities' stated years to maturity. For example, a ten-year bond has a stated ten-year maturity. The second method calculated the average weighted maturity of the 326-K Fund based on the securities' "years to call," which uses the call date of callable securities in which the government invested the 326-K Fund. According to the testimony of plaintiffs' liability expert, Mr. Nunes, at the liability trial, a callable security is a security for which the issuer retains the right to call the security back before maturity by a specific "call" date. Therefore, if an issuer exercises its right call back a ten-year callable bond after five years following its issuance, then the ten-year bond's maturity would be five years. The parties' liability experts agreed in their respective expert reports that the government began to invest the 326-K Fund in callable securities beginning in the early 1990s. According to the testimony of plaintiffs' liability expert, Mr. Nunes, at the liability trial, approximately 85% of the callable securities in which the 326-K Fund was invested were called back, which defendant did not contest. Even though only approximately 85% of the callable securities chosen by the government for the 326-K Fund were called back, both of the parties' liability experts appear to use the call dates for all callable securities in which the government invested the 326-K Fund when calculating the average weighted maturity based on years to call.

The third method discussed by the parties based the average weighted maturity of the 326-K Fund on the call dates of the callable securities and made an adjustment for the prepayment of mortgage-backed securities. Mortgage-backed securities, as explained in plaintiffs' rebuttal expert report by Dr. Goldstein,

> are asset backed securities backed by mortgages and include pass-through securities (such as those from GNMA [Government National Mortgage Association], FNMA [Federal National Mortgage Association], and FHLMC [Federal Home Loan Mortgage Corporation]) and Collateralized Mortgage Obligations ("CMOs"). Pass-through securities such as those from GNMA, FNMA, and FHLMC differ from normal bonds in that the principal value of the bond is amortized and thus paid off over time, rather than just at the time of maturity, so that each payment over the life of the mortgage-backed security contains some principal repayment. As such, the stated maturity of pass-through securities is not representative of the expected, or average, life of the investment. Some mortgage-backed securities, such as CMOs, are often also divided into tranches, each with a different level of risk. Higher tranches (such as tranche A) have their principal paid back first, whereas later tranches have to wait longer hence have a longer expected life.

(footnotes omitted; capitalization in original). According to plaintiffs' rebuttal expert report, "in the 1990s," the government invested the 326-K Fund "into mortgage backed securities where the average or expected life is notably shorter than the stated maturity. As a result, the actual weighted maturity of the fund," even "after considering the impact of callable bonds," would be "overstated" if not adjusted for the pre-payment of various mortgage-backed securities. Similar to plaintiffs' rebuttal expert report regarding the government's use of mortgage-backed securities, defendant's liability expert, Dr. Starks, testified at trial that the government began investing in mortgage-backed securities during the early 1990s, and that, "what's important about mortgage-backed securities is, especially in a falling interest rate environment, people refinance their homes, and so -- so you -- you usually don't get the maturity you think you're going to get because it can be paid off early."

Although the parties discussed the pre-payment mortgage issue, neither party presented at the liability trial, or, in their expert reports, an accurate, complete calculation of the average weighted maturity of the 326-K Fund taking into account the pre-payment issue. Defendant's liability expert, Dr. Starks, presented at trial her attempt to account for the pre-payment issue in defendant's Demonstrative Exhibit 10,[12] a line graph depicting the 326-K Fund's average weighted maturity based on (1) the stated maturity, (2) years to call, and (3) years to call with an adjustment for the pre-payment issue. Dr. Starks, however, admitted at trial that her attempt was not the most accurate because she "throws out the mortgage-backed securities because of the prepayment issue" from her calculations, and, thus, undercalculates the average weighted maturity of the 326-K Fund. Plaintiffs did not present any calculation of the average weighted maturity of the 326-K Fund which accounted for the pre-payment issue during the course of the liability trial.

When analyzing the average weighted maturity of the 326-K Fund, the court will rely on the average weighted maturity based on the years to call. This method, as both parties agreed, more accurately depicts the maturity structure of the 326-K Fund than the average weighted maturity based on the stated years of maturity. As plaintiffs' counsel noted at closing argument, "Dr. Starks [defendant's liability expert] and Mr. Nunes [plaintiffs' liability expert] agree[]" that "the stated years to maturity was not as accurate when you're dealing with callable bonds, because it was more accurate to use the call date." Dr. Starks, defendant's liability expert, testified at trial that only considering the stated years to maturity of the 326-K Fund would make the 326-K Fund maturity structure appear a "little too long," because the government had invested in callable bonds that were called back before maturity. Mr. Nunes, plaintiffs' liability expert, similarly testified at trial that relying only on the stated years to maturity when calculating the average weighted maturity of the 326-K Fund, "actually makes the portfolio look like it has a longer structure than it actually does" because "almost entirely" all of the government's callable bonds were called back. The court is aware that the average weighted maturity based

---

[12] Both parties' counsel used various demonstrative exhibits throughout the liability trial, which were all introduced and accepted into the trial record for the liability trial. The parties similarly used demonstrative exhibits, some of which are referenced below, and which were admitted into the trial record for the damages trial.

only on years to call does not take into account the pre-payment of the mortgage-backed securities. The record before the court, however, does not contain an accurate depiction of the weighted average maturity, taking into account the pre-payment issue of mortgage-backed-securities for the 326-K Fund, and the actual calculations to analyze the performance of the 326-K Fund, taking into account the pre-payment issue, remain somewhat elusive and speculative.

According to both parties' liability expert reports, which relied on the government's data from the TAD, beginning in December 1979 to approximately December 1991, the average weighted maturity years to call of the 326-K Fund never exceeded two years, and during most of this period, the average weighted maturity was one year or less. Beginning in December 1991 until September 1993, the average weighted maturity years to call increased, reaching a peak of a little less than ten years. Following this peak in September 1993, until May 2002, the average weighted maturity years to call steadily decreased, reaching a low of approximately less than one year in May 2002. Then, from June 2002 until approximately early-2008, the average weighted maturity years to call fluctuated between a less than one year and slightly more than two years. Beginning around mid-2008 until December 2010, the average weighted maturity years to call fluctuated, starting around two and a half years, increasing to almost three years, and then dropping back down to approximately one year. Beginning in early-2011, when the government began to distribute the 326-K Fund to qualifying members of Western Shoshone tribes, the government effectively liquidated the 326-K Fund such that the average weighted maturity years to call decreased to an all-time low of almost zero years of maturity and flatlined at almost zero years of maturity until September 2013, the end of the time period at issue.

As a visual aid of the 326-K Fund's average maturity structure throughout the thirty-three-year period at issue, defendant's Demonstrative Exhibit 10, which was introduced at trial during defendant's direct examination of defendant's liability expert, Dr. Starks, and used by plaintiffs' counsel during their cross-examination of Dr. Starks, is displayed below. Defendant's Demonstrative Exhibit 10 is titled "Maturity of WSJF [Western Shoshone Judgment Funds][13] portfolio varies over time" and contains three separate lines. The top most line, which was colored gray, displays the average weighted maturity of the 326-K Fund based on the stated years to maturity. The middle line, which was colored a light blue, depicts the average weighted maturity of the 326-K Fund, based on the call dates of the securities, and is the line which the court looks to in this Opinion. The bottom line, which was colored dark blue, displays the average weighted maturity of the 326-K Fund, based on the call dates of the securities and which did not include any mortgage-backed securities in order to account for the mortgage-backed security prepayment issue. As previously discussed, defendant's attempt to account for the pre-

---

[13] As the Western Shoshone Claims Distribution Act, Pub. L. No. 108-270, 118 Stat. 805 (2004) (the Claims Distribution Act of 2004), the act which created the distribution mechanism for the three funds at issue, states, the "Western Shoshone Judgment Funds" refers to the 326-K Fund. The "Western Shoshone Joint Judgment Funds" refers to the 326-A-1 and 326-A-3 Funds.

payment issue in Demonstrative Exhibit 10 would distort the average weighted maturity of the 326-K Fund and is not considered by this court. At the liability trial, plaintiffs did not contest Demonstrative Exhibit 10's representation of the average weighted maturity of the 326-K Fund based on the stated years to maturity, which was colored gray in Demonstrative Exhibit 10, or the years to call, which was colored light blue in Demonstrative Exhibit 10.[14] In addition, both parties agree that the years to call, the middle line, which was colored a light blue, is a more accurate indicator than the years to maturity, the top line, which was colored gray.[15]

---

[14] At the liability trial, plaintiffs did contest Demonstrative Exhibit 10's depiction of the average weighted maturity of the 326-K Fund that was adjusted to account for the pre-payment issue, which was colored dark blue.

[15] Demonstrative Exhibit 10 displays only one line between December 1979 and December 1991. This is because, as defendant's liability expert, Dr. Starks, testified to at trial, the 326-K Fund was not invested in any callable bond or mortgage-backed securities during this time, and, therefore, the average weighted maturity of the fund was the same whether one considered the years to maturity, the years to call, or whether there was any adjustment made for the pre-payment of mortgages.

# Maturity of WSJF portfolio varies over time



The Types of Securities in which the Government Invested the 326-K Fund

According to both parties' liability expert reports, which relied on the government data in the TAD, from 1979 to 1989, the government invested the 326-K Fund almost solely in jumbo CDs, with a small portion of the 326-K Fund invested in agency, Treasury, and "overnight" securities. According to the testimony of Mr. Winter, one of defendant's fact witnesses and director of Trust Operations at the Office of the Special Trustee at the Department of the Interior, at the liability trial, overnight securities are highly "liquid" "one-day" securities that are invested and redeemed "the very next day." In the early 1990s, although the government continued to invest a portion of the 326-K Fund in CDs, the government began investing the 326-K Fund in a combination of agency securities, Treasury securities, mortgage-backed securities, and overnight securities. Some of the securities selected by the government beginning in 1991 were callable securities. Notably, by June of 1995, the government was no longer investing any of the 326-K Fund in CDs. From June 1995 until July 2011, the government invested the 326-K Fund in a mixture of agency securities, Treasury securities, mortgage-backed securities, non-government securities, and overnight securities. Beginning in August 2011, the government invested the 326-K Fund solely in overnight securities.

The Department of the Interior's Investment of the 326-A-1 and 326-A-3 Funds

The investment period at issue for the 326-A-1 Fund was from March 25, 1992, when the judgment award of $823,752.64 was deposited into the United States Treasury, until September 30, 2013. The investment period at issue for the 326-A-3 Fund was from September 15, 1995, when the judgment award of $29,396.60 was deposited into the United States Treasury, until September 30, 2013, the last date for which the TAD, the government's electronic account database, reported account information for the 326-A Funds. The government did not co-mingle the 326-A-1 Fund with the 326-A-3 Fund and kept them in separate investment accounts. As discussed in more detail below, defendant did not present any evidence at trial regarding the 326-A-1 and 326-A-3 Funds because, according to defendant, plaintiffs do not have standing to assert a breach of trust with regard to the 326-A-1 and 326-A-3 Funds. Throughout the liability trial and the damages trial, plaintiffs referred to the 326-A-1 and 326-A-3 Funds together as the "326-A Funds." Therefore, as with the June 13, 2019 liability Opinion on liability issued by the court, for purposes of this Opinion, the court will discuss the investment performance of the 326-A-1 and 326-A-3 Funds together. By September 30, 2013, according to the TAD, the balance of the 326-A-1 and 326-A-3 Funds had grown to a total of $2,022,891.50.

The Maturity Structure of the 326-A-1 and 326-A-3 Funds

The only party to present evidence at the liability trial regarding the maturity structure of the 326-A-1 and 326-A-3 Funds were plaintiffs, who based their maturity calculations on data from the TAD. At trial, plaintiffs' liability expert, Mr. Nunes, testified that, as with the 326-K Fund, the government called back approximately 85% of the callable bonds in which the 326-A-1 and 326-A-3 Funds were invested. As with the 326-K Fund, Mr. Nunes also testified at trial that the average weighted maturity of the 326-A

Funds, based on the years to call, more accurately displays the maturity structure of these two funds than the average weighted maturity based on the stated years to maturity. For purpose of this Opinion, when discussing the maturity structure of the 326-A-1 and 326-A-3 Funds, the court, therefore, refers to the average weighted maturity years to call.[16]

Between the deposit dates for the 326-A-1 Fund, which occurred on March 25, 1992, and the 326-A-3 Fund, which occurred on September 15, 1995, and August 1999, the average weighted maturity years to call for the 326-A-1 and 326-A-3 Funds was approximately three years or less. Then, around September 1999, the average weighted maturity years to call for the 326-A-1 and 326-A-3 Funds spiked to approximately six years. The 1999 spike in maturity was relatively short-lived. The average weighted maturity years to call of the 326-A Funds fluctuated between five and seven years until September of 2001, when the average weighted maturity years to call for both A Funds decreased to less than one year. For the next eight years, from October 2001 to February 2009, the average weighted maturity years to call for both A Funds did not exceed three years. Around March 2009, the average weighted maturity years to call for the 326-A-1 and 326-A-3 Funds spiked to a high of approximately ten years and then immediately began to decrease, reaching an average weighted maturity years to call of five years by August 2009. Between September 2009 to February 2012, the average weighted maturity years to call for the 326-A-1 and 326-A-3 Funds fluctuated between approximately five and eight years. Around February 2012, the average weighted maturity years to call for the 326-A-1 and 326-A-3 Funds, increased to fourteen years and began to decrease around December 2012, reaching an average weighted maturity years to call of eleven years. The average weighted maturity years to call for the 326-A-1 and 326-A-3 Funds remained at approximately eleven years until September 2013, the end of the time period in question.

As a visual aid of the 326-A-1 and 326-A-3 Funds' maturity structure throughout the twenty-one-year period at issue, plaintiffs' Demonstrative Exhibit 14, introduced at trial, and prepared and testified to by plaintiffs' liability expert, Mr. Nunes, is displayed below. Plaintiffs' Demonstrative Exhibit 14 contains two separate lines. The top line of the graph, which was colored blue, depicts the average weighted maturity based on the stated years of maturity. The bottom line of the graph, which was colored red, displays the average weighted maturity for the 326-A-1 and 326-A-3 Funds, taking into account the call dates for the callable securities and is the line which the court looks to in this Opinion. Defendant did not contest plaintiffs' representation of the average weighted maturity of the 326-A Funds contained in plaintiffs' Demonstrative Exhibit 14.

---

[16] As with the 326-K Fund, the record before the court does not contain data regarding the average weighted maturity of the 326-A Funds accounting for the pre-payment of mortgage-backed securities.



<u>The Types of Securities in which the Government Invested the 326-A-1 and 326-A-3 Funds</u>

According to plaintiffs' expert liability and damages report by Rocky Hill Advisors, which relied on the TAD, beginning from August 1992, when the government began to invest the 326-A-1 Fund, until March 1993, the government invested the entire 326-A-1 Fund in jumbo CDs. Around March 1993, the government began to diversify its investment of the 326-A-1 Fund by decreasing its investment in jumbo CDs and increasing its investment in agency securities. Then, from 1995, when the 326-A-3 Fund was deposited into the United States Treasury, until 2011, the government invested both the 326-A-1 and 326-A-3 Funds primarily in agency securities with a small portion of the funds invested in overnight securities and Treasury securities. From 2012 until September 2013, the government invested the 326-A-1 and 326-A-3 Funds in a mix of agency securities, mortgage-backed securities, and overnight securities.

<u>The Distribution of the 326-K, 326-A-1 and 326-A-3 Funds</u>

In 1973, even before the ICC entered its judgment in Docket 326-K, the BIA was aware that the distribution of any potential judgment award to the plaintiffs would require advance planning. According to a February 15, 1973 internal memorandum, the BIA stated that:

> [A]lthough the Western Shoshone case as of October 11, 1972 has only reached the interlocutory stage, it is mandatory that planning begin now in terms of the identification of beneficiaries, the disposition of the funds and the dissemination of useful information to interested groups and individuals. We are aware that the award of $26,154,600, subject to allowable offsets, may be appealed by either or both parties, but we are in full agreement with the Agency and the Western Shoshone Claims Committee that early attention to this case is necessary if we hope to avoid the confusion and the very time consuming problems encountered with the rather similar Northern Paiute judgment.

Mr. Nunes, plaintiffs' liability expert, testified at the liability trial that the distribution of the Northern Paiute judgment, which was referenced by the BIA in its February 15, 1973 internal memorandum, had taken approximately sixteen years to execute.

Shortly following the deposit of the 326-K Fund into the United States Treasury, the BIA put together a research memorandum about the Western Shoshone. According to the research memorandum, dated March 11, 1980, there was a significant element of the Western Shoshone who, "[f]or many years," opposed any monetary award in the Western Shoshone Identifiable Group's case on Docket No. 326-K, which was litigated before the ICC regarding the Western Shoshone Identifiable Group's claim for title to aboriginal lands. This faction of Western Shoshone believed that their ancestral lands in Nevada never were ceded over to the government or taken by the government. They, therefore, believed that granting of the 326-K award "would deprive all Western Shoshone

of the land itself or at least jeopardize their claim to such land." The March 11, 1980 research memorandum also recognized that "[t]he Western Shoshone entities were and are extremely scattered," and that "[i]t is not possible to describe the Western Shoshone in terms of forming a tribe or group of organized tribes." Nonetheless, the March 11, 1980 memorandum identified the following entities as the Western Shoshone beneficiaries of the 326-K Fund located in Nevada:

1. Temoak Bands of Western Shoshone Indians (Elko, Battle Mountain, South Fork and. Wells)
2. Shoshone-Paiute Tribes of the Duck Valley Reservation
3. Duckwater Shoshone Tribe of the Duckwater Reservation
4. Yomba Shoshone Tribe of the Yomba Reservation
5. Ely Indian Colony
6. Reno-Sparks Indian Colony
7. Paiute-Shoshone Tribe of the Fallen Reservation and Colony
8. Fort McDermitt Pauite and Shoshone Tribes of the Fort McDermitt Indian Reservation
9. Walker River Pauite Tribe of the Walker River Reservation
10. Lovelock Paiute Tribe of the Lovelock Indian Colony

The March 11, 1980 memorandum also identified the following entities as the Western Shoshone beneficiaries of the 326-K Fund located in California:

1. Owens Valley Paiute-Shoshone Band of Indians (Bishop, Big Pine, Fort Independence and Lone Pine Reservations),
2. Death Valley Timbi-Sha Shoshone Band.

Despite the divisions of interests and different positions on their claims among the Western Shoshone, the BIA attempted to work with the Western Shoshone to submit a distribution plan to Congress for approval within the 180-day statutory timeline, as required under the Use and Distribution Act of 1973. For example, on February 23, 1980, representatives from the BIA and Western Shoshone individuals met in Elko, Nevada. At the meeting, the "Western Shoshone Planning Committee" was officially formed to elicit distribution proposals from the various tribal groups of the Western Shoshone. This committee consisted of "about 10 [individuals]" from various tribal groups with the possibility of an additional three individuals, two of whom would be from Californian Shoshone tribal groups.

The BIA's willingness to move forward with a distribution plan, however, was temporarily slowed down by the August 25, 1980 Order granting an injunction in United States v. Dann, Civil No. R-74-60, Order (D. Nev. Aug. 25, 1980) before the United States District Court for the District of Nevada. In United States v. Dann, the United States had sued Mary Dann and Carrie Dann, two sisters, who were members of an autonomous band of the Western Shoshone, for trespass, alleging that the sisters, in grazing livestock without a permit from the United States, were acting in violation of regulations issued by the Secretary of the Interior. The sisters denied that they were trespassing, affirmatively

asserted their beneficial ownership of the land, and argued that their aboriginal title to the land precluded the United States from requiring grazing permits. In United States v. Dann, Judge Thompson found that the December 6, 1979 judgment in the ICC Docket 326-K was the date that Western Shoshone's title to the Nevada land was extinguished, as opposed to July 1, 1872, the date to which both the Western Shoshone Identifiable Group and the government had stipulated was the takings date of the Western Shoshone Identifiable Group's land before the ICC in Docket 326-K. Judge Thompson also enjoined the Dann sisters from using the lands located in Nevada, which the sisters had alleged belonged to them, as a basis to allow their livestock to graze upon, without first complying with the requirements of the Taylor Grazing Act of 1934, Pub. L. 73-482. Steve Feraca, a Tribal Services Specialist for the BIA, wrote in a memorandum to the Chief of the Division of Tribal Government Services for the BIA, dated May 6, 1980:

> In view of the [April 1980 district court] Thompson decision which cites a new taking date, December 6, 1979, I said that I could not recommend that a proposal for the funds be prepared until legal advice was forthcoming from the Solicitor [of the Department of the Interior] and the Department of Justice.

On May 23, 1980, BIA reviewed the April 25, 1980 Order issued in Dann and decided to try to move forward with preparing a distribution plan. The BIA concluded that the April 25, 1980 Dann Order "in no way affects the mandate of the 1973 Indian Judgment Funds Act," and that "[w]e appreciate that it is possible to meet the statutory deadlines," for submitting a distribution plan.

On June 20, 1980, the then Department of the Interior, Acting Deputy Assistant Secretary for Indian Affairs, Ralph Reeser, made a formal request to the United States Senate Select Committee on Indian Affairs for a 90-day extension of the 180-day period to submit a distribution plan to Congress. According to Mr. Reeser's letter, "the 180-day period for the submittal of a Secretarial plan ended on June 16, 1980."

On July 26, 1980, the BIA held a public hearing for Western Shoshone members to discuss a potential distribution plan for the 326-K Fund. According to an August 1, 1980 article published in the Native Nevadan, 85 individuals testified or submitted written statements at the July 26, 1980 public hearing regarding the distribution plan for the 326-K Fund. According to the article, the majority of the individuals who testified were opposed to immediate distribution of the funds. The article stated:

> In Summary, the majority of people who testified wanted the award money to be placed in an interest-bearing account until such times as the title issue is legally resolved. Those who testified in favor of an immediate distribution favored a 100 percent per capita distribution, with the 1/4 degree eligibility requirement.

William Robert McConkie, the BIA official leading the July 26, 1980 public hearing wrote a memorandum for his files, dated August 3, 1980, regarding his experience at the

public hearing. According to Mr. McConkie, there appeared to be disagreement among those that testified regarding the distribution plan, but such disagreement was allegedly staged by three lawyers representing certain Western Shoshone groups. Mr. McConkie wrote:

> Eighty persons testified. The hearing was adjourned at 5:30 p.m. The three lawyers were quite disruptive during the proceedings. They each represented essentially the same group. The Planning Committee had no lawyer. It was the apparent purpose of the lawyers opposed to the distribution to prevent the hearing, or secondarily to control the hearing and have their people discuss the various Federal District Court suits which dealt with obtaining the land rather than the judgment from the Court of Claims. Mrs. Carrie Dan [sic] was escorted from the hall after about 6 or 7 minutes testimony by herself. She refused to limit her remarks and I directed a tribal policeman to escort her into the lobby.

On August 4, 1980, Congress denied BIA's requested 90-day extension to submit a distribution proposal for the 326-K Fund. Senator John Melcher, Chairman of the Select Committee on Indian Affairs, wrote to Ralph Reeser, Department of the Interior, Acting Deputy Assistant Secretary for Indian Affairs, on August 4, 1980, noting that "[a]s a general rule, such extensions are routinely granted upon Departmental request. However, there are several factors which weigh against granting the extension in this case," including that "a significant number of Western Shoshone people oppose acceptance of the award at this time," and that,

> [t]here is pending litigation in the case of U.S. v. Dann in the U.S. District Court for the district of Nevada in which title to certain land and the date of compensable taking are still in issue. The outcome of that case could clearly have a strong bearing on the course of action the Congress, the Department and the Western Shoshone people might wish to pursue.

(underline in original). Mr. Melcher concluded by noting that "I trust the Department will submit appropriate legislation early in the 97th Congress."

Following Congress's denial of the BIA's request for a 90-day extension on August 4, 1980, the BIA worked with the Western Shoshone to get a draft distribution plan ready to submit to Congress. Although the BIA continued to work with the Western Shoshone, the BIA was aware that actually submitting a plan to distribute the 326-K Fund to Congress would likely have to await the outcome of the Dann sisters' appeal of the August 25, 1980 District Court Order in United States v. Dann, in which Judge Thompson established a takings date of the Western Shoshone's Nevada land as December 7, 1979. See United States v. Dann, Civil No. R-74-60, Order.

On December 30, 1980, Jay Suager, the Acting Director of the Office of Indian Services at the BIA wrote to Senator Alan Cranston of California, stating:

[A] significant faction among the Western Shoshone people rejects the award and is seeking title to the land. In particular, this faction is supporting the continuance of litigation in <u>United States v. Dann</u> which pertains to Western Shoshone land title issues. Probably, all interested parties will have to await the outcome of the appeal in the <u>Dann</u> litigation.

The Secretary of the Interior, pursuant to direction of the Act of October 19, 1973, 87 Stat. 466, undertook, through the Commissioner of Indian Affairs, to prepare a plan for the distribution of the judgment funds within 180 days of the appropriation of those funds. Such plan was not completed. A request for a 90-day extension . . . was denied by the Senate Select Committee on Indian Affairs. Accordingly, under the 1973 Act authorizing legislation will be necessary before there may be any distribution of the judgment funds. That should present sufficient opportunity to address questions which may be raised by <u>United States v. Dann</u>.

As of August 20, 1981, approximately one year after Congress denied the BIA's 90-day extension, an internal government memorandum sent from Kenneth Payton, the BIA Acting Deputy Assistant Secretary for Indian Affairs, to the BIA Phoenix Area Director, stated:

Primarily due to the status of the <u>Dann</u> litigation, in which some Western Shoshone people assert title to a vast portion of Nevada, the Senate Select Committee on Indian Affairs denied an extension of the date for the submittal of a Secretarial plan. The case is on appeal. If the plaintiffs' assertions are denied, we will then propose legislation. The existence of the <u>Dann</u> litigation, however, does not inhibit further discussion with the eligible Western Shoshone entities on the programing potential of these funds. On the contrary, such possibilities can be thoroughly examined and proposals developed during this time. This subject was considered at previous general Western Shoshone meetings and with the individual tribes prior to the Hearing of Record of July 26, 1980.

On January 22, 1982, in an internal BIA memorandum sent from the BIA Deputy Assistant Secretary for Indian Affairs to the BIA Phoenix Area Director, the BIA Deputy Assistant Secretary stated that, "we should now begin working with the beneficiaries on the development of the legislation which will be required in this instance." The BIA Deputy Assistant Secretary also stated in the January 22, 1982 memorandum:

To be kept in mind during this process is the fact that the actual introduction of legislation may not be possible until the <u>Dann</u> litigation is completed. However, this should not preclude beginning the process of working with the tribes to clarify their desires with respect to programming and to initiate appropriate planning with them providing such technical assistance as requested and as resources permit.

The January 22, 1982 memorandum also amended the results of the BIA's research report, dated March 11, 1980, which had originally listed twelve beneficiary groups for the 326-K Fund, reducing the number of beneficiaries of 326-K Fund to the following four groups:

1. Te-Moak Bands of Western Shoshone Indians (which includes the Elko, Battle Mountain, South Fork and Wells bands),
2. Duckwater Shoshone Tribe of the Duckwater Reservation,
3. Yomba Shoshone Tribe of the Yomba Reservation,
4. Ely Indian Colony.

The January 22, 1982 memorandum also stated that the "remaining beneficiaries consist of all other persons of Western Shoshone ancestry, in their individual capacity, who otherwise meet the criteria detailed in the March 11, 1980, Results of Research Report."

On May 11, 1982, the BIA Phoenix Area Director held a meeting with leaders of the Te-Moak Bands, Duckwater, Yomba, and Ely Indian Colony, the four identified beneficiary groups of the 326-K Fund. Following the May 11, 1982 meeting, Thomas Luebben, an attorney representing the Western Shoshone Identifiable Group, wrote to the BIA Phoenix Area Office on May 25, 1982 "to confirm the understandings" reached between the Phoenix Area Office and the Western Shoshone Tribal leaders, which included, in relevant part, the leaders' request for "[a] commitment from the BIA to not begin compiling a descendancy roll in anticipation of distribution of the Western Shoshone judgment." Mr. Luebben's May 25, 1982 letter also requested from the BIA:

A commitment from the BIA that the Interior Department will not attempt to draft legislation to distribute the Western Shoshone judgment prior to an actual written agreement between representatives of the United States and a Western Shoshone negotiating team (including primarily representatives of Western Shoshone tribal governments) on an appropriate draft of proposed legislation to achieve an overall settlement of Western Shoshone land claims and provide for distribution of the judgment funds.

On June 8, 1982, the BIA Phoenix Area Director responded to Mr. Luebben's May 25, 1982 letter in writing, stating that with regard to the descendancy roll request, "[s]ince we cannot develop any kind of roll for distribution purposes without an approved plan, we have no problem agreeing to this." With regard to the draft legislation request, the BIA Phoenix Area Director responded:

As far as draft legislation for the distribution of the Western Shoshone judgment, we can decide our course of action within the Area, however, we cannot make a commitment for the Central Office or the Department. We expect any legislation developed would have the direct input of the affected Tribes and individuals that have an interest in the award.

On May 19, 1983, the United States Court of Appeals for the Ninth Circuit reversed the August 25, 1980 District Court Order in United States v. Dann and remanded the case back to the District Court for further proceedings regarding "factual issues of whether aboriginal title had been preserved to the date of trial and whether the Danns are entitled to share in it." United States v. Dann, 706 F.2d 919, 923 (9th Cir. 1983) ("We reverse the judgment granting the injunction and remand for further proceedings."), rev'd, 470 U.S. 39 (1985).

According to a July 28, 1983 internal BIA memorandum, "[s]ince the recent Federal court decision regarding the Dann case is now widely known, the various entities that have an interest in the Western Shoshone Land Claim have been actively pursuing their individual interests." The memorandum further stated:

> The entities we [the BIA] are aware of are: 1. Te-moak Tribe of Western Shoshone Indians. This groups appears to have a split as to what they want. . . . 2. Western Shoshone Sacred Lands Association. . . . Their main contention is that by the Treaty of Ruby Valley, [17] they never lost land title to their aboriginal lands. The Dann decision [by the Ninth Circuit] appears to support that premise. . . . 3. Tribal Chairmen Association. . . . I believe they support land plus money concept. 4. Great Basin Western Shoshone Descendants. . . . Their main interest is a per capita distribution and have not really been supportive of the additional land issue. . . . 5. Western Shoshone Land Federation. This is the newest entity to come upon the scene, and purportedly represent all of the above entities as a unified Shoshone group. Since I am not totally aware of what has been negotiated out among themselves with all of the already described interests, I am surmising that this group supports the per capita distribution, land return and tribal program concepts. It is my understanding that it will be through this group that negotiations with Federal officials to develop a comprehensive legislative package relative to the Western Shoshone Land Claim will be conducted.

---

[17] On October 1, 1863, the United States entered into the Ruby Valley Treaty with the "Western Bands of the Shoshone Nation of Indians," which, according to the treaty, was a "Treaty of Peace and Friendship" between the United States and the western bands of Shoshone Indians. The Ruby Valley Treaty authorized non-Indians to cross the Shoshone land located in Nevada on several already established traveled routes, such as train, mail, and telegraph lines, without "molestation or injury" from the western bands of Shoshone Indians. It also granted the United States the right to establish military posts in Shoshone lands, and that such lands "may be explored and prospected for gold and silver, or other minerals." In exchange for the western bands of Shoshone Indians' "inconvenience" resulting from the use of the travel routes in their land by "white men," the United States agreed to compensate the western bands of the Shoshone Indians $5,000.00 per year for twenty years, a total of $100,000.00.

Additionally, following the Ninth Circuit's 1983 decision in United States v. Dann, the BIA notified Congress that it could not submit proposed legislation at that time. The Director of the Office of Indian Services at the BIA wrote to Congresswoman Barbara Vucanovich, who was one of Nevada's Congressional representatives at the time, noting:

> For some time we and the Congress have been awaiting a Court of Appeals decision in the Dann case, Carrie and Mary Dann having contended that the Western Shoshone still retain aboriginal title to the Nevada portion of the lands claimed. On May 19, 1983, the Court ruled that no evidence had been presented by the Government establishing that aboriginal title had been lost. We do not know whether this decision will be appealed to the Supreme Court.[18] Meanwhile, the Western Shoshone people are scheduling a series of general meetings in an effort to develop a proposal that would incorporate the distribution of the funds and the utilization of the subject lands. The situation has become, as a result of the decision, extremely confused and under the circumstances we are most reluctant to submit proposed legislation for only the monetary award.

---

[18] The Dann case was appealed to the United States Supreme Court in 1985, which found that the Western Shoshone peoples' tribal title to their aboriginal land passed to the government when the 326-K Fund was awarded to the Western Shoshones in the ICC case, Docket No. 326-K, and placed into the United States Treasury in December 1979. See United States v. Dann, 470 U.S. 39, 49-50 (1985). The Dann case returned to lower courts for further proceedings regarding whether the Dann sisters had individual aboriginal rights, as opposed to tribal rights, in the Nevada lands at issue. See id. at 50. The Dann case was appealed once more to the United States Court of Appeals for the Ninth Circuit in 1989, which ruled that the Dann sisters had limited individual title rights, "restricted" to the land that they or their lineal ancestors actually occupied prior to November 26, 1934, the date that the federal government withdrew the Nevada lands in question from entry and settlement by the public. See United States v. Dann, 873 F.2d 1189, 1199, 1200-01 (9th Cir. 1989). Following the 1989 Ninth Circuit appeal, the Dann sisters pursued their land claim in the late 1990s before the Organization of American States' Inter-American Commission on Human Rights, an international tribunal, which found, on December 27, 2002, in favor of the Dann sisters' claim for title to their Nevada lands, and made the "RECOMMENDATION[]" that the sisters be "[p]rovide[d]" with "an effective remedy, which includes adopting the legislative or other measures necessary to ensure respect for the Danns' right to property." See Mary Dann and Carrie Dann v. United States, Case 11.140, Inter-Am. Comm'n H.R., Report No. 75/02, 47 (2002) (capitalization in original). The United States government, however, did not adopt the Inter-American Commission on Human Right's December 27, 2002 recommendation. On July 7, 2004, Congress passed the Claims Distribution Act of 2004, which provided for a monetary per-capita distribution of the 326-K Fund to qualifying Western Shoshone members, but did not provide the Dann sisters or any other Western Shoshone members with title to their ancestral lands.

Undoubtedly, considerable time will have elapsed before the Western Shoshone people, the Secretary of the Interior and the Congress are able to reach agreement in this complex matter.

Also, on December 15, 1983, the Assistant Secretary for Indian Affairs at the BIA wrote Senator Mark Andrews, the Chairman of the United States Senate Select Committee on Indian Affairs, noting that it was "premature and not in the best interest of either the tribes or the government" to introduce proposed legislation. The Assistant Secretary for Indian Affairs at the Department of the Interior also noted:

Presently, groups of Western Shoshone have been discussing proposed legislation to secure both the monetary settlement and a portion of the lands in Nevada. A particularly difficult problem exists with respect to any land restoration approach due to the virtual absence of a successor tribe or tribes representative of all the recommended beneficiaries. Consequently, meaningful planning has not yet occurred.

In November of 1984, the BIA began negotiations with the "Western Shoshone National Council," regarding potential distribution legislation for the 326-K Fund. The Western Shoshone National Council was comprised of various Western Shoshone tribal governments and political organizations and was designated by the Western Shoshone as the entity to represent the Western Shoshone in negotiations with the United States.

On May 20, 1985, the BIA received the Western Shoshone National Council's "PROPOSAL TO COMPLETE DATA GATHERING," (Proposal) in which the Western Shoshone National Council stated that they would need the next three years to prepare for their negotiations with the BIA. (capitalization in original). The Proposal detailed the various steps the Western Shoshone National Council would have to complete before entering into negotiations. The steps included:

[E]stablish a data base for their land and land use; organize for negotiations, determine general land control assignments, and determine general policy for joint areas; develop preliminary policy for land use and preliminary land development plans; and, enter into and complete negotiations with the Federal government and define terms that can be incorporated into a legislated agreement.

According to the "Work Schedule" included in the Proposal, the Western Shoshone National Council stated that certain "Work Products," such as "Historical Analysis," "Demographic Description of Population," "Resources Inventory," and "Land Interests," would be completed between one to three years, and that these work products would be "needed for negotiations and development of agreement terms." (capitalization in original).

According to the BIA, by mid-1986, whatever negotiations had taken place between the government and the Western Shoshone National Council came to a virtual

standstill. On June 30, 1986, the BIA sent the Western Shoshone National Council a letter, stating that, "[a]fter over two years of negotiations, I am truly sorry that our respective positions remain so far apart. . . . [T]he Department does not recognize any valid legal claim to Western Shoshone tribal ancestral lands," and "the Department believes further negotiations at this time would be futile." As of July 27, 1986, as evidenced by a memorandum from the Assistant Secretary for Indian Affairs to the Phoenix Area Office, negotiations between the government and the Western Shoshone National Council were "not proceeding," and the government "consider[ed] the negotiations to have been suspended indefinitely."

In light of the standstill in negotiations, on October 28, 1986, Senator Paul Laxalt, Senator Chic Hecht, Congresswoman Vucanovich, and then Congressman Harry Reid, of the Nevada Congressional delegation, wrote to the Secretary of Interior and noted that, "[i]f the Shoshones do have a viable claim to private lands (approximately two million acres), the Nevada Congressional delegation is concerned that the Shoshone land rights question be resolved as quickly as possible without disruption of private titles." The Nevada Congressional delegation recognized that organizing a distribution for the 326-K Fund had been complicated, stating that,

> [t]he extent of continuing Western Shoshone land rights has been a frustrating problem for the Western Shoshone Indians, private parties, and governmental agencies for many years now. Although four negotiating sessions between Western Shoshone National Council delegates and the Department of the Interior have taken place over the last year, little progress has been made toward a comprehensive solution.

The Nevada Congressional delegation's October 28, 1986 communication also noted that,

> the United States Claims Court and the Senate Select Committee on Indian Affairs agree that a comprehensive legislative solution will be necessary. The present situation only promises to get worse. Once again, we urge the Department to meet with the Western Shoshone National Council to find a common basis for moving forward. While we realize that financial demands upon the Department are heavy, we urge you to consider resolution of the Shoshone controversy a priority, and to assist the Shoshones with necessary funding.

As of mid-1987, Congress did not believe a final resolution to the Western Shoshone judgment claim was "immediate." According to a May 29, 1987 letter from Senator Daniel Inouye, Chairman of the United States Senate Select Committee on Indian Affairs to Senator Hecht and Senator Reid, it appears that the Western Shoshone National Council requested a Congressional hearing to discuss the Western Shoshone judgment claims. Senator Inouye stated in his letter that "I do not believe that a hearing will lead to any immediate solution to this problem," but, that such a hearing could at least establish "a basis for a fair resolution of this matter."

There also was disagreement within the government as to how to proceed with negotiations with the Western Shoshone National Council. The Chairman and Vice-Chairman of the United States Senate Select Indian Committee on Indian Affairs believed that future negotiations were dependent on the Western Shoshone National Council receiving sufficient funding for their requested "study to develop an inventory of the aboriginal lands and other natural resources which were the subject of the 1863 Treaty of Ruby Valley and the judgment of the Indian Claims Commission in Docket No. 326-K." According to a July 28, 1987 letter from the Chairman and Vice-Chairman of the United States Senate Select Indian Committee on Indian Affairs to the Assistant Secretary of Indian Affairs with the Bureau of Indian Affairs at the Department of the Interior, "[t]he project that the Western Shoshone National Council now proposes would appear to be essential in order to establish a frame-work for future negotiations," and "we strongly urge that the Bureau of Indian Affairs join with ANA [Administration for Native Americans] to assure sufficient funds are made available to complete this project in a timely fashion." The Assistant Secretary of Indian Affairs with the Bureau of Indian Affairs, however, disagreed with the Chairman and Vice-Chairman, and responded to the letter on August 12, 1987, stating:

> [T]he Western Shoshone have been compensated in the 'usual practice' for the loss of their aboriginal title and there is no further legal claim against the United States. Consequently, we do not perceive a need to survey their entire historical use area as that matter was addressed at length in the [Indian Claims] Commission and Court of Claims proceedings.

(brackets added).

As of August 1988, negotiations with the Western Shoshone National Council were still suspended, with no known date for re-opening negotiations. According to an August 3, 1988 BIA Phoenix Area briefing paper prepared for the Secretary of Interior, "negotiations have been suspended indefinitely" and "subsequent communication had not changed the situation."

Despite the lack of negotiations between the government and the Western Shoshone National Council, on September 28, 1989, Congresswoman Vucanovich proposed H.R. 3384, a distribution plan of the 326-K Fund. The Western Shoshone tribal governments strongly objected to the introduction of the bill. The Te-Moak Tribe of Western Shoshone Indians were "extremely angry" that H.R. 3384 was introduced without "consultation with the Western Shoshone National Council and without the approval of any of the nine Western Shoshone tribal governments." H.R. 3384 also was opposed by the staff at the Department of the Interior. According to an October 13, 1989 document from the BIA Acting Phoenix Area Director to the Assistant Secretary of the Interior commenting on H.R. 3384, "we [Phoenix Area Office] strongly recommend the proposal be opposed by the Department." According to the April 26, 1990 statement of Walter R. Mills, Deputy to the Assistant Secretary for Indian Affairs with the Bureau of Indian Affairs at the Department of the Interior, before the United States House of Representatives'

Congressional Committee on Interior and Insular Affairs, Mr. Mills indicated, on behalf of the Department of the Interior, "[w]e strongly oppose enactment of H.R. 3384" for several reasons. For example, according to Mr. Mills, "[t]he timeframes cited in the bill for publication of regulations, the time allotted for applications to enroll, and the time cited for the preparation of the Final Judgment Roll, are unrealistically short." According to H.R. 3384, as introduced, the Secretary of Interior had one hundred and twenty days from the enactment of the Act to complete a proposed judgment roll, sixty days from the disposition of appeals from individuals denied inclusion on the judgment roll to publish the final judgment roll, and sixty days from publication of the final roll to distribute the 326-K Fund on a per capita basis. The bill was not passed.

Thereafter, the Department of the Interior sent a letter, dated November 14, 1990, to the Western Shoshone National Council, stating:

> Our understanding is that the Nevada Congressional delegation and the Senate Select Committee are willing to act on the distribution of the funds in Docket 326-K and develop a settlement of outstanding land issues as they relate to Western Shoshone lands. Neither the Department of the Interior nor the Bureau of Indian Affairs have any immediate solutions to these exceedingly complex issues. However, when a new Congress convenes in January we certainly will be available to work with the Congress in developing a resolution of these issues.

(capitalization in original).

On November 22, 1991, Congresswoman Vucanovich introduced a second bill, H.R. 3897, to distribute the 326-K Fund. Denis Homer, the acting BIA director of Tribal Services testified before Congress on behalf of the Department of the Interior, and stated that the Department had concerns about the "tight timeframes specified in the legislation [H.R. 3897] in which the Secretary is to fulfill certain administrative responsibilities," similar to the concerns the Department of the Interior had with H.R. 3384. Mr. Homer stated that "[s]ome of these timeframes would be impossible to meet." Mr. Homer explained:

> While the process of updating the tribal rolls may be completed in a relatively short period of time, the overall technical process of bringing the supplemental rolls into final form could take far longer than the timeframes allotted in the bill. If the supplemental roll is considered a lineal descendancy roll, regulations necessary for its implementation will require considerable time to formulate, approve, and publish. The 90-day timeframe in section 5 to develop regulations to implement the provisions of the legislation and the 11-month period to publish the final judgment roll provided in section 2(c) do not provide adequate time to prepare a lineal descendancy roll in light of Administrative Procedures Act requirements.

In 1992, H.R. 3897 was not voted out of committee. According to a June 19, 1992 letter from Congressman George Miller, Chairman of the United States House of Representatives Committee on Interior and Insular Affairs, to Congresswoman Vucanovich regarding H.R. 3897,

> [i]n reviewing the record, there still appears to be a wide diversity of opinions and suggested approaches regarding the distribution of the Docket Funds[19] and resolution of other issues.

> While I believe we are closer to a resolution of this issue than we were in the 101st Congress, the Committee will not consider the measure until there is more of a consensus among the tribal governments.

(capitalization in original).

By mid-1992, the government was attempting to re-open negotiations with the Western Shoshone. According to a July 27, 1992 letter from the Department of the Interior to the Chairman of the United States Senate Select Committee on Indian Affairs, the Department of the Interior was contacting individuals to participate in an interagency negotiating team to assist the Chairman "in the development of a legislative solution to the claims of the Western Shoshone tribal governments against the United States." According to a June 22, 1992 letter from the Chairman of the United States Senate Select Committee on Indian Affairs to the Department of the Interior, "[i]t appears that there is a consensus growing among leaders of Shoshone tribal governments and other interested parties toward a comprehensive solution to the Western Shoshone claims." By June of 1993, the government was still working towards opening negotiations with the Western Shoshone. According to a June 6, 1993 letter from Secretary of the Interior, Bill Babbitt, to Senator Inouye, "we will be contacting representatives of the Western Shoshone Bands for preliminary discussions in the near future."

Also, during this time, certain governmental actors were not in favor of a 100% per capita distribution of the funds, as was proposed in prior bills which had not been passed by Congress. According to a January 7, 1994 letter from Congressman William Richardson, Chairman of the United States House of Representatives Subcommittee of Native American Affairs, which was part of the United States House of Representatives Committee on Natural Resources, to Secretary of the Interior Babbitt, "[t]he Subcommittee on Native American Affairs generally would frown on any plan that does not include provisions for tribal economic development and long range economic planning." Further, Congressman Richardson stated that, "I feel it is of paramount

---

[19] The 326-A-1 Fund were deposited into the United States Treasury for investment by the government on March 25, 1992. At the time that Congressman Miller wrote the June 19, 1992 letter, the Department of Interior was holding in trust the 326-K Fund and the 326-A-1 Fund. The 326-A-3 Fund, the third and last of the tribal trust funds at issue in this case, was not deposited into the United States Treasury to be held in trust by the Department of Interior until September 15, 1995.

importance that the docket funds of the Western Shoshone should not merely be divided up on a per capita basis and distributed." He also stated that "[i]n hearings before this Committee, Members have commented that the Western Shoshone should be provided with some land base." (capitalization in original). On September 15, 1995, the 326-A-3 Funds, the last of plaintiffs' three tribal trust funds, were deposited into the United States Treasury for investment by the government.

In early 1997, consensus among the Te-Moak Bands of Western Shoshone Indians, one of the four Western Shoshone tribes recognized by the BIA as a beneficiary of the 326-K Fund in the BIA's January 22, 1982 amended research report, began to emerge. The Te-Moak Bands of Western Shoshone Indians was comprised of the Elko, Battle Mountain, South Fork, and Wells bands. The other three Western Shoshone tribes recognized by the BIA as beneficiaries of the 326-K Fund in the January 22, 1982 amended research report were the Duckwater Shoshone Tribe, the Yomba Shoshone Tribe, and the Ely Indian Colony. According to a March 3, 1997 internal BIA memorandum, the Te-Moak Tribal Council, the governing group for the Te-Moak Bands of Western Shoshone Indians, was planning to "pursue 100% distribution to 1/4 degree of Docket 326-K." The March 3, 1997 BIA memorandum also noted that the Te-Moak Tribal Council would pursue "a separate or companion proposal to seek restoration of land in Western Shoshone country," and that both proposals, "could run concurrently and not necessarily have to be tied together." The March 3, 1997 BIA memorandum also discussed a March 1, 1997 meeting between the BIA and two hundred members of Western Shoshone tribes. According to the March 3, 1997 BIA memorandum, after the March 1, 1997 meeting was over, "several people came up to tell us [the BIA] that they support the proposed Te-Moak plan but did not want to stand up in front of the audience and express themselves."

Also, according to a March 7, 1997 internal BIA memorandum from the Superintendent of the Eastern Nevada Agency to the Phoenix Area Director, other Western Shoshone tribes, apart from the Te-Moak Bands of Western Shoshone Indians, would potentially be introducing to the BIA their own version of a potential distribution plan for the 326-K Fund. According to the March 7, 1997 internal BIA memorandum:

> The Te-Moak Tribe will be sending a copy of their plan to the other three tribes named in the results of research. The purpose is to try and get the four proposed plans submitted about the same time so resolution could be achieved quickly. Duckwater has already presented their plan to the federal negotiating team. Ely will be supporting the Te-Moak Plan. We do not know what Yomba will do, rumors are they will parallel the Duckwater plan.

(capitalization in original). Despite the Te-Moak Tribal Council's emerging consensus in favor of a distribution plan for the 326-K Fund, the BIA was not optimistic that distribution plan legislation would be passed by Congress for the 326-K Fund in the near-term. On May 15, 1998, Donna Peterson, BIA Branch Chief of the Tribal Government Services sent a memorandum to the BIA Phoenix Area Director, stating that the BIA did "not anticipate a final distribution plan being presented to Congress by the end of this year." Ms. Peterson

also noted that, "we do anticipate the development of a payment roll will be a tremendous and expensive task once the distribution plan is approved. Both the Eastern and Western Nevada Agencies have been very cognizant of this fact and are working along with the tribes in maintaining current tribal rolls." (capitalization in original).

Beginning in 1998, support from various Western Shoshone tribes in favor of a monetary distribution of the 326-K Fund and the setting aside of the 326-A-1 and 326-A-3 Funds as educational trust funds began to increase. In 1998, the BIA attended two public hearings held by the Western Shoshone Steering Committee, a "group of individual Western Shoshones that have organized to try and prepare a distribution plan," for a vote of approval a draft distribution proposal, in which the 326-K Fund would be fully distributed on a 100% per capita basis and the 326-A-1 and 326-A-3 Funds would be placed into a permanent education trust fund. The vote at the two meetings was that 1230 Western Shoshones were in favor of the draft proposal, while 53 were against the proposal.

On December 1, 1998, the BIA Phoenix Area Director wrote to the Deputy Commissioner for Indian Affairs at the BIA, noting that "an overwhelming majority of adult Western Shoshones favor distribution." In addition, according to a 1999 letter from Elko Band representatives to Bruce Babbitt, the Secretary of Interior at that time, the Elko Band representatives, co-chairmen of the Western Shoshone Claims Steering Committee, the committee that voted in favor of a distribution plan at two public hearings in 1998, noted that "at this point we feel it is both reasonable and prudent to move forward," and "we would be most appreciative of the Department of Interior's assistance in promoting the 'Western Shoshone Claims Distribution Act'[20] as the 'Act' enters and progresses through the congressional process." The Elko Band representatives further stated that they are the "largest number (approx. 1500) of Western Shoshone enrollees," and, therefore, wrote to the Secretary "on behalf of the **'majority'** of Western Shoshone people." (emphasis in original). Also, between February and March of 1999, the Fallon Paiute Shoshone Tribe, "the second largest band of Shoshones in the state of Nevada," numbering approximately 601 eligible Western Shoshone beneficiaries of the 326-K docket, the Elko Band Council, the "largest Band of Western Shoshone in the State of Nevada," and the Western Shoshone of the Duck Valley Reservation, numbering "approximately 400 direct descendants of eligible Western Shoshone who are possible beneficiaries of Docket 326-K," each passed resolutions in favor of Congress passing the Western Shoshone Claims Distribution Act.

By June 7, 1999, the BIA was drafting proposed legislation as requested by various groups of Western Shoshone. According to a June 7, 1999 email from Daisy West, a BIA Tribal Relations Officer, to Pat Gerard, whose specific employment position is not identified in the email, but who appears to be another BIA employee, Ms. West was

---

[20] The "Western Shoshone Claims Distribution Act," was the act that the Western Shoshones voted in favor of during the two public hearings in 1998 and which proposed to distribute the 326-K Fund on a 100% per capita basis to individuals of ¼ Western Shoshone blood.

"working on the draft legislation for the Western Shoshone Judgment Funds" and requested from Pat Gerard the "current balances" of plaintiffs' three tribal trust funds.

During the early 2000s, Senator Reid, Senator John Ensign, and Congressman James Gibbons, members of the Nevada Congressional delegation, introduced legislation for the distribution of plaintiffs' three tribal trust funds. On May 9, 2000, the Assistant Secretary of Indian Affairs with the Bureau of Indian Affairs at the Department of the Interior submitted proposed draft legislation to "'authorize the Use and Distribution of the Western Shoshone Judgment Funds in Docket Nos. 326-K, 326-A-1 and 326-A-3'" to the Speaker of the House. (capitalization in original). The Assistant Secretary stated in the letter to the Speaker of the House:

> Although the governing bodies of three of the four successor tribes, due to the dynamics of tribal politics, have changed their position, or been silent until recently concerning the legislative proposal for the use of these funds, the individual Western Shoshone have been anxious for quite some time to have these funds distributed.

The Assistant Secretary of Indian Affairs with the Bureau of Indian Affairs at the Department of the Interior also stated:

> We are confident that the Western Shoshone want these funds distributed as quickly as possible. We also believe that the best interests of the Western Shoshone will not be served by providing additional time for successor tribes to reach a consensus on the division and distribution of the land claims funds in Docket 326-K.

On June 27, 2000, Senator Reid introduced S. 2795, Western Shoshone Claims Distribution Act, which, however, did not pass during the 106th Congress. On September 6, 2001, Congressman Gibbons introduced H.R. 2851, Western Shoshone Claims Distribution Act in the United States House of Representatives Committee on Natural Resources, which, however, also did not pass. On November 14, 2002, Senator Reid tried again and introduced S. 958, Western Shoshone Claims Distribution Act, which was passed by the United States Senate, but later died before the United States House of Representatives Committee on Natural Resources.

On April 29, 2003, the BIA Office of Trust Funds Management met to discuss the investment performance of plaintiffs' three tribal trust funds at issue in the above-captioned case. The meeting was memorialized in a one-page document, dated April 29, 2003, which stated, in part, "[a]s the securities mature, reinvest the principal and interest not to exceed two year [sic]. The tribes at some point in the future may settle and distribute the funds." The above document also stated under the "Comments" section:

> The four successor Western Shoshone Tribes eligible to share in this award include Te-Moak, Ely, Duckwater, and Yomba. Also tribes with a significant number of tribal members of Western Shoshone descent eligible to share

in the distribution are Duck Valley, Fallon and Fort McDermitt. The proposed use of Docket 326-K is 100% per capita distribution, however, at least one of the successor tribes still opposes acceptance of the award for land sale. The proposed use of Dockets 326-A-1 and 326-A-3 are principal restriction [sic] of the award, with income to be used for educational grants and other forms of educational assistance to tribal members and descendants.

In 2003, Congressman Gibbons of Nevada introduced H.R. 884 in the United States House of Representatives. Also, in 2003, Senator Reid and Senator Ensign of Nevada introduced S. 618 in the United States Senate. Congress passed both H.R. 884 and S. 618, which were almost identical bills, were reconciled, and became law on July 7, 2004, when President George W. Bush signed the Claims Distribution Act of 2004. According to the Claims Distribution Act of 2004, the 326-K Fund was to be paid out on a 100% per capita distribution, whereas the 326-A-1 and 326-A-3 Funds were to be used as education trust funds, from which individuals selected by the Western Shoshone Educational Committee would receive educational grants. The principals of the 326-A-1 and 326-A-3 Funds were to be held in perpetual trust and the interest of those funds would be distributed to selected individuals meeting certain eligibility criteria.

On May 19, 2005, the BIA published a proposed rule regarding the process for individuals to enroll in the judgment roll, as required under the Claims Distribution Act of 2004. See Preparation of Rolls of Indians, 72 Fed. Reg. 9,836 (Mar. 5, 2007) (to be codified at 25 C.F.R. pt. 61). The comment period for the proposed rule was open for 162 days, from May 19, 2005 to October 28, 2005. Id. Copies of the proposed rule were mailed to approximately 2,300 individuals and the BIA held two public meetings for the purpose of discussing the proposal. Id. The first meeting was held on August 20, 2005 in Elko, Nevada, which approximately 500 individuals attended. Id. The second meeting was held one week later, on August 27, 2005, in Reno, Nevada, which approximately 600 individuals attended. Id. The BIA also received written comments from 36 individuals regarding the proposed rule. Id.

On October 25, 2005, the Office of Trust Funds Management at the BIA met again to discuss the 326-K, 326-A-1, and 326-A-3 Funds, and documented the meeting, noting, "JA.9087.691 Funds [326-A Funds] are invested in short, intermediate and long securities. JA.9334.697 Receipt of award: as the securities mature, reinvest the principal and interest not to exceed 2008 [i.e., not to exceed a maturity of three years]. Settlement of docket 326-K is in the horizon." (capitalization in original).

On February 12, 2007, approximately two and a half years after the enactment of the Claims Distribution Act of 2004, Daisy West, BIA Chief, Division of Tribal Government Services, wrote an email to Robert Craff, BIA Regional Trust Administrator within the Western and Navajo Office of the Special Trustee for American Indians, and one of defendant's fact witness at trial, stating:

The final enrollment regulations are with Mike Olsen for his signature. Once the regulations are signed they will be published in the Federal Register and

become effective 30 days after the date of publication. The first distribution of funds will be in approximately 2 to 3 years when the application period closes. At that time we will make a partial per capita to approximately 2,500 individuals. . . . The balance of Docket 326-K funds will be distributed in 6 to 10 years.

On March 5, 2007, a little less than three years after the Claims Distribution Act of 2004 was enacted, the BIA published the final rule that established the process for enrolling in the judgment roll. The final rule establishing the judgment roll enrollment process was codified at 25 C.F.R. § 61.4(k) (2007). See Preparation of Rolls of Indians, 72 Fed. Reg. 9,836 (Mar. 5, 2007) (to be codified at 25 C.F.R. pt. 61).

According to 25 C.F.R. § 61.4(k),

(1) Under section 3(b)(1) of the Act of July 7, 2004, Pub. L. 108–270, 118 Stat. 805, the Secretary will prepare a roll of all individuals who meet the eligibility criteria established under the Act and who file timely applications prior to a date that will be established by a notice published in the Federal Register. The roll will be used as the basis for distributing the judgment funds awarded by the Indian Claims Commission to the Western Shoshone Identifiable Group of Indians in Docket No. 326–K. To be eligible a person must:

> (i) Have at least ¼ degree of Western Shoshone blood;
> (ii) Be living on July 7, 2004;
> (iii) Be a citizen of the United States; and
> (iv) Not be certified by the Secretary to be eligible to receive a per capita payment from any other judgment fund based on an aboriginal land claim awarded by the Indian Claims Commission, the United States Claims Court, or the United States Court of Federal Claims, that was appropriated on or before July 7, 2004.

(2) Indian census rolls prepared by the Agents or Superintendents at Carson or Western Shoshone Agencies between the years of 1885 and 1940, and other documents acceptable to the Secretary will be used in establishing proof of eligibility of an individual to:

> (i) Be listed on the judgment roll; and
> (ii) Receive a per capita payment under the Western Shoshone Claims Distribution Act.

(3) Application forms for enrollment must be mailed to Tribal Government Services, BIA–Western Shoshone, Post Office Box 3838, Phoenix, Arizona 85030–3838.

(4) The application period will remain open until further notice.

25 C.F.R. § 61.4(k). An individual who was denied eligibility for enrollment in the judgment roll could appeal the decision pursuant to the administrative appeal process set forth in 25 C.F.R. § 62. See 25 C.F.R. § 62.4 (2007) ("A person who is the subject of an adverse enrollment action may file or have filed on his/her behalf an appeal.").

On April 5, 2007, the BIA began to send applications to individuals to enroll in the judgment roll. By October 5, 2007, ninety days after the BIA began to send out applications, the BIA had received 5,265 applications. Approximately two years later, according to the BIA's September 30, 2009 progress report, BIA had received 2,819 more applications, for a total of 8,084 applications received as of September 2009. The progress report also stated that as of September 2009, 341 applications were reviewed and determined to be ineligible. The BIA also stated in that same update that "[t]he final deadline [for receiving applications] will be published in the Federal Register."

On October 19, 2009, the BIA was in the process of establishing the Educational Committee pursuant to section 4(a) of the Claims Distribution Act of 2004. The Educational Committee was the group of Western Shoshone tribal leaders who would select the winning individuals of educational grants to be paid from the interest earned on the 326-A-1 and 326-A-3 Funds. According to the BIA's October 19, 2009 update, "[f]ive of the six groups have identified their representative and are providing the documentation to confirm the appointments." The update also stated that, "[o]nce the Educational Committee is established, it will begin to develop the rules and procedures for approval by the Secretary."

On May 20, 2010, the BIA published the deadline for receiving applications for eligibility in the Federal Register. The notice stated that "[a]pplications must be received by close of business (5 p.m. Mountain Time) August 2, 2010." Deadline for Submission of Applications To Be Included on the Roll of Western Shoshone Identifiable Group of Indians for Judgment Fund Distribution, 75 Fed. Reg. 28,280 (May 20, 2010). The BIA also had sent by mail notice to potential applicants of the deadline for receiving applications. Some individuals, however, did not receive notice by mail, and, therefore the BIA extended the deadline for submitting applications for these individuals to December 31, 2010.

According to a November 30, 2010 BIA progress report, introduced by both parties as a joint exhibit at trial in the above-captioned case, the BIA had received 9,108 applications. Of these applications, 4,023 were determined eligible, 2,201 were determined ineligible, and 2,576 were pending review. The BIA also stated that 308 appeals had been filed and that it had "begun the quality control review process for the proposed partial payment targeted for February 2011." On March 6, 2011, the first partial distributions of the 326-K Fund were made to 3,187 individuals. The partial payment to each individual was $22,013.00. On September 28, 2012, the BIA completed the final judgment roll for the 326-K Fund, which contained a total of 5,415 individuals. Final distributions from the 326-K Fund were made to eligible recipients via direct deposit to

individuals' bank accounts on September 29, 2012, and via check on October 2, 2012. The individuals who received an initial partial payment, received a second payment of $13,124.93, for a total of $35,137.93. The individuals who did not receive an initial partial payment received a one-time, final payment of $35,137.93.

<u>History after the Case was filed in the United States Court of Federal Claims</u>

On December 26, 2006, plaintiff Yomba Shoshone Tribe, one of the Western Shoshone tribes recognized by the Department of the Interior as a member of the Western Shoshone Identifiable Group, filed a complaint in the United States Court of Federal Claims against the United States, resulting in the above-captioned case. The complaint alleged that the government's "mismanagement of Plaintiff's trust funds and other trust assets in Defendants' custody and control," caused plaintiff Yomba Shoshone Tribe "damages not sounding in tort." Since the filing of the complaint, more plaintiffs have joined the case and plaintiffs have narrowed the time frame at issue in this case, seeking damages from December 1979, when the 326-K Fund was deposited into the United States Treasury, until September 2013, the last month for which there is available data of the government's investment of the three tribal trust funds at issue. On that same day, the case was assigned to Judge Edward Damich. On February 22, 2007, Judge Damich ordered a stay of the proceedings in light of ongoing settlement discussions between the parties. On March 12, 2008, the complaint was amended adding individual plaintiffs Maurice Frank-Churchill, Jerry Millet, and Virginia Sanchez, on behalf of the Western Shoshone Identifiable Group.

On March 28, 2008, defendant filed a motion to dismiss plaintiffs' amended complaint, arguing that plaintiff Yomba Shoshone Tribe cannot state a claim for relief that would entitle it to money damages for "inadequate interest earnings *to the tribe*," because "[t]he Tribe has no right to any part of the distribution or interest that was earned during the time the funds reside[d] in Government accounts." (emphasis in original). Defendant argued that according to the Claims Distribution Act of 2004, "Congress expressly contemplated and directed that the entire fund [the 326-K Fund] be distributed *per capita*" on an individualized basis and not to any tribe. (emphasis in original). Defendant also argued that the Claims Distribution Act of 2004 similarly required that any interest earned on the 326-A-1 and 326-A-3 Funds be distributed not to any tribe but to "individual Shoshone members" for "the specific purpose of education-related assistance." Defendant argued that, in the alternative, all of the other Western Shoshone tribes were necessary parties under Rule 19(a) of the Rules for United States Court of Federal Claims (RCFC) (2008) and indispensable parties under RCFC 19(b), requiring dismissal, pursuant to RCFC 12(b)(7) (2008) and RCFC 19, for failure to join all of the other Western Shoshone tribes as necessary parties.

On June 25, 2008, the complaint was amended for a second time, before Judge Damich ruled on defendant's March 28, 2008 motion to dismiss, adding tribal plaintiffs Timbisha Shoshone Tribe and the Duckwater Shoshone Tribe, two additional Western Shoshone Tribes recognized by the Department of the Interior as members of the Western Shoshone Identifiable Group, bringing the total number of plaintiffs to six. The

six plaintiffs, according to the June 25, 2008 amended complaint, were (1) tribal plaintiff Yomba Shoshone Tribe, (2) tribal plaintiff Timbisha Shoshone Tribe, (3) tribal plaintiff Duckwater Shoshone Tribe, (4) individual plaintiff Maurice Frank-Churchill, (5) individual plaintiff Jerry Millet, and (6) individual plaintiff Virginia Sanchez, the current six plaintiffs at issue in the above-captioned case.

On October 31, 2008, Judge Damich issued an unpublished Opinion denying defendant's motion to dismiss, the first of two Opinions he issued in this case. Judge Damich rejected defendant's March 28, 2008 argument that tribal plaintiff Yomba Shoshone Tribe [21] had no right to the distribution of the three tribal funds at issue because the funds were to be distributed on an individualized basis, not a tribal basis. Judge Damich found that "all three Tribal Plaintiffs—Yomba, Timbisha, and Duckwater (collectively 'the Tribes')—are federally-recognized tribes with interests in the tribal trust funds of the Western Shoshone Identifiable Group to which the Tribal Plaintiffs belong." W. Shoshone Identifiable Grp. v. United States, 2008 WL 9697144, at *1. Judge Damich explained that:

> As owners of tribal trust funds, the Tribes have the right to pursue their breach of trust claims against the Government for mismanagement of the tribal trust funds. The pro rata distribution mechanism in the Distribution Act is irrelevant because the Distribution Act does not divest the Tribes of any ownership interest in the trust funds and because the Tribes are not, in this case, challenging the distribution mechanism set forth in the Distribution Act.

Id. Judge Damich then stated that defendant "failed to show that the other Western Shoshone tribes are necessary parties, because, under 28 U.S.C. § 1505 (2006), any tribe may represent the Western Shoshone without joinder," and that defendant

> failed to show that either complete relief could not be granted to the Western Shoshone in the absence of all the Western Shoshone tribes or that any of the parties to the litigation are subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the Tribes' interest.

Id.

On August 7, 2009, defendant filed its motion for reconsideration of Judge Damich's Opinion denying its motion to dismiss. Defendant repeated its allegation that

---

[21] At the time that defendant filed its motion to dismiss, tribal plaintiff Yomba Shoshone Tribe was the only tribal plaintiff involved in this case. As previously discussed, following the filing of defendant's motion to dismiss and before Judge Damich issued his Opinion on defendant's motion to dismiss, the plaintiffs amended their complaint for a second time, adding two additional tribal plaintiffs, the Timbisha Shoshone Tribe and the Duckwater Shoshone Tribe.

the tribal plaintiffs were not the beneficial owners of the 326-K, 326-A-1 and 326-A-3 Funds and that the beneficial owners were "individuals" who qualified to receive a pro-rata share of the 326-K Fund and an educational grant of the 326-A-1 and 326-A-3 Funds under the Claims Distribution Act of 2004. Defendant also argued that the tribal plaintiffs failed to establish the requisite money-mandating duty owed to them in order to sustain their breach of trust claims.

On November 24, 2009, Judge Damich denied defendant's motion for reconsideration in an unpublished Opinion. See W. Shoshone Identifiable Grp. v. United States, 2009 WL 9389765, at *11. The court stated once again that the tribal plaintiffs are the beneficial owners of the 326-K, 326-A-1 and 326-A-3 Funds. See id. at *6. The court also explained that "insofar as the Tribal Plaintiffs are members of, and assert that they are representatives of, the Western Shoshone Identifiable Group and are advancing its claims under the Indian Tucker Act," there was "no basis" for "Defendant's argument that the Tribal Plaintiffs do not have a money-mandating basis for jurisdiction in this Court or otherwise lack standing to bring this action on behalf of the Western Shoshone Identifiable Group." Id. at *10.

Judge Damich extended discovery in the case until May 11, 2012. Then, on June 7, 2012, the case was stayed, including expert discovery, pending the parties' then current settlement negotiations. Judge Damich subsequently lifted the stay on April 21, 2014, and the parties continued with expert discovery. On August 26, 2015, this case was re-assigned to the undersigned, who set the case on a course to trial.

For the liability trial, the parties submitted several pre-trial filings, including a joint exhibit list of 433 joint exhibits, and various demonstrative exhibits. The court held a five-day trial in Washington, D.C. Plaintiffs did not offer any fact witnesses at trial, but offered two experts: Mr. Kevin Nunes, of Rocky Hill Advisors, as an expert on liability and damages, and, Dr. Michael Goldstein, as a rebuttal expert to defendant's liability expert and defendant's damages expert. For the liability trial plaintiffs also submitted as joint exhibits an expert report addressing both liability and damages, co-authored by Mr. Nunes and Peter Ferriero of Rocky Hill Advisors, and a rebuttal expert report, also co-authored by Mr. Nunes and Mr. Ferriero. Plaintiffs' expert report stated that the "government breached its duty to invest prudently to maximize return" on the 326-K and 326-A Funds "through its failure to properly align the maturity capacity of WSIG's [Western Shoshone Identifiable Group's] funds with the maturity structures of WSIG's investment portfolios."

According to the damages portion of plaintiffs' expert report by Rocky Hill Advisors, plaintiffs suffered $216,386,589.83 in damages due to the government's mismanagement of the 326-K Fund and $1,592,822.43 in damages due to the government's mismanagement of the 326-A Funds. The damages portion of plaintiffs' expert report stated that it employed the Barclays United States Treasury Index, a "passive benchmark" index, "to compute the returns that reasonably should have been obtained through prudent investment of WSIG's trust funds." The damages portion of plaintiffs' expert report based its damages model on its opinion that the 326-K Fund had an investment horizon

of about fifteen years from 1980 to 2004, that it shortened to about seven and a half years after the passage of Claims Distribution Act of 2004, and that it became very short-term at the start of 2011, once the enrollment process for the judgment award was nearly complete.

For the liability trial, plaintiffs also submitted the rebuttal expert report of Dr. Goldstein, which responded to the expert reports of the government's liability expert, Dr. Starks, and the government's damages report, prepared by defendant's expert, Dr. Gordon J. Alexander. Dr. Goldstein's report disagreed with defendant's liability expert report by Dr. Starks, which concluded that the government did not breach a fiduciary duty. According to Dr. Goldstein's report, the BIA "knew" that distribution process for plaintiffs' three tribal trust funds at issue "would take a long time," and, thus, a "prudent portfolio" for plaintiffs' three tribal trust funds "would have held more long-term investments." Dr. Goldstein's report also disagreed with the government's damages expert report submitted by Dr. Alexander, which argued that plaintiffs' damages request is "driven by unprecedented and unexpected drops in interest rates," and is "flawed and misleading" because plaintiffs' damages included the unexpected "capital gains," the gains earned on a bond from the unexpected decrease in interest rates. According to Dr. Goldstein, the decrease in interest rates during the investment period at issue in the above-captioned case, 1979-2013, "were not unexpected in the early 1980s," based on "yield curve data" and "contemporaneous discussions by the Federal Reserve." In addition, Dr. Goldstein argued that "it is important to recognize that there is no economic principle that asserts one must strip out the impact of unexpected interest rate movements when calculating damages."

At the liability trial, defendant offered two fact witnesses: Mr. Robert Winter, the then-current Director of Trust Operations within the Office of Special Trustee for American Indians, Department of the Interior, and Mr. Robert Craff, the Regional Fiduciary Trust Administrator for the Eastern Oklahoma and Southern Plains Region at the Department of the Interior, Office of the Special Trustee. Defendant also offered two experts at the liability trial: Dr. Starks, as an expert on liability, and Mr. Justin Mclean,[22] as an expert on damages.

Defendant submitted as two separate exhibits at the liability trial the expert report and a supplemental expert report prepared by Dr. Starks regarding the government's alleged liability, but only in regard to the 326-K Fund. Dr. Starks' expert report argued that the "government acted prudently" when it invested the 326-K Fund during the entire investment period at issue. Dr. Starks stated in her liability expert report:

---

[22] At the liability trial, Dr. Alexander was originally scheduled to testify regarding the government's alleged damages. He was the author of the government's expert reports regarding damages. Dr. Alexander, however, became unavailable to testify at the liability trial due to illness and, thus, Mr. Mclean became a substitute testifying expert. Mr. Mclean had assisted Dr. Alexander in preparing the expert and supplemental reports, and as stated at the liability trial, Mr. Mclean fully endorsed the opinions expressed in Dr. Alexander's expert and supplemental reports.

While it is my opinion that the Government would not have acted imprudently had it maintained the WSIG funds in shorter-term investments (due to the continued uncertainty, and unclear timeline of eventual disbursements), I also believe that moving the funds into securities with a somewhat longer WADTM [weighted average days to maturity] at this stage of the period [beginning around 1993] was within the range of prudence. Indeed, such a move could be seen as more desirable at this time (*i.e.*, relative to the beginning of the period) – both from an information perspective and also based on the available investment.

(emphasis in original). For the "balance of the period at issue," i.e., mid 1990s to 2013, Dr. Starks stated in her liability expert report:

[I]t may have been optimal for the Government to target a slightly longer WADTM *if* it had reason to believe that a significant portion of the distributions would not be occurring at the front end of the anticipated distribution window. I have not seen evidence indicating that the Government had this understanding or the ability to forecast it based on the information at hand.

(emphasis in original) (footnote omitted). Dr. Starks concluded that "the investments made by the Government for the WSIG portfolio were prudent given the totality of information available to the Government *a priori*, and that the Government fulfilled its fiduciary duty by making independent investment decisions to maximize return given prudent investments." (emphasis in original). Dr. Starks also indicated in her report that "only hindsight suggests a portion of the WSIG's trust funds could have safely been invested longer-term."

Defendant also submitted as two separate joint exhibits at the liability trial the expert report and supplemental expert report by Dr. Alexander, regarding the government's alleged damages in the above-captioned case. Dr. Alexander's report stated that the plaintiffs' damages calculations for the 326-K Fund of approximately $216 million "is due to historical circumstances present during the damages period that were, in part, unique and unknowable *ex ante*." (emphasis in original). According to Dr. Alexander's expert report:

[T]he major driver of the damages [in the damages portion of plaintiffs' expert report by Rocky Hill Advisors] is the unprecedented decline in interest rates over a period of three decades. That decline caused longer-term bonds to increase in value and earn returns in excess of their yields. Rocky Hill's Investment Model [created by Mr. Nunes and Mr. Ferriero] would not necessarily have produced better earnings if interest rates had moved differently or circumstances had differed for the WSJF.

Dr. Alexander also proposed twelve alternative damages models that are "based on the assumption that the BIA should have used a 'but-for' portfolio different from what it actually chose, but more reasonable than that suggested by RHA [Rocky Hill Advisors]." The highest amount of damages proposed by Dr. Alexander's alternative models was $34,589,957.00. The lowest amount was zero dollars.

At the liability trial, the parties' liability experts each presented their analyses of the investment horizon for the 326-K Fund during the thirty-three-year period at issue. Plaintiffs' liability expert, Mr. Nunes, presented an analysis of the investment horizon for the 326-K Fund divided into roughly ten-year increments, and during direct-examination, Mr. Nunes first discussed the evidence regarding the government's investment of the 326-K Fund from "'79, when the funds were awarded," and "all through this time period," referring to the 1980s. Mr. Nunes then discussed the government's investment of the 326-K Fund during the "1990s." Mr. Nunes then testified about the "2000s" up until distribution legislation was passed in July 2004. Following the enactment of distribution legislation in July 2004, Mr. Nunes discussed the government's investment of the 326-K Fund from mid-2004 "up until 2011," when the first distribution of the 326-K Fund occurred. Mr. Nunes then discussed the final years of the thirty-three-year period at issue, which, according to Mr. Nunes, began in 2011, with the first partial distribution made to qualifying Western Shoshone members, and ended in September 2013.

Similar to Mr. Nunes, at the liability trial, Dr. Starks, defendant's liability expert, presented an analysis of the investment horizon for the 326-K Fund by dividing the thirty-three-year period into sub-periods which did not specifically identify a start or end date. Dr. Starks first discussed the government's investment of the 326-K Fund during the "1980s," and up through "1991," when Congresswoman Vucanovich attempted for the second time to pass distribution legislation for the 326-K Fund. Dr. Starks then discussed the government's investment of the 326-K Fund during the "mid-1990s," which defendant's counsel tried to clarify during Dr. Starks' direct examination as "about '92 and on for the next few years." Dr. Starks then discussed the government's investment of the 326-K Fund between 2000 and 2004. The next time period discussed by Dr. Starks at trial was between 2004 and a "point in 2010," although the exact date was not identified, when the government, according to Dr. Starks, began to shorten the 326-K Fund for distribution. The final time period discussed by Dr. Starks at trial was from "2011," when the distribution of the 326-K Fund began, until September 2013, the end of the investment period at issue.

The Court's June 13, 2019 Liability Opinion

Regarding the liability Opinion issued by the court, the following statement was included:

The issue in the above-captioned case is whether the government prudently invested plaintiffs' three tribal trust funds. Neither the statute, the applicable regulations, nor the Department of the Interior's policies introduced at trial, however, attempt to offer a definition or examples of a "prudent" investment,

recognizing, of course, that the particular factual circumstances and market conditions at the time of the investment decision change what can be considered a prudent investment at any given time. For example, 25 C.F.R. § 115.809, promulgated in 2001 following the creation of the Office of the Special Trustee, the office within the Department of the Interior which took over the responsibility of investing tribal trust funds from the BIA in 1996, consistent with the statute, states that the government must prudently invest tribal trust funds, but does not give further guidance. See 25 C.F.R. § 115.809 ("Tribes may recommend certain investments to OTFM, but the recommendations must be in accordance with the statutory requirements set forth in 25 U.S.C. §§ 161a and 162a. The OTFM will make the final investment decision based on prudent investment practices.").

In addition, as the trial record indicates, the Department of the Interior issued various policies regarding the investment of tribal trust funds over the investment period in question, but the policies did not give much direction on which investment practices and investments might be considered prudent or imprudent. Beginning with the first investment policy issued by the BIA in 1966, the BIA noted that "[e]ach Area Office is requested to review the amount of tribal trust funds each tribe in the respective Areas has on deposit in the Treasury," and that "[w]herever it appears that the amount is in excess of foreseeable cash needs of the tribe, discussions should be held with the tribal council and its wishes regarding investment of the funds ascertained." The 1966 policy statement also noted that "[g]overnment-backed securities, while basically safe, can result in losses unless held to maturity." The 1966 policy, however, did not discuss which types of investments were considered prudent for tribal trust funds.

The next policy issued by the BIA was in a 1974 internal BIA memorandum, which indicated that the BIA should "maximize returns on all tribal, as well as individual, trust funds." The 1974 policy memorandum also noted that "[e]ach Area Director has the responsibility for determining if surplus funds are available for investment purposes and notifying the Branch of Investments, Albuquerque, to take the necessary action to invest the funds." The 1974 policy memorandum, however, did not explain under what circumstances the government's investment of a tribal trust fund might satisfy the government's goal to maximize returns or what constituted prudent investment of tribal trust funds.

The government also issued a further policy statement within its report of its investments for tribal trust funds for fiscal years 1986 and 1987. The report recognized that the government has the authority to invest tribal trust funds pursuant to 25 U.S.C. § 162a and that the BIA should, "through knowing the amounts required and when disbursements are necessary," "plan the timing of investment maturities to maximize interest rates and earnings and also have the funds available when needed." The report for

1986 and 1987, however, like past BIA investment policies, did not provide more specific guidance as to when the government's investment of tribal trust funds might satisfy the duty of prudence.

Next, the trial record includes a 1997 internal policy memorandum released by the Office of the Special Trustee, the office which took over the BIA's investment of tribal trust funds in the 1996. The 1997 policy was updated with policy amendments by the Office of the Special Trustee in 1999, 2000, and 2005, and took its final form for the purposes of this case in 2005. The 2005 policy was the policy in place up through the disbursement of the tribal trust funds at issue. According to the 2005 policy, an acceptable investment practice was to "purchase securities with the intent to hold each security until maturity," i.e., a buy and hold strategy, as opposed to frequent trading of securities. The 2005 policy also indicated that unacceptable portfolio investments and practices included investing in any "corporate stock," the purchase of "commercial mutual funds," and "overtrading, adjusted trades or bond swapping." In sum, the Department of the Interior's investment policies issued throughout the years acknowledged the Department's role as the trustee and investor of tribal trust funds and attempted to provide broad guidance to government officials as to what investment practices were prohibited by agency policy, what investment practices were encouraged, and offered general investment goals, including to maximize investment returns. Given the fluctuating market conditions and changing events regarding the timing of distribution for plaintiffs' tribal trust funds, including the required actions the BIA would need to take in order pay-out the 326-K Fund, however, specific, formulaic guidance as to what practices constituted a "prudent" investment practice would have been very difficult to establish by the Department of the Interior or any other governmental body.

W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States, 143 Fed. Cl. at 622-23.

Following the liability trial in the above captioned case and after a careful review of the record, including the testimony, expert reports, and exhibits before the court, the court divided its analysis of whether the government breached its fiduciary duty for the 326-K Fund over the approximately thirty-three-year investment period at issue into three major sub-periods, December 1979 to November 1992, December 1992 to June 2004, and July 2004 to September 2013. At times, the court further divided the three periods into even smaller sub-periods in order to account for identifiable shifts in the government's investment approach for the 326-K Fund.[23]

---

[23] As explained in the June 13, 2019 liability Opinion: "Daily, weekly, monthly, or even yearly analysis of the investment horizon for government's investment of the 326-K Fund was not undertaken by any of the experts and would have proven an expensive and

Initially, the court determined after the liability trial that the evidence before the court indicates that defendant could have, and should have, become aware that the 326-K Fund had a longer-term investment horizon between August 4, 1980 and November 1992, and, thus, should have at least partially invested the 326-K Fund in longer-term securities. Defendant, however, consistently invested the 326-K Fund in short-term securities between August 4, 1980 and November 1992, which prevented the fund from obtaining higher returns and, therefore, breached the agency's fiduciary duty to prudently invest the 326-K Fund during that time.

The court explained:

Beginning in December 1992, the government significantly increased the average weighted maturity years to call of the 326-K Fund, reaching a peak of a little less than ten years by September 1993. Following the September 1993 peak, the maturity structure of the 326-K Fund steadily declined to about an average weighted maturity years to call of a little less than five years by March 1997. Also, by March 1997, the 326-K Fund was no longer invested in any CDs, and instead invested in a mixture of agency, Treasury, and mortgage-backed securities. At trial, plaintiffs acknowledged that the government invested the 326-K Fund in longer-term securities between December 1992 and March 1997 than it had previously done during the 1980s and early 1990s. Plaintiffs' liability expert, Mr. Nunes, however, testified at trial that government should have invested the 326-K Fund in even longer-term investments than those selected by the government, with an average weighted maturity of approximately fifteen years, due to the uncertainty surrounding when distribution plan legislation would be enacted by Congress and the time intensive process of compiling descendancy rolls and distributing the monies to qualifying Western Shoshone members. Defendant's liability expert, Dr. Starks, however, testified at trial that the government's investment of the 326-K Fund during this time, the "mid-1990s," was within a range of prudence.

W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States, 143 Fed. Cl. at 639. Additionally, the court determined:

Although the government could have possibly invested the 326-K Fund in more longer-term securities following the approximate ten-year peak of the average weighted maturity years to call in September 1993, the government's decision to decrease the 326-K Fund to an approximate average weighted maturity years to call of a little less than five years by March 1997, is arguably within the range of prudence. As discussed above, both parties' experts agreed that there is a range of investments that an

unwieldly task due to the lengthy investment period at issue in this case." W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States, 143 Fed. Cl. at 628.

investor may select and still maintain a prudent portfolio. The record does not indicate that getting distribution legislation for the 326-K Fund passed through Congress or that getting the money distributed to plaintiffs would necessarily take longer than five to ten years, despite plaintiffs' argument to the contrary. In addition, the government's investment of the 326-K Fund between December 1992 and March 1997 stands in stark contrast to the government's far less prudent investment of the 326-K Fund during the 1980s and early 1990s. As previously discussed, during the 1980s and early 1990s, the government employed a stagnant investment approach of investing the 326-K Fund in ultra-short-term CDs with an average weighted maturity years to call of approximately two years or less. Between December 1992 and March 1997, however, the government diversified the types of securities in which the 326-K Fund was invested, and also invested the fund in significantly longer-term securities, with an average weighted maturity years to call ranging from approximately five to ten years. As previously noted, "reasonably sound diversification" of a portfolio is part of a trustee's duty to prudently invest. <u>See</u> Restatement (Third) of Trusts § 90 cmt. e(1).

Also, the government's investment of the 326-K Fund between December 1992 and March 1997 was in line with Mr. Kellerup's[24] October 1992 guidance provided in the Office of Trust Funds Management quarterly journal "TRUST," which announced to the public that the government should invest tribal trust funds in government bonds ranging from three to seven years. (capitalization in original). Furthermore, when pushed at trial on cross-examination, plaintiffs' liability expert, Mr. Nunes, conceded that the government's lengthening of the maturity structure of the 326-K Fund in late 1992 and early 1993 was "reasonable." When specifically asked whether the "portfolio they [defendant] had built at this period in time was a reasonable portfolio," Mr. Nunes testified at trial that "'reasonable' is accurate." Thus, the government's decision to maintain the 326-K Fund in an intermediate-term portfolio between December 1992 and March 1997, with an average weighted maturity years to call ranging between approximately five to ten years does not appear to violate the range of prudence so as to be too short-term.

As stated previously, the court recognizes that there is no scientific or formulaic way to decide a correct range of prudence. The record before the court, with its many gaps, and the expert reports and testimony of the experts in roughly ten-year blocks, as well as the trial testimony of defendant's fact witnesses, leaves many unanswered questions. The burden of proof, however, rests on plaintiffs to prove their claim that defendant imprudently invested the 326-K Fund between December 1992

---

[24] As indicated above, Fred Kellerup was the Branch of Investments Chief at the Department of the Interior.

and March 1997 in too short-term securities, which the plaintiffs have not done for this time period, and, in fact, plaintiff's liability expert, Mr. Nunes, conceded at trial that the government's investment of the 326-K Fund during part of this time period was "reasonable."

W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States, 143 Fed. Cl. at 640-41 (capitalization in original; brackets in original). The court next found the government did breach its fiduciary duty to prudently invest the 326-K Fund during the next three timeframes the court considered, spanning April 1997 to September 2006. For the remaining two timeframes spanning October 2006 to September 2013, the court found a breach of the fiduciary duty to prudently invest the 326-K Fund occurred.

Regarding the 326-A Funds, the court found a breach by the government of the fiduciary duty to prudently invest between March 1992 and January 2012, spanning three timeframes. The court, however, found the government did not breach its fiduciary duty between February 2012 to September 2013.

Therefore, as noted above, on June 13, 2019, after careful review the lengthy record in this case, including the documents and expert reports in evidence, the liability trial testimony, and the post-trial filings, the court concluded that there were "various times during the investment periods at issue for both the 326-K Fund and for the 326-A Funds when the government's investment of all three tribal trust funds fell below the required standard of prudence." W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States, 143 Fed. Cl. at 658. To summarize, in the liability Opinion the court found:

### For the 326-K Fund:

1. Between December 19, 1979 and August 3, 1980, the government did not breach its fiduciary duty. During this time, the BIA was actively working towards getting a distribution plan passed within the statutory 180-day period required under the Use and Distribution Act of 1973, and, therefore, reasonably maintained the 326-K Fund in short-term securities in the event that a distribution plan could be negotiated with the Western Shoshone tribes and timely considered by and accepted by Congress.

2. Between August 4, 1980 and November 1992, the government breached its fiduciary duty when Congress did not act on the BIA's request for an extension to submit a distribution plan for the 326-K Fund and no distribution legislation was forthcoming. During this twelve-year period, the government invested the 326-K Fund primarily in short-term CDs with an average weighted maturity years to call of approximately two years or less, even though the government knew or should have known during that time that there was a low probability that distribution legislation could be passed in the near-term. The short-term nature of the 326-K Fund portfolio, therefore, was not prudently aligned with the fund's longer-term investment horizon.

3. Between December 1992 and March 1997, the government did not breach its fiduciary duty. During this time, when the enactment of distribution legislation for the 326-K Fund still remained unlikely to occur in the near-term, the government began to shift the 326-K Fund into different types of securities, including agency and Treasury bonds, and to decrease its reliance on short-term CDs. The government also lengthened the maturity structure of the 326-K Fund into longer-term securities, with an average weighted maturity years to call ranging from approximately five to ten years. Therefore, the government's lengthening of the maturity structure of the 326-K Fund portfolio during this time was within the range of prudence, given the longer-term investment horizon of the fund.

4. Between April 1997 and December 1997, the government, however, breached its fiduciary duty when the government shortened the maturity of 326-K Fund into securities with an average weighted maturity years to call ranging from three years to approximately three years and eight months. During this time, although there was emerging consensus for a distribution plan among the Te-moak Tribal Council, which represented one of the four beneficiary tribes of the 326-K Fund, the BIA was awaiting approval of a distribution plan from the remaining three Western Shoshone beneficiary tribes, and, thus, the enactment of distribution legislation for the 326-K Fund likely was not imminent. Further, even with distribution legislation enacted, the BIA would still need additional time to organize for and pay-out the 326-K Fund to qualifying Western Shoshone members. Therefore, the government's decrease of the maturity structure of the 326-K Fund during this time did not prudently corresponded with the investment horizon of the 326-K Fund, which was not likely to be distributed in the nearer-term.

5. Between January 1998 and April 2002, the government continued to breach its fiduciary duty by placing the 326-K Fund in even shorter-term securities with an average weighted maturity years to call ranging from approximately one to two and a half years. The government then continued to breach its fiduciary duty between May 2002 and June 2004, when the average weighted maturity years to call of the 326-K Fund dropped still further to approximately ten months or less. Although the likelihood for distribution legislation to be passed was increasing during the late-1990s and early 2000s, even after distribution legislation was enacted, the government would still have to distribute the 326-K Fund monies to qualifying Western Shoshone members, which probably would not get accomplished within two and a half years and was even less likely to be completed within ten months or less. Therefore, from January 1998 to June 2004, the government imprudently invested the 326-K Fund by continually and steadily decreasing the maturity structure of the 326-K Fund, resulting in an ultra-short-term portfolio, which did not align with the fund's investment horizon.

6. Between July 2004 to September 2006,[25] the government breached its fiduciary duty by continuing to maintain the 326-K Fund in short-term portfolio with an average weighted maturity years to call ranging from approximately six months to one year. Although Congress passed the Claims Distribution Act of 2004 on July 7, 2004, the government still had to develop its plan to distribute payment of the 326-K Fund to Western Shoshone members, which would have likely taken longer than six months to one year to accomplish at that time.

7. Between October 2006 and December 2010, the government did not breach its fiduciary duty. During this time, the average weighted maturity years to call of the 326-K Fund ranged from approximately one year and seven months to a little less than three years.[26] The record indicates that distribution legislation for the 326-K Fund had been enacted in July 2004 and that government officials reasonably believed that a pay-out of the 326-K Fund would occur within a couple of years and invested the 326-K Fund in accordance with such information. Therefore, the government's decision to place the 326-K Fund in shorter-term securities during this time prudently corresponded with the shortening investment horizon of the fund.

---

[25] In a footnote, the court noted:

[T]here was a brief five-month period between January 2005 and May 2005 that the average weighted maturity years to call hovered around approximately one year and eight months before dropping back down to an average weighted maturity years to call of approximately one year in June 2005, where it remained until September 2006, the end of this sub-period. This slight increase in the maturity structure of the 326-K Fund between January 2005 and May 2005, however, was still too short-term and too short-lived to be considered prudent.

W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States, 143 Fed. Cl. at 658 n.52.

[26] In a footnote, the court noted:

[T]he government's investment of the 326-K Fund in a portfolio with an average weighted maturity years to call of approximately one year and seven months lasted during a brief two-month period in 2007, which was immediately followed by the government's decision to increase the average weighted maturity years to call of the 326-K Fund to two years or more for the next, approximately, two and half years.

W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States, 143 Fed. Cl. at 658 n.53.

8. Between January 2011 to September 2013, the government did not breach its fiduciary duty, nor did plaintiffs appear to argue that the government's investment of the 326-K Fund was imprudent. During this time, the government began the distribution of the 326-K Fund monies to qualifying Western Shoshone members and, therefore, transitioned the entire fund into ultra-short-term overnight securities in order to liquidate the fund for distribution. Thus, the government's placement of the 326-K Fund in ultra-liquid securities during this time was prudent.

### For the 326-A Funds:

1. Between March 1992 and August 1995, the government breached its fiduciary duty to prudently invest the 326-A-1 Fund, and also between September 1995 and November 1998 to prudently invest both the 326-A-1 and 326-A-3 Funds, by placing both of these funds in short-term securities with an average weighted maturity years to call of approximately two years or less. During this time, it was unlikely that distribution legislation for the 326-A Funds was going to pass in the near-term, and, therefore, the government knew or should have known that the investment horizon for the 326-A Funds should have been longer than two years.

2. Between December 1998 and June 2004, the government also breached its fiduciary duty by primarily investing the 326-A Funds in short-term securities with an average weighted maturity years to call of approximately two years or less.[27] During this time, the government became aware that various members of the Western Shoshone tribes were supportive or becoming supportive of placing the 326-A Funds into a permanent education trust fund, the principal of which was not to be invaded. The

---

[27] In a footnote, the court explained:

The government increased the maturity structure of the 326-A Funds for a brief period between mid-1999 and mid-2001 to an average weighted maturity years to call of approximately five to seven years. This increase, however, was still too short-term given the fact that the principal of the A Funds were likely not to be invaded, but were to be set-aside as permanent education trust funds. Also, this increase in maturity was short-lived. The government proceeded to decrease the average weighted maturity years to call of the A Funds to approximately eight months by late 2001, and the average weighted maturity years to call never exceed three years for the next, approximately, eight years.

W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States, 143 Fed. Cl. at 658 n.54.

government even acknowledged in its 2003 internal investment report for the 326-A Funds that these funds likely would be set-aside as permanent education trust funds. Therefore, the government should have begun to transition the 326-A Funds into longer-term securities because the principal of the funds was not intended to be distributed.

3. Between July 2004 and January 2012, the government breached its fiduciary duty by maintaining the 326-A Funds in shorter-term securities even though the government had certainty that the principal of the 326-A Funds was not to be invaded as of July 7, 2004, when distribution legislation for the A Funds was passed. Between July 2004 and February 2009, the average weighted maturity years to call for the A Funds was approximately two and a half years or less. From April 2009 to January 2012,[28] the average weighted maturity years to call ranged between approximately five years to a little over eight years, which was still too short-term, given the fact that the principal of the 326-A Funds was not to be invaded. The government, therefore, imprudently maintained the 326-A Funds in too short-term securities even though the 326-A Funds had a long-term investment horizon between July 2004 and January 2012.

4. Between February 2012 to September 2013, the government did not breach its fiduciary duty when it lengthened the maturity structure of the 326-A Funds into investments with an average weighted maturity years to call of eleven to fourteen years. Plaintiffs' liability expert, Mr. Nunes, acknowledged at trial that the government began to finally shift the 326-A Funds into longer-term securities during this time and testified that this shift was "good news." Therefore, in light of the fact that the 326-A Funds' principal was not to be invaded and was to be perpetually held in trust, the government's decision to lengthen the maturity structure of the 326-A Funds during this time was prudent and consistent with the long-term nature of the funds.

---

[28] In a footnote, the court explained:

In March 2009, the average weighted maturity years to call of the A Funds spiked to ten years, but then, without any apparent reason, rapidly decreased back down to approximately eight years in April 2009 and hovered between eight to five years for the next approximately three years. The government's random and short-lived one-month increase of the maturity of the 326-A Funds in March 2009 is not sufficient to make the government's investment of the 326-A Funds between July 2004 and January 2012 prudent.

W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States, 143 Fed. Cl. at 658 n.55.

<u>W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States</u>, 143 Fed. Cl. at 658 (emphasis and capitalization in original).

<u>Proceedings after the Liability Opinion was issued</u>

After the court issued the June 13, 2019 liability Opinion, the court held a hearing with the parties to discuss how to proceed on the remaining damages issues. At the hearing, the court set a schedule for expert discovery and explained that "the parties are free to use their existing experts for expert discovery, expert reports and depositions, but may use additional experts to help assist the court in reaching a decision on damages." The court continued: "Regardless of the experts selected, the expert reports shall be responsive to the decision on liability issued by the court on June 13, 2019."

After expert discovery closed, the court set a damages trial schedule. For the damages trial, the parties submitted several pre-trial filings, including a joint exhibit list, and various demonstrative exhibits. The court held a four-day trial on the sole issue of damages. Plaintiffs offered one expert witness, Mr. Kevin Nunes, of Rocky Hill Advisors, who had testified at the liability trial. For the damages trial, plaintiffs also submitted as joint exhibits an expert report addressing damages, authored by Mr. Nunes of Rocky Hill Advisors, and a rebuttal expert report, also authored by Mr. Nunes.

Defendant offered two expert witnesses at the damages trial, Dr. Laura Starks, who had testified at the liability trial, and Dr. Francis Longstaff, a "professor of finance at UCLA, Anderson School of Management." At the damages trial, Dr. Longstaff was qualified "as an expert in financial economics, including the subdisciplines of investments and risk management." For the damages trial, defendant also submitted as joint exhibits an expert report addressing damages authored by Dr. Starks and an expert report addressing damages, authored by Dr. Longstaff. Defendant also submitted rebuttal expert reports by both Dr. Starks and Dr. Longstaff, and Dr. Starks filed a surrebuttal declaration. Neither party offered any fact witnesses at the damages trial. The expert reports prepared for the damages phase of the trial arrived at different calculations of damages than the expert reports prepared for in advance of the liability trial, as the experts for both parties prepared their damages models consistent with the court's findings in the June 13, 2019 liability Opinion.

Plaintiffs have noted that "[t]here was a potential issue about how to calculate the growth of accrued damages during the non-breach periods," but explained:

> The experts agreed that the growth rate for the non-breach periods should be based on the Government's actual investment performance. Initially, they used different methods to measure this growth rate but RHA [Rocky Hill Advisors] accepted Dr. Starks' approach, which simply divides the ending balance by the starting balance to calculate the growth rate. Thus, all of the damages calculations presented at trial use the same growth rate

for the non-breach periods. The divergence between the damages figures presented by RHA and Dr. Starks are attributable to the different ways in which they calculate damages during the breach periods.[29]

Consistent with Mr. Nunes' expert report and his testimony at the damages trial, plaintiffs argue that "RHA determined the appropriate maturity structure of the 326-K Fund for the initial breach period (August 1980 – November 1992) by using the same maturity structure that the Court found to be appropriate during the following non-breach period (December 1992 – March 1997)," and contend that "[b]ased on the Court's findings, RHA concluded that a maturity structure in this 5-10 year 'range of prudence' would also have been appropriate for the earlier breach period." Plaintiffs also argue "[f]or the next two breach periods, from April 1997 – June 2004, RHA took a similar approach, keyed to the Court's finding that a maturity structure in the range between 5-10 years was prudent during 1992-1997. RHA reasoned that this same range remained prudent during the following periods." Plaintiffs also claimed that "[f]or the final breach period, from July 2004 to September 2006, a shorter maturity structure was needed because the Distribution Act had now been enacted. To establish this new maturity structure, RHA relied on the Court's finding that the Government had invested the 326-K Fund prudently during the following period, October 2006 – December 2010, when the average maturity was 2.97 years." Regarding the 326-A Funds, plaintiffs argued

> [t]he first breach period for the 326-A Funds was from March 1992 – November 1998. To determine the appropriate maturity structure, RHA started from the Court's finding that the 326-A Funds had the same investment horizon as the 326-K Fund during this period. . . in a portfolio whose maturity ranged between 5-10 years. Thus, RHA reasoned that a maturity structure in that same range would also have been prudent for the 326-A Funds during this period.

Plaintiffs indicated that for the second breach period with respect to the 326-A Funds, December 1998 to June 2004, "RHA transitioned the 326-A Funds over the first six months of 1999 to a long-term portfolio, reflecting the unlimited investment horizon for these funds." Plaintiffs noted that for the final breach period with respect to the 326-A Funds, from July 2004 to January 2012, "RHA continued to use the same long-term maturity structure for these funds."

---

[29] Plaintiffs' counsel noted at the closing argument:

> And so as we sit here today, the differences between the experts' calculations relate solely to how they determined damages during the breach periods, how that, being brought forward during the nonbreach periods, has some impact, because there was obviously an increase there, but the methodology for the nonbreach periods is exactly the same.

Regarding Mr. Nunes' methodology, plaintiffs argue "[i]nstead of making a subjective decision about exactly how the Docket 326 Funds should have been invested by the Government, RHA used benchmarks which reflect the <u>market-average</u> rate of return for a diversified portfolio with the appropriate maturity structure. This approach is neutral and objective." (emphasis in original). Plaintiffs noted that "[t]o develop these market-average benchmarks, RHA used the Barclays U.S. Treasury indexes," and "RHA used transition periods in its investment model when significant changes were made to the maturity structure of the Docket 326 Funds."

Plaintiffs were critical of Dr. Starks' expert report and testimony at the damages trial.[30] Plaintiffs argue that

the investment horizons that Dr. Starks uses are inappropriate because they are based on her new opinions rather than the Court's findings and because her new opinions lack credibility. Further, her contention that constructing a damages model also requires selecting an appropriate investment methodology (strategy) is incorrect. And the particular methodology she selects is not plausible.

In sum, plaintiffs stated:

RHA offered two alternative calculations of damages, depending on whether the legal presumption in *Confederated Tribes of Warm Springs Reservation of Or. v. United States*, 248 F.3d 1365, 1371 (Fed. Cir. 2001) (*Warm Springs*) is applied to select the maturity structure of the "but for" damages model. RHA calculated damages of **$133,125,302** if the *Warm Springs* presumption is used, and **$113,830,811** if it is not used.

(emphasis in original; footnote omitted).[31] As discussed in greater detail below, the United States Court of Appeals for Federal Circuit in <u>Confederated Tribes of Warm Springs Reservation of Oregon v. United States</u>, 248 F.3d 1365 (Fed. Cir. 2001) (<u>Warm Springs</u>) held: "Where several alternative investment strategies would have been equally plausible, the court should presume that the funds would have been used in the most profitable of these." <u>Warm Springs</u>, 248 F.3d at 1371.

---

[30] Regarding Dr. Longstaff, plaintiffs argue that "Dr. Longstaff did not offer an opinion on the amount of damages in this case. His role was simply to criticize RHA's damages computations."

[31] Plaintiffs also indicate that "[t]here is no basis in the evidence for awarding WSIG [plaintiffs] less than the amount of damages that Dr. Starks opines is due, or more than the amount of damages that RHA opines is due."

By contrast, defendant argues:

> In accordance with the Court's opinion, Dr. Starks selected alternative prudent investments that were longer-term in character, and reflect an investment time horizon consistent with the investments the Court found prudent during the non-breach periods. Dr. Starks also selected a buy-and-hold alternative investment strategy consistent with the Interior Department's policies and practices, which require Interior to balance investment returns against the risk of capital losses and prohibit frequent trading. The portfolio she proposes is based on a buy-and-hold ladder of bonds with a broad range of maturities. This approach mitigates interest rate risk, while also taking advantage of higher-yielding longer-term bonds. Dr. Starks's model also offers Interior flexibility to adapt its portfolio — replacing maturing bonds with longer or shorter-term bonds as the circumstances warrant.

Defendant explains:

> Dr. Starks calculated the additional income that Interior would have earned using her proposed alternative investment portfolio for each breach period. She then compared the investment income generated during each breach period to the actual balance of the Fund at the end of that breach period. For *non-breach periods*, Dr. Starks applied the *actual growth rate* of the Fund during those periods to the but-for portfolio balance resulting from the breach periods.

(emphasis in original). In sum, defendant argues "Dr. Starks's calculations present a fair approximation of damages grounded in a prudent and achievable investment strategy that Interior could have executed in the real world, in accordance with its policies and practices and in light of contemporaneous facts."

Defendant is critical of plaintiffs' damages model, arguing that "[i]n contrast to Dr. Starks's reasonable and realistic calculation of damages, Plaintiffs have presented the Court with a damages estimate that contradicts the Court's Liability Opinion, ignores Interior Department policy, relies upon hindsight, and fails to acknowledge the risks inherent in the active trading approach that would have been required to achieve the investment gains Plaintiffs seek." Defendant also argues "Mr. Nunes' model lacks credibility because it was designed to inflate damages."

Ultimately, defendant contends that, consistent with the court's findings during the liability phase of trial, "the Court should award damages of no more than **$73,816,515** for the breaches of trust associated with the Interior Department's management of the Docket 326-K Fund, and damages of **$987,920** for the breaches of trust associated with the Interior Department's management of the Docket 326-A-1 and Docket 326-A-3 Funds." (emphasis in original).

**DISCUSSION**

As determined in the court's June 13, 2019 liability Opinion, and as noted above, the government breached its fiduciary duty to prudently invest the 326-K Fund for the plaintiffs between August 4, 1980 and November 1992, and again between April 1997 and September 2006. Additionally, the government breached its fiduciary duty to prudently invest the 326-A-1 Fund for the plaintiffs between December 1998 and January 2012. See W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States, 143 Fed. Cl. at 658-61. Therefore, with breach established, the court must determine the proper measure of damages.

"[O]nce the beneficiary has shown a breach of the trustee's duty," the "risk of uncertainty as to the amount of the loss" falls on the government. See Warm Springs, 248 F.3d at 1371; see also Bear v. United States, 147 Fed. Cl. 54, 87 (2020). "'The ascertainment of damages is not an exact science,' the Federal Circuit has warned, and 'where responsibility for damages is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision.'" Jicarilla Apache Nation v. United States, 112 Fed. Cl. 274, 304-05 (2013) (Jicarilla III) (quoting Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001)).[32] As a Judge of this court recognized, the Federal Circuit's decision in Warm Springs, under certain circumstances, allows for "inferences" to be "drawn" as to the amount of damages to be

---

[32] As noted in the court's June 13, 2019 liability Opinion, there are three separate, relevant Jicarilla decisions, all stemming from the same Native American breach of trust case regarding allegations of mismanagement of tribal trust funds pursuant to 25 U.S.C. § 162a, the statute at issue in the above-captioned case. In United States v. Jicarilla Apache Nation, 564 U.S. 162 (2011) (Jicarilla I), the United States Supreme Court was tasked with determining whether the common-law "fiduciary" exception to the attorney-client privilege, which prevents a trustee from withholding from trust beneficiaries attorney-client communications relating to the administration of the trust, applies to 25 U.S.C. § 162a. See Jicarilla I, 564 U.S. at 170. The Supreme Court held that the common-law fiduciary exception to the attorney-client privilege did not apply within the context of 25 U.S.C. § 162a and reversed and remanded the case back to the United States Court of Federal Claims. See Jicarilla I, 564 U.S. at 165-66, 186. In United States v. Jicarilla Apache Nation, 100 Fed. Cl. 726 (2011) (Jicarilla II), following the Supreme Court's remand in Jicarilla I, the Court of Federal Claims held that the court had jurisdiction over the tribe's breach of trust claim pursuant to the Indian Tucker Act, and that the Department of Interior had a fiduciary duty to "'maximize the trust income by prudent investment,'" pursuant to 25 U.S.C. § 162a. See Jicarilla II, 100 Fed. Cl. at 738-39 (quoting Cheyenne-Arapaho, 206 Ct. Cl. at 348, 512 F.2d at 1394). In Jicarilla III, cited above, the United States Court of Federal Claims found that the government had breached its fiduciary duty to invest the plaintiff's funds due to the "BIA's heavy reliance on short-term investments" for "nearly two decades," which "reduced the yield on Jicarilla's portfolios by failing to take appropriate advantage of the higher yields on longer-term investments." Jicarilla III, 112 Fed. Cl. at 290-92.

awarded in the beneficiaries' favor, once liability has been established. Osage Tribe of Indians of Okla. v. United States, 97 Fed. Cl. 542, 544 (2011) (quoting Osage Tribe of Indians of Okla. v. United States, 93 Fed. Cl. 1, 22 (2010) (citing Warm Springs, 248 F.3d at 1371)).

Even if a potential inference is appropriate, however, a beneficiary will only be "'entitled to a reasonable estimate of the damages it is due.'" Osage Tribe of Indians of Okla. v. United States, 97 Fed. Cl. at 544 (quoting Osage Tribe of Indians of Okla. v. United States, 96 Fed. Cl. 390, 409 (2010)); see also Warm Springs, 248 F.3d at 137 (noting that plaintiffs only are entitled to the amount of damages that would place them "in the position in which [they] would have been absent a breach"); Jicarilla III, 112 Fed. Cl. at 304 ("Courts determine the amount of damages for such a breach by attempting to put the beneficiary in the position in which it would have been absent the breach."). Defendant, as the trustee, always has the opportunity to disprove plaintiffs' alleged damages amount. See Warm Springs, 248 F.3d at 1371 ("The burden of proving that the funds would have earned less than the amount is on the fiduciaries found to be in breach of their duty." (quoting Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir. 1985)); see also Bear v. United States, 147 Fed. Cl. at 87. While "approximations certainly are appropriate," damages "awards may not be speculative." Jicarilla III, 112 Fed. Cl. at 307 n.52 (citing Franconia Assocs. v. United States, 61 Fed. Cl. 718, 746 (2004) ("[C]are must be taken lest the calculation of damages become a quixotic quest for delusive precision or worse, an insurmountable barrier to any recovery.")). Furthermore, as indicated by the Federal Circuit in Warm Springs, it would be inappropriate to apply an inference when "the issue of damages" is based entirely on "unguided speculation." Warm Springs, 248 F.3d at 1372.

As in the liability trial, in the damages phase of this case, plaintiffs rely heavily on the decision in Jicarilla III. Despite some similarities between Jicarilla III and the facts of this case, as this court noted during the liability phase of trial, the specifics presented for review in the case currently before the court are different from Jicarilla case, and, moreover, Jicarilla III is not binding on this court.[33] As discussed in greater detail below, the procedural posture and approach the Judge took in Jicarilla III differs from the above captioned case. In addition, the model presented by Rocky Hill Advisors to the court in Jicarilla III differs from the model assembled by plaintiffs in this case.

---

[33] This court is only bound by precedent from the United States Supreme Court, the United States Court of Appeals for the Federal Circuit, and its predecessor, the United States Court of Claims. See Dellew Corp. v. United States, 855 F.3d 1375, 1382 (Fed. Cir. 2017) (noting that "the Court of Federal Claims must follow relevant decisions of the Supreme Court and the Federal Circuit"); see also Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353 (Fed. Cir.) ("There can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, our court, and our predecessor court, the Court of Claims."), reh'g denied (Fed. Cir. 2006), cert. denied (2007).

Moreover, the plaintiff in <u>Jicarilla III</u> raised, and prevailed on, claims that are not before this court in the above captioned case. In <u>Jicarilla III</u>, the Judge of the United States Court of Federal Claims determined that the government was responsible for the unauthorized disbursement of the Jicarilla Tribe's trust funds. <u>See</u> <u>Jicarilla III</u>, 112 Fed. Cl. at 303. Additionally, the Judge found the government's failure to timely process deposits of oil and gas royalties "amounted to a breach of trust that entitles the Nation to damages." <u>Id.</u> at 304. As evidenced by the lengthy recitation of facts above, neither the unauthorized disbursement of the plaintiffs' trust funds, nor the failure to timely process deposits of oil and gas royalties are at issue in the case currently before the court.

The comments to the Restatement (Third) of Trusts § 100 has indicated

*Determining amount of loss.* If a breach of trust causes a loss, including any failure to realize income, capital gain, or appreciation that would have resulted from proper administration of the trust, the trustee is subject to surcharge for the amount necessary to compensate fully for the breach. Occasionally a situation arises that offers an essentially objective means of ascertaining the loss for which a trustee is liable. . . .

Illustrative of more difficult "loss" determinations is the determination of the recovery from a trustee for imprudent or otherwise improper investments. The recovery in such a case ordinarily would be the difference between (1) the value of those investments and their income and other product at the time of surcharge and (2) the amount of funds expended in making the improper investments, increased (or decreased) by a projected amount of total return (or negative total return) that would have accrued to the trust and its beneficiaries if the funds had been properly invested. (A return projection for "properly invested" funds should reflect the standards of prudent investment in § 90(a), and should not rely on hindsight (cf. § 77, Comment *a*) in selecting a benchmark (below) for hypothetical performance.).

Restatement (Third) of Trusts § 100 (emphasis in original).

The court acknowledges that there is no scientific method or modeling that can be applied to calculate damages in the current, above captioned case as is reflected in the models proposed by both the plaintiffs and the defendant. The parties and their respective experts have been tested to reconstruct what the investment strategy of the government should have been dating back to the 1970s and continuing until 2013. After the parties' reconstruction, which differ greatly between the parties, and is the subject of this court's decision, the parties next applied a calculation of damages based on their models. Assumptions and projections are inherent to any model that could have been developed in the above captioned case given the limitations on investment by the government during the investment period in the above captioned case, as well as the fluctuating interest rates and evolving market conditions. Noting the limitations of any model that could have been presented to the court in the above captioned case, and based on the information

provided to the court, the court considers each of the parties' models prepared for the damages trial.

Plaintiffs' Damages Model

As indicated above, plaintiffs did not call any fact witnesses for its case at the damages trial, but plaintiffs did call one expert witness, Kevin Nunes of Rocky Hill Advisors. Mr. Nunes had prepared expert reports for plaintiffs in advance of both the liability trial and damages trial, and testified at both the liability and damages phases of trial. In his expert reports for the damages portion of the trial, Mr. Nunes noted that, in light of the court's liability decision he "utilized the returns of the Government's extant investment portfolios for those periods in which the Court found no breach of trust," and additionally, "utilized investment horizons and matured structures consistent with the Court's analysis for those periods which the Court didn't find a breach." At the damages trial, Mr. Nunes admitted there was an error in his calculations for his original expert report on damages.[34] Mr. Nunes had the following exchange on cross-examination with counsel for the United States:

> Q. What you had done in your original report was you had inadvertently imposed damages for a period in which the Court found the Government was not in breach.
>
> A. By applying the manner in which returns of a portfolio are typically calculated in the investment world, yes. That did end up resulting in a larger growth rate in the non-breach period than was realized by the Government.
>
> Q. And the net result of that mistake was to increase your damage calculation between 45 and 50 million dollars in both Scenario A and Scenario B.
>
> A. That's correct, yes, in round numbers.

In creating his model for the damages trial, plaintiffs' expert Mr. Nunes explained that he had relied on the court's determination that "the government's decision to maintain the 326-K Fund in an intermediate-term portfolio between December 1992 and March 1997, with an average weighted maturity years to call ranging between approximately five to ten years does not appear to violate the range of prudence so as to be too short-term," see W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States, 143 Fed. Cl. at 640, and determined "that a maturity structure in this 5-10 year 'range of prudence' would also have been appropriate for the earlier breach period." Therefore, Mr. Nunes concluded in his damages expert report:

---

[34] As discussed in greater detail below, Dr. Starks first identified the error in Mr. Nunes' original expert report.

The investment horizon of the 326-K Fund during the 12-year period from August 5, 1980 through November 1992 was at least as long as the horizon during the subsequent 4.3 years. Thus, prudent investment during the earlier period required a maturity structure at least as long as during the later period, or somewhere in the range between five to ten years.

At the damages trial, Mr. Nunes testified that

logic says that if in a subsequent period, the immediate subsequent period, the Court had found the Government to be prudent, then the portfolio in the period preceding that would have to be -- would be at least as long as the period following it. So that's the lesson of how the later period informed us on the period prior to that[.]

On direct examination, Mr. Nunes responded to the following questions proposed by plaintiff's counsel:

Q. So with respect to this five- to ten-year range, you testified that you looked to see if there was any specific point within that range that was consistently used by the Government during this nonbreach period. Is that correct?

A. That's correct.

Q. And did you see anything in the record that would indicate one specific point in that five- to ten-year range was more likely than another specific point?

A. None whatsoever. It was a period where almost overnight -- it certainly happened rather quickly -- the Government lengthened the portfolio to about 11 years, and then it immediately began to shorten somewhat substantially through roughly four years of this nonbreach period, shedding about 6 1/2 or so years of weighted average maturity in a roughly four-year period, as well -- so no clear pattern there whatsoever except that the Government was reverting back to its old ways. The other thing we looked at was the types of -- when we had done our analytics and reported this in our first report, we also provided a lot of transactional information so we could look at purchases and sales and things like that. So we took a look also at purchase activity to see if there was any kind of a pattern there, and it was absolutely nothing. It roams all over the map. So clearly, to us, there is no consistency, again, in spite of the fact that they had found that this was a period where the Government was operating prudently.

Plaintiffs' counsel followed up with Mr. Nunes about the five to ten year range and the government's investing strategy, asking

[Q.] [T]he five- to ten-year maturity structure that Rocky Hill determined was applicable during this breach period, how did you decide within that range what particular structure within the five- to ten-year range to use?

A. Again, as I described before, since there was no pattern in the way in which the Government was, again, using the baseline, if you will, the first – the nonbreach period, there was no consistent pattern in the data that we could tease out that would reflect that the Government had any plan whatsoever, and so we are then using the five to ten bounds as the range of prudence and applying the <u>Warm Springs</u> presumption. We determined that for these two periods, as well as how we used it in the first period, that the ten-year targeted term structure used in the <u>Warm Springs</u> presumption would be prudent. And, of course, then we looked at the actual investment of the funds from the first nonbreach period, the 7.86-year maturity or term structure, and we used that to inform us for our Alternative B calculations.

Specifically, regarding the government's investing strategy for the 325-K Fund, counsel for plaintiffs asked Mr. Nunes:

Q. Did the Government ever use a particular methodology in investing the 326K funds?

A. Not that we can discern -- well, let me retract that. Certainly in its very infancy, the methodology that the Government employed across 75, 85 percent of native trust funds was the CD program, and, of course, the 326-K was no exception to that, but once that program was wound down and sort of conventional investing of the portfolio was happening, we could not discern any pattern, any strategy throughout the entire life of these funds.

At the damages trial, Mr. Nunes discussed his decision to create two different damages calculations and the ranges for the two calculations, first with what the parties refer to as the <u>Warm Springs</u> presumption:[35]

[Q.] on the <u>Warm Springs</u> presumption, what maturity structure within this five- to ten-year range did Rocky Hill apply for the '80 to '92 breach period?

A. The ten-year.

Q. And under the <u>Warm Springs</u> presumption, why was ten years the maturity structure chosen?

---

[35] As discussed in greater detail below, plaintiffs base the "<u>Warm Springs</u> presumption" on the language of the Federal Circuit's decision in <u>Warm Springs</u>, in which the Federal Circuit indicated, "[w]here several alternative investment strategies would have been equally plausible, the court should presume that the funds would have been used in the most profitable of these." <u>Warm Springs</u>, 248 F.3d at 1371.

A. Again, when -- as we had been advised on <u>Warm Springs</u>, when there are several alternative, equally plausible scenarios, the courts have found in favor of the Plaintiffs for a profitable, generally speaking -- and this is a generalization, I will admit -- but when interest rates are -- irregardless of level, but normalized, meaning longer rates are higher than shorter rates, more often than not, as long as the maturity picture is in alignment, the longer will outperform the shorter. And so in this particular case, the ten-year, you know, meets -- sort of matches the <u>Warm Springs</u> presumption as we understand it.

Q. Now, did Rocky Hill also prepare an alternative calculation in the event the Court finds the <u>Warm Springs</u> presumption inapplicable?

A. We did.

Q. And how did you go about doing that?

A. Well, again, using the subsequent period to inform us on the period where they were not in breach, we looked at simply what was the average of the term structure over that roughly four years and three or four months, and it turns out that is 7.86 years' maturity, and so we used that for our alternative B calculations.

Plaintiffs reasoned that "[f]or the next two breach periods, from April 1997 – June 2004, RHA took a similar approach, keyed to the Court's finding that a maturity structure in the range between 5-10 years was prudent during 1992-1997. RHA reasoned that this same range remained prudent during the following periods." Mr. Nunes expert report reflected, therefore, that "there was no development prior to July 2004 that required any shortening of the maturity structure of the 326-K portfolio to mitigate the interest rate risk." At the damages trial, Mr. Nunes testified, regarding this time frame:

There's several things that are kind of going on here, so I will kind of work through our analysis and thought processes as we looked at this. It's a period that ultimately ends with the distribution legislation, but for this length of time from '97 to '04, It's largely a continuation of all the things that we had read and analyzed and explained in our original work that suggested that the funds were of a long-term nature. There is still a lack of consensus. There is still at least a reckoning of the period or the early parts of the period. There is still a faction of Western Shoshone that wanted land back. This was a period where, as I recall, at least Senator Reid had presented maybe two or three distribution plans to Congress that had been rejected. So, although, as the Court points out in its decision, there was a building of a consensus, there -- this period of time for us, as we understand it, is really a continuation of all of the stuff that had been going on prior to this period. So that's kind of part one.

The second thing that we see -- and it's also described in the Court's decision -- is that this is an ever-larger pool of funds that has a very sort of a complex distribution facing it, a lot of different tribal entities, and that this was going to be a very difficult distribution, and folks in the Government were also -- understood that the task of developing roles was going to be a tremendous one. I think there was one thing I read that they called it tremendous and highly expensive, they anticipated. So -- as well -- and this I know was discussed at [the liability] trial by Dr. Goldstein. We have experience and the Government has significant experience with the length of time it takes for distributions that are highly complex and involve a significant amount of funds, that they can sometimes take literally decades, but in the end what we relied on was the Court's opinion that references a minimum of at least 2 1/2 years. That was a reasonable expectation of how long it would take for the development of -- in a "post-distribution plan having been accepted" environment, how long it would take, at minimum, to effect the distribution of these funds. So we have those two things informing us about sort of the conditions on the ground.

For the final breach period for the 326-K Fund, from July 2004 to September 2006, Mr. Nunes determined that

a shorter maturity structure was needed because the Distribution Act had now been enacted. To establish this new maturity structure, RHA relied on the Court's finding that the Government had invested the 326-K Fund prudently during the following period, October 2006 – December 2010, when the average maturity was 2.97 years. Once again, RHA reasoned that the investment horizon of the Fund was at least as long during the earlier breach period as during the non-breach period that followed. Therefore, it used 2.97 years as the maturity structure for the breach period.

On direct examination, plaintiffs' counsel and Mr. Nunes had the following exchange:

Q. I want to ask you about subperiod 6 in your chart [included below], which is July 2004 to September 2006. Now, this is the last breach period for the K funds, correct?

A. That's correct.

Q. How did you determine what maturity structure to apply for this breach period?

A. So we now know that the distribution legislation has passed, and, again, this is a restructuring moment, and so we recognize, of course, that the portfolio needs to be shortened. Similarly to the earlier period, in the next adjacent subperiod, the October of '06 to December of 2010, the Court had

found that the Government was not in breach. Now, this is a period that is later than the period that we're talking about here. During that period, we looked at the actual investment of the funds in that nonbreach period and saw that the average term structure was 2.97 years, and so, again, applying the same logic for the period -- the logic being the later period had a term structure deemed to be prudent of 2.97 years -- then logic indicates and it's reasonable to assume that the period prior to that -- so further back in time -- would have a prudent term structure at least as long, and so we went with the 2.97 from the next nonbreach period.

Q. The July 2004 to September 2006 period?

A. For the July 2004 to September 2006, using the term structure of the October '06 to December 2010.

Plaintiffs provided, on a cumulative, period-by-period basis, two damages calculations for the 325-K Fund, one if the Warm Springs presumption is applied, and another one if the Warm Springs presumption is not applied, which was referenced in plaintiffs' counsel's questions of Mr. Nunes. First, Mr. Nunes' cumulative damages calculations with the Warm

| Gov't in Breach? | Period | Sub-Period | Citation to RHA Model Calculated Amount[36] | 326-K Alternative A | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Model Calculated Balance - Period End Date | Balance per Statement | Difference (Cumulative Damages) |
| No | | Sub-period 1: 12/1979 to 8/4/1980 | N/A | N/A | N/A | N/A |
| Yes | Period 1: December 1979 to November 1992 | Sub-period 2: 8/5/1980 to 11/1992 | JX-443, WSIG-TRIAL-10825, located electronically at "JX-443-Rocky Hill Data", "June 29-2020 Production" | $ 111,846,793.00 | $ 79,012,301.00 | $ 32,834,492.00 |
| No | Period 2: December 1992 to June 2004 | Sub-period 3: 12/1992 to 03/1997 | JX-443, WSIG-TRIAL-10825, located electronically at "JX-443-Rocky Hill Data", "June 29-2020 Production" | $ 138,690,023.00 | $ 99,701,405.00 | $ 38,988,618.00 |
| Yes | | Sub-period 4: 04/1997 to 12/1997 | JX-443, WSIG-TRIAL-10825, located electronically at "JX-443-Rocky Hill Data", "June 29-2020 Production" | $ 154,675,356.00 | $ 104,314,686.00 | $ 50,360,670.00 |
| Yes | | Sub-period 5: 01/1998 to 06/2004 | JX-443, WSIG-TRIAL-10825, located electronically at "JX-443-Rocky Hill Data", "June 29-2020 Production" | $ 230,305,882.00 | $ 145,440,296.00 | $ 84,865,586.00 |
| Yes | Period 3: July 2004 to September 2013 | Sub-period 6: 07/2004 to 09/2006 | JX-443, WSIG-TRIAL-10825, located electronically at "JX-443-Rocky Hill Data", "June 29-2020 Production" | $ 247,682,272.00 | $ 155,739,419.00 | $ 91,942,853.00 |
| No | | Sub-periods 7 & 8: 10/2006 to 09/2013 | JX-443, WSIG-TRIAL-10825, located electronically at "JX-443-Rocky Hill Data", "June 29-2020 Production" | $ 113,847,294.00 | $ 36,707.00 | $ 113,810,587.00 |
| | | Balance at 6/30/2020 | JX-443, WSIG-TRIAL-10825, located electronically at "JX-443-Rocky Hill Data", "June 29-2020 Production" | $ 130,588,757.00 | N/A | $ 130,588,757.00 |

Springs presumption, is depicted below:

---

[36] The court removed from the chart the references to other spreadsheets.

| Gov't in Breach? | Period | Sub-Period | Citation to RHA Model Calculated Amount | 326-K Alternative B | | |
|---|---|---|---|---|---|---|
| | | | | Model Calculated Balance - Period End Date | Balance per Statement | Difference (Cumulative Damages) |
| No | Period 1: December 1979 to November 1992 | Sub-period 1: 12/1979 to 8/4/1980 | N / A | N/A | N/A | N/A |
| Yes | | Sub-period 2: 8/5/1980 to 11/1992 | JX-443, WSIG-TRIAL-10825, located electronically at "JX-443-Rocky Hill Data", "June 29-2020 Production" | $ 108,643,569.00 | $ 79,012,301.00 | $ 29,631,268.00 |
| No | Period 2: December 1992 to June 2004 | Sub-period 3: 12/1992 to 03/1997 | JX-443, WSIG-TRIAL-10825, located electronically at "JX-443-Rocky Hill Data", "June 29-2020 Production" | $ 134,718,026.00 | $ 99,701,405.00 | $ 35,016,621.00 |
| Yes | | Sub-period 4: 04/1997 to 12/1997 | JX-443, WSIG-TRIAL-10825, located electronically at "JX-443-Rocky Hill Data", "June 29-2020 Production" | $ 148,450,258.00 | $ 104,314,686.00 | $ 44,135,572.00 |
| Yes | | Sub-period 5: 01/1998 to 06/2004 | JX-443, WSIG-TRIAL-10825, located electronically at "JX-443-Rocky Hill Data", "June 29-2020 Production" | $ 218,499,659.00 | $ 145,440,296.00 | $ 73,059,363.00 |
| Yes | Period 3: July 2004 to September 2013 | Sub-period 6: 07/2004 to 09/2006 | JX-443, WSIG-TRIAL-10825, located electronically at "JX-443-Rocky Hill Data", "June 29-2020 Production" | $ 234,019,604.00 | $ 155,739,419.00 | $ 78,280,185.00 |
| No | | Sub-periods 7 & 8: 10/2006 to 09/2013 | JX-443, WSIG-TRIAL-10825, located electronically at "JX-443-Rocky Hill Data", "June 29-2020 Production" | $ 97,178,838.00 | $ 36,707.00 | $ 97,142,131.00 |
| | | Balance at 6/30/2020 | JX-443, WSIG-TRIAL-10825, located electronically at "JX-443- Rocky Hill Data", "June 29-2020 Production" | $ 111,463,006.00 | N/A | $ 111,463,006.00 |

(all capitalization and emphasis in original).

Next, Mr. Nunes' cumulative damages calculations without the <u>Warm Springs</u> presumption, is depicted next as:

(all capitalization and emphasis in original).

For the 326-A Funds and the first breach period from March 1992 to November 1998, to determine the appropriate maturity structure, "Mr. Nunes started from the Court's finding that the 326-A Funds had the same investment horizon as the 326-K Fund during this period." Plaintiffs explain:

> This means that a maturity structure that was prudent for one fund would also have been prudent for the other. The Court found that the Government had prudently invested the 326-K Fund during most of this period in a portfolio whose maturity ranged between 5-10 years. Thus, RHA reasoned that a maturity structure in that same range would also have been prudent for the 326-A Funds during this period.

For the second breach period, between December 1998 and June 2004, Mr. Nunes' model "transitioned the 326-A Funds over the first six months of 1999 to a long-term

portfolio, reflecting the unlimited investment horizon for these funds," relying on the court's earlier finding, described above, that

> [b]etween December 1998 and June 2004, the government also breached its fiduciary duty by primarily investing the 326-A Funds in short-term securities with an average weighted maturity years to call of approximately two years or less. During this time, the government became aware that various members of the Western Shoshone tribes were supportive or becoming supportive of placing the 326-A Funds into a permanent education trust fund, the principal of which was not to be invaded. The government even acknowledged in its 2003 internal investment report for the 326-A Funds that these funds likely would be set-aside as permanent education trust funds. Therefore, the government should have begun to transition the 326-A Funds into longer-term securities because the principal of the funds was not intended to be distributed.

According to plaintiffs' post-trial brief, for the last breach period between July 2004 to January 2012, in order to try and reach a damages conclusion, Mr. Nunes "continued to use the same long-term maturity structure for these funds." At the damages trial, Mr. Nunes and plaintiffs' counsel discussed Mr. Nunes evaluation of the 326-A Funds:

> [Q.] [F]or the A funds, how did you determine what maturity structure to apply for the first breach period, which is labeled subperiod 1, March 1992 to November 1998?

> A. Well, this -- for this period of time, it predates the moment of the -- when the conversation around converting the 326A funds into a permanent education fund, and so at this point we see that there's no difference -- although in a different account, of course, and a much lesser amount -- that there is no real difference between these funds than there are from the K funds, because they have not been designated for anything yet. And so looking at the K funds to inform us about the A funds, the -- almost the entirety of this period aligns with the -- for the K funds the first nonbreach period found by the Court, and as we've explained, that's the -- the Warm Springs presumption, ten years, with the non-Warm Springs, 7.86 years. And so -- seeing no difference in the funds, we used the same term structure, and we recognized the Government did not coordinate the investment of these funds, but the nature of the funds and the investment horizon to us were in alignment.

> Q. Now, for subperiod 2, which is December 1998 to June 2004, what did Rocky Hill determine for the maturity structure for this breach period?

> A. In the Court's decision, it was noted that by this point, December -- the start of this period, the Government essentially knew that these were going to be earmarked for permanent funds, although officially they became

permanent funds when the Distribution Act was passed, but the Court's decision makes it very clear that the Government knew this at that point, and it would be like any other permanent fund where you are never allowed to invade the principal, and at that point you almost have an instant investment horizon. And so we began -- we transitioned over six months the funds into a long-term -- a true long-term structure.

Q. Now, for the next subperiod, July 2004 to January 2012, what approach did Rocky Hill take with respect to maturity structure?

A. So once the Distribution Act was passed, it made it final that these were going to be -- that these now were permanent funds, and so we just continued to use the long-term term structure.

After establishing the parameters of the model and the maturity structure, Mr. Nunes determined the rate of return for a portfolio with the maturity structure he identified. When asked by plaintiffs' counsel: "How many possible strategies could have been used to invest the WSIG funds?" Mr. Nunes responded: "I hesitate to say infinite, but certainly there could be hundreds of different portfolios, you know, and a portfolio, by definition, is the result of a strategy, and there could have been hundreds of different variations, all -- all still properly aligned, you know, with the investment horizon of the funds."

Mr. Nunes, in his rebuttal expert report, concluded

the Government's investment methodology was essentially ad hoc, with no apparent consistency, both during the 1992-1997 period when the court found it prudently invested the 326-K Fund and during the periods when it imprudently invested the 326-K and 326-A Funds. The Government's ad hoc, inconsistent methodology is highlighted by the disparity between its investment of the 326-K Fund and its investment of the 326-A Funds in the period before December 1998.

Upon reaching this conclusion, Mr. Nunes decided to use a benchmarks, which plaintiffs argue "provide a neutral and objective measure of market average returns," and which reflects "the market-average rate of return for a diversified portfolio with the appropriate maturity structure. This approach is neutral and objective." (emphasis in original). During his direct testimony, in response to plaintiffs' counsel's question, "regarding your use of recorded benchmarks to establish the rates of return, why is that the approach that Rocky Hill takes to determine rates of return for purposes of damages?" Mr. Nunes explained:

Well, it's a couple of reasons. They're passive and rules-based, and so there's no – we're not using a portfolio that somebody else is managing and claiming that that is, you know, what the Government should have attained. We are strategy- and portfolio-agnostic, and we want to be strategy- and portfolio-agnostic because we recognize that to achieve a certain term

structure of a portfolio, it could be done any number of ways, and so the indexes are plain vanilla in that regard, and they provide us, again, with a sort of baseline. It's the market average performance based on the rules of the index, without any subjectivity whatsoever, and so, you know, we've always considered that to be, let's say, the lowest common denominator, but we take our -- we take our lead from the investment world itself. Indices, benchmarks are an invaluable measurement tool, because if your portfolio gets 4 percent in a given quarter and mine gets 4 1/2, I may feel pretty good about having beat you, but if both of our returns are substandard and what we both should have gotten was 7, the only way you know that is to have a measurement tool, and that's what the index is, because it's just reporting, if you will, the market average performance for whatever market it is trying to define.

Mr. Nunes' expert report for the damages phase of trial reflected that the benchmarks set are "passive and unbiased <u>measures</u> of the returns that could be achieved through prudent investment, <u>regardless</u> of the particular investment methodology that was employed." (emphasis in original).

Plaintiffs argue that "RHA's approach assumes that prudent investment in a correct maturity structure would have achieved results that match the market-average performance. No more and no less," and further allege that

RHA's benchmark approach to calculating damages does not specify how the funds should have been invested during the period at issue. It does not specify an active or a passive investment strategy. It does not specify what securities should have been purchased or how long they should have been held. Instead, its benchmarks reflect the <u>market-average</u> investment return for a diversified portfolio with the appropriate maturity structure. RHA's benchmark approach assumes that prudent investment in a correct maturity structure would have achieved results that match the market-average performance.

(emphasis in original). At the damages trial, Mr. Nunes explained the benchmarks used by plaintiffs' model:

[Q.] [W]hat indices did Rocky Hill use?

A. We used a family of indices from Barclays. It's the U.S. -- not the whole family, but pieces of their U.S. Treasury Index family, and we used those primarily because way back when we were researching the various Barclays indices, they were the only ones that at all times we felt confident were fully compliant with U.S. -- 25 USC 162, which governs the types of securities that the United States is allowed to invest Indian funds in.

Q. So how does Rocky Hill develop a benchmark for a particular maturity structure using the Barclays indices?

A. So what the Barclays indices are a -- so each one of them has their own set of rules, and they describe a piece of the Treasury index. In the broadest sense, the Barclays U.S. Treasury is all treasuries with maturities from 1 to 30 years, so that's almost the whole Treasury market without the T-bills. Other indices strip that down, but regardless of which index we're talking about -- and we did these three of them, which we can explain in a moment -- what these indices do is provide an objective, neutral measure of market average performance.

Mr. Nunes and plaintiffs' counsel later continued this line of questioning, with plaintiffs' counsel asking Mr. Nunes:

[Q.] Why -- first of all, what do the indices include and what is the reason that the decision was made to use certain Barclays Indices?

A. So way back when we first started doing this work and became aware of the USC -- 25 USC 162, where it very specifically defines what are allowable investments that BIA may purchase for investing Native American funds, that provided us with sort of the marching order of what we had to be careful not to be in violation of in anything that we would present in a model. And so we knew that we would use indices as the neutral and objective way to measure market average performance, but we had to look at what indices included, and in the case of then Lehman Brothers, we looked at -- they have a gazillion different indices, the U.S. Aggregate and subindices below it and some below that, and it's a really complicated grouping of indices, but in all of the indices that we looked at that also incorporated agencies, through taking a pretty deep dive, we found that they could include agency securities that we could not tie back to the constructs of 25 USC 162. But the Treasury indices were always clean, and so we ended up using Treasury indices because at least we could never be challenged on having unauthorized securities in the index that we're using.

As reflected in Mr. Nunes' expert report, Rocky Hill Advisors used three Barclays indices to develop the benchmarks for its revised damages calculations:

• the Barclays U.S. Treasury (UST) index, which includes all Treasury notes/ bonds with maturities between 1-30 years.
• the Barclays Long-Term U.S. Treasury (LT UST) index, which includes all Treasury notes/bonds with maturities between 10-30 years.
• the Barclays 1-5 Year U.S. Treasury (1-5 UST) index, which includes all Treasury notes with maturities between 1-5 years.

Based on the Barclays indexes used by Mr. Nunes to develop the benchmarks, at the damages trial, Mr. Nunes explained on direct testimony with plaintiffs' counsel:

[Q.] Now, based on the Court's liability decision, as you testified earlier, you established maturity structures of ten years or, alternatively, 7.86 years and then 2.97 years, for the various breach periods. How did you create benchmarks for those maturities from the various Barclays indices?

A. Each one of the indices that Barclays produces has a host of data points that they provide, and, of course, the weighted average maturity is one of them. So at any given point in time, we can see what the term structure of the index is, and so using -- to marry up the term structure of our model to the investment horizon of the funds as they changed based on the Court's decision, we used allocations between three of the Barclays indices to achieve the term structure targets that we were looking for.

Q. And how did you determine what proportion of each of the three indices to use as a benchmark for these specific maturity structures?

A. Well, in addition to proper alignment of term structure with investment horizon, one of the other basic tenets of prudent investment management is diversification, and so the most broadly diversified index that Barclays produces in the Treasury sector is the 1 to 30 year Treasury, and so that is always the starting point for us where we need to do allocations, because we always want to maintain the broadest amount of diversity -- diversification as possible to make sure that we're remaining in a prudent portfolio. And so just using round numbers, if, for example, if the Barclays UST [United States Treasury] for a given timeline, on average, was seven years to maturity and we were looking for a target maturity of eight, we would take out some of the Barclays UST, the shorter one, and we would plug in a little bit of the longer one, which is the Barclays Long-Term, so that the weighted average of the -- based on the allocations was as close as we could get to that target 8 percent -- eight-year term structure. Conversely, if we're looking for a shorter term structure than the Barclays UST is, by allocating, we would swap out some of the Barclays UST and bring in the shorter index, again, such that we could attain the targeted maturity that made sense based on the nature of the funds.

In his testimony at the damages trial, Mr. Nunes explained how plaintiffs' expert blend indices together to reach a specific maturity structure:

[O]ne of the key concepts of prudent investment, of course, is diversification. This actually sort of anecdotally supports that argument. So we always, where we can -- so if the UST is not a -- so, for example, in our roll-forward period, we used the 1-5, so the UST is not even part of the mix, but wherever the UST is a viable part of any kind of an allocation, we will

always attempt to stay in the highest allocation percentage of the UST because it is clearly, of the indices we use, the broadest and most diverse, and anecdotally, in that it returns a better number than most of her other scenarios, supports the fact that diversification matters. And so we concentrate on being the most diverse in our model constructs as we possibly can be.

Q. And so, then, when you needed maturity -- needed to meet a maturity structure, how did you then blend in either a shorter index or a longer index? Did you run a hundred different scenarios or how did you blend in either a longer or shorter index?

A. So the answer to did we run a hundred scenarios is, God, no. So we would start with the -- you know, obviously we know what 100 percent of the UST would return in terms of an average maturity, and so we would look at it and say, okay, let's just -- I think this is the example I used in my testimony -- let's just say that the UST at a point in time we're looking at has a term structure of eight years, and we need to be at ten years. We would simply begin sort of ratably -- and that's a bit of a guess at first, how much of the UST do I need to take out and how much of the UST Long do I need to bring in to maintain maximum diversification and still hit the ten-year targeted structure. And so, you know, it may have gone something like this. Okay, let's see what happens if I do 10 percent of an allocation -- reallocation from UST to long-term of 10 percent. What's that look like? That's 9.7, all right. So maybe we've got to shave it a little bit or add a little bit. So it's a little bit trial and error, but it's once we get to the targeted maturity that we need to be at at the maximum amount of diversification, that's the allocation.

Plaintiffs explain in their brief that "[w]hen RHA combines two Barclays indexes to develop a benchmark, it starts with the Barclays UST, which is the broadest-based and most diversified because it includes all maturities from 1-30 years. Then RHA adds in as much of the longer or shorter index as necessary to achieve the desired weighted average maturity." (citation omitted). In the above captioned case, plaintiffs' post-trial brief and Mr. Nunes' expert report for the damages phase of trial reflects that various benchmarks are composed as:

| Benchmark | Period | Composition |
|-----------|--------|-------------|
| 10-year | 1980-1992 | 86.05% Barclays UST; 13.95% Barclays LT |
| 7.86-year | 1980-1992 | 97.90% Barclays UST; 2.10% Barclays 1-5 UST |
| 10-year | Apr. – Dec. 1997 | 88.35% Barclays UST; 11.65% Barclays LT |
| 7.86-year | Apr. – Dec. 1997 | 90.20% Barclays UST; 9.80% Barclays 1-5 UST |

| 10-year | 1998-2004 | 91.60% Barclays UST; 8.40% Barclays LT |
| 7.86-year | 1998-2004 | 81.25% Barclays UST; 18.75% Barclays 1-5 UST |
| 2.97-year | 2004-2006 | 6.75% Barclays UST; 93.25% Barclays 1-5 UST |

As plaintiffs indicate in their post-trial briefs, the expert report

> used transition periods in its investment model when significant changes were made to the maturity structure of the Docket 326 Funds. It used a transition period of one-year in 1980-1981 to shift the 326-K Fund from cash equivalents into a diversified portfolio with a weighted average maturity of either 10 years or 7.86 years. It used a transition period of six months in 1999 to shift the 326-A Funds into a long-term portfolio. And it used a transition period of six months in 2004 to shorten the maturity structure of the 326-K Fund (from either 10 or 7.86 years) to a weighted average maturity of 2.97 years.

(footnotes omitted). On direct testimony, plaintiffs' counsel and Mr. Nunes discussed the purpose of the transition periods:

> Q. Now, did Rocky Hill also include a transition period as of August 1980 in order to transition the fund from short-term into these maturity structures that you've just discussed?
>
> A. We did.
>
> Q. And what was the reason to include this transition period?
>
> A. Well, as I pointed out at trial, there is not --well, there isn't an investment manager in the world, nor would there be a client in the world, that would want a portfolio of approximately $28 million that is for all intents and purposes in cash. Even though some of it was in very short-term CDs, it would be absolutely imprudent to convert that in another portfolio and essentially overnight. I mean, an example we used at trial, it's done rhetorically, through the Government and its witnesses, that if any of them had hit -- at that point we were talking about the original 26 million -- if any of them had hit a $26 million net lottery jackpot, would any of them show up the next morning at their investment manager's office, ask them to have a fully structured portfolio, seven or eight or ten years, by 4:00 the next -- the same business day? And, of course, it was a rhetorical question because I know the answer. It would just never be done. So you have to -- to be prudent, you need to have -- when you're doing something significant, like building a portfolio of this size out of cash or cash equivalents, you must do it over some length of time and not just like flipping a light switch and all of a sudden the portfolio is built.

Later during the damages trial, plaintiffs' counsel and Mr. Nunes revisited the transition periods with the following exchange on direct examination:

Q. Now, I know you've – you've provided testimony on this earlier, but, again, why does Rocky Hill include transition periods?

A. Well, no prudent investment approach is ever going to flip a switch and go from zero to a hundred with a portfolio overnight. You know, again, I use the example, which one of the experts that the Government uses would take $26 million to their investment advisor and say, hey, can you have my portfolio built by 4:00? I've got a tee time at 5:00. It just doesn't work that way, and they would not want that, and honestly I think it's disingenuous for them to say that that's the way this should be calculated. Now, it's a great story because interest rates are rising. That's not our fault that the funds were awarded in 1979, late in '79, at or near the cyclical high in interest rates that the world had never seen before, but nevertheless, that's when they were awarded. And one year later, when the Court says the first breach period happens, the discipline is the discipline. Regardless of where interest rates are and what direction they're heading, you are not going to convert an entire portfolio from nothing to something overnight. So there has to be a transition period of some length.

Finally, regarding the calculation of damages based on plaintiffs' model, Mr. Nunes testified on direct examination:

So at any given point in time, the real term structure of the portfolio is somewhere in between, and, yeah, we do know that -- I don't remember the exact number, but around 83, 84, 85 percent of the Government's callables did get called, not always on the first call date but fairly close to it. And so from a liability standpoint -- and we agree with the Court's decision -- the proper bound to use is the lower one because that's much closer to the real term structure of the portfolio. So, in other words, the portfolio was even shorter than one might think it was based on maturity structure, but -- so, you know, that informs the liability decision. In calculating damages, though, if because the real maturity structure is somewhere above that lower bound, if we were to use a term structure based on the weighted average years to the call for the purpose of calculating damages, then we would be understating damages somewhat. Conversely, by using the weighted average years to maturity, which is what we did for the purpose of calculating damages, we recognized someone could make the argument we're overstating damages, but, again, as we understand trust law and as we understand Western Shoshone, where there is any ambiguity or doubts regarding potential investment earnings, that they're resolved against the trustee. So in the -- the choice, I guess, between understating damages or overstating damages, we felt that the guidance was clear and that we

should use weighted average years to maturity with a purpose of calculating damages, even though weighted average year to call was used for the purpose of calculating -- for determining liability.

Defendant's Damages Model

Similar to plaintiffs, defendant did not call any fact witnesses at the damages trial. Instead, defendant called two experts, Dr. Starks and Dr. Longstaff. Although both Dr. Starks and Dr. Longstaff submitted expert reports and rebuttal expert reports for the damages trial, only Dr. Starks created a damages model for the court to evaluate, and offered testimony about her approach.[37]

Defendant contends that "Dr. Starks's calculations present a fair approximation of damages grounded in a prudent and achievable investment strategy that Interior could have executed in the real world, in accordance with its policies and practices and in light of contemporaneous facts."[38] In the post-trial briefing, defendant explains:

Dr. Starks selected alternative prudent investments that were longer-term in character, and reflect an investment time horizon consistent with the investments the Court found prudent during the non-breach periods. Dr. Starks also selected a buy-and-hold alternative investment strategy consistent with the Interior Department's policies and practices, which require Interior to balance investment returns against the risk of capital losses and prohibit frequent trading. The portfolio she proposes is based on

---

[37] As noted above, regarding Dr. Longstaff, plaintiffs argue that "Dr. Longstaff did not offer an opinion on the amount of damages in this case."

[38] At trial, defendant's counsel asked: "Dr. Starks, what types of data did you use to calculate damages?" Dr. Starks responded:

A. I used data on Treasury securities from the Center for Research Security Price, CRSP, which is maintained by the University of Chicago, Booth School of Business.

Q. And what types of information does that data set contain?

A. It has information on Treasury prices. It has information on Treasury issues. It has information on prices, information on the bid price, the ask price, the maturity of the Treasury bonds. It has detailed information on Treasury bonds.

Q. What time period did you look at for those data?

A. From 1980 to 2013.

a buy-and-hold ladder of bonds with a broad range of maturities. This approach mitigates interest rate risk, while also taking advantage of higher-yielding longer-term bonds. Dr. Starks's model also offers Interior flexibility to adapt its portfolio — replacing maturing bonds with longer or shorter-term bonds as the circumstances warrant.

Defendant continues:

Dr. Starks' calculated the additional income that Interior would have earned using her proposed alternative investment portfolio for each breach period. She then compared the investment income generated during each breach period to the actual balance of the Fund at the end of that breach period. For *non-breach periods*, Dr. Starks applied the *actual growth rate* of the Fund during those periods to the but-for portfolio balance resulting from the breach periods. So, for example, for the Docket 326-K Fund for the breach period August 1980 to November 1992, Dr. Starks calculated that her proposed alternative investment portfolio would have generated an additional $21,382,643. Dr. Starks effectively added that additional investment income to the balance of the Fund in December 1992, and assumed that it would have grown at the actual rate that the Fund grew during the December 1992 to March 1997 prudent period, growing the damages amount from $21,382,643 to $26,505,699 by April 1997. Dr. Starks's total calculations of damages therefore included not only the amounts of income Interior would have earned for the Funds during the breach periods, but also *additional income* that would have been earned on breach period damages during *non-breach periods* if Interior had invested prudently during the breach periods.

(emphasis in original; internal citation and footnote omitted).

At the damages trial, defendant's counsel asked Dr. Starks on direct examination about the relationship between the actual average maturity of the 326-K Fund and the buy-and-hold policy. Dr. Starks indicated:

[A.] Well, I think what you're seeing here is the effects on maturity of a buy-and-hold policy, because -- because once purchased -- or in the eighties, longer term CDs were purchased, and then they come down. Longer term securities are purchased and then it -- as time goes by, they go down, and then they're purchased again.

Q. Does the shape of the maturity structure of the 326-K fund over the period reflect a buy-and-hold strategy?

A. It does to me, yes.

Q. And is it your opinion, based on your review of the record in this case and the record of the Government's investments in this case, that the Government, indeed, followed a buy-and-hold strategy at all times in its management of this fund?

A. It appears that they -- that they were consistently following a buy-and-hold strategy.

Dr. Starks also used a chart as a demonstrative, which was admitted into evidence at the damages trial, to illustrate the actual average maturity of the 326-K Fund:



WSIG-TRIAL-10729

;

The court notes the similarities between this and the chart that Dr. Starks prepared as Demonstrative Exhibit 10 at the liability trial, and included above in the findings of fact. The above chart, however, does not include the representation of WSJF Years to Call with mortgage-backed securities which was included in Demonstrative Exhibit 10 at the liability trial.

To describe her model, Dr. Starks and defendant's counsel had the following discussion on direct examination at the damages trial:

Q. What types of information did you consider in conducting your damages analysis?

A. I looked at the Court's [liability] opinion. I looked at a number of documents in this case with regard to the Government. I looked at -- I also looked at a number of documents and research studies that I would use in my field and also considered other kinds of information to come up with what kind of model I thought would be appropriate for this.

Q. Okay. And, generally speaking, how did you go about calculating damages?

A. I -- just from the general perspective, I constructed a but-for ladder portfolio, and then I took the difference between the performance on that ladder portfolio over the time period and the actual performance, and the difference was -- were my damages.

Q. All right. Now, Dr. Starks, did you -- did you attempt to create a but-for portfolio that you felt was plausible?

A. Yes. That was very important, that it be plausible.

Q. What considerations did you -- did you make to suggest that your investment selections were plausible?

A. Well, again, I looked at the Court's [liability] opinion, I looked at what the Government could have done given their objectives, their policies, and their practices, and I also considered, given a buy-and-hold model, what would be the most logical buy-and-hold model to use to calculate damages.

Q. What were the Government's investment objectives?

A. To earn an acceptable return while preserving tribal capital and taking into account the needs of the tribes.

As indicated in Dr. Starks' expert report prepared for the damages phase of trial:

The BIA's investment decisions were constrained by a set of specific investment objectives guiding its management of the tribal trust funds. These objectives, which were specified by BIA policy, reflect the Bureau's practice with respect to managing the tradeoff between risk and return inherent in financial markets. In particular, the BIA's investment objectives reflect the Government's priority of earning an acceptable rate of return on the trust funds at issue while simultaneously mitigating the risk of loss, preserving capital, and having funds available for timely distribution when needed.

(footnotes omitted). At the damages trial, defendant's counsel asked Dr. Starks on direct examination:

Q. [W]hat were the Government's investment constraints?

A. As I've talked about before, one was this holding-versus-trading policy, the buy-and-hold policy that existed, and the other was the concern, the scrutiny that was given to bonds that were longer term.

Q. Now, are buy-and-hold strategies risk-free?

A. No, they're not. Buy-and-hold strategies -- again, you know, if we're just looking at treasuries, we don't really need to worry about the quality, don't have to worry as much about the liquidity risk, but we still have interest rate risk, and we have reinvestment risk. And so a buy-and-hold strategy, as I said earlier, you don't have the effects of interest rate risk while you are holding that bond because you're going to get back the principal since it's a government bond.

Q. Now, are there other types of risk beyond interest rate risk -- you say buy-and-hold strategies account for interest rate risk. Are there other kinds of risk that the Government might face in executing a buy-and-hold strategy?

A. One particular reinvestment rate risk. So you have the reinvestment rate risk when you're reinvesting the coupons, that you might not receive the same return that you were receiving on the bond when you bought it, and then you also -- when you -- when that bond matures, you have to reinvest those proceeds in another bond.

Q. Are there some -- are some buy-and-hold strategies better than others at managing reinvestment risk?

A. Yes. The ladder strategy -- the ladder portfolio is very useful for mitigating reinvestment risk.

Q. All right. Let's look at Demonstrative 60, please, and I'd just like for you to describe to the Court what a ladder strategy is.

A. It's -- a ladder strategy is that you set up your portfolio as if it's a ladder, so in this case this would be a ten-year ladder portfolio. You take one-tenth of the principal that you have to invest and you put it in that top rung in the ladder, and then you take another one-tenth and you put it in – I'm sorry, I should have been more clear. The top rung of the ladder is a bond with a maturity of ten years. Then you take one-tenth and put it in the second rung of the ladder, in effect a bond that has a maturity of nine years, and so forth. You do this for -- you put one-tenth in bonds of different maturities for each year all the way down to one year left of maturity.

Q. How does a ladder strategy operate to mitigate reinvestment risk?

A. Because when you are reinvesting either the coupons or you're reinvesting the principal, because you have the bonds maturing at different points in time, you're reinvesting at different interest rates if interest rates are changing, so you are mitigating that reinvestment risk.

Dr. Starks expanded on the benefits of the ladder approach during her direct examination, indicating

a ladder portfolio conforms to the buy-and-hold policy. It mitigates interest rate risk because you're holding the bonds to maturity. It mitigates reinvestment risk from those maturing securities, as I had talked about earlier, and -- and I think this is also important -- the average time to maturity and the duration of the portfolio remains stable over time, and so you have -- you have this stability in the risk of this portfolio over time. I would also say that ladder portfolios are particularly used with – they've been used a lot with government securities. They've been used a lot with pension funds, with endowments, with foundations. It's a very common thing.

In response to defendant's counsel's question: "Did you use a ladder strategy for your but-for portfolios for the 326-K fund and the 326-A funds?" Dr. Starks responded: "Yes, I did." Regarding her modeling, during direct examination, defendant's counsel and Dr. Starks had the following exchange:

[Q.] [W]hat did you look at it in terms of plausibility when selecting an investment horizon for your portfolio?

A. When selecting the investment horizon, I thought about the concern that the Government had -- and like I said earlier, that I saw throughout -- of being careful with the long-term bonds, and so I also thought about the degree of uncertainty there was and the amount of interest rate there was during the time period, particularly the early time period. And so I decided that ten years would be the appropriate ladder in terms of -- so the bonds ranged from ten years to one year in maturity.

Q. What is your understanding of the Court's findings [in the liability Opinion] as it relates to a prudent investment horizon?

A. I looked at the time period between 199 --December 1992 and March 1997, which is the time period that the Court found that the Government had invested prudently, and I looked at that time period, and as we looked at earlier, most of the months had maturities, weighted years to call, less than six years, and, in fact, less than 5.5 years, and so I took that time period

and looked at what was most plausible in terms of the weighted average years to call for this portfolio

Q. Now, Mr. Nunes testified that he based his investment horizons and maturity structures consistent -- in a way that's consistent with the Court's analysis for the periods in which the Court found no breach. Is that what you did, too?

A. Well, I would say that I took into account what the weighted average years to call really looked like in that period, because they took the high points, but I don't think you can base an investment strategy just on one month or two months when it was higher, because then it was going down. And so I took into account, in terms of plausibility, the frequency of the weighted average years to call, the months that had the different – I'm not being very articulate with this -- the months that had five years versus six years, seven years, eight years, and 9.7.[39]

Q. And, Dr. Starks, did you attempt to select an investment horizon that was consistent with the way in which the Government most frequently invested in that '92 to '97 period?

A. Yes, I did.

Q. Now -- and, I'm sorry, what was the investment horizon that you selected for your but-for portfolio?

A. I selected five years. So, again, with an average of five years, the average portfolio would be a ten-year ladder.

Q. Does that mean –

---

[39] As closing argument in the damages trial, defendant's counsel argued

the evidence actually is that although the weighted average years to call -- and that's the metric the Court used in its liability opinion for reasons it stated in that opinion -- but the facts are that the weighted average years to call of the portfolio during the prudent period, it did range between 4.7 years and 9.7 years, which in shorthand we have said, you know, we have kind of estimated about five to ten years, but, in fact, 80 percent of the time, those investments were in a portfolio that had a weighted average years to call of 7 1/2 years or less. So that information we know from the prudent period that can be brought to bear on what a reasonable alternative portfolio should be in this case and, you know, what information we can look to to damages during the breach periods.

A. They have bonds from ten years in maturity down to one year in maturity.

Q. And is that true for every -- every point in time during the breach periods, the ladder would hold bonds between -- ranging in maturities from 1 to 10 years?

A. Well, in the -- in -- when -- in 2004, when the Claims Distribution Act passed, I lowered -- I started reinvesting the one-year bond. Instead of reinvesting in another ten-year bond, I reinvested in a one-year bond, so the maturity started going down. I would also say that for the 326-A fund, when it became clear that the Government was going to be investing this money for the long term, I moved -- I put those funds from a ten-year ladder into a 28-year ladder, with an average maturity of 14 years, which was consistent with the Court's [liability] opinion about the 2012, 2013 period.

Q. All right. What -- which government policies inform your selection of five years for the average portfolio maturity?

A. Well, the trading versus holding as well as -- or I should say the holding-versus-trading policy, as well as the practice and policy of not -- of not going long term unless there was a particular reason for doing it.

Q. What aspects of finance theory inform your selection of five years as the average portfolio maturity?

A. Interest rate risk is also an important component of my decision because the longer term bonds -- and we've talked about them -- they have much higher interest rates, and given the uncertainty during the 1980s, I felt that interest rate was also an important consideration.

On direct examination with Dr. Starks, defendant's counsel asked "how does the investment time horizon change over time in your portfolio for the 326-K fund?" Dr. Starks answered: "The 326-K fund is -- I had a ten-year ladder until -- for the 1980 to 1992 period, and then – and then in the April 1997, I go back to a ten-year ladder, and until 2004, it stays with a ten-year ladder, and then it starts reducing in maturity." Dr. Starks continued:

So starting in August 1980, I invest everything, and like I said, I put one-tenth in each -- in bonds of each of these different maturities that are shown on the left-hand side. So it starts out with the ten-year ladder, has one-tenth in each of these bonds, and then a year later, when the one-year bond matures, that gets reinvested into a new ten-year bond. And then if you . . . look across time, you can see how these bonds mature. So the ten-year bond becomes a nine-year bond, becomes an eight-year bond, a seven-year bond, and a six-year bond, and each year as you reinvest, you're getting a new ten-year bond as the one-year bond is maturing.

Q. And when you transition in 2004 to a shorter investment time horizon based on the passage of the Distribution Act . . . how does the model perform that shortening of portfolio maturity.

A. Instead of buying a -- so in 2004, instead of buying a another ten-year bond, as you're continuing the ladder, you buy an additional one-year bond, and then you do that again in 2005. So you're shortening the maturity. That's one thing a ladder can do, it gives you flexibility to be able to shorten maturity.

For the 326-A Funds, Dr. Starks testified,

for 2004, I had a ten-year ladder, and then -- and then I moved the money into -- when it became clear from the Claims Distribution Act that it would -- it would be long term -- and, again, I used the Court's saying that the 11- to 14-year yield to call during the -- during the 2012-2013 period was prudent for the 326-A funds, I used that and I moved into a 28-year ladder, which has an average maturity of 14 years for the A funds. And I do this in two different ways. I do it in 2004, because that's when the Government knew for sure, but I also included in my rebuttal report calculations in case it would be useful for the Court if it -- if it's decided that the Government should have known this in 1998, and I -- because in the decision it said this became probable that it would become permanent, and so I moved it -- for my secondary calculations, I changed it from -- from going in 2004 to a 28-year ladder to going to the 28-year ladder in 1998.

After explaining the methodology of her model at the damages trial, Dr. Starks also provided a calculation of damages owed plaintiffs. As defendant explains:

With respect to the 326-K Fund, Dr. Starks started with the balance of the Fund at the beginning of the first breach period on August 4, 1980 and calculated the amount of additional income that Interior could have earned using a ten-year ladder portfolio between August 1980 and November 1992, instead of investing in the CD program the Court found imprudent. This calculation resulted in additional investment income of **$21,382,643** over and above the income that Interior actually earned during the period. Dr. Starks then assumed that, in a but-for world, this additional $21,382,643 would have been part of the 326-K Fund during the December 1992 to March 1997 *non-breach period*, and calculated the amount of additional income that the 326-K Fund would have earned during that period — using the rate of actual growth for the 326-K Fund during that period. This calculation resulted in **$5,123,056** in additional income during the December 1992 to March 1997 non-breach period. Dr. Starks then carried forward the balance of her calculations to determine how much additional income Interior would have earned had it invested the 326-K Fund in a one-to-ten-year ladder portfolio from April 1997 through June 2004. That

calculation resulted in additional investment income of **$29,507,915**. Dr. Starks then calculated the additional investment income that would have been earned between July 2004 and September 2006 if Interior had continued a ladder portfolio approach, but had begun replacing retiring bonds with one-year bonds to shorten the overall portfolio maturity in 2005 and 2006. That calculation resulted in additional investment income of **$4,684,779**. Finally, Dr. Starks calculated the amount of additional investment income that the 326-K would have earned during the *non-breach period* from October 2006 through September 2013 when the 326-K Fund was fully distributed to its beneficiaries. As she did for the damages during the October 1992 to March 1997 non-breach period, Dr. Starks assumed the balance of the Fund would have included the additional investment income earned during the previous breach periods and that the Fund would have grown at the same rate it actually grew from October 2006 to September 2013. That calculation resulted in additional investment income of **$13,118,123.** In total, Dr. Starks calculated that a prudent portfolio throughout the life of the 326-K Fund would have resulted in investment income of $262,606,465 million, instead of the $188,789,950 million that Interior actually earned over the life of the Fund. Thus, Dr. Starks calculated damages of **$73,816,515** — the difference between what Interior actually earned and what a prudent investment approach would have earned over the life of the 326-K Fund.

(emphasis in original; internal citations omitted). Dr. Starks also used a chart as a demonstrative, which was admitted into evidence, which the court reproduces below:



Source: Starks Damages Report (JX-435), at Exhibits 1, 3.                                    PAGE 64

WSIG-TRIAL-10764

For the 326-A Funds, defendant explains in the post-trial briefing:

Dr. Starks's calculations of damages for the 326-A Funds follow the same methodology. Dr. Starks began with the actual balances of the 326-A-1 Fund at its inception in 1992 and the 326-A-3 Fund at its inception in 1995, and determined the additional investment income these combined Funds would have earned, had they been invested in accordance with Dr. Starks's one-to-ten year ladder approach from March 1992 to November 1998. That calculation resulted in additional investment income of $165,782. Dr. Starks then carried forward the balance of the Funds as of December 1998 and calculated how much additional investment income the 326-A Funds would have earned between December 1998 and January 2012, had Interior invested the Funds in accordance the twenty-eight year ladder portfolio Dr. Starks adopted in her analysis. That calculation resulted in additional investment income of $1,010,314. Dr. Starks then took the balance of the 326-A Funds at the end of January 2012, and calculated the growth of the Funds at the same rate the Funds actually grew from February 2012 to the September 2013 end date of Plaintiffs' claims. The final calculation of damages totaled **$987,920**.

(emphasis in original; internal citations omitted). Dr. Starks also used the same demonstrative chart for the 326-A Funds which the court reproduces below:



**Value of the 326-A-1/A-3 Funds**

Damages
$1.0 M

Non-Liability Period

— Date of Change in Investment Strategy

— 10-Year / 28-Year Laddered Portfolio Value ■ Actual Fund Market Value

Source: Starks Rebuttal Report (JX-438), at Exhibit 26.

PAGE 66

WSIG-TRIAL-10766

Dr. Starks, in addition to testifying on direct examination about her model and her calculations of damages, offered a number of challenges to Mr. Nunes' modeling, both in her expert reports and her testimony at the damages trial. As noted above, the Mr. Nunes admitted there was an error in his calculations for his original expert report on damages, which was identified by Dr. Starks. Dr. Starks, in her rebuttal expert report for the damages trial, noted:

> The RHA Damages Report purports to "utilize the returns of the 326-K Fund portfolio as it was constructed by the Government *in calculating how the Fund should have grown*" during the period from the start of December 1992 through the end of March 1997, when the Court found the Government was not in breach of its trust responsibilities. This should be a straightforward exercise: all one needs to do is divide the March 1997 amount by the December 1992 amount. But RHA does this incorrectly.

(emphasis in original; footnotes omitted). As indicated in her expert rebuttal report, once the error is corrected, "ultimately RHA's damages for the 326-K Fund by $47.7 million for RHA's 10-year model, which is 26.8 percent of the total estimated damages, and by $45.0 million for RHA's 7.86-year model, which is 28.8 percent of the total estimated damages using that model." (footnote omitted).

As indicated in Dr. Starks' rebuttal expert report:

> RHA manipulates the damages it calculates by selecting an arbitrary transition period that avoids realizing market declines in the original period. Throughout its analysis, RHA employs "transition" periods for the Funds at various points in time "to adjust the maturity structure of the portfolio" to the benchmark structure selected by RHA for its analyses. That is, RHA makes the assumption that the counterfactual portfolio changes would have taken some months to implement. The first transition period in RHA's models for the 326-K Fund begins at the start of the investment period in August 1980 and occurs over twelve months, with 8.33 percent of value of the total 326-K portfolio transitioning every month from the assets actually held at that time to RHA's synthetic index. The second transition in RHA's models for the 326-K Fund begins in July 2004 and occurs over six months (not 12 months, as RHA assumed for the first transition period), with 16.67 percent of the value of the total 326-K portfolio transitioning every month to a maturity structure of 2.97 years. RHA also includes a transition period in its analysis of the 326-A-1/A-3 Funds; in that case it is assumed that the new investment strategy would take six months to implement.
>
> RHA's transition periods are problematic for several reasons. First, the use of the transition periods does not comport with the Court's [Liability] Opinion as to the timing of the damages periods. The Court found, for example, that the 326-K Fund was imprudently managed starting in August 1980, not one year later, when RHA's transition period for the 326-K Fund concludes. Second, setting aside for now my disagreement about the need for a transition period, RHA does not explain why the timing of the transition it selected does not match the maturity schedules of the securities actually held in the 326-K Fund as of the start of the relevant period. . . . Third, RHA's transition periods also are arbitrary. . . . Finally, RHA appears to have improperly implemented the six-month transition period it claims to have applied to the 326-A-1/A-3 Funds over the course of the first six months of 1999.

(footnotes omitted). At the damages trial, Dr. Starks responded to defendant's counsel's question during direct examination, what "would have happened if the Government had immediately executed Mr. Nunes' investment strategy from day one instead of just keeping the Government's portfolio in CDs and cash?" by explaining:

> So as of August 4th, 1980, the fund was about $28 million, and it would have immediately started losing money, and within just the first couple of months, it would have lost about a million dollars, and it -- as you can see, it still stayed where it was -- where it was in a loss from the 28 million throughout the entire transition period, had they not had a transition period. So the bottom line shows a ten-year model without any transition period.

Q. All right. And what impact does this 2. – would this $2.6 million loss in the very beginning of the breach period in 1980, what impact would that have had over the course of Mr. Nunes' damages model if he had employed it from the start?

A. If he did not have this transition period, then -- then because this $2 million would have accumulated, it would have resulted in damages being lowered by about $36 million.

Q. All right. And have you put together a demonstrative that demonstrates your effort to quantify the impact of the loss shielding transition period or loss shielding transition periods that Mr. Nunes uses in his model?

A. Yes. If you look at -- if you look at slide 42, it shows for the ten-year model, the transition period, if you took it away or corrected for it, it would -- it would have lowered damages by 36.7 million; and for the 7.86-year model, it would have lowered damages by 30 million.[40]

Plaintiffs respond that "RHA properly uses transition periods," and "Dr. Starks' contention that transition periods are unwarranted is belied by her own damages model."

At the damages trial, Dr. Starks also questioned the logistics of plaintiffs' model, explaining in an exchange with defendant's counsel:

[A.] Selecting the Barclays Index, in my opinion, is a choice of investment strategy; selecting the -- which indices to combine with which weights is an investment strategy decision.

Q. Now, could the Government have simply invested in Barclays Indices?

---

[40] At the damages trial, Dr. Starks was also critical of building a portfolio slowly with Treasury securities, noting "I haven't seen where, with Treasury securities, somebody waits a year to -- to invest slowly over time with this idea of, oh, I have reinvestment risk. What I see is portfolio managers that are trying to get in as quickly as possible, and they will even take used futures in order to be fully invested." Defendant's second expert, Dr. Longstaff, similarly commented at the damages trial, that "the Treasury securities market is incredibly liquid, even back in the 1980 era, you know, it was – daily trading volume was in the billions, and it's so liquid that it's very -- you know, very easy, straightforward, low-cost to put on large positions and do those within minutes, literally," and, therefore, "the idea that, you know, that a portfolio that's on the magnitude of a hundred million or 26 million, that it might take 18 months to transition it into a portfolio is just kind of astonishing. That's just not consistent with the realities. In liquid markets, you could turn those kind of portfolios around literally in days, weeks at the worst."

A. No, not back in -- in the beginning. It would have required investing in a very large number of different bonds, and you need to -- again, as the composition is changing, because the Treasury is constantly issuing new bonds and other bonds are maturing, as this -- as you have these changes, the Government would have had to have been changing the index.

Just to explain a little bit more about it, a bond index is very different from a stock index. The S&P 500 isn't as difficult because you -- and let's just act as if the 500 stocks don't change. You invest in the 500 stocks. As the prices go up or down, your index naturally goes up or down, and you don't have to be selling or buying new shares because you have your portfolio constructed of the S&P 500. So it's – it's not that difficult. A bond index, as I said, is much more difficult because you have bonds that are maturing, you have new bonds that are consistently coming in, and so your -- your -- and this index is market valued. So you have to be reproportioning every bond in the index. Mr. Nunes gave an example with just two bonds and how it wouldn't be that much or he made a comment it wouldn't be that much, but you have hundreds of bond securities. If you want to emulate that index, you would have to be buying some, selling some, and to make sure that you're keeping up with the market value as new bonds are being issued by the Treasury.

After hearing testimony at the damages trial from Dr. Starks, court heard testimony from Dr. Longstaff. As explained by Dr. Longstaff on his direct testimony, prompted by a question from defendant's counsel:

[Q.] have you conducted any analysis in this case to demonstrate the fallacy of reaching for yield as it applies to investing in Treasury securities?

A. Yes. I conducted kind of a simulation exercise to try to illustrate the point that if you invest in a longer term bond, you don't necessarily get higher returns than investing in shorter maturity bonds. And I'll try to, kind of in a bit of a pedantic way, just use a simple simulation exercise to kind of illustrate this concept in as simple way as I can.

Q. So if you could just describe these three simulated strategies that you looked at.

A. Okay. Well, what we would do as a simple simulation exercise, we are going to imagine that we were standing back there at August of 1980, looking at the term structure that existed in the market at that date, and we are going to basically explore just what would happen if I had invested $1 in each of three different strategies.

In the first strategy, we are going to basically simulate what would happen if I bought a one-year zero-coupon bond and then, you know, a year later it

matures, and roll it over into a new one-year bond, and we do that each year for ten years and keep track of what happens to the value of that portfolio over ten years.

In the second strategy -- so that's the rollover strategy, the first one. The second one is we are going to conduct that same exercise but this time we are going to assume that you start off in 1980 and you buy a ten-year zero-coupon bond, and we hold that bond to maturity. So we have a buy-and-hold strategy here, and we hold that bond to maturity for ten years.

And then the third variation on this, we are going to simulate what happens if we follow kind of a targeted maturity strategy. The idea here is that at the beginning of the ten-year period, we buy a ten-year zero-coupon bond, but this time we hold it for a year, and then we go into the market, sell it at whatever its new price is, reinvest the proceeds into a brand new ten-year bond, and we just keep doing that every year. So you're kind of zig-zagging between the, you know, ten-year maturity, nine-year, back and forth, kind of in a targeted maturity, similar, as I understand, to kind of the -- well, the Rocky Hill approach here.

Defendant's counsel then asked Dr. Longstaff to further describe his analysis:

A. Yes. What we do is -- again, as I mentioned, we go back, looked at the term structure that existed in 1980, August 1980, used kind of a simple model to generate paths of the interest rate over time, and just modeled what the value of each of these three strategies would have been at each point in time, each year over the next ten years, and we kind of then take a look at the over a million simulations and kind of try to get some understanding of what the range of possibilities are.

Q. All right. Turning to your Demonstrative Number 7, would you describe for the Court the results of your simulation with respect to strategy number 1?

A. Yes. So there are way too many to show on one piece of paper, so we first break out the first, I think, hundred, and it shows here what happens if you invest $1 in Strategy 1, just rolling over a one-year zero-coupon bond each year for ten years, start off with $1, and, you know, depending on whether -- you know, if rates go up, the strategy will do better, and if rates go down, it will do less well, and just keep track over time what some of the possibilities are. This is just one of a hundred paths that we're looking at, but you'll see that over time the value tends to grow, but there is risk about what the value of the portfolio will be at any point in time, and that's true even over ten years. We don't know what's going to happen. It depends on reinvestment rates, and you can see that there's a wide range of possibilities. I think, very significantly, the fact that because of its nature,

rollover strategy, we never end up in a situation, for example, where we will have a principal loss. The value of the portfolio will always be greater than one. The strategy, even though we don't know exactly what the outcome will be, we do know it has the nice feature that it's not going to produce any capital losses. This would be important if, for example, there was uncertainty about the investment horizon. It might take us ten years, but what if it's only three or five or something happens? It shows that there will be some randomness in the value of the portfolio, but we would never have a principal loss with this strategy.

Q. Thank you. Let's turn to Demonstrative Number 8, and could you describe for the Court the results of your simulation with respect to Strategy 2?

A. Okay. Just a reminder to the Court, what we're doing here is we're starting off with buying a ten-year zero-coupon bond, and we're buying and holding that -- buying and holding it for ten years. And as you can see, there are situations here where, after one year, let's say if interest rates go up, the value of that bond could actually go down. It could actually have a principal loss. Vice versa, the rates could go down and the bond price could go up, but there's, you know, considerable risk about the value of that portfolio after one year. Going forward, even out to five years, there's a -- there is a substantial probability that if you had to liquidate that portfolio early or, you know, had to pull the plug on the strategy after five years, you could actually do that where you have lost money and have less than one dollar. That occurs approximately about 8.7 percent. Now, because of the strategy, because in ten years the bond is going to mature, and you are assuming that there's no default risk, the bond will then actually convert to a value of 2.69, guaranteed. So with this strategy, over -- if you hold it for ten years, there's no risk. Now, there is risk, however, if you have to liquidate at an earlier point, but this strategy then, after we get past the about six- or seven-year point, it's sufficiently short term that we wouldn't have losses if we had to liquidate in, let's say, year eight or year nine. But it does illustrate that this portfolio has a very different risk and return characteristics and that a longer maturity bond doesn't necessarily guarantee that you will have more returns than a shorter maturity bond.

After Dr. Longstaff outlined the three strategies in his analysis, defendant's counsel asked Dr. Longstaff to compare the three strategies "in terms of risk and return." Dr. Longstaff explained:

Just keeping track of what is the probability of having a principal loss, which is one metric of maybe underperformance, and that's a dramatic measure of underperformance, but we can see, for example, that Strategy 1 will never lose principal. It's of a short-term nature. It does well when rates go up. The other strategies do poorly when rates go up, a kind of the opposite

type of risk there. With Strategy 2, we can see that in the first year, if you have to liquidate after one year, suddenly there's like a 36 percent chance you would be under water, where you would actually have lost money over the first year. As you go farther into the future, that probability declines, and by the time you get to about seven years, then the chances of having a principal loss are pretty much gone. So that has a little more risk than Strategy 1 in that sense. Strategy 3, again, which is much more like a targeted maturity strategy like Rocky Hill, you can see that that strategy has a positive probability of loss over all investment horizons. It's more pronounced at the beginning because of the way that the term structures evolve. It starts out with about a 36 percent chance of a principal loss after one year, but it's still substantial after seven, eight, nine, ten years.

Q. And let's turn to your Demonstrative Number 11. What did the simulation tell you about the expected magnitude of a loss when a principal loss did occur?

A. Yes, this was kind of interesting. It's not just that the loss can happen. It's that the loss could actually, when it does happen, could be very, very severe. This demonstrates -- of course, Strategy 1 never has a loss. There's no graph on this chart for Strategy 1. But for Strategy 2, if you had to, let's say, liquidate after one year, after one year, Strategy 2 -- remember, this can happen with a 36 percent chance -- if there is a loss, the average loss is somewhere between 15 and 20 percent. That means that you've lost almost 20 percent of the initial funds. That's a severe, severe shortfall. Strategy number 2 I think after about two years is probably the worst scenario, about 20 percent, starts coming down, but the losses, when they can occur, on average could be very severe losses, in the range of 5, 10, 20 percent. Things are even more dramatic for the third strategy, because when you do -- when the loss does occur, it's on average a very bad loss. Even after three, four, five years, some of those losses are on the order of 20, 25 percent. Even going out to ten years, if there's a loss, it, on average, would be somewhere between 15 to 20 percent. These are significant -- significant from the perspective of managing funds. This would be a huge hit to the value of the portfolio. People who were expecting positive returns could end up in scenarios where they have actually lost money and have less than they initially started with.

With regard to the demonstrative exhibit 11, created by Dr. Longstaff, and referenced above, the demonstrative shows:



Therefore, defendant argues,

the two buy-and-hold strategies performed similarly to or even offered higher expected returns than Strategy 3 depending on how long the portfolio is maintained but exposed the portfolio to a substantially lower risk of losses, and a much lower risk of significant losses. Dr. Longstaff's simulation demonstrates that, at least by comparison to the type of frequent trading strategy Plaintiffs' expert Mr. Nunes advocates, Dr. Starks's buy-and-hold ladder portfolio both mitigates risk and ensures competitive returns on investment.

During his direct examination, Dr. Longstaff was asked the following questions by defendant's counsel about Mr. Nunes' model:

[Q.] Now, as a part of your assignment, did you prepare a damages calculation in response to Rocky Hill's damages calculation?

A. Yes. I was asked to do kind of a sensitivity analysis, and so, yes, I did that analysis.

Q. All right. Let's turn to Demonstrative 15, and, Dr. Longstaff, could you describe for the Court sort of how you set up your sensitivity analysis, what you took from Rocky Hill's approach, and then how you sort of modified it to perform your sensitivity analysis.

A. Yes. What I wanted to do is basically use their framework, their modeling approach, their infrastructure, architecture, and preserve as much of that as possible to be consistent with this period and what they were doing, but I wanted to sort of get at the issue of how much are they relying on these two assumptions, as I had mentioned, the assumption that everything in the five-to ten-year range was equally plausible and that you would reliably do better by always picking the longest maturity in available range. So I wanted to relax those two assumptions just to because their damages estimate change when you just change those two assumptions. I'm trying to keep everything else as much the same as possible.

Q. And how did you go about doing that?

A. So, again, what I wanted to do is adopt their assumptions, so what we preserved -- as you know, they're focusing only on Treasury bonds, not the agencies or the CDs. We're doing the same thing. They used an index-based approach. I think they have three different indexes. We said let's do the same thing. Let's just pick three indexes, just parallel what they're doing, picked three indexes. So that was the approach. We are going to use the same periods over which, you know, they're doing their analysis and try to keep everything the same, other than kind of maybe relaxing those two objectionable assumptions.

Q. Are you -- just to clarify -- and at the top here for the Court -- are you testifying that the sensitivity analysis -- excuse me, that the sensitivity analysis that you performed is your affirmative damages opinion?

A. No, no. This is – we're simply evaluating the impact of those assumptions made by Rocky Hill on their damages estimates. It's in no way an independent, stand-alone damages estimate. I'm just simply taking their framework and testing the sensitivity of their damage estimates to be what I view as their cornerstone or foundational assumptions that underlies their investment strategy.

Q. All right. Let's talk about the mechanics of how you correct Rocky Hill's damages' approach in your exercise.

A. Yes. You know, this demonstrative -- the key things we wanted to focus on is we wanted to avoid this possibility of hindsight bias. We don't know ahead of time what's going to happen. And so we wanted to use an approach, you know, within their context that is basing portfolio construction on the information that is known at the time. Furthermore, it's important to recognize that, as we've seen in some of these demonstratives, that the risk and return characteristics of different bonds change over time. This was a dramatic periods where rates are going up, they're very volatile, and they're

lower in different periods. It's important to sort of reflect that circumstances, the economics of the markets, can be changing.

In response to Dr. Longstaff's critiques, plaintiffs argue that "Dr. Longstaff used financial <u>theory</u> to criticize RHA's conclusion that no particular maturity structure in the range of 5-10 years was more plausible than another," and contend that "Dr. Longstaff either misapprehends or ignores what RHA actually did. He criticizes RHA's approach based on theoretical analyses about how a maturity structure should be chosen on an *ex ante* basis." (emphasis in original).

Moreover, although noting that Dr. Longstaff did not create a model for damages in the above captioned case, plaintiffs and Mr. Nunes were still critical of Dr. Longstaff's role in the case.[41] Plaintiffs argue that Dr. Longstaff's "critiques are utterly irrelevant because RHA did not purport to select its 10-year and 7.86-year maturity structures on an *ex ante* basis; to the contrary, it explicitly relied on hindsight." (emphasis in original). Plaintiffs conclude by alleging "Dr. Longstaff criticizes RHA's choices of maturity structure based on academic exercises that have no relation to RHA's evidence-based determination. Moreover, Dr. Longstaff bases his criticism on an alternative investment model that is unrealistic and imprudent. Accordingly, his testimony is irrelevant to the issues before the Court." On direct examination, Mr. Nunes and plaintiffs' counsel discussed Dr. Longstaff approach:

[Q.] I want to ask you about Dr. Longstaff's financial theory that he offers regarding choosing an optimal maturity structure within that five- to ten-year range. What is your response to Dr. Longstaff's use of this financial theory for choosing this optimal maturity?

A. I mean, for starters, it -- I think it disregards the Court's decision and instead -- I don't know what the proper term is -- it kind of runs this million iteration mostly like game theory or something that reminded me of -- oh, I

_____

[41] In defendant's post-trial reply brief, defendant responded to the criticism of Dr. Longstaff by indicating

it is noteworthy that Plaintiffs' Reply Brief studiously avoids any discussion of Dr. Longstaff's testimony, which among other things, supports Dr. Starks's selection of a one-to-ten year bond ladder portfolio with a 5-year weighted average maturity. The sensitivity analysis that Dr. Longstaff prepared and presented at trial showed that, viewing each investment contemporaneously and without the benefit of hindsight, and accounting for the risk-return tradeoff, a portfolio with a weighted average years-to-maturity of 5.7 years would have been optimal for the 1980-1992 and 1997-2004 breach periods.

(internal reference omitted; capitalization in original).

can't think of the right term, but in any event, it's -- it's a simulation of a bunch of iterations that tries to -- and then purports to come up with some optimal structure.

In addition to the criticism of Dr. Longstaff, plaintiffs were critical of Dr. Starks and her model. Plaintiffs criticized Dr. Starks changing her model from the liability phase of the trial to the damages phase of the trial. Furthermore, plaintiffs argued that Dr. Starks did not properly articulated her reasons for making the adjustments. Plaintiffs point to the following exchange on cross-examination between Dr. Longstaff and plaintiffs' counsel at the damages trial:

> [Q.] Dr. Starks, when you formulated your opinion that you're now giving about five years being the appropriate structure, you knew that the Court had said that from 1992 to 1997, five to ten years was the appropriate range, and you had also opined that the Government was appropriate within that range, correct?
>
> A. I had -- I think as I've said, I had said that -- I had given my opinion that as they changed their maturities – there's a range of prudence, and as they changed their maturities over that time period, I thought that they had been investing prudently.
>
> Q. All right. Now, knowing all of that, you now say that in your opinion five years was the appropriate investment horizon or maturity structure for the period from 1980 to 1992, correct?
>
> A. I believe that five years -- given, again, the Court's opinion, given the Government's policies, practices, and investment objectives, given the conditions at the time, and given the financial and economic theory -- that five years was the most plausible portfolio -- maturity.
>
> Q. During the liability trial, you testified that you weren't clear on whether five years would have been a prudent maturity structure during the 1980s, didn't you?
>
> A. I -- I may have. I said that there was a range of prudence. There's a lot of interest rate uncertainty. I may have said I wasn't clear on the five years.
>
> Q. Well, then, my question becomes, Dr. Starks, when is it that you became clear on the five years?
>
> A. Well, in order to -- I haven't changed my opinion, but in order to meet with the decision that the Court has made, I had to -- I had to consider a wider range of prudence. But I hadn't said that five years wasn't prudent, only that –

Q. So you –

A. -- the only thing I said was that 15 years wasn't prudent over that time period.

Q. I asked you whether five years would be prudent, and you said you weren't clear on that, didn't you?

A. I did, but I didn't say it wasn't prudent.

Q. So you reached the opinion that it was prudent after you knew the Court's decision that a range between five to ten years was prudent between 1992 and 1997. You took the Court's decision into account, did you?

A. I took the Court's decision into account. I also took into account, again, the government constraints, the government policies, practices, and the financial conditions at the time, and the other -- and the other -- what was going on with the tribe at the time.

Q. Now -- and on that basis, you chose the maturity that was at the low end of the range that the Court had said in its opinion was prudent, right?

A. I chose -- it wasn't the most conservative portfolio, but it was a conservative portfolio, again, as I testified yesterday, because of the great deal of uncertainty in both interest rates as well as in what was going to happen with these funds -- the tribal funds.

Q. My question didn't go to the portfolio, Doctor; it went to the maturity structure. You chose the maturity structure at the bottom end of the range that the Court had said was prudent from 1992 to 1997, right?

A. And when you – I'm very confusing -- confused by your having corrected me on this, because the maturity structure is embedded in the portfolio, so I think my answer is the same.

Additionally, plaintiffs argue that "Dr. Starks' damages model is not credible because its maturity structure is based solely on her own *ipse dixit* opinions, and it produces a return far below the market-average returns calculated by RHA. It is not plausible because the Government never used her proposed investment methodology (bond ladders) to invest the Docket 326 Funds." (emphasis in original). Responding to plaintiffs' contentions regarding Dr. Starks, defendant argues "Dr. Starks's plausible and substantial damages estimate is supported by the evidence, complies with this Court's Liability Opinion, and offers the only reasonable basis for a damages award in this case."

As described above, Mr. Nunes, in his expert report, concluded

the Government's investment methodology was essentially ad hoc, with no apparent consistency, both during the 1992-1997 period when the court found it prudently invested the 326-K Fund and during the periods when it imprudently invested the 326-K and 326-A Funds. The Government's ad hoc, inconsistent methodology is highlighted by the disparity between its investment of the 326-K Fund and its investment of the 326-A Funds in the period before December 1998.

Upon reaching this conclusion, Mr. Nunes decided to use benchmarks, which plaintiffs argue, "provide a neutral and objective measure of market average returns," and which "reflect the market-average rate of return for a diversified portfolio with the appropriate maturity structure. This approach is neutral and objective." (emphasis in original). In addition, in their post-trial briefs, plaintiffs argue that "the evidence does not indicate that the Government would have used a particular investment methodology or strategy had it invested the Docket 326 Funds prudently. The Government's investment policies do not mandate any particular investment methodology." Citing to the court's June 13, 2019 liability Opinion, plaintiffs claim the Department of the Interior "policies 'give very limited guidance and set almost no rules regarding what would or would not be a prudent investment of tribal trust funds.' Nor did the Government follow any consistent investment methodology in practice." (quoting W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States, 143 Fed. Cl. at 624).

In the June 13, 2019 liability Opinion, and as described above, the court explained that the Department of the Interior issued various policies regarding the investment of tribal trust funds over the investment period in question, but the policies did not give much direction on which investment practices and investments might be considered prudent or imprudent. Beginning with the first investment policy issued by the BIA in 1966, the BIA noted that "[e]ach Area Office is requested to review the amount of tribal trust funds each tribe in the respective Areas has on deposit in the Treasury," and that "[w]herever it appears that the amount is in excess of foreseeable cash needs of the tribe, discussions should be held with the tribal council and its wishes regarding investment of the funds ascertained." The 1966 policy statement also noted that "[g]overnment-backed securities, while basically safe, can result in losses unless held to maturity." The 1966 policy, however, did not discuss which types of investments were considered prudent for tribal trust funds. As indicated in the June 13, 2019 liability Opinion:

The next policy issued by the BIA was in a 1974 internal BIA memorandum, which indicated that the BIA should "maximize returns on all tribal, as well as individual, trust funds." The 1974 policy memorandum also noted that "[e]ach Area Director has the responsibility for determining if surplus funds are available for investment purposes and notifying the Branch of Investments, Albuquerque, to take the necessary action to invest the funds." The 1974 policy memorandum, however, did not explain under what circumstances the government's investment of a tribal trust fund might

satisfy the government's goal to maximize returns or what constituted prudent investment of tribal trust funds.

The government also issued a further policy statement within its report of its investments for tribal trust funds for fiscal years 1986 and 1987. The report recognized that the government has the authority to invest tribal trust funds pursuant to 25 U.S.C. § 162a and that the BIA should, "through knowing the amounts required and when disbursements are necessary," "plan the timing of investment maturities to maximize interest rates and earnings and also have the funds available when needed." The report for 1986 and 1987, however, like past BIA investment policies, did not provide more specific guidance as to when the government's investment of tribal trust funds might satisfy the duty of prudence.

Next, the trial record includes a 1997 internal policy memorandum released by the Office of the Special Trustee, the office which took over the BIA's investment of tribal trust funds in the 1996. The 1997 policy was updated with policy amendments by the Office of the Special Trustee in 1999, 2000, and 2005, and took its final form for the purposes of this case in 2005. The 2005 policy was the policy in place up through the disbursement of the tribal trust funds at issue. According to the 2005 policy, an acceptable investment practice was to "purchase securities with the intent to hold each security until maturity," i.e., a buy and hold strategy, as opposed to frequent trading of securities. The 2005 policy also indicated that unacceptable portfolio investments and practices included investing in any "corporate stock," the purchase of "commercial mutual funds," and "overtrading, adjusted trades or bond swapping." In sum, the Department of the Interior's investment policies issued throughout the years acknowledged the Department's role as the trustee and investor of tribal trust funds and attempted to provide broad guidance to government officials as to what investment practices were prohibited by agency policy, what investment practices were encouraged, and offered general investment goals, including to maximize investment returns.

W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States, 143 Fed. Cl. at 622-23. The court noted, however,

[g]iven the fluctuating market conditions and changing events regarding the timing of distribution for plaintiffs' tribal trust funds, including the required actions the BIA would need to take in order pay-out the 326-K Fund, however, specific, formulaic guidance as to what practices constituted a "prudent" investment practice would have been very difficult to establish by the Department of the Interior or any other governmental body.

Id. at 623.

In addition, as described above, in 1997 the Office of the Special Trustee adopted the 1997 Office of the Special Trustee Policy. The 1997 Office of the Special Trustee Policy also listed "**ACCEPTABLE PORTFOLIO INVESTMENTS AND PRACTICES**," which explained, among other practices, the Office of the Special Trustee's "'Holding' versus 'Trading'" practice. (capitalization and emphasis in original). According to the section of the 1997 Office of the Special Trustee Policy discussing "Holding versus Trading,"

> OTFM intends to manage its Indian trust portfolios in a manner that protects the integrity of the primary function of the portfolio, which is to provide maximum income for the tribes while conforming to prescribed statutory limitations and prudent fiduciary investment principles.

> Because OTFM has a small number of investment managers responsible for the investment management of over 1450 separate portfolios, OTFM will purchase securities with the intent to hold each security until maturity, while realizing that sales can and may occur prior to maturity form some of the following reasons:

> 1. When account review presents obvious opportunity for portfolio enhancement from the reinvestment of sales proceeds into comparable maturities thereby improving yield or quality without adversely affecting overall quality, mix or maturity of the investment portfolio.
> 2. The need to improve or increase portfolio liquidity.
> 3. The need to invest the proceeds of a security maturing within one year because of an interest-rate scenario that would be detrimental to the performance of the portfolio if held to maturity before investing, i.e., a rapidly falling interest rate period.
> 4. A reduced credit rating of the issuing Agency renders the security to be of less than acceptable quality to remain in the portfolio.

The 1997 Office of the Special Trustee's "Holding versus Trading" section also noted that "[i]nfrequent investment portfolio restructuring carried out in conjunction with a prudent overall risk-management plan that does not result in a pattern of gains being taken and losses deferred will generally be viewed as an acceptable practice within the context of an investment portfolio." According to the testimony of defendant's fact witness, Mr. Winter, at the liability trial, the 1997 Office of the Special Trustee's "Holding versus Trading" practice meant that,

> that we need to purchase securities with the intent and ability to hold to maturity; and that, secondly, we're permitted infrequent investment restructuring if the market conditions present themselves as such, but we

can't be doing so by establishing a pattern of buying and selling, reaping gains and losses on any sort of frequency.

Mr. Winter also testified at the liability trial that the 1997 Office of the Special Trustee Policy was the "first formal policy adopted by the Office of the Special Trustee." Mr. Winter further testified at liability trial that the Office of the Special Trustee issued amendments to the 1997 Office of the Special Trustee Policy in 1999, 2000, and 2005, but that these policy amendments, apart from extending the maturity limits of certain government-backed securities from an "average life" of ten to fifteen years, were not "material" changes to the 1997 Office of the Special Trust Policy. Moreover, Mr. Winter testified that the 2005 policy amendment was the policy in place up until the distribution of the 326-K Fund. Mr. Winter further testified at the liability trial that the 1966 policy, the 1974 policy and the 1986 and 1987 report were consistent with the 1997 Office of the Special Trust Policy, and the later 2005 policy to "purchase securities with the intent to hold each security until maturity," i.e., a buy and hold strategy, as opposed to frequent trading of securities.[42]

---

[42] At the liability trial, Mr. Winter and defendant's counsel had the following exchange:

Q. So let me point you to paragraph four, Mr. Winter, and it states here in paragraph four, "Preparatory to undertaking any investment program with surplus trust funds, a tribe necessarily would have to make a careful analysis of its current and future cash needs." My question to you, Mr. Winter, is, is there a corollary between this statement here in the 1966 policy and the Office of the Special Trustee policies we were just discussing?

A. Yes, there is.

Q. Okay. What is that?

A. Well, this -- the corollary is to our current -- in the policies we were just reviewing, to the objective of liquidity.

Q. Okay. And what do you mean by that?

A. Meaning that we have to identify the cash flow needs of the tribe in order to adequately invest in maturities suitable to the needs of the tribe in order to discern the most advantageous rates for those maturities.

The questioning between defendant's counsel and Mr. Winter continued:

[Q.] Is this a statement of policy by the Bureau of Indian Affairs in and around 1974?

A. Yes, it is.

As noted in the findings of facts above, during the early 1990s, the Department of the Interior transitioned from its program of pooling together and investing tribal trust funds in short-term jumbo CDs to primarily investing tribal trust funds into other securities with varying maturities, such as agency and Treasury securities. Mr. Nunes testified at the liability trial that around the early 1990s, the BIA made "a wholesale transition away from the CD program, which ultimately went away completely, and monies now were being invested in agency securities, mortgage-backeds, callable bonds, and things like that." Defendant's liability expert, Dr. Starks, testified at the liability trial that after about 1991, the BIA made a "programmatic" switch from investing tribal trust funds in jumbo CDs into "agency securities in particular and a little bit longer term U.S. Treasuries." Dr. Starks discussed the change in type of securities held by the government at the liability trial noting that

> [A.] Well, I think what you're seeing here is the effects on maturity of a buy-and-hold policy, because -- because once purchased -- or in the eighties, longer term CDs were purchased, and then they come down. Longer term securities are purchased and then it -- as time goes by, they go down, and then they're purchased again.

---

> Q. All right. Turn with me, please, to the second page of this document at Bates page 259, and, in particular, I want to draw your attention to the second paragraph that appears on that page, and, in particular, just let me read the first few lines. "Investments can be made for a period of one day or for as much as 25 years or longer. Therefore, all funds except the funds for immediate needs can be invested to provide a greater income to the tribe. The maturity dates can be arranged to coincide with the needs for the funds." Do you see that, Mr. Winter?

> A. Yes.

> Q. Okay. And, again, without belaboring it, does this statement of policy in 1974 have a relationship/corollary to statements of policy that we were discussing with respect to those policies of the Office of the Special Trustee?

> A. Yes, it definitely relates directly to the liquidity, the rate of return, and the holding versus trading aspects.

Finally, in response to defendant's counsel question "this document is in the form of a 'Report of Investment of Indian Trust Funds for the Fiscal Years 1986 and 1987' . . . is there a corollary between this statement of policy and those that appear in the Office of the Special Trustee formal policies we were discussing earlier?" Mr. Winter testified: "Yes, it definitely does. The corollary would be to the liquidity aspect and the rate of return objective."

Q. Does the shape of the maturity structure of the 326-K fund over the period reflect a buy-and-hold strategy?

A. It does to me, yes.

Q. And is it your opinion, based on your review of the record in this case and the record of the Government's investments in this case, that the Government, indeed, followed a buy-and-hold strategy at all times in its management of this fund?

A. It appears that they -- that they were consistently following a buy-and-hold strategy.

The demonstrative chart prepared by Dr. Starks, included above, shows that the government generally followed a buy-and-hold strategy during the time periods at issue in the above captioned case. This approach adopted by the government is consistent with the approach adopted by Dr. Starks in constructing her model for this case. Although the plaintiffs and Mr. Nunes repeatedly claim the government's "investment methodology was essentially ad hoc, with no apparent consistency," the court disagrees. Nor does the court agree with plaintiffs contention that the government did not follow "any consistent investment methodology in practice." Although the court concluded that, at times, the government did not prudently invest the tribal trust funds, the court did not reach this decision because it found that the government did not have a consistent investment strategy or that it was operating in an ad hoc fashion. Rather the court found the government was in breach because the government was investing the tribal trust funds in shorter term securities with an average weighted maturity years to call that did not align with the investment horizon of the funds.

On cross-examination with defendant's counsel, Mr. Nunes discussed the consistency of the buy-and-hold approach by the government.

[Q.] [I]n looking at BIA's investment practices, you discerned no patterns whatsoever that would guide you in deciding where, within this five- to ten-year range, you should set your benchmark. Have I -- have I characterized your opinion correctly?

A. Close. I would -- we could not discern anything in this time period that indicated the BIA had any kind of a consistent investment approach.

Q. Okay. Now, they did have a consistent investment approach in that their policy that they wrote and adhered to was a buy-and-hold policy, right?

A. In the -- it does state that in the policy, but that was not a consistent practice, as we know from the data.

Q. Okay. But, in fact, you looked at this and you found that in 85 percent of the time or more, BIA adhered to a hold until maturity policy, right?

A. Based on the number of sales that we saw in the data, assuming they were properly classified, that's approximately correct, yes.

Q. Okay. And, in fact, you did an analysis of this subject and you found that between 1997 and 2011, there were only 60 instances in which BIA sold WSIG securities before maturity, right?

A. I think in the broader timeline, it's 74, but I think that's right for the narrower timeline.

Q. And the broader timeline is what? Help me here.

A. Life of the fund, but really insignificant until the CD -- you don't buy and sell -- well, you buy them, but you don't sell them.

Q. So by the life of the fund, you're talking about 1980 until 2013?

A. Yes, but from a practical standpoint it's not until the CD program is wound down, so really the first sale in advance of maturities, probably '92-ish, but don't hold me to it. Again, I would have to look at the data.

Q. Okay. So the time period you're talking about is, since it's post-CD period, is 1992 to 2013?

A. It's something like that.

Q. Okay. And you're telling me that in that period, 1992 to 2013, you found that there were approximately 74 instances in which BIA sold the WSIG security before maturity?

A. I think that's right, correct.

Q. Okay. In 20 years? 30 years? No, 20 years?

A. Well, really up until -- and that doesn't include any activity around the liquidation of the fund to do the disbursement, so say through 2010.

Q. Sure. Well, that wouldn't -- including the liquidation for the disbursement period would skew the numbers, wouldn't it?

A. It would.

Q. Especially for this analysis?

A. Right.

Q. So 74 instances where the security was sold before maturity between 1992 and 2013?

A. 2010.

Q. That's what you found?

A. 2010.

Q. Out of how many hundreds of -- how many securities did BIA hold on behalf of Western Shoshone between 1992 and 2010?

A. Oh, I don't know. Over the life of the – you know, as they rolled in and out? I don't know. A fair number.

Q. Several hundred, right?

A. That's reasonable.

Q. So 85 percent or more of the securities that WSIG that BIA purchased on behalf of the Western Shoshone were held until maturity.

A. Again, roughly, or to the call. . . .

Q. Do you recall Dr. Goldstein's testifying as an expert on behalf of Plaintiffs in this case at the liability phase?

A. I do.

Q. Do you recall him testifying in the case that the Government actually did adhere to a buy-and-hold policy and they didn't turn over the bond portfolio regularly?

A. Well, as I said in my deposition, there is no such thing as a little bit pregnant. If you're buy and hold, you're buy and hold. If you're only 85 percent or 72 percent or 91 percent buy and hold, you're not buy and hold. . . .

Q. But in your opinion, adhering to a buy-and-hold policy 85 percent of the time is not adhering to a buy-and-hold policy?

A. Well, it doesn't -- it means you're adhering to a buy-and-hold concept 85 percent of the time.

The court disagrees with Mr. Nunes' conclusion about the buy-and-hold approach adopted by the government over the thirty three year timeframe. Therefore, the court disagrees with plaintiffs' conclusion that "the evidence does not support the use of any particular investment strategy to calculate damages because the Government never consistently followed a particular strategy when it did prudently invest the Docket 326 Funds. Since the Government's actual investment practices do not provide a template for measuring damages, it is necessary to turn elsewhere." The court believes the trial exhibits and testimony from the liability phase of the trial as well as the trial exhibits and testimony from the damages phase of the trial demonstrated when the government invested the tribal funds, it did so consistent with the government's policy objections and statutory requirements.

Even if the court agreed with plaintiffs' conclusion that the government had not provided a template to calculate damages, the court would not necessarily follow the model created by plaintiffs' expert Mr. Nunes. In defendant's post trial brief, defendant argues that Mr. Nunes' model is

> not realistic. Mr. Nunes's damages model does not fairly measure income that could have been earned by investing in a manner consistent with sound principles of finance and real-world constraints, including the Interior Department's statutory obligations, policies and practices. Plaintiffs continue to repeat that Mr. Nunes's model is based on "objective, verifiable data" and "market averages" but ignore that Mr. Nunes's synthetic indices reflect subjective decisionmaking in almost every way, and mimic an inappropriate and risky investment strategy that the Interior Department simply could not execute in the real world. Plaintiffs' mantra that its proffered "benchmarks" do not reflect specific investment strategies defies reality, and Plaintiffs do not explain how the Interior Department could have possibly achieved the investment gains measured by Barclay's indices without undertaking the kinds of portfolio management that Barclay's uses to generate its results.

Although Mr. Nunes suggested that this model would be "strategy- and portfolio-agnostic, and we want to be strategy- and portfolio-agnostic because we recognize that to achieve a certain term structure of a portfolio, it could be done any number of ways, and so the indexes are plain vanilla in that regard, and they provide us, again, with a sort of baseline. It's the market average performance based on the rules of the index," the defendant argues "plaintiffs' bond index approach is not 'neutral' but instead reflects a specific and risky investment strategy." Dr. Longstaff's analysis of Mr. Nunes approach likened it to a "targeted maturity strategy like Rocky Hill, you can see that that strategy has a positive probability of loss over all investment horizons. It's more pronounced at the beginning because of the way that the term structures evolve. It starts out with about a 36 percent chance of a principal loss after one year, but it's still substantial after seven, eight, nine, ten years."

Furthermore, in Dr. Starks' expert report prepared for the damages phase of trial, Dr. Starks indicated that

> investment strategies involving regularly trading securities prior to their maturities would be inconsistent with the Government's objective of preserving capital and holding-versus-trading policies and general practice. In addition, from a financial economics perspective, strategies involving regularly trading securities prior to their maturities generally offer no obvious *ex ante* comparative benefit, and involve additional costs and risks.

(emphasis in original; footnotes omitted).

In addition, plaintiffs explain in the post-trial briefing, "[w]hen RHA combines two Barclays indexes to develop a benchmark, it starts with the Barclays UST, which is the broadest-based and most diversified because it includes all maturities from 1-30 years. Then RHA adds in as much of the longer or shorter index as necessary to achieve the desired weighted average maturity." (citation omitted). As noted above, Mr. Nunes' expert report prepared for the damages phase of trial reflects that various benchmarks are composed as follows:

| Benchmark | Period | Composition |
|-----------|--------|-------------|
| 10-year | 1980-1992 | 86.05% Barclays UST; 13.95% Barclays LT |
| 7.86-year | 1980-1992 | 97.90% Barclays UST; 2.10% Barclays 1-5 UST |
| 10-year | Apr. – Dec. 1997 | 88.35% Barclays UST; 11.65% Barclays LT |
| 7.86-year | Apr. – Dec. 1997 | 90.20% Barclays UST; 9.80% Barclays 1-5 UST |
| 10-year | 1998-2004 | 91.60% Barclays UST; 8.40% Barclays LT |
| 7.86-year | 1998-2004 | 81.25% Barclays UST; 18.75% Barclays 1-5 UST |
| 2.97-year | 2004-2006 | 6.75% Barclays UST; 93.25% Barclays 1-5 UST |

Defendant argues that

> the bond indices that Plaintiffs' expert Mr. Nunes adopts to calculate damages are not standard off-the-shelf Barclays indices but instead reflect Mr. Nunes's own curated data, mixed and matched to create a "market measure" that Mr. Nunes has crafted to maximize Plaintiffs' damages claims. Thus, rather than presenting the Court with a "neutral" benchmark, Plaintiffs have calculated damages based on a specific investment strategy, and one that is not only far less plausible than the one offered by Dr. Starks, but is also inconsistent with Interior's practices and policies.

As noted above, Mr. Nunes testified on redirect with plaintiffs' counsel about his approach:

[O]ne of the key concepts of prudent investment, of course, is diversification. This actually sort of anecdotally supports that argument. So we always, where we can -- so if the UST is not a -- so, for example, in our roll-forward period, we used the 1-5, so the UST is not even part of the mix, but wherever the UST is a viable part of any kind of an allocation, we will always attempt to stay in the highest allocation percentage of the UST because it is clearly, of the indices we use, the broadest and most diverse, and anecdotally, in that it returns a better number than most of her other scenarios, supports the fact that diversification matters. And so we concentrate on being the most diverse in our model constructs as we possibly can be.

Q. And so, then, when you needed maturity -- needed to meet a maturity structure, how did you then blend in either a shorter index or a longer index? Did you run a hundred different scenarios or how did you blend in either a longer or shorter index?

A. So the answer to did we run a hundred scenarios is, God, no. So we would start with the -- you know, obviously we know what 100 percent of the UST would return in terms of an average maturity, and so we would look at it and say, okay, let's just -- I think this is the example I used in my testimony – let's just say that the UST at a point in time we're looking at has a term structure of eight years, and we need to be at ten years. We would simply begin sort of ratably – and that's a bit of a guess at first, how much of the UST do I need to take out and how much of the UST Long do I need to bring in to maintain maximum diversification and still hit the ten-year targeted structure. And so, you know, it may have gone something like this. Okay, let's see what happens if I do 10 percent of an allocation -- reallocation from UST to long-term of 10 percent. What's that look like? That's 9.7, all right. So maybe we've got to shave it a little bit or add a little bit. So it's a little bit trial and error, but it's once we get to the targeted maturity that we need to be at at the maximum amount of diversification, that's the allocation.

Despite Mr. Nunes' testimony that his aim was "[t]o determine what the earnings rate should be if the Government had properly aligned the term structure of the portfolio with the investor horizon, we simply use market average returns for a plain vanilla, nonsubjective, nonhuman intervention index that says here's what the market did," it appears from the above testimony, and from Mr. Nunes' expert reports, that the model was designed to achieve an outcome. Regarding Mr. Nunes' approach, defendant's counsel and Dr. Starks had the following exchange at the damages trial:

Q. Now, did you analyze whether it was possible to construct other investment benchmarks with the same maturity horizon, the ten-year

horizon or 7.86-year horizon that Rocky Hill targets, and use these same indices, but that lead to different returns by weighting the industries differently?

A. Yes. If you use different proportions of the indices, you can come up with different damages estimates.

Q. All right. Let's turn now to Demonstrative 19. What did your analysis of the different ways in which you could weight the Barclays Indices to create an index, what did your analysis of that process show in terms of the different returns that might be generated if you weighed things a little differently?

A. Well, if you weighted them differently -- so the far right bar shows Rocky Hill's weights, which, as I said before, was 86.05 percent UST and 13.95 percent UST Long. Much of their period, that was the weights that were used. But if you go all the way to the left and you had 62.3 percent in the UST 1-5 Index and 37.7 percent in the UST Long Index, you would have again had an average target ten-year maturity over the time period, but the damages would have been substantially less, 169.5 million rather than their 177.6 million. The middle one shows if you used all three indices how you could have weighted them again to come up with a target maturity that was -- that was an average over the time period of ten years, and it would have been 173.8 million.

Q. All right. So -- and I just want to pare that down a little more specifically as to each bar. So the bar on the far right of this demonstrative, which is labeled RHA's weights, Rocky Hill's weights, Dr. Starks, is that the combination of the UST Long, UST Treasury Index, and UST Long Index -- or UST 1-5 Index that Mr. Nunes used to create his benchmark?

A. It's a com -- out of those three indices, it's a combination of two of the indices with zero percent and the UST 1 -5.

Q. And was that a choice that Mr. Nunes made in putting together his index?

A. Yes, it was.

Q. Okay. And that -- am I reading this demonstrative correctly that that resulted in 177.6 million in damages?

A. Yes.

Q. Okay. But there were -- there were other ways -- were there other ways to put together these three bond indices that would also reach a ten-year weighted average maturity target for the benchmark?

A. I think there are limitless ways that you could have combined those -- those indices.

In addition, defendant suggests "[t]o replicate the performance of Mr. Nunes's bond indices the Interior Department would have to buy and sell huge volumes of bonds and realize gains and losses from those transactions." Defendant continues:

Mr. Nunes's synthetic indices, which reflect combinations of different Barclays indices, must rebalance each month to reflect the changes in each of the Barclays indices it contains. In practical terms this means that any investor trying to emulate the performance of the Barclays indices, or Mr. Nunes's synthetic indices, would have to buy and sell bonds each month to match the index.

Plaintiffs note that defendant argued

"[i]n practical terms this means that any investor trying to emulate the performance of the Barclays indices, would have to buy and sell bonds each month to match the index." This statement is true but it is irrelevant and misleading. RHA does <u>not</u> propose to <u>emulate</u> the Barclays indexes, like an index mutual fund would do. Instead, it uses the Barclays indexes as a measure of the market-average performance of a diverse portfolio of Treasury bonds with a particular maturity structure.

(emphasis in original). The court finds this argument to be a distinction without a difference. The court is unclear how the government would have been able to replicate the return on investment achieved by the Barclays indexes without adopting an approach of frequent buying and selling securities. Nor is it clear from Mr. Nunes' model or his testimony at the damages trial how the government was to achieve such a rate of return if the government was operating under the general restrictions of a buy-and-hold approach to the investments held in trust for the plaintiffs.

Plaintiffs also cite to the <u>Jicarilla III</u> decision dozens of times in their post-trial submissions, as well as numerous references by Mr. Nunes at the damages trial. One reason for the numerous references of the <u>Jicarilla III</u> opinion was that the Judge in <u>Jicarilla III</u> accepted the Barclay's index approach developed by Rocky Hill Advisors to calculate damages. <u>See</u> <u>generally</u> <u>Jicarilla III</u>, 112 Fed. Cl. 274. In a succinct decision, the Judge in <u>Jicarilla III</u> explained,

plaintiff seeks to calculate damages by using a market index as a benchmark for determining the performance of a properly invested portfolio. Plaintiff's Rocky Hill investment model uses, for this purpose, a Barclay's index of U.S. Treasury instruments, specifically the Barclays UST, which is part of the Barclays U.S. Government Index. That index captures all public obligations of the U.S. Treasury with a remaining maturity of at least one

year, and includes Treasury obligations with maturities ranging from one to 30 years. Under this index, the allocation as between short-, medium-, and long-term bonds at any point reflects market forces (i.e., all relevant obligations outstanding) rather than any judgment by plaintiff's experts or others regarding what that mix should have been. Put another way, the Barclays UST is a passive, mechanical representation of market performance for a defined debt instrument market. In measuring performance, the Barclays index also includes, on a quarterly basis, the gains and losses on the bonds being tracked, thereby providing for the further accretion of principal.

In selecting this index, the Rocky Hill experts carefully considered the maturity structure of the Barclays UST to make sure that it aligned with what would have been a prudent investment of Jicarilla's funds. They ascertained that the Barclays UST had an aggregate average maturity that grew from 3.8 years to 9.1 years over the period in question, but observed that during this entire period, approximately 60 percent of the index was comprised of maturities ranging between one and five years, with an average maturity for this component of less than 2.5 years. In their view, the maturity structure of the Barclays UST aligned well with the maturity capacity of the funds in the Nation's trust accounts. They viewed their choice of the Barclays UST as somewhat conservative, as it was based neither upon the notion that there would be active management of the tribal trust funds nor upon any assumption that the funds would have been invested so as to generate an extraordinary performance that beat the market. In their view, the use of this index was also consistent with Jicarilla's demonstrated liquidity needs—a view that this court has confirmed in concluding that the BIA's short-term investment practices constituted a breach of trust.

In challenging plaintiff's investment model, defendant reiterates many of the claims that this court has already rejected. Echoing assertions made by its experts (or vice-versa), defendant's banner claim thus is that the short-term investment strategy employed by the BIA was prudent and particularly attuned to the Nation's liquidity needs. Based on the evidence discussed above, however, the court has rejected both prongs of this claim. And these arguments are no more persuasive the second time around, in this damages context, even if they now take on a somewhat different cast. As such, based upon the strength of its liability findings, the court cannot remotely accept Dr. Alexander's damages model, which, in relying upon those rejected propositions, produces damages of at most approximately $50,000.

That said, in talking about damages, defendant takes a somewhat different tack regarding liquidity. It claims that even if a significant portion of the portfolio should be treated as having been invested in longer-term securities, some portion of the portfolio needed to be kept in short-term

instruments, to provide some opportunity for the Nation to make withdrawals without having to liquidate investments. Based on this proposition, defendant claims that, at most, plaintiff is entitled to the damages associated with a hypothetical used by plaintiff's witness, Dr. Goldstein, who examined the performance of a portfolio invested eighty percent in five-year Treasury notes and twenty percent in three-month CDs—the approach that, in the chart above, the court references as "Defendant (High)." But, there are several major flaws with this claim.

First, defendant's claim hinges on an unproven proposition, namely, that the Nation's trust funds needed to maintain a certain balance of cash or cash equivalents in order to meet periodic withdrawal needs. The record simply does not support this factual claim. While the record suggests that the BIA often invested in very short-term obligations, there is no evidence that this was necessary to meet the Nation's true liquidity needs. Even assuming *arguendo* that there was a periodic need for the BIA to have cash on hand, there is no reason to believe that the BIA could not have produced that cash by selling longer-term securities—that, for example, the U.S. debt instruments in the Barclays UST were any less marketable or liquid than the three-month CDs used in Dr. Goldstein's hypothetical portfolio. To the extent that the sale of such instruments might have produced gain or loss, this was accounted for in the Barclays UST, which presumed that there would be periodic sales of the instruments in that index. Lastly, plaintiff was, in the court's view, entitled to assume in its model that the special debt certificates made available by the Treasury to the BIA—which offered the BIA the ability to shift in and out of investments without transaction costs or penalties—still would have been available if the BIA had employed an investment strategy using maturities like those in the Barclays UST. For all these reasons, the court credits the testimony of plaintiff's experts that a portfolio patterned after the Barclays UST represented a reasonable proxy for how the trust funds in question should have been invested. And, on that basis, the court concludes that the model proposed by plaintiff provides a reasonable and appropriate basis for calculating the damages owed here.

Jicarilla III, 112 Fed. Cl. at 307–10 (emphasis in original; footnotes omitted). As noted in both the June 13, 2019 liability Opinion and this Opinion, Jicarilla III is not binding on this court, and, although there are some similarities between the two cases, the facts in both cases are different. Moreover, as noted above, the plaintiff in Jicarilla III raised, and prevailed on, claims that are not before this court in the above captioned case. In Jicarilla III, the Judge of the United States Court of Federal Claims determined that the government was responsible for the unauthorized disbursement of the Jicarilla Tribe's trust funds and, further, that the government failed to timely process deposits of oil and gas royalties. See id. at 303-304.

Most significantly, in the above captioned case, and which was not true in Jicarilla III, the court found that there were periods of time in which the government did not breach its fiduciary duty. The court determined:

> Between December 1992 and March 1997, the government did not breach its fiduciary duty. During this time, when the enactment of distribution legislation for the 326-K Fund still remained unlikely to occur in the near-term, the government began to shift the 326-K Fund into different types of securities, including agency and Treasury bonds, and to decrease its reliance on short-term CDs. The government also lengthened the maturity structure of the 326-K Fund into longer-term securities, with an average weighted maturity years to call ranging from approximately five to ten years. Therefore, the government's lengthening of the maturity structure of the 326-K Fund portfolio during this time was within the range of prudence, given the longer-term investment horizon of the fund.
>
> . . .
>
> Between October 2006 and December 2010, the government did not breach its fiduciary duty. During this time, the average weighted maturity years to call of the 326-K Fund ranged from approximately one year and seven months to a little less than three years. The record indicates that distribution legislation for the 326-K Fund had been enacted in July 2004 and that government officials reasonably believed that a pay-out of the 326-K Fund would occur within a couple of years and invested the 326-K Fund in accordance with such information. Therefore, the government's decision to place the 326-K Fund in shorter-term securities during this time prudently corresponded with the shortening investment horizon of the fund.
>
> Between January 2011 to September 2013, the government did not breach its fiduciary duty, nor did plaintiffs appear to argue that the government's investment of the 326-K Fund was imprudent. During this time, the government began the distribution of the 326-K Fund monies to qualifying Western Shoshone members and, therefore, transitioned the entire fund into ultra-short-term overnight securities in order to liquidate the fund for distribution. Thus, the government's placement of the 326-K Fund in ultra-liquid securities during this time was prudent.

W. Shoshone Identifiable Grp. by Yomba Shoshone Tribe v. United States, 143 Fed. Cl. at 658–60 (footnote omitted). For the 326-A Funds, the court also concluded:

> Between February 2012 to September 2013, the government did not breach its fiduciary duty when it lengthened the maturity structure of the 326-A Funds into investments with an average weighted maturity years to call of eleven to fourteen years. Plaintiffs' liability expert, Mr. Nunes, acknowledged at trial that the government began to finally shift the 326-A

Funds into longer-term securities during this time and testified that this shift was "good news." Therefore, in light of the fact that the 326-A Funds' principal was not to be invaded and was to be perpetually held in trust, the government's decision to lengthen the maturity structure of the 326-A Funds during this time was prudent and consistent with the long-term nature of the funds.

Id. at 661.

In addition, as noted in the June 13, 2019 liability Opinion

Beginning in December 1992, the government significantly increased the average weighted maturity years to call of the 326-K Fund, reaching a peak of a little less than ten years by September 1993. Following the September 1993 peak, the maturity structure of the 326-K Fund steadily declined to about an average weighted maturity years to call of a little less than five years by March 1997. Also, by March 1997, the 326-K Fund was no longer invested in any CDs, and instead invested in a mixture of agency, Treasury, and mortgage-backed securities. At trial, plaintiffs acknowledged that the government invested the 326-K Fund in longer-term securities between December 1992 and March 1997 than it had previously done during the 1980s and early 1990s. Plaintiffs' liability expert, Mr. Nunes, however, testified at trial that government should have invested the 326-K Fund in even longer-term investments than those selected by the government, with an average weighted maturity of approximately fifteen years, due to the uncertainty surrounding when distribution plan legislation would be enacted by Congress and the time intensive process of compiling descendancy rolls and distributing the monies to qualifying Western Shoshone members. Defendant's liability expert, Dr. Starks, however, testified at trial that the government's investment of the 326-K Fund during this time, the "mid-1990s," was within a range of prudence.

Id. at 639. Moreover, as noted by defendant,

in *Jicarilla*, where the Court accepted a "benchmark" approach, the UST Index "benchmark" came much closer to representing an *objective* "market measure" for Treasuries than does the synthetic portfolio Mr. Nunes created for the damages trial in this case. The UST Index, used all by itself, and without Mr. Nunes's *ad hoc* "transition periods" and *ad hoc* conglomeration of multiple indexes, at least represents the entire universe of outstanding Treasury bonds and notes (excluding "T-bills" with maturities under one year). Thus, when Judge Allegra looked to Mr. Nunes's model as a benchmark, he was at least evaluating Interior's investment performance against a "market" that Mr. Nunes had not manipulated through subjective decision-making for purposes of calculating damages.

(emphasis in original). Furthermore, defendant argues "Mr. Nunes did not use the 'market measure' here that he proffered in *Jicarilla*, and had he done so, his damages estimate would likely have resulted in tens of millions less in damages." The different model used by Mr. Nunes in the above captioned case, including the blending of the indices, as well as the different posture of the two cases, does not compel this court to agree with the Jicarilla III Judge that the benchmark approach by Mr. Nunes is the proper measure for damages in this case.

Although the court has not found plaintiffs' model to be plausible, it does not follow that the court must adopt defendant's model. As noted above, Dr. Starks' model uses a buy-and-hold ladder portfolio. The court finds this approach is consistent with the approach previously used by the government. Plaintiffs argue, however, that Dr. Starks "investment methodology (bond ladders) is completely implausible because the Government never invested the Docket 326 Funds in that manner." The court notes that at trial defendant identified a number of examples of tribal trust funds that appeared to use a ladder approach, and discussed them with Mr. Nunes. Defendant's counsel first asked,

> in this policy – BIA policy document, do you see there's a description of how a laddered portfolio is designed and how it can be designed -- structured so as to anticipate future interest rates?
>
> A. I do.
>
> Q. And there are specific instructions about how to design and implement a laddered portfolio?
>
> A. That appears to be what's there, correct. . . .
>
> Q. What we were looking at before was Section 5.1 of this 2004 instruction -- appears to be an instruction manual . . . and do you see how in this sort of recipe for an initial presentation to a Tribe, that under lettered number (i), lettered item (i) it's said that they should go over and describe a laddered portfolio strategy? Do you see that?
>
> A. I do, I do.
>
> Q. And on the next page . . . they also describe how in a followup meeting with the Tribe when discussing their investments, again, lettered item (i), they should go over again a laddered portfolio strategy. Do you see that?
>
> A. I do.
>
> Q. You'll agree with me it does not appear that BIA was a stranger to laddered portfolios?

A. Ah, I never said that they were, only that we've never seen them actually do it. . . .

[Q.] Now, this is a July 1997 document involving the investment of the funds of the Jicarrilla [sic] Apache Tribe. Do you see that?

A. I do.

Q. Now, Jicarilla, that's a tribe you had a lot of involvement in, isn't it?

A. We testified on behalf of Jicarilla. I've never actually been involved with the tribe in that regard.

Q. But you were involved in studying their portfolio and their investments, yes?

A. That's correct, but this is the water rights settlement fund, which we never looked at.

Q. You never looked at this, okay. Do you see how under investment objective it says, "Per tribal instruction these funds are invested in a six month ladder with monthly rungs." Do you see that?

A. I do.

Q. So would you agree with me that it appears in this case that BIA used the laddered portfolio for trust funds -- for tribal funds held in trust?

A. Well, they're saying that that's what they've constructed, yeah, but, again, it's a water rights settlement fund, was not part of the case, so we've never seen this.

Q. You've never analyzed that particular fund?

A. No. . . .

Q. Okay. And this one appears to have to do with management of funds of the Pueblo Laguna. Do you see that?

A. I do.

Q. Okay. And under the investment approach, it says that the approach is going to be to ladder the account to ten years by purchasing both bullets and callable bonds. Do you see that?

A. I do see that, yes.

Q. This looks like another example where BIA used a laddered approach to a Tribal Trust Fund claim, right?

A. Well, I am going to state this again. They're saying they do. The proof in the pudding would be to analyze the portfolio and see if they actually did construct --

Q. Do you have any reason to believe they didn't invest the Pueblo Laguna's funds in a ladder?

A. I can't answer that without seeing the portfolio, and that's a Tribe I've never worked with their data.

It appears from the exhibits introduced by defendant at both the liability trial and the damages trial, that the government had adopted in the past a ladder approach to securities for the investment of tribal trust funds. Even if the government, as it relates to the investment strategy for the 326-K Fund and the 326-A Funds did not specifically identify the investment approach as "laddered," the buy-and-hold method, which Dr. Starks used to create her ladder portfolio analysis, appears consistent with the general buy-and-hold approach taken by the government. Moreover, as defendant notes, "Plaintiffs' argument, if accepted, *completely rules out* Plaintiffs' own damages calculations, which are premised upon a frequent trading strategy that Interior not only never used in managing the Funds, but which is *forbidden* by Interior's policies and *cannot be used* for *any* tribal fund under Interior's management." (emphasis in original).

As noted above, plaintiffs also contend that "Dr. Starks' damages model is not credible because its maturity structure is based solely on her own *ipse dixit* opinion, which is at odds with the evidence." Although plaintiffs argue that Dr. Starks' model is without evidence, the court found her expert reports as well as her expert testimony at the damages trial, and at the liability trial, to be well thought out and supported. As quoted above, Dr. Starks was able to articulate her methodology and the basis for her opinions and conclusions. The court found Dr. Starks' testimony to be credible and supportable by the documents in the record before the court at the liability trial, and the court again finds Dr. Starks' testimony at the damages trial credible and supported by her expert reports and exhibits introduced at the damages trial. Again, in arguing that "Dr. Starks' investment horizons are *ipse dixits* that lack credibility," plaintiffs challenge the basis for Dr. Starks opinion that "the appropriate pre-Distribution Act investment horizon for the 326-K Fund was five years." (emphasis in original). Plaintiffs also indicate that "[s]he uses this investment horizon for the periods from August 1980 until November 1992, and from April 1997 until June 2004." The court notes that for the interim period, December 1992 to March 1997, the timeframe the court determined in the June 13, 2019 liability Opinion to have been prudently invested, Dr. Starks' expert report reflects the government "invested the Docket 326-K Fund in a portfolio of securities reflecting a weighted average years-to-call ranging from 4.7 years to 9.7 years." Moreover, as explained in defendant's post-trial

reply brief, "[t]he portfolio during this prudent period *never* reflected a weighted average years-to-call of 10 years, and exceeded 7.5 years only 20% of the time. For the vast majority of this prudent period (80% of the time), Interior's investments reflected a weighted average-years-to-call of 7.5 years or less, and about half the time (49% of the period) reflected a weighted average years-to-call of 6 years or less." (emphasis in original). Dr. Starks' testimony at the damages trial is consistent with her conclusions in her expert report, and as she explained to defendant's counsel on direct examination that

> weighted average years to call is the better measure, because this difference here shows there were callable bonds in this portfolio, but then I also looked at the number or the percentage of months that had five years, 5 1/2 years, six years, so forth, in terms of the weighted average years to call.
>
> Q. All right. Let's look at Demonstrative 30. What's shown here on Demonstrative 30, Dr. Starks?
>
> A. Demonstrative 30 shows the frequency in months of the different maturities between 4.7 years and ten years. And so, for example, the -- the less than five years was 19 percent of the month, and only 2 percent was between 9 1/2 and ten years. And as the chart shows, 80 percent of the months have holdings with the weighted average years to call under 7 1/2 years, and, in fact, if you look at the first three bars, which shows the percentage of the months under six years, it is almost 50 percent.

The use of the investment horizon consistent with the non-breach period by Dr. Starks appears to the court to be reasonable.

Further, the court is puzzled by plaintiffs' criticism of Dr. Starks' decision to adjust her models between the liability trial and the damages trial. Plaintiffs specifically identified Dr. Starks' testimony on cross-examination that: "I haven't changed my opinion, but in order to meet with the decision that the Court made, I had to -- I had to consider a wider range of prudence." The court notes that the parties and their experts were specifically instructed to "be responsive to the decision on liability issued by the court on June 13, 2019." Moreover, Mr. Nunes' expert report for the damages trial states:

> Based on the this decision, [the court's Liability Opinion] we have revised our investment models to recalculate damages for the 326-K Fund and the 326-A Fund. Our revisions to the models (1) utilize the returns of the Government's extant investment portfolios for those periods in which the Court found no breach of trust, and (2) utilize investment horizons and maturity structures consistent with the court's analysis for those periods which the Court did find a breach.

Although the experts may have disagreed with some of the conclusions in the court's June 13, 2019 liability Opinion, the experts were specifically instructed to tailor their expert

reports for the damages trial phase, and, therefore, their testimony at the damages trial, to the framework established by the court. As indicated in the following exchange on direct examination between Mr. Nunes and plaintiffs' counsel at the damages trial:

> Q. Mr. Nunes, after the Court issued its liability opinion in June of 2019, was Rocky Hill Advisors asked to perform additional expert services for this case?

> A. Yes, we were.

> Q. And what was the scope of work that Rocky Hill was asked to perform?

> A. Based on the Court's decision on liability, we were asked to recalculate the damages that we had presented in the liability phase of the trial.

> Q. And what was the first step that Rocky Hill took to begin this second phase of work?

> A. Essentially, you know, reading the Court's decision to gain an understanding of where the Court had found the Government to either be in breach or not in breach and to understand -- I'll call it the moving parts to the Court's decision.

Mr. Nunes additionally testified at the damages trial: "I mean, as much as I love my own opinions, once the Court rendered its decision, my opinion was no longer applicable." The court does not take issue with the revisions to Dr. Starks' expert reports in light of the court's rulings after the liability phase of trial.

Plaintiffs also allege that Dr. Starks made a mistake in alleging that Mr. Nunes miscalculated his returns by incorrectly converting the Barclay indices. At the damages trial, Dr. Starks addressed her claim with defendant's counsel:

> Q. Explain to the Court what you mean by your statement that Rocky Hill has improperly – improperly stated the frequency of reinvestment in its model.

> A. So Rocky Hill has said that their reinvestment of earnings occurs quarterly; however, Barclays in the index reinvested monthly. . . . I'm not critiquing what Barclays does. Barclays is very good at transforming a monthly interest rate to a quarterly interest rate to an annual interest rate. My critique is that Rocky Hill said that they were reinvesting quarterly when, in fact, in their model, they are reinvesting monthly. So this difference between what they said they were doing and what they did in their spreadsheet is what I'm calling improper reinvestment frequency, because it doesn't align with what they said they were doing.

Q. All right. So let's look at Demonstrative 49. What did Rocky Hill say in its expert report -- these are excerpts from -- I should say, these are excerpts from Rocky Hill's report, JX420, and this is their liability phase report. What did they say about how the model reinvests returns?

A. Well, twice in this they said they were reinvesting the returns quarterly to align with the quarterly reset of the indices, and then at another point they said the investment earnings are reinvested quarterly.

Q. Okay. But what does their model actually do?

A. It actually reinvests monthly.

Q. And how do you know that?

A. Because I asked the people at Analysis Group to look at the model and see what they -- what they did, and I also know that the Barclays Index reinvests monthly.

Q. Let's look at Demonstrative 50. What does this indicate about how the Barclays model reinvests the interest income and gains that its model produces every month?

A. So they specifically say, for indices that rebalanced less frequently, cash is still reinvested pro rata at the end of each month, and cumulative returns over periods longer than one month still reflect monthly compounding.

In response to her testimony, plaintiffs allege,

Dr. Starks was wrong. A review of RHA's model demonstrates that there is no compounding of earnings within a quarter. Instead, the model reinvests earnings quarterly in accord with the Barclays data it is using – it applies the same earnings rate for each day of a quarter to the balance in the account at the beginning of the quarter. At the end of the quarter, those daily earnings are totaled up and added to the beginning balance to become the new balance for the next quarter.

Plaintiffs continue:

[t]he Government's entire damages case rests upon Dr. Starks. In its brief, the Government extols Dr. Starks and asks the Court to credit her testimony, and to discredit RHA based on her testimony. Yet it turns out that Dr. Starks made a multi-million dollar error in her testimony and a serious false accusation against RHA. A mistake of this magnitude seriously undercuts her reliability and credibility, and hence the Government's position.

In response, defendant argues "Plaintiffs' unfounded accusations appear to arise from Plaintiffs' own failure to understand the contradictions in Mr. Nunes's testimony, as explained by Dr. Starks." Defendant claims

> Mr. Nunes's expert reports and testimony raise the question Dr. Starks identified in her rebuttal report: because the Nunes damages model employs Barclays index data, does his model reflect the *monthly* compounding that the Barclays indexes incorporate into their returns? Mr. Nunes has repeatedly insisted that his model reinvests quarterly, not monthly. But Dr. Starks has demonstrated that Mr. Nunes's opinion on this point is, at a minimum, confused. The source of that confusion is the fact that Mr. Nunes's model incorporates the returns calculated by the Barclays U.S. Treasury indexes, and *the Barclays indexes reinvest earnings monthly.*

(emphasis in original). The cross-examination testimony of Mr. Nunes demonstrates that the parties are discussing two separate issues, which caused confusion. In discussing the mechanics of Mr. Nunes' model, defendant's counsel asked Mr. Nunes on cross-examination:

> Q. So it's the -- the cash is invested at the -- the cash income is reinvested every month, and as a result, in the following month starts to make money on its own.

> A. That's right.

> Q. Okay. Now, if instead the Barclays index reinvested the cash not monthly but quarterly, the actual revenue reflected in the index would be significantly less, would it not?

> A. No, because the quarterly calculation is the return for the quarter. It's a data point. There's nothing –

> Q. Okay, I think you're answering a different question than the one I asked.

> A. Okay.

> Q. And if I'm wrong about that, you can correct me, but my question isn't about the fact that you can report the earnings on a monthly or quarterly or annual basis. My question is how does the -- as a matter of mechanics, how does the Barclays model actually reask invest [reinvest] the income, the dollars coming in? And as I understand it, it reask invests [reinvests[43]]

---

[43] Although the trial transcript from the damages trial repeatedly refers to "reask invest" and "reask invests" from the context of the cross-examination by defendant's counsel of Mr. Nunes, it appears the testimony was "reinvest" and "reinvests."

dollars at the end of each month. So money coming in in January is invested and deployed, actively deployed, at the end of January and starting in February.

A. Yes. What it means is for February you're deploying more cash, but it's across the same index allocation once the index resets.

Q. Fair enough. But that cash is used, in effect, to buy more Treasury bills, treasuries, so that cash is now earning its own coupon payment.

A. Correct.

Q. Now, if instead what Barclays did or what your model did was invest that cash not at the end of each month but at the end of each quarter, meaning the actual earnings would be significantly reduced, would they not?

A. I mean, as you're describing it, it would likely have an impact, but you're bastardizing the Barclays index.

Q. I'm describing something that the Barclays index doesn't do.

A. That is correct.

Q. Is that your point?

A. Yes, correct.

Q. And my point is that -- well, your model, the mechanics of your model operates just as the Barclays index does; namely, it invests and actively deploys cash earned on a month-by-month basis, not on a quarter-by-quarter basis.

A. No.

Q. I'm wrong about that?

A. How our model does it?

Q. Yeah.

A. No. Our model reask invests [reinvests] each quarter's earnings at the end of the quarter in the same cadence as the Barclays index quarterly return data point resets.

Q. Okay, but I'm not -- I think we're talking about different things again. I'm not talking about data points. I'm talking about how the cash earnings -- at

what point the cash earnings are actually invested, okay, in treasuries, and my understanding is that in Barclays, the cash earnings are invested into new treasuries at the end of each month.

A. In the construction of the index.

Q. Okay. And then your -- your model does the same thing. It invests that cash on a monthly basis.

A. No.

Q. It doesn't? Your model invests it on a quarterly basis?

A. We use a data point that Barclays calculates and that we showed in validation that says this is the return of the index for the quarter, so meaning that in the quarter, the market average return of the index was -- pick a number, 5 percent. In our model -- and we validated that when we show how a monthly index produces the same result as the quarterly index produces the same result as an annual index -- again, all of those are data points that Rocky Hill is not calculating or in Dr. Starks' parlance converting. We take that 5 percent, and that becomes the model market average earning rate for the quarter, no reinvestment month to month. At the end of the quarter, whatever the quarter's earnings are based on that quarterly data point, they get reinvested such that day one of quarter two includes the prior quarter's principal balance plus the prior quarter's earnings based on the quarterly market average earnings rate.

Q. Okay. So your model reask invests [reinvests] the cash earnings on a quarterly basis.

A. Correct.

Q. Now, there would -- and my point is I think a simple one, which is that reinvesting the cash on a quarterly basis versus a monthly basis is going to have an effect on the actual returns.

A. In our model if we were to do it?

Q. No, just in the abstract. If Barclays reask invests [reinvests] the cash on a monthly basis or a quarterly basis, that's going to make it different as to what the returns will be.

A. No. We showed you in the data validation, it doesn't make a difference, because the data points that they're providing are clean data points for the frequency period in which they're providing them.

The court agrees with the defendant regarding the alleged "mistake" by Dr. Starks, and does not find Dr, Starks made a mistake labeling Mr. Nunes' model as reinvesting monthly given the Barclays index monthly reinvesting and monthly rebalancing. The court believes it was a fair criticism for Dr. Starks to identify, even if the confusion stems from the phrasing used by Mr. Nunes, and for defendant's counsel to address with Mr. Nunes on cross-examination.

The court, however, does take issue with a mistake made by Mr. Nunes. As noted above, on cross-examination with defendant's counsel Mr. Nunes admitted there was an error in his calculations in his original expert report on damages, a mistake which was discovered by Dr. Starks. At the damages trial, Mr. Nunes had the following exchange with counsel for the United States:

[Q.] [A] few minutes ago, you said that -- you acknowledged that Dr. Starks was right, and that was begrudgingly, and in the deposition you said you accepted the truth of what she said reluctantly. Why were you reluctant or begrudging in accepting that she had it right?

A. Because I hate giving up possible money, but, you know, you do what you have to do when it's right.

Q. What you had done in your original report was you had inadvertently imposed damages for a period in which the Court found the Government was not in breach.

A. By applying the manner in which returns of a portfolio are typically calculated in the investment world, yes. That did end up resulting in a larger growth rate in the non-breach period than was realized by the Government.

Q. And the net result of that mistake was to increase your damage calculation between 45 and 50 million dollars in both Scenario A and Scenario B.

A. That's correct, yes, in round numbers.[44]

In addition to what appears to be a clear error, examining the expert reports of all the experts, the court finds that Dr. Starks was a more credible and a more supported expert witness than Mr. Nunes, and offered to the court a more plausible model of damages.

---

[44] Plaintiffs complain that the "Government harps throughout its brief on a '$50 million error' made by RHA in originally calculating the growth of the Docket 326 Funds during the non-breach periods, which RHA corrected well before the trial," and note "Mr. Nunes addressed this issue forthrightly during his trial testimony and it played no role in the damages figures that RHA presented to the Court." (footnote omitted).

The court notes that, in addition to questioning the methodology and credibility of Dr. Starks, in their post-trial reply brief, plaintiffs also alleged, "[t]he government breached its duty of candor to the Court," arguing "[t]he Government's advocacy in its brief simply cannot be squared with its duty of candor to this Court." After citing to the Model Rules of Professional Conduct,[45] plaintiffs stated,

> the Government has a duty to candidly and accurately present the facts to this Court. While it is free to present those facts in the light most favorable to it and to argue the most favorable inferences from those facts, it cannot mislead the Court about those facts or permit one of its witnesses to do so, whether deliberately or inadvertently. Rather, the Government, like plaintiff's counsel, has a paramount, affirmative duty of candor to the Court that requires it to correct the record to ensure that this case is decided on its merits. Accordingly, the Government was required to correct Dr. Starks' erroneous testimony. It is not sufficient for the Government to stay silent and simply not respond to WSIG's attack on this aspect of Dr. Starks' testimony, without acknowledging this major chink in her armor. However reluctant the Government may be to undermine the credibility of its star witness, it has no choice. The Court has a paramount need to be accurately apprised of the material facts, as well as which factual issues are legitimately disputed and must be resolved by it. The Government owes an accounting to this Court for this breach of its duty of candor.

Defendant responds that "Dr. Starks's critique is accurate, there is no 'error' for the United States to 'acknowledge,'" and, therefore, there is "no merit in Plaintiffs' contention that the United States has breached a duty of candor to the Court." Defendant also argues that "[t]hese unfounded accusations are contradicted by the trial record." Having found that that Dr. Starks did not make the error plaintiffs allege, the court agrees with defendant there the government has not breached a duty of candor to this court. Although the American court system is based on an adversarial relationship between the parties, the unnecessary allegations of breaching the duty of candor made by the plaintiffs have no place in the above captioned case.

---

[45] In addition to citing the Model Rules of Professional Conduct, plaintiffs, quoting from a decision by the United States Court of Appeals for the Fourth Circuit note:

> "While Rule 3.3 articulates the duty of candor to the tribunal as a necessary protection of the decision-making process, and Rule 3.4 articulates an analogous duty to opposing lawyers, neither of these rules nor the entire Code of Professional Responsibility displaces the broader general duty of candor and good faith required to protect the integrity of the entire judicial process."

(quoting United States v. Shaffer Equip. Co., 11 F.3d 450, 457 (4th Cir. 1993)).

Although finding defendant offered a plausible model for the calculation of damages, the court remains cognizant of the Federal Circuit statement in Warm Springs:

> "Where several alternative investment strategies would have been equally plausible, the court should presume that the funds would have been used in the most profitable of these. The burden of providing that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them."

Warm Springs, 248 F.3d at 1371 (quoting Donovan v. Bierwirth, 754 F.2d at 1056); see also Jicarilla III, 112 Fed. Cl. at 310. Additionally, as noted above, plaintiffs prepared different measures of damages based on whether the "*Warm Springs* presumption is used." In Mr. Nunes' expert reports, Mr. Nunes selected the longest possible profitable maturity structure and applied that term to calculate damages, without comparison to any of the facts of the Warm Springs case to the facts of the case currently before the court. Mr. Nunes' initial expert report, for example, makes reference to the Warm Springs presumption, but does not describe the holding of that decision or make any assessment of how to apply that case to the above captioned case. Mr. Nunes explained at trial that

> we are then using the five to ten bounds as the range of prudence and applying the Warm Springs presumption. We determined that for these two periods, as well as how we used it in the first period, that the ten-year targeted term structure used in the Warm Springs presumption would be prudent. And, of course, then we looked at the actual investment of the funds from the first nonbreach period, the 7.86-year maturity or term structure, and we used that to inform us for our Alternative B calculations.

Plaintiffs indicated that "[h]ere, the most profitable maturity structure is the longest one – 10 years – and so RHA selected that structure as the basis for calculating damages." At closing argument, plaintiffs reiterated how plaintiffs' expert calculated the damages

> Rocky Hill didn't want to impose its own opinion in choosing a particular maturity structure between five to ten years. So it came up with two alternative maturity structures. The first is a structure of ten years, right at the top of the range, and this is based on the legal presumption in Warm Springs that the funds would have been invested in the most profitable of the plausible alternatives. So there's no question that taking that top-of-the-range maturity structure would yield the most damages, and the justification for doing that is not because Rocky Hill says, gee, in our opinion, that's the best. It's because of the Warm Springs presumption. Alternatively, in the event the Court concludes that the Warm Springs presumption is inapplicable here, Rocky Hill calculated -- used the actual weighted average return -- average maturity structure, pardon me, of the 326-K fund during the nonbreach period. So for that entire period of about five years, the actual weighted average maturity was 7.86 years, and so that became the second

maturity structure that Rocky Hill used. And in their reports, they refer to the first as Alternative A and the second as Alternative B.

Even if the court had adopted plaintiffs' model of damages, it does not necessarily follow that the court would have adopted the ten year time frame under the Warm Springs presumption. Although the plaintiffs repeatedly pointed to the language used by the Federal Circuit in Warm Springs, the factual postures of that case and the above captioned case are very different. As noted above, the Federal Circuit indicated:

> "Where several alternative investment strategies would have been equally plausible, the court should presume that the funds would have been used in the most profitable of these. The burden of providing that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them."

Warm Springs, 248 F.3d at 1371 (quoting Donovan v. Bierwirth, 754 F.2d at 1056). Immediately preceding that statement, however, the Federal Circuit noted:

> Although the trial court held that the United States breached its fiduciary duty by selling the green timber prematurely, the court denied the Tribes any recovery for that breach on two grounds: (1) the Tribes "received full value for the green trees cut improperly," i.e., the Tribes received the full domestic price for those trees; and (2) the court could "only speculate on what prices in the export market might have been at some hypothetical time" in the future. Neither of those grounds justifies refusing to award any damages for the improperly harvested green timber. To deny recovery on the ground that the Tribes recovered the full value of the trees in the unfavorable market in which they were sold ignores the nature of the breach, which consisted of harvesting and selling the trees on the domestic market rather than waiting to harvest and sell them for export. It also disregards the legal principle, recognized by the Court of Claims in the *Mitchell* case, that Indian tribes in a case of improper sales of timber assets are entitled to recover "the proceeds of the sales which should have been made under proper management—not merely the actual proceeds of actual sales."

Warm Springs, 248 F.3d at 1371 (quoting Mitchell v. United States, 229 Ct. Cl. 1, 10 664 F.2d 265, 271 (1981), aff'd, 463 U.S. 206 (1983)). This court did not preclude any finding of damages for plaintiffs like the trial court in Warm Springs, to the contrary, the court permitted extensive expert discovery and held a second phase of the trial devoted to the damages owed plaintiffs after the court issued its liability Opinion. Moreover, as noted above, defendant conceded that pursuant to the court's liability Opinion, plaintiffs would be owed $74.8 million dollars. In Warm Springs, even after finding error by the trial court in awarding no damages to the Warm Springs plaintiffs, the holding of the Federal Circuit was to

vacate the judgment of the Court of Federal Claims and remand for determination of damages. The Court of Federal Claims should determine the following items in a manner consistent with this opinion: (1) the amount that the Tribes would have earned from the sale of the green timber that was improperly included in the blowdown sale; (2) the amount of timber, if any, that was harvested under the logging contract but is missing from the BIA records and did not result in payment to the Tribes; and (3) the amount of timber that was harvested in trespass, if any, and whether the BIA breached its duty to the Tribes by failing to prevent that trespass. Damages should be awarded to the Tribes based on these determinations.

Warm Springs, 248 F.3d at 1375–76.[46] Therefore, it does not necessarily follow that under Warm Springs, even with the expansive language used by the Federal Circuit, plaintiffs would presumptively have been entitled to the "most profitable maturity structure," i.e., the 10 year calculation by Mr. Nunes. Moreover, as referenced above in Dr. Starks' testimony, the use of a ten year maturity structure, which Mr. Nunes stated was "right at the top of the range," may not be plausible figure. Using a demonstrative she prepared for the damages trial, Dr. Starks explained

> Demonstrative 30 shows the frequency in months of the different maturities between 4.7 years and ten years. And so, for example, the -- the less than five years was 19 percent of the month, and only 2 percent was between 9 1/2 and ten years. And as the chart shows, 80 percent of the months have holdings with the weighted average years to call under 7 1/2 years, and, in fact, if you look at the first three bars, which shows the percentage of the months under six years, it is almost 50 percent.

Defendant's counsel followed up with Dr. Starks:

> Q. Now, what -- and I'm sorry, Dr. Starks. What percentage of the time during the 1992 to '97 prudent period did the Government hold a portfolio that had a weighted average years to call of 9.5 years or higher?

> A. Two percent of the time.

> Q. Two percent of the time. Did it ever have a weighted average years to call of ten years?

> A. No. 9.7 is the highest, and that was only again, that was -- it was 2 percent of the months that was even close to that.

---

[46] As noted by the United States Court of Appeals for the Federal Circuit in a subsequent unpublished decision: "On remand, the Court of Federal Claims made a determination of the above three issues and assessed the amount of damages owed by the government to the Tribes for the mismanagement of the Tribes' timber resources to be $13,805,607. We *affirm*." Confederated Tribes of Warm Springs Rsrv. of Oregon v. United States, 101 F. App'x 818, 819 (Fed. Cir. 2004) (emphasis in original).

Q. Did Rocky Hill pick a maturity structure based on the nonbreach period that was actually higher than the maturity structure of the fund during the nonbreach period ever really was?

A. Yes, they did.

Q. All right. Is Rocky Hill's evaluation of the plausibility of investment strategies as between five years or ten years reasonable in light of finance theory?

A. No, it is not. It is -- again, we have this -- this chart on page 30 that shows it wasn't -- it was -- the -- it was an improbable over the time period. It didn't happen often, but then there are also the case facts that there was a lot of uncertainty in the 1980 to 1992 period about what was going to happen with the distribution, and, arguably, there's even more uncertainty in that period than there was in the 1992 to 1997 period.

Therefore, in selecting a ten year maturity structure to attempt to apply the damages to the <u>Warm Springs</u> presumption, Mr. Nunes picked a figure that was never reached during the entire non-breach period in which the government had prudently invested. The court finds that, based on the model prepared by Mr. Nunes, and reviewing the plaintiffs' expert reports, and the testimony at the damages trial, that the investment strategy put forth by plaintiffs is not equally plausible to the investment strategy offered by defendant and Dr. Starks. <u>See</u> <u>Warm Springs</u>, 248 F.3d at 1371.

## CONCLUSION

From all the testimony of the multiple experts at both the liability trial and the damages trial, only one thing is clear: there are a multiplicity of ways to analyze the investment strategy of a thirty three year period, especially given economic variables, including varying interest rates, changing market conditions, different policies adopted by the government during the investment period, and the retrospective theoretical and alterative choices made by experts to analyze, and account for, the complex history surrounding the 326-K and 325-A Funds. Based on the testimony at both the liability and damages trials, the expert reports and trial exhibits at both the liability and damages phases of trial, the court concludes that plaintiffs are entitled to damages in the above captioned case, using the methodology put forth by defendant's expert Dr. Starks at the damages trial, as Dr. Starks offered the more logical, credible, and plausible method of calculating damages in this case.

**IT IS SO ORDERED**.

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**